**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>– against –<br><br>JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU,<br><br>Defendants. | No. 25-cr-54 (S-1) (RPK) |

**DEFENDANT JULIO MEDINA'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS OMNIBUS PRETRIAL MOTIONS**

**ELLIOTT LEVINE JAROSLAW NEILS LLP**
Attorneys for Defendant Julio Medina
One Grand Central Place
60 East 42nd Street, Suite 1570
New York, New York 10165
(212) 321-0510

## TABLE OF CONTENTS

Page

**Preliminary Statement** 1

**I. THE GOVERNMENT SHOULD BE ORDERED TO DISCLOSE HOW AND WHEN THE CITY'S INQUIRY CAME ABOUT, AND WHETHER CERTAIN OF THE CHARGED CONDUCT WAS PROMPTED, SHAPED OR INDUCED BY LAW ENFORCEMENT** 1

A. The Facts 2

1. The City Built the Emergency Housing Program and Knew Who Guarded Its Hotels. 2
2. In 2022, the City Stopped Paying and Started Investigating 3
3. The City Stops Paying for Security, and Exodus Terminates Watchforce 4
4. The City Demands Answers from Mr. Medina Three Times 4
5. Exodus Answers, and Mr. Medina Forwards the Answers 5
6. DOI Was Already Investigating 6
7. DOI Was in Touch with the Town About the Clifton Park Deed 6

B. If Law Enforcement Was Behind the City's Questions, the Government Created the Wire It Charges 7

C. The Court Should Order Disclosure of the Origin of the City's Inquiry 8

**II. COUNT TWO SHOULD BE DISMISSED: IT PLEADS DECEPTION OF THE CITY, NOT OF EXODUS, AND ITS ONLY WIRE COULD NOT HAVE EXECUTED THE SCHEME; AND THE COURT LACKS VENUE** 9

A. Background and the Count Two Allegations 9

B. Count Two Fails 9

1. The Standard 10
2. Rybicki Defines the Offense as Deception of the Employer; the Indictment Pleads Deception of the City 10
3. The Charged Wire Told the City That Exodus Did Not Know, and Could Not Have Executed a Scheme to Deceive Exodus 12
4. The Indictment Pleads No Exchange, and the Business It Describes Began With the City's Own Vendor and Hotels 13

**III. THE COURT SHOULD ORDER A BILL OF PARTICULARS** 14

A. The Law 15

B. Counts Two and Six Do Not Identify the Payments, the Exchange or the Act They Charge 15

C. The Particulars That Remain 16

**IV. THE INDICTMENT JOINS TWO CONSPIRACIES WITH ONE COMMON**

**MEMBER AS ONE; MR. MEDINA SHOULD BE TRIED SEPARATELY UNDER RULE 8(b) OR, IN THE ALTERNATIVE, SEVERED FROM MS. HU UNDER RULE 14..........17**

A. The Indictment Charges One Scheme, but the Facts It Pleads Are Two Bilateral Relationships With Mr. Medina at the Hub and No Rim.........................................................18

B. Mr. Medina Is Misjoined With Ms. Hu and Mr. Dantzler Under Rule 8(b).....................19

C. In the Alternative, Rule 14 Requires Severance From Ms. Hu........................................20

**V. ACCESS IS NOT DISCLOSURE: THE GOVERNMENT SHOULD BE ORDERED TO CERTIFY THAT IT HAS REVIEWED FOR BRADY MATERIAL............................23**

A. Brady Is Measured by Usability, Not Possession in Common.........................................23

B. There Can Be No Brady Certification Without a Search..................................................25

C. The Brady Statement..........................................................................................................27

**VI. THE GOVERNMENT'S RULE 16 PRODUCTION IS INCOMPLETE, AND THE COURT SHOULD COMPEL IT TO PRODUCE THE OUTSTANDING MATERIAL AND TO IDENTIFY WHAT IT WILL USE AT TRIAL.......................................................27**

A. The Requests, by Subject....................................................................................................28

**VII. THE EVIDENCE OF OBSTRUCTION TAKEN FROM THE TELEPHONES SHOULD BE SUPPRESSED UNLESS THE GOVERNMENT SHOWS A WARRANT THAT REACHES IT, AND THE GOVERNMENT SHOULD PRODUCE THE RETURNS AND THE EXECUTION RECORD AND RETURN THE NON-RESPONSIVE DATA....32**

A. The Telephones Were Searched for Evidence of an Offense the Warrant Does Not Name 32

B. The Court Should Order the Returns and the Execution Record, and Hold a Hearing on Any Disputed Fact.................................................................................................................. 36

**VIII. MR. MEDINA'S PRIVILEGED COMMUNICATIONS SHOULD BE PROTECTED: THE COURT SHOULD PRECLUDE ANY USE OF HIS PRIVILEGED COMMUNICATIONS, DIRECT AN ACCOUNTING OF WHO HAS HAD ACCESS TO THEM, AND BAR ANY FURTHER PRODUCTION OF HIS DEVICE IMAGES............37**

The Government Produced Mr. Medina's Privileged Communications to Co-Counsel and Possibly the Prosecution Team.............................................................................................37

A. Any Use of Mr. Medina's Attorney-Client Communications Should Be Precluded.........37

B. Mr. Medina's Marital Communications Should Be Precluded..........................................38

C. The Government Should Account for Who Has Had Access to the Unfiltered Images, and the Court Should Hold a Hearing if the Case Team Reviewed Them.......................................38

D. No Further Production of Any Image of Mr. Medina's Devices, and Sequestration of the Health Information Already Produced..........................................................................39

**CONCLUSION................................................................................................................ 40**

## TABLE OF AUTHORITIES

### Cases

*Abouammo v. United States*, 608 U.S. 597 (2026)........................................................................10

*United States v. Ackerly*, No. 16-cr-10233-RGS (D. Mass. Nov. 15, 2017), ECF No. 235.......................................................................................................................16

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011)..........................................................................7

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998)............................................................................10

*Andresen v. Maryland*, 427 U.S. 463 (1976)............................................................................................33

*United States v. Attanasio*, 870 F.2d 809 (2d Cir. 1989)........................................................................19

*United States v. Avenatti*, 559 F. Supp. 3d 274 (S.D.N.Y. 2021)............................................................39

*United States v. Avenatti*, 81 F.4th 171 (2d Cir. 2023)............................................................................11

*United States v. Aziz*, 837 F. Supp. 3d 449 (E.D.N.Y. 2026)...................................................................30

*Badders v. United States*, 240 U.S. 391 (1916)........................................................................................12

*United States v. Berger*, 224 F.3d 107 (2d Cir. 2000)........................................................................18, 19

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) (per curiam)..................................................15

*Brady v. Maryland*, 373 U.S. 83 (1963)................................................................................................8, 26

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011)...............................................................................13

*Bruton v. United States*, 391 U.S. 123 (1968)...........................................................................................21

*United States v. Buie*, 407 F.2d 905 (2d Cir.), *aff'd on other grounds sub nom. Minor v. United States*, 396 U.S. 87 (1969)..........................................................7

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001)........................................................................23, 25

*Crawford v. Washington*, 541 U.S. 36 (2004)............................................................................................21

*United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013)..............................................................................7

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988)...........................................................................15

*United States v. deVegter*, 198 F.3d 1324 (11th Cir. 1999).......................................................................11

*United States v. Estes*, 793 F.2d 465 (2d Cir. 1986)..................................................................................38

*United States v. Feyrer*, 333 F.3d 110 (2d Cir. 2003)................................................................................19

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980).......................................................................21, 22

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)..................................................................................11

*United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004)..................................................................................18

*United States v. Gentile*, 60 F.R.D. 686 (E.D.N.Y. 1973)...........................................................................19

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002).......................................................................23, 24, 25, 30

*United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025)...........................................................................39

*In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127 (2d Cir. 2025)....................37

*Gray v. Maryland*, 523 U.S. 185 (1998)....................21, 22

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012)....................30

*Hamling v. United States*, 418 U.S. 87 (1974)....................10

*United States v. Helbrans*, 547 F. Supp. 3d 409 (S.D.N.Y. 2021)....................26

*United States v. Hess*, 124 U.S. 483 (1888)....................10

*Jacobson v. United States*, 503 U.S. 540 (1992)....................7

*United States v. Jass*, 569 F.3d 47 (2d Cir. 2009)....................21

*Kann v. United States*, 323 U.S. 88 (1944)....................12

*United States v. Kerik*, 615 F. Supp. 2d 256 (S.D.N.Y. 2009)....................13

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001)....................10

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................18, 19

*Kyles v. Whitley*, 514 U.S. 419 (1995)....................8, 25, 27

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001)....................24, 27

*United States v. Licavoli*, 604 F.2d 613 (9th Cir. 1979)....................36

*United States v. Lustyik*, 57 F. Supp. 3d 213 (S.D.N.Y. 2014)....................34

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990)....................18

*Mathews v. United States*, 485 U.S. 58 (1988)....................7

*United States v. Matias*, 836 F.2d 744 (2d Cir. 1988)....................33, 34, 35

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012)....................24

*United States v. Morante*, 947 F. Supp. 2d 309 (E.D.N.Y. 2013)....................26

*United States v. Nejad*, 436 F. Supp. 3d 707 (S.D.N.Y. 2020)....................33, 34

*United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988)....................19

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013)....................13

*United States v. Pena*, 961 F.2d 333 (2d Cir. 1992)....................36

*Pereira v. United States*, 347 U.S. 1 (1954)....................12

*United States v. Pikus*, 39 F.4th 39 (2d Cir. 2022)....................26, 27, 31

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018)....................36

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)....................10, 11

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005)....................10

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008)....................19

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451

(S.D.N.Y. 2011)....................26

*Russell v. United States*, 369 U.S. 749 (1962)....................14

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc)....................10, 11, 12

*United States v. Saenz*, 721 F. Supp. 3d 188 (E.D.N.Y. 2024)....................31

*United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020)....................25, 26

*Schmuck v. United States*, 489 U.S. 705 (1989)....................12

*United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991)....................39

*United States v. Shi Yan Liu*, 239 F.3d 138 (2d Cir. 2000)....................36

*Skilling v. United States*, 561 U.S. 358 (2010)....................10, 13

*Snyder v. United States*, 603 U.S. 1 (2024)....................13

*United States v. Sotomayor*, No. 1:22-cr-122 (RDA), 2022 WL 17363020
(E.D. Va. Dec. 1, 2022)....................26

*United States v. Stewart*, No. 02 CR 395 (JGK), 2002 WL 1300059
(S.D.N.Y. June 11, 2002)....................39

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013)....................11, 15

*United States v. Tanner*, 942 F.3d 60 (2d Cir. 2019)....................11

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014)....................21, 22

*United States v. Thomas*, 981 F. Supp. 2d 229 (S.D.N.Y. 2013)....................26

*United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 5001186
(S.D.N.Y. Aug. 4, 2023)....................29, 30

*Trammel v. United States*, 445 U.S. 40 (1980)....................38

*United States v. Valentin*, No. 23-CR-292 (RPK), 2024 WL 4444417
(E.D.N.Y. Oct. 8, 2024)....................19

*United States v. Vinyard*, 266 F.3d 320 (4th Cir. 2001)....................11

*In re von Bulow*, 828 F.2d 94 (2d Cir. 1987)....................37

*United States v. Weaver*, 992 F. Supp. 2d 152 (E.D.N.Y. 2014)....................26

*Zafiro v. United States*, 506 U.S. 534 (1993)....................20, 21, 22

**Constitutional Provisions, Statutes and Rules**

U.S. Const. amend. IV....................32

18 U.S.C. § 666....................13

18 U.S.C. § 1028A....................11

18 U.S.C. § 1343....................12

18 U.S.C. § 1346....................10, 11

18 U.S.C. § 1512 ... 33, 34, 36
18 U.S.C. § 1519 ... 33, 34, 36
Fed. R. Crim. P. 7(f) ... 15
Fed. R. Crim. P. 8(b) ... 17, 19
Fed. R. Crim. P. 12 ... 10, 11, 18, 38
Fed. R. Crim. P. 14 ... 17, 20
Fed. R. Crim. P. 16 ... passim
Fed. R. Crim. P. 17(c) ... 32
Fed. R. Crim. P. 41 ... 33, 35
Fed. R. Crim. P. 41 advisory committee's note to 2009 amendment ... 33
Fed. R. Evid. 404(b) ... 23, 31
Fed. R. Evid. 502(d) ... 37
Local Crim. R. 16.1 (E.D.N.Y.) ... 28, 36

**Other Authorities**

Press Release, Office of the Mayor, *Mayor Adams Appoints Jean-Claude LeBec as Director of Mayor's Office of Risk Management and Compliance, Citywide Lead Compliance Officer* (May 16, 2024) ... 5
Rule 5(f) Order, ECF No. 20 (Feb. 13, 2025) ... 23, 27
Stipulation and Protective Order, ECF No. 35 (Apr. 10, 2025) ... 2, 40

## Preliminary Statement

Defendant Julio Medina respectfully submits this memorandum of law, together with the Declaration of Lynn A. Neils ("Neils Decl.") and the exhibits thereto (cited "Ex. __ at __," by exhibit letter and the page of the exhibit as filed), in support of his omnibus pretrial motions and for the relief set out in the accompanying notice of motion and proposed orders.

Mr. Medina also joins in the motions of his co-defendant identified in the defendants' joint letter filed today, including the motion of co-defendant Weihong Hu ("Ms. Hu") to dismiss Count Six, which this memorandum does not brief separately.

Mr. Medina does not set out a separate statement of facts. The facts that bear on each motion are set out in the Point that presents it, with citations to the record.[1]

## I. THE GOVERNMENT SHOULD BE ORDERED TO DISCLOSE HOW AND WHEN THE CITY'S INQUIRY CAME ABOUT, AND WHETHER CERTAIN OF THE CHARGED CONDUCT WAS PROMPTED, SHAPED OR INDUCED BY LAW ENFORCEMENT

Count Two of the Superseding Indictment (ECF No. 46) ("S-1" or the "indictment") charges one email: Mr. Medina's September 29, 2022 forward of answers that Exodus Transitional Community, Inc. ("Exodus") gave to questions the City of New York (the "City") had demanded three times. (S-1 ¶ 26.) The questions came from a City office run by a former General Counsel of the New York City Department of Investigation ("DOI"). The day after the third demand, JPMorgan Chase generated Mr. Medina's and Exodus's bank records for DOI. If law enforcement was behind the City's questions, the government created the wire it now charges. The government has not said whether it was, or when its own investigation began. Mr. Medina asks the Court to order it to say.

[1] On October 26, 2026, the Court set October 27, 2026 for these motions and permitted supplemental pretrial motions on the topics discussed at that day's status conference, including the government's late production and the partial waiver by Exodus on which it relies, by November 10, 2026. (Minute Entry and Order, Oct. 26, 2026; Neils Decl. ¶ 49; *see* ECF Nos. 73, 73-1, 74.)

## A. The Facts

### 1. The City Built the Emergency Housing Program and Knew Who Guarded Its Hotels

Mr. Medina founded Exodus, a non-profit reentry organization, in 1999 and led it for more than 25 years. (S-1 ¶ 3.)

When Covid-19 reached the City's jails in March 2020, the City and New York State released people early to slow the spread of the virus, and many had nowhere to live. The City's answer was the Emergency Housing Program (the "EHP"). (S-1 ¶¶ 1–2.) The Mayor's Office of Criminal Justice ("MOCJ") was running the EHP and asked Exodus to help, although Exodus had never run a program like it. (Ex. A at 7; Ex. B at 4–5 (E-MOCJ005445, 005990).)[2]

The City, not Exodus, brought in the first hotels. The first two hotels in the EHP were the Wyndham and the Howard Johnson in Long Island City (the "HU Hotels"). (S-1 ¶ 7.) On information and belief, MOCJ chose the Wyndham and announced it to the City's reentry providers in mid-April 2020. By then, New York City Emergency Management ("NYCEM") had placed the hotel in its own hotel program, and Global Operations Security, Inc. ("Global"), the City's chosen security contractor, was guarding it under an NYCEM contract effective April 18, 2020 that also covered the Howard Johnson. (Ex. B at 2–3 (E-MOCJ000045–46).) The Howard Johnson was already under contract with the City, and until the fall of 2021 it was also a Department of Homeless Services ("DHS") shelter site; its move into the EHP required DHS's coordination and City Hall's approval. (Ex. B at 11 (SENSITIVE_EDNY_0000220767).)

The EHP grew as the City added to it. Between October 2020 and June 2021, MOCJ amended Exodus's contract at least five times, adding hotels, security and food, and raised its value to $55,634,811. (Ex. B at 105.)

Security began the same way. When Exodus took on security in the summer of 2020, it

[2] The Neils Declaration and its exhibits are filed under seal, with a slip sheet on the public docket for each, except Exhibit N (excerpts of the transcript of the August 21, 2025 status conference), which is filed publicly, and the government's letter of July 22, 2026, which comprises the first part of Exhibit C and is filed publicly; the list enclosed with that letter is filed under seal. The exhibits that are Discovery Material within the meaning of the Stipulation and Protective Order, ECF No. 35, are filed under seal pursuant to ¶ 9 of that order. The accompanying letter-motion seeks leave to file the sealed papers and states Mr. Medina's position under ¶ 9(a).

took over NYCEM's Global contract "to help with the transition from OEM to us with Global security," and the City helped, providing NYCEM's form as the model for Exodus's agreement with Global. (*Id.* at 2 (E-MOCJ000045); E-MOCJ000516–19, 026745–48.) Exodus later told the City that it had "inherited" Global "from MOCJ and OEM." (Ex. A at 7.)

From early 2021, Watchforce Security Services, Inc. ("Watchforce"), the company the indictment calls the "Security Company," and its subcontractors guarded the hotels the City added. (S-1 ¶¶ 5–6; Ex. A at 7.) Exodus told the City about Watchforce as the work was done (see Neils Decl. ¶ 47). On April 1, 2021, for example, Exodus's chief financial officer wrote MOCJ that Exodus owed "Global approximately $1.5M (for March) and Watchforce $250K (for March as well)." (Ex. B at 7–10 (E-MOCJ039901–04).) Global kept the Wyndham and the Holiday Inn until it walked off the job on March 13, 2022. Watchforce, managed by Christopher Dantzler, was assembled overnight to guard both hotels the next morning. (Ex. A at 22 n.3, 60–61.)

On March 17, 2022, MOCJ's Joseph Berkman-Breen asked colleagues, copying Exodus, whether Watchforce was "technically a subcontractor." (Ex. A at 4–5.) That afternoon, Exodus's counsel reported that the City wanted Exodus "to enter into a formal subcontract with Watchforce (since we pay them directly)," with Watchforce's own subcontractors listed in it. (Id. at 5–6.) MOCJ then supplied its template, and the Watchforce subcontract signed that day was placed "on file with the City." (Ex. A at 37, 70–75.) The City knew Watchforce's role and how it was paid.

**2. In 2022, the City Stopped Paying and Started Investigating**

In March 2022, the City turned from paying invoices to investigating. It began with Global, the security company Exodus had inherited from the City. (Ex. A at 54–61.) It turned out Global did not hold a security license. On information and belief, this led the New York City Comptroller (the "Comptroller") to ask, through MOCJ, for a list of Exodus's subcontractors. (Ex. A at 54–59.) By April, MOCJ had rejected Exodus's Watchforce invoices for the fiscal year.

(Ex. A at 62–69.) On May 11, at the request of the Mayor's Office of Risk Management and Compliance ("MORMC"), Department of Social Services teams made unannounced visits to all six hotels. (Ex. A at 21.)

The City knew about Mr. Dantzler's connection to Exodus before it brought Mr. Medina in for questioning. MORMC noted that Exodus's own website identified Watchforce's principal "as a coordinator for an Exodus program." (Ex. A at 26.) A week after the spot checks, MORMC told the Mayor's chief counsel that, "in cooperation with" MOCJ, it would ask Exodus "about its connections with Watchforce and its principal." (*Id.* at 21, 25–26.) The City did not need Exodus to tell it about a connection it had already found. It wanted a written answer from Mr. Medina.

### 3. The City Stops Paying for Security, and Exodus Terminates Watchforce

On June 1, 2022, City officials met with Exodus. (Ex. A at 10, 29.) Two days later, MOCJ's General Counsel, David Goldin, stopped all payments for security "until Exodus is able to provide complete and appropriate information to support those payment requests." (Ex. A at 2.) The same day, Exodus terminated Watchforce and replaced it with International Trendz LLC d/b/a Presidential Security Company ("International Trendz"). On June 8, Mr. Goldin had Exodus revise the termination notice so that Watchforce's duty to "respond to audits or investigations" would survive. (*Id.* at 52–53.) The City was planning for "audits or investigations" months before it had any answers from Exodus.

### 4. The City Demands Answers from Mr. Medina Three Times

On June 6, 2022, MORMC's director, Marjorie Landa, wrote to Mr. Medina as Exodus's Chief Executive Officer. She asked for nineteen categories of records and answers to nine written questions (the "Questionnaire"). (Ex. A at 10–14.) On June 8, she sent the Questionnaire again, saying that the new letter "superseded" the first. (*Id.* at 29–34.) Question nine, in both letters, is the one the indictment charges:

> Has Exodus or any employee of Exodus or immediate family member (i.e., spouse/domestic partner, child, sibling or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly? Include

> any service, thing of value, or other benefit Exodus or any of the above-specified persons received from any business in which Mr. Dantzler was associated in any way. . . . (Ex. A at 33.)

These questions did not come from a contract officer. They came from two mayoral offices working together: MOCJ, through its General Counsel, and MORMC, run by Ms. Landa,[3] who had spent twelve years as General Counsel and Deputy Commissioner of DOI.[4]

When no answer came, Ms. Landa sent the Questionnaire a third time, on September 21, 2022, again to "Julio Medina, Chief Executive Officer." This time she copied only MOCJ's General Counsel, not Exodus's chief legal officer. A fifteen-page appendix listed every record still outstanding, repeated the nine questions and noted that "[n]one of these questions were answered." (Ex. A at 36–51.)

### 5. Exodus Answers, and Mr. Medina Forwards the Answers

The email Count Two charges forwarded answers that Mr. Medina did not sign. At 5:13 p.m. on September 29, 2022, Diana Ortiz emailed the completed answers to Mr. Medina, with notes on the supporting documents. (Ex. A at 4–6.) The answers respond to all nine questions for Exodus. Among other things, they disclose that Exodus had contracted with two companies in which Mr. Dantzler held executive positions, "CD James Electric and Watchforce Security." (Ex. A at 7–9.) The answer to question nine reads, in full:

> Other than the contracted services that Exodus received from Watchforce or Mr. Dantzler, Exodus does not have any awareness or knowledge that any employee of Exodus or immediate family member of an Exodus employee received, directly or indirectly, anything of value from Watchforce or Mr. Dantzler. (Ex. A at 9.)

It is signed "Diana Ortiz / VP of Wellness/Contracts." It is not sworn or notarized. (*Id.*)

The same day, Mr. Medina forwarded Ms. Ortiz's email to MORMC's Keith Schwam, Ms. Landa and Mr. Goldin: "I apologize for the delay. Attached are answers to questions and

[3] Ex. A at 2, 35, 36, 52–53.

[4] From 2002 to 2014, Ms. Landa was General Counsel and Deputy Commissioner of DOI. From 2014 through December 2021, she was the City Comptroller's Deputy Comptroller for Audit & Investigations. Mayor Adams then chose her to establish the new risk-management office. Press Release, Office of the Mayor, *Mayor Adams Appoints Jean-Claude LeBec as Director of Mayor's Office of Risk Management and Compliance, Citywide Lead Compliance Officer* (May 16, 2024), https://www.nyc.gov/mayors-office/news/2024/05/mayor-adams-appoints-jean-claude-lebec-director-mayor-s-office-risk-management-and.

supporting contracts. Below are email exchanges that took place between respective teams." (Ex. A at 4.) The exchanges below included the March 2022 MOCJ emails about Watchforce's role. (*Id.* at 4–6.) That forward is the wire charged in Count Two. (S-1 ¶ 26.) Ms. Landa replied the next afternoon with a list of records still outstanding. (Ex. A at 128–31 (E-MOCJ066726–29).)

The answers could not have caused the City to pay Watchforce anything. By the time Mr. Medina forwarded them, the City had stopped paying for security, Exodus had terminated Watchforce after the City's June 3 call, and, by the government's own account, Exodus had stopped paying Watchforce four months earlier. (Ex. A at 2, 52–53; S-1 ¶ 6.)

#### 6. DOI Was Already Investigating

When Ms. Landa sent her third demand, DOI was already investigating. The next day, September 22, 2022, JPMorgan Chase generated records for four accounts in Mr. Medina's name and five of Exodus's, which it produced to DOI three weeks later. (Ex. A at 36; Neils Decl. ¶ 47.) If Chase was generating those records on September 22, it likely already had a subpoena. Its cover letter to DOI gave the case name as "Christopher J Dantzler, Julio Medina, Exodus Transitional Community, Inc, Watchforce Security Services, Inc, Watchforce Security Services, LLC, International Trendz LLC d/b/a Presidential Security Company," with the reference "Case No.: 22-963." (Ex. D at 2–3 (EDNY_0000051662 at 1–2).) On November 23, 2022, Santander Bank answered a DOI subpoena for the records of International Trendz, the company that replaced Watchforce. (Ex. D at 4–6; Neils Decl. ¶ 47.) The government has not produced the subpoenas or said when they were issued. (Neils Decl. ¶ 47.)

#### 7. DOI Was in Touch with the Town About the Clifton Park Deed

On May 1, 2023, Mr. Dantzler bought a house in Clifton Park in his own name, and it stayed in his name alone for more than sixteen months. Mr. Medina was Mr. Dantzler's uncle by marriage. (Ex. E at 7; Neils Decl. ¶ 48.) Before September 20, 2024, Mrs. Medina had been handling the house renovations. The deed was changed only because the Town asked. In May 2024, the Town's zoning attorney wrote to Mr. Dantzler's title office that the application before

the zoning board "was presented by [Mrs. Medina], as an owner of the property yet she is not named on the deed," and asked for "a corrected deed." (Ex. E at 7–8.) On September 20, 2024, Mr. Dantzler added her as a tenant in common, keeping his own interest, by a deed that "is being recorded to add a certain zoning condition which will forever run with the land." (S-1 ¶ 17; Ex. E at 2–4.) Mr. Medina has never been on the deed. (*Id.* at 3.)

On September 23, 2024, three days after the deed was recorded, the Town's attorney sent it, "[a]s discussed," to the same DOI Assistant Inspector General to whom Chase and Santander had answered the 2022 subpoenas and who was copied on the May 2024 exchanges with MORMC and MOCJ. (Ex. E at 5; Neils Decl. ¶ 47; *see* Ex. A at 15–20.)[5] The Town and DOI had already spoken about the house.

### B. If Law Enforcement Was Behind the City's Questions, the Government Created the Wire It Charges

The September 29 answers were not volunteered. The City demanded them from Mr. Medina by name, three times. (Point I.A.2–4.)

If those officials acted at law enforcement's request, in coordination with it, or as its conduit, the government created the wire it now charges. That bears first on entrapment, which has two elements: government inducement of the crime, and the defendant's lack of predisposition to commit it. *Mathews v. United States*, 485 U.S. 58, 63 (1988).[6] It also bears on whether the charged wire could have executed any scheme, and on due process.[7] The government will say that asking a question is not inducing a crime. Whether that is all that happened here

---

[5] In May 2024, MORMC sent DOI's forensic auditors Mr. Goldin's June 3, 2022 payment-stop email and MORMC's own May 2022 memorandum on the hotel spot checks. (Ex. A at 15 (May 2, 2024).)

[6] *See Jacobson v. United States*, 503 U.S. 540, 548–49 (1992); *accord United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013). The inducement need not come from a federal agent directly: although "the entrapment defense does not extend to inducement by private citizens," "the defense is available, of course, where government agents act through private citizens." *United States v. Buie*, 407 F.2d 905, 908 (2d Cir.), *aff'd on other grounds sub nom. Minor v. United States*, 396 U.S. 87 (1969).

[7] The Due Process Clause sets a limit separate from entrapment. Government involvement in a crime "may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *Cromitie*, 727 F.3d at 218 (quoting *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)). Mr. Medina does not ask the Court to apply that standard now. Whether it could be met here turns on a fact only the government has: whether law enforcement was behind the City's questions.

turns on facts only the government has: who drafted question nine, who timed it, who discussed it, and who chose to send it to Mr. Medina. Mr. Medina does not ask the Court to decide an entrapment defense now. He is entitled to those facts before trial.

The record already places DOI in the picture. By September 22, 2022, DOI likely had a subpoena out naming Mr. Medina, Exodus, Mr. Dantzler and Watchforce, and question nine, re-sent the day before, asked about the same vendor and the same man. (Neils Decl. ¶ 47; Ex. A at 36–51.) Upstate, the Town's zoning attorney asked for a deed adding Mrs. Medina as an owner in May 2024, in the same week that DOI was meeting with MORMC and gathering MOCJ's Exodus records. (Ex. E at 7–8; Ex. A at 15–20.) Whether the question and the subpoena were coordinated, and whether DOI had a hand in what the Town required (S-1 ¶ 17), are the facts Mr. Medina asks the Court to require the government to disclose.

**C. The Court Should Order Disclosure of the Origin of the City's Inquiry**

The government must disclose when its investigation began and whether law enforcement prompted, shaped, or induced the conduct it charges. That information is favorable to the defense and material to its preparation. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); Fed. R. Crim. P. 16(a)(1)(E)(i). The government's disclosure duty reaches information held by others acting on its behalf. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). DOI, MOCJ, and MORMC fall within that duty.[8]

Mr. Medina asks the Court to order the government to disclose when DOI opened the matter it references as 22-963 and the date and recipient of each subpoena DOI or a grand jury issued before September 29, 2022; the first communication between law enforcement and MOCJ, MORMC or the Comptroller about Exodus, Mr. Medina, Watchforce or Mr. Dantzler; and whether any law-enforcement agency or prosecutor drafted, suggested, reviewed, timed or directed the City's 2022 requests or question nine; and to produce the communications between

[8] The defense asked for this information on September 21, 2026. (Neils Decl. ¶ 37.) The government did not respond in writing. On October 6, 2026, it said only that its investigation of Exodus grew out of another investigation and that it would reach out to DOI to determine what communications it had with MOCJ. It did not say when its investigation began or whether any City inquiry was made at law enforcement's request. (*Id.* ¶ 40.)

those City offices and law enforcement, and between law enforcement and the Town of Clifton Park about the Clifton Park house, all as set out in paragraph 4 of the proposed discovery order. He also seeks leave to file a supplemental motion, including a request for a hearing, once that information is produced.

## II. COUNT TWO SHOULD BE DISMISSED: IT PLEADS DECEPTION OF THE CITY, NOT OF EXODUS, AND ITS ONLY WIRE COULD NOT HAVE EXECUTED THE SCHEME; AND THE COURT LACKS VENUE

### A. Background and the Count Two Allegations

Count Two charges a scheme to defraud Exodus, "the Organization," of its right to Mr. Medina's honest services, executed by a single wire: his September 29, 2022 email forwarding Exodus's answers to the City's Questionnaire. (S-1 ¶ 26.) The same email is listed as an overt act of the Travel Act conspiracy, as a document sent "on behalf of the Organization to New York City officials containing misrepresentations about the Security Company." (S-1 ¶ 29(g).) As set out in Point I.A.4–5, the City demanded the answers three times; Ms. Ortiz signed them and sent them to Mr. Medina; and the answer to question nine stated that, other than the contracted services, Exodus had no "awareness or knowledge" that any employee or family member had received anything of value from Watchforce or Mr. Dantzler. (Ex. A at 4–9, 36–51.) The answers were not sworn, notarized or signed by Mr. Medina. (Id. at 9.) The indictment does not allege that anyone at Exodus other than Mr. Medina knew of any payment.

### B. Count Two Fails

Count Two fails on its face for two related reasons. First, honest-services fraud by a private employee requires a scheme accompanied by a material misrepresentation to, or omission from, the employer. The indictment pleads deception of New York City officials, not of Exodus. Second, the charged wire told the City that Exodus was unaware of any payment. That statement is true on the government's own theory, and it could not have executed a scheme to keep Exodus in the dark.

Count Two is also subject to dismissal for improper venue. The government bears the

burden of proving that venue is proper for each count. *United States v. Ramirez*, 420 F.3d 134, 139–40 (2d Cir. 2005). *See also Abouammo v. United States*, 608 U.S. 597, 602–05 (2026) (venue lies where the offense's essential conduct elements occurred). For wire fraud, that conduct is the transmission, so venue lies where the wire was sent or received. *United States v. Kim*, 246 F.3d 186, 191–92 (2d Cir. 2001). The indictment does not say where the charged wire was sent from, and nothing the government has produced places Mr. Medina in this District when he sent it; the email went to City officials in Manhattan. (S-1 ¶ 26; Ex. A at 4.) Mr. Medina raises the objection now, Fed. R. Crim. P. 12(b)(3)(A)(i), and will renew it at trial.

### 1. The Standard

An indictment "is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).[9] When "one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (internal quotation marks omitted).[10] Where the facts alleged do not constitute the offense charged, the count is dismissed. Fed. R. Crim. P. 12(b)(3)(B)(v).

### 2. Rybicki Defines the Offense as Deception of the Employer; the Indictment Pleads Deception of the City

Section 1346 reaches bribery and kickback schemes "and nothing more." *Skilling v. United States*, 561 U.S. 358, 408–10 (2010). The en banc Second Circuit defines the private-sector offense as a scheme to use the mails or wires to enable an officer or employee, "purporting

[9] The statutory language "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

[10] The indictment is judged "as it was actually drawn, not as it might have been drawn," and a defendant who objects before trial "is entitled to a more exacting review of the indictment than one who waits until after trial." *Pirro*, 212 F.3d at 92.

to act for and in the interests of his or her employer," secretly to act in his own or the defendant's interests instead, "accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person." *United States v. Rybicki*, 354 F.3d 124, 141–42, 146–47 (2d Cir. 2003) (en banc).[11]

The indictment pleads none of that. It alleges that Mr. Medina "executed or caused to be executed multiple contracts with MOCJ on behalf of the Organization," that some of those contracts included budgets that were "fraudulently inflated," and that the vendors' invoices "were provided to MOCJ to obtain payment." (S-1 ¶ 18.) Exodus's budgets were statements to the City in its contracts, and the invoices were provided to the City to obtain payment. Neither, as pleaded, misrepresents anything to Exodus. The indictment does not allege that anyone at Exodus relied on a budget or an invoice or was misled by one. If the government contends that someone was, it should say who, by what document, and when. (Point III.C.)

That omission is fatal. Section 1346 itself says only that a scheme to defraud includes one "to deprive another of the intangible right of honest services." The elements that give the phrase its content are implicit in the statute and supplied by *Rybicki*: the fiduciary's secret action in his own interest, and the material misrepresentation to or omission from the employer. An indictment that tracks § 1346's words but pleads deception of the City omits the implicit element. *Pirro*, 212 F.3d at 93.

The identity of the person to whom the fiduciary's duty ran and from whom the material fact was withheld is not a detail the defendant can obtain on demand, like the name of a victim under 18 U.S.C. § 1028A. *See United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013). It is the fact on which guilt depends. And Count Two does not omit it. It names "New York City

---

[11] Mr. Medina also raises a further point to preserve it. The courts of appeals are divided on whether private-sector honest-services fraud requires that the employee foresaw economic harm to the employer. The Sixth, Fourth and Eleventh Circuits require it. *United States v. Frost*, 125 F.3d 346, 368 (6th Cir. 1997); *United States v. Vinyard*, 266 F.3d 320, 328–29 (4th Cir. 2001); *United States v. deVegter*, 198 F.3d 1324, 1328–30 (11th Cir. 1999). The Second Circuit, sitting en banc, rejected the requirement. *Rybicki*, 354 F.3d at 145; *United States v. Tanner*, 942 F.3d 60, 65 (2d Cir. 2019); *United States v. Avenatti*, 81 F.4th 171, 196 (2d Cir. 2023). This Court is bound by *Rybicki*. The indictment alleges no economic harm to Exodus, and Mr. Medina submits that *Rybicki* and *Avenatti* were wrongly decided on this question. Fed. R. Crim. P. 12(b)(3)(B)(v), (c)(3).

officials" as the party deceived, and Mr. Medina did not owe them honest services.

### 3. The Charged Wire Told the City That Exodus Did Not Know, and Could Not Have Executed a Scheme to Deceive Exodus

The charged email attached a statement of Exodus's knowledge. The government itself describes the email as sent "on behalf of the Organization." (S-1 ¶ 29(g).) The response did not say that Mr. Medina had received nothing.

The distinction matters because the government's theory of Count Two is that Mr. Medina hid the payments from Exodus. But if Exodus did not know of the payments, the statement that "Exodus does not have any awareness or knowledge" of them was accurate. The government cannot call it false without saying who at Exodus knew. There are only two possibilities, and neither supports the charge.

First, if the government contends that some officer or employee of Exodus other than Mr. Medina knew, it must identify that person. The indictment names no one. And the more the organization knew, the weaker the claim that Mr. Medina deceived it.

Second, if the government contends that Mr. Medina's own knowledge is Exodus's knowledge, then by its own logic Exodus knew, and there was no "misrepresentation made or omission of information disclosed to the employer," the element *Rybicki* requires. The government cannot impute Mr. Medina's knowledge to Exodus to make the answer false and, at the same time, treat Exodus as the victim who was kept in the dark.

The wire must be transmitted "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343; S-1 ¶ 26. A use of the mails or wires must be "part of the execution of the fraud" ("incident to an essential part of the scheme" or "a step in [the] plot"), and a communication that is "merely incidental and collateral to the scheme and not a part of it" will not do. *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944), *Pereira v. United States*, 347 U.S. 1, 8 (1954), and *Badders v. United States*, 240 U.S. 391, 394 (1916)); *Kann*, 323 U.S. at 95. Under *Rybicki*, the scheme Count Two charges is one to act against Exodus's interests while keeping Exodus in the dark. An email to City officials

reporting what Exodus did and did not know is not a step in that plot. If it executed anything, it executed a different course of conduct that the indictment describes in the same paragraph: concealment "from New York City officials" (S-1 ¶ 19).[12]

**4. The Indictment Pleads No Exchange, and the Business It Describes Began With the City's Own Vendor and Hotels**

Count Two depends on an exchange: payments to Mr. Medina in return for business he provided. (S-1 ¶ 10 ("in exchange for MEDINA providing business through the Organization").) That is because honest-services fraud after *Skilling* requires a bribe or kickback, and a bribe requires an exchange: "an intent to give or receive something of value in exchange for an . . . act." *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) (quoting *United States v. Bruno*, 661 F.3d 733, 743–44 (2d Cir. 2011)). A payment that follows an act, with no agreement preceding it, is a gratuity, not a bribe ("the timing of the agreement is the key, not the timing of the payment"). *Snyder v. United States*, 603 U.S. 1, 5, 11–13, 18–19 (2024) (construing 18 U.S.C. § 666).

The indictment does not identify that business, and the record shows a program that the City started and controlled; neither of the HU Hotels came to the City through Exodus. (Point I.A.1; Ex. B at 2–3, 11.)

The indictment alleges that Mr. Medina signed the Organization's contracts and budgets with MOCJ (S-1 ¶ 18), but it does not identify which decision to award either vendor business he made, or agreed to make, in exchange for anything. As to the payments the indictment attributes to Mr. Dantzler, the three Watchforce checks of August and September 2021 came seven months after Watchforce's first contract in January 2021, and the Clifton Park house the indictment pleads was bought in May 2023 and its deed added Mr. Medina's wife only in September 2024, a

[12] Nor does calling the email a "lulling" communication help. Lulling communications are "designed to lull a victim into a false sense of security." *United States v. Kerik*, 615 F. Supp. 2d 256, 270 (S.D.N.Y. 2009). *Kerik* left to the jury a company's "no" to a City agency asking whether it had paid a public servant, where the scheme charged was to deprive the City's citizens of a City official's honest services, *id.* at 269. But the court dismissed as untimely the count resting on a later fax, which "was not sent to a victim" and, "more important," was sent when Kerik was already under investigation by the Bronx District Attorney and the New York Department of Investigation, id. at 270. Count Two names Exodus as the victim, but the email went to the City. (S-1 ¶¶ 26, 29(g).)

year and more than two years after Exodus's last payment to Watchforce. The indictment does not say what act any of these benefits bought. The indictment's September 12, 2020 meeting is different on its face: it pleads cash passing from Ms. Hu to Mr. Medina at the same meeting at which she received the Organization's checks to the Catering Company. But it does not say what act Mr. Medina took or agreed to take in exchange, and the checks it describes were payments to a vendor the indictment itself says was paid for providing food services.[13]

## III. THE COURT SHOULD ORDER A BILL OF PARTICULARS

On September 21, 2026, the defense asked the government whether it contends the response was false because Mr. Medina's knowledge is attributed to Exodus or because another officer or employee knew, and if so, who; what prompted the City's queries; and when the investigation was opened. On October 6, 2026, the government declined to answer, saying only that it had asked DOI to collect any communications with MOCJ, without giving a date.[14] The government also declined to provide a bill of particulars.[15]

The indictment does not say which payments are the bribes and kickbacks of Count Two. Nor does it say what act Count Six charges, by whom or on what date. The Court should order a bill on those counts or, in the alternative, direct the government to identify the payments and acts by a date certain before trial.[16]

To the extent the Court views the disclosures sought in Point I, when the investigation began and whether law enforcement prompted the City's inquiry, as particulars of the wire charged in Count Two rather than as discovery, Mr. Medina asks for them here in the alternative. He relies on Point I and does not repeat it.

[13] Mr. Medina does not ask the Court to decide on this motion whether the government can prove an exchange. He asks that the government be required to state the act or decision for which each benefit was given, the agreement, and whether each benefit was promised before the act or given after it. A bill cannot cure the pleading defects described above, *Russell v. United States*, 369 U.S. 749, 770 (1962); the request is made only in the alternative.

[14] S-1 at 1; Gov't Ltr. of May 13, 2025; ECF Nos. 1, 46; S-1 ¶¶ 10, 19, 26, 29(g); Neils Decl. ¶¶ 37, 40.

[15] Neils Decl. ¶¶ 37–38.

[16] On September 21, 2026, Mr. Medina asked the government for a bill of particulars and related disclosures. (Neils Decl. ¶ 37.) When counsel conferred with it on October 6, 2026, the government stated that it would not provide a bill of particulars. It did not contend that the request was untimely. (*Id.* ¶ 38.)

### A. The Law

Rule 7(f) authorizes the Court to direct the government to file a bill of particulars. Fed. R. Crim. P. 7(f). A bill serves "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). For some statutes, "specification of how a particular element of a criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013). Point II explains why Count Two is such a charge. If the Court disagrees, the specification must still come from somewhere: for an essential fact the indictment need not plead, the defendant "is of course entitled on demand to its disclosure in a bill of particulars or otherwise." *Id.* at 127. Counts Two and Six recite their elements categorically and leave the specification for trial.

Nor does the production answer the request. The government "did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided" as to which of them mattered. *Bortnovsky*, 820 F.2d at 575. See United States v. Davidoff, 845 F.2d 1151, 1154–55 (2d Cir. 1988) (reversing where some 6,000 pages substituted for identifying the victims). The production here is 4.3 terabytes, of which the government itself designated 1.47% as responsive over fourteen months. (Point VI.) The request does not ask for the government's evidence or its theory. It asks which acts are charged.

### B. Counts Two and Six Do Not Identify the Payments, the Exchange or the Act They Charge

Count Two charges a scheme to deprive the Organization of Mr. Medina's honest services "through bribery and kickbacks, to wit: one or more payments to MEDINA." (S-1 ¶ 26.) It identifies none of the payments. The narrative it incorporates alleges that the bribes and kickbacks "took various forms, including" currency, "financing for a luxury vehicle," payments toward debts "including a mortgage," and "the purchase of two homes" (¶ 11), and introduces

what follows as illustration ("For example," ¶ 12). It also alleges that they were received "in exchange for MEDINA providing business through the Organization" to the vendors (¶ 10), but identifies no act of Mr. Medina's for which any payment was exchanged, and no agreement.

Count Six charges that between January 30 and February 15, 2025, Mr. Medina and Ms. Hu did "alter, destroy, mutilate and conceal" the car. (S-1 ¶ 35.) The count does not say what act within the seventeen-day window is charged, who did it, or what Mr. Medina is alleged to have done or caused. Nothing else in the record supplies the particulars. The government's responsive designations mark what it considers relevant to the case as a whole, not which payment is a charged bribe or which act is the charged obstruction.[17]

### C. The Particulars That Remain

After conferring, Mr. Medina has narrowed his request to the following particulars. Each goes to an element of Count Two or Count Six, and the government has supplied none of them. (Neils Decl. ¶¶ 37–38, 45.) They are set out in full in Schedule A to the proposed order. In summary:

(1) Count Two: which payments are charged as bribes or kickbacks; what act of Mr. Medina's was exchanged for each, and the agreement linking them; each misrepresentation to, or omission from, the Organization relied on; whether anyone else at the Organization knew of any payment; and how the September 29, 2022 email executed a scheme to defraud the Organization, including whether the statement quoted in ¶ 19 is said to be false, and why.

(2) Count Six: each act from January 30 to February 15, 2025 charged as altering, destroying, mutilating or concealing the car, with its date and participants and which acts Mr. Medina committed or caused; the grand jury "details" he allegedly learned; the "others"; and the proceeding each act was meant to affect.

[17] In the alternative, Mr. Medina asks the Court to direct the government, under Rule 16(d)(1) and its authority to manage the trial, to identify by a date certain the payments it will prove as the bribes and kickbacks charged in Count Two and the act or acts it will prove under Count Six. The relief is narrower than a bill. A court has ordered such a list in a bribery case. See Order at 8 & n.3, *United States v. Ackerly*, No. 16-cr-10233-RGS (D. Mass. Nov. 15, 2017), ECF No. 235 (a final list of the bribes and invoices the government would offer, forty-five days before trial). This list should be due on the date the Court sets for the production and identifications sought in Point VI.

## IV. THE INDICTMENT JOINS TWO CONSPIRACIES WITH ONE COMMON MEMBER AS ONE; MR. MEDINA SHOULD BE TRIED SEPARATELY UNDER RULE 8(b) OR, IN THE ALTERNATIVE, SEVERED FROM MS. HU UNDER RULE 14

### The Indictment Pleads Two Vendor Relationships With One Common Member

The indictment, however, describes two relationships. On one side are Mr. Dantzler and Watchforce, which provided security from early 2021 to May 2022. The indictment alleges payments of "approximately $75,000 toward several debts" in August and September 2021 and charges a $20,000 check as an overt act.[18] The indictment also pleads the Clifton Park house. (Point I.A.7.)

The other relationship is with Ms. Hu and her hotel and food businesses. On September 11, 2020, Exodus wrote two checks to Meiqiao LLC, the company the indictment calls the Catering Company, and on September 12, Mr. Medina and Ms. Hu met at a Hu hotel. On November 3, 2021, Crosscity Construction Corp., one of Ms. Hu's companies, bought a 2022 Mercedes-Benz CLS450. On September 16, 2022, Nicholas Management Inc. bought a townhouse at 946 St. Nicholas Avenue, which the indictment alleges Mr. Dantzler and Ms. Hu bought together for approximately $1.3 million.

The indictment does not allege that Mr. Dantzler and Ms. Hu ever communicated with each other, and when the defense asked for the basis for charging a single conspiracy, the government declined to say.[19]

The indictment charges one conspiracy among three people, but the facts it pleads describe two: a hub with two spokes and no rim. Mr. Medina therefore asks the Court to hold that he is misjoined under Rule 8(b) and to order that he be tried separately or, in the alternative, severed from Ms. Hu under Rule 14(a).

---

[18] S-1 ¶ 14 alleges that Mr. Dantzler, "through the Security Company, paid approximately $75,000 toward several debts incurred by" Mr. Medina "and members of his family, including a mortgage and a vehicle loan"; ¶ 29(f) charges a $20,000 check of September 17, 2021. The bank records show three checks drawn by Watchforce Security Services Inc. on its account at Bethpage Federal Credit Union: #101 (Aug. 14, 2021, $25,000, to Fifth Third Bank); #105 (Aug. 14, 2021, $31,000, to Wells Fargo Home Mortgage); and #102 (Sept. 17, 2021, $20,000, to Metropolitan Life Insurance Company). (Ex. F at 15.)

[19] S-1 ¶¶ 5–6, 9–18, 21, 29(f); checks #619 and #620 (Ex. F at 3–4); deed recorded May 9, 2023, doc. 2023012140 (recited at Ex. E at 3); Ex. F at 5–14 (946 St. Nicholas Avenue deed); Neils Decl. ¶¶ 37–38.

### A. The Indictment Charges One Scheme, but the Facts It Pleads Are Two Bilateral Relationships With Mr. Medina at the Hub and No Rim

People who each deal separately with the same central figure are not, for that reason, members of one conspiracy. In *Kotteakos v. United States*, the proof was "that of separate spokes meeting at a common center," "without the rim of the wheel to enclose the spokes," and it "made out a case, not of a single conspiracy, but of several, notwithstanding only one was charged in the indictment." 328 U.S. 750, 754–55 (1946) (internal quotation marks omitted). The Second Circuit applies the same rule.[20] What makes one conspiracy out of several schemes is "their common purpose, overlapping participants, and mutual dependence." *United States v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000).

The indictment pleads none of them. It alleges that "the defendants" "conspired" (S-1 ¶ 9) and that Mr. Dantzler and Ms. Hu "provided" Mr. Medina with at least $2.5 million (S-1 ¶ 21), but the facts it pleads describe two relationships. The overt acts follow the same line, and no overt act involves both vendors.[21] The indictment does not allege a single communication between Mr. Dantzler and Ms. Hu, an agreement between them, or any act by either in aid of the other's business.

Paragraph 16 alleges that Mr. Dantzler and Ms. Hu together bought the townhouse at 946 St. Nicholas Avenue for Mr. Medina's benefit. That is the one joint act the indictment alleges, but it is a transaction with the hub, not an agreement between the spokes. The indictment does not allege that either vendor's dealings with Exodus depended on the other's, or that either knew the terms of the other's arrangement. The government has therefore charged as one agreement what its own allegations describe as two. This preserves both the objection that Counts One, Three and Five each charge two agreements in one count, Fed. R. Crim. P. 12(b)(3)(B)(i), and

---

[20] A single conspiracy requires that "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal," *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (internal quotation marks omitted), and "mere awareness does not satisfy the conspiracy requirement that two parties act in concert toward a common goal," *United States v. Geibel*, 369 F.3d 682, 692 (2d Cir. 2004).

[21] Five concern Ms. Hu and the September 2020 checks and meeting (S-1 ¶ 29(a)–(e)). One is Mr. Dantzler's $20,000 check, applied to a debt of Mr. Medina's (¶ 29(f)). Another is the September 29 email with the Questionnaire (¶ 29(g)).

the multiple-conspiracies instruction Mr. Medina will request at trial. *Kotteakos*, 328 U.S. at 767–74; *Berger*, 224 F.3d at 113–16.

### B. Mr. Medina Is Misjoined With Ms. Hu and Mr. Dantzler Under Rule 8(b)

This Court measures joinder against the indictment alone: whether defendants are properly joined under Rule 8(b) "must be measured only against the allegations contained in the indictment," a rule that "forecloses consideration of government proffers and defense proffers alike." *United States v. Valentin*, No. 23-CR-292 (RPK), 2024 WL 4444417, at *2 (E.D.N.Y. Oct. 8, 2024); *see United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008). Rule 8(b) permits defendants to be charged together only "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The acts must be "unified by some substantial identity of facts or participants," or "arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks omitted); *Rittweger*, 524 F.3d at 177. Where "[t]he only fact alleged in the indictment tying the counts together is that [one defendant] was charged in both," that "does not alone suffice." *Valentin*, 2024 WL 4444417, at *3. And where Rule 8(b) is not met, severance follows "even absent a showing of prejudice." *United States v. Feyrer*, 333 F.3d 110, 113 (2d Cir. 2003).

Measured against the indictment, Mr. Medina is the single participant common to the Dantzler and Hu allegations. In *United States v. Gentile*, this Court severed three schemes to bribe the same IRS employee because, beyond the common participants, "there is nothing in the indictment which indicates the defendants had acted in concert or participated in a common scheme or plan," 60 F.R.D. 686, 687 (E.D.N.Y. 1973), and held on reargument that a separate conspiracy charge for each scheme "surely cannot alleviate the misjoinder problem," *id.* at 689.[22]

The remedy is a separate trial of Mr. Medina.

[22] The government will rely on the rule that "a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)." *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988). But the presumption yields where the indictment's own allegations describe two agreements rather than one. *Valentin* looked past the government's characterization to "what the indictment actually charges," 2024 WL 4444417, at *3.

### C. In the Alternative, Rule 14 Requires Severance From Ms. Hu

On January 30, 2025, before anyone in this case had been charged, prosecutors met with Ms. Hu's lawyers and told them what the government believed it could prove. Ms. Hu's lawyers took notes. (Ex. M at 2 (¶¶ 1–3).) Mr. Medina was not there. On September 16, 2025, the government obtained a superseding indictment adding Count Six, which charges Mr. Medina and Ms. Hu with obstruction beginning on January 30, 2025, the day of the meeting. (ECF No. 46; S-1 ¶ 35.)

On July 30, 2025, as part of a *Curcio* hearing, Ms. Hu and the government signed an "Admission and Stipulation" built around those notes. (Ex. M; Minute Entry of July 30, 2025.) The typed portion recites only that the prosecutors said Ms. Hu had given "an executive of Exodus Transitional Community" the use of a Mercedes-Benz paid for through a company she controlled. (*Id.* at 2 (¶ 1).) The notes, Attachments A and B, go further and name Mr. Medina. In the portions not blacked out, he appears four times, each time beside an accusation: "Mercedes for Julio"; "Medina 2022 → Dec. 2024 payments"; "Purchased a home for Medina as well 1.3 million"; and, in the margin, "Kickbacks to J.M. unrelated to," with an arrow to the entries below. (*Id.* at 6–7.) Those are the charges in this case. (S-1 ¶¶ 11, 16.) The stipulation declares the notes "[t]rue and accurate copies" and makes the document, "including Attachments A and B, . . . admissible as evidence at trial," without limit as to purpose or defendant and without any witness. (Ex. M at 2–3 (¶¶ 3–4).) Ms. Hu's trial counsel, Benjamin Brafman, signed it for her. (*Id.* at 3.) Mr. Medina did not. The government has not said whether it will offer the stipulation at a joint trial. (Neils Decl. ¶ 34.)

Even if the defendants are properly joined, a joint trial with Ms. Hu would "compromise a specific trial right" of Mr. Medina's, *Zafiro v. United States*, 506 U.S. 534, 539 (1993): his right to confront the witnesses against him. The stipulation would put before the jury an accusation against Mr. Medina, written and vouched for by his co-defendant's lawyers, with no witness to cross-examine. The 96 devices would bring into his trial the fruits of other investigations of Ms. Hu that have nothing to do with him. Neither can be cured by redaction or instruction.

Two of *Zafiro*'s examples apply here. First, a non-testifying co-defendant's statement that names the defendant cannot be cured by a limiting instruction. *Bruton v. United States*, 391 U.S. 123, 135–37 (1968). The rule reaches any "statements containing accusations against the defendant" offered without the accuser on the stand, *United States v. Taylor*, 745 F.3d 15, 28 (2d Cir. 2014) (quoting *United States v. Jass*, 569 F.3d 47, 55 (2d Cir. 2009)). Second, "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty," *Zafiro*, 506 U.S. at 539, and a limiting instruction "cannot be regarded as a guaranty against prejudice." *United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980).

*Gray* and *Taylor* fix the limits of redaction. A blank or obvious deletion "call[s] the jurors' attention specially to the removed name," and such statements, "considered as a class," are "so prejudicial that limiting instructions cannot work." *Gray v. Maryland*, 523 U.S. 185, 192–93 (1998). Replacing a name with a role the jury can "immediately infer" is a "mechanical substitution" that fails for the same reason. *Taylor*, 745 F.3d at 29–30.

**1. The Stipulation**

The stipulation is an accusation that Ms. Hu gave Mr. Medina a car, a house and years of kickbacks, made by prosecutors who will not testify to it, in a document Mr. Medina never signed and could not have stopped. It was made to be offered at trial, so it is testimonial. *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004).

Its source makes the prejudice inherent. They were written by Ms. Hu's defense lawyers, who then stipulated they are accurate. Jurors will assume defense counsel had no reason to overstate the government's case and will credit an accusation that survived their scrutiny more than ordinary hearsay. That credit falls on Mr. Medina, because the notes name him. And the authors will sit at the next table and argue Ms. Hu's case from opening to summation. Mr. Medina cannot cross-examine a stipulation. His only recourse would be to call his co-defendant's lawyers as witnesses or tell the jury they got it wrong, and either would set him against Ms. Hu's

counsel before the jury deciding both their fates.

Redaction cannot fix this. The typed paragraphs already establish what Ms. Hu was told; the attachments add only accusations against Mr. Medina, which are there to be believed. He is identified three ways, so deletions would "call the jurors' attention specially to the removed name," *Gray*, 523 U.S. at 193, and a neutral label would be the "mechanical substitution" rejected in *Taylor*, 745 F.3d at 29. Even the typed stipulation identifies him by role, as "an executive of Exodus Transitional Community" who received "the use of a 2022 Mercedes-Benz vehicle," a description that fits one defendant only. (Ex. M at 2 (¶ 1).) The only redaction that works is to strike the entries, which concedes the point.

Nor can an instruction. The notes say Ms. Hu paid for a Mercedes "for Julio." A jury cannot accept that as proof she gave the car without accepting it as proof he took it. *Gray*, 523 U.S. at 192.

**2. The 96 Devices from Other Investigations**

The devices and accounts the government holds from other investigations present the second kind of prejudice in its starkest form. The government "has reason to believe" they "contain communications involving at least one of the defendants"; none is Mr. Medina's, and Ms. Hu's communications are on them; and the government has not finished reviewing them and will not say which investigations they come from. (Ex. C at 2–6; Neils Decl. ¶¶ 33, 41.) Whatever they hold about Ms. Hu's other dealings has nothing to do with whether Mr. Medina took a bribe, yet a joint jury could hear it in his trial. That is the evidence *Zafiro* warned "erroneously could lead a jury to conclude that a defendant was guilty." 506 U.S. at 539. The government's assurance that "[a]t present" it does not intend to use the devices "during its case-in-chief" protects nothing: it excludes rebuttal and cross-examination, lasts only as long as the government chooses, and carries no notice deadline. (Ex. C at 3.) No instruction given afterward is "a guaranty against prejudice." *Figueroa*, 618 F.2d at 946. For the same reason, Mr. Medina asks for notice by a date certain of any evidence from these devices the government intends to

offer.

Mr. Medina therefore asks that his trial be severed from Ms. Hu's. In the alternative, he asks that the stipulation and its attachments be excluded as against him and, if received against Ms. Hu, redacted to remove every reference to him, direct or by description, with an instruction that the jury may not consider it in deciding the charges against him. He also asks that the government identify, by a date certain, any evidence from the ninety-six devices that it intends to offer under Federal Rule of Evidence 404(b).

## V. ACCESS IS NOT DISCLOSURE: THE GOVERNMENT SHOULD BE ORDERED TO CERTIFY THAT IT HAS REVIEWED FOR BRADY MATERIAL

On February 13, 2025, Magistrate Judge Cho entered the Rule 5(f) order on the government's *Brady* obligations. (ECF No. 20.) Mr. Medina asks the Court to direct the government to certify its *Brady* review.

The prosecutor, before representing that it has complied with *Brady*, must have looked. Asked at the August 21, 2025 status conference about the Chinese-language devices, it told the Court: "We have turned over the materials. We've turned over the entire devices and turned over the materials we identified as responsive. It satisfies Rule 16 and Brady. Nothing is suppressed." Status Conf. Tr. 8:15–19 (Aug. 21, 2025) (Ex. N at 4). The Court answered that it had "a worry whether Brady obligations would be satisfied merely by the Government turning over many terabytes of data," and that it "would be happier if [it] knew that the Government thought it had an obligation to review and identify any exchanges like that and disclose them." *Id.* at 9:9–16 (Ex. N at 5).

### A. Brady Is Measured by Usability, Not Possession in Common

"Brady material must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001); *United States v. Gil*, 297 F.3d 93, 105 (2d Cir. 2002). The extent and timing of the disclosure the rule requires are judged "in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is

made," *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). "It is not enough for the prosecution to avoid active suppression of favorable evidence; Brady and its progeny require disclosure." *Id.* at 103.

*Gil* applied those rules to a production the district court had found "labeled and indexed." 297 F.3d at 105. The defense had requested a two-page memorandum. The government produced it among more than 2,700 pages of § 3500 material. The Second Circuit held it suppressed: "the defense was not in a position to read it, identify its usefulness, and use it." 297 F.3d at 106. The document "was not easily identifiable as a document of significance, located as it was among reams of documents." *Id.* Measured that way, this production has not yet disclosed what is favorable in it. The images were produced before anyone on the government's side had reviewed them (Point VI).[23] A forensic image is not a set of documents until someone runs forensic tools over it. The defense has done that at its own expense for fourteen months. (Point VI; Neils Decl. ¶ 32.) Part of the production is also in a language the defense cannot read.

The Court asked: "If there is a chain of communications in Mandarin in which the cooperator says these defendants have nothing to do with this, and it's in Mandarin, have you satisfied your Brady obligations? I have a worry about that." Status Conf. Tr. 9:11–14 (Ex. N at 5).[24] Mr. Medina does not ask the Court to prescribe a method of review. He asks for English translations of the foreign-language material by a date, which the government told the Court it would provide at least in part, and a statement of whether it has reviewed for *Brady* the material that remains untranslated. (ECF No. 45; Minute Entry of Aug. 21, 2025; Status Conf. Tr. 7:20–23 (Ex. N at 3).)

The government now says the same about Mr. Medina's own telephones. It describes the

---

[23] That is the posture condemned in *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012). The government there kept imaged evidence for fifteen months without reviewing it, which the court found unreasonable, and it had announced that it would release the images to every defendant before any review, which the court said "only compounds the assault on his privacy concerns." *Id.*

[24] The government answered that its review team had been "instructed, to the extent they identify anything that they think arguably under a broad definition might constitute Brady, that should be brought to the Government's attention," and that the Chinese-language material was being reviewed "either . . . by a linguist or" on "a review platform" into which text could be copied and pasted for translation: "a combination of means." Status Conf. Tr. 10:10–17, 11:3–16 (Ex. N at 6–7).

material it produced on October 21, 2026 as "first produced to the defendants pursuant to Rule 16 seventeen months ago," when it produced the complete images (ECF No. 74 at 1), and at the October 26, 2026 conference it said that the telephones had been Rule 16 material since May 2025. (Neils Decl. ¶ 49.) But its own responsiveness designations reach 0.58% of one telephone and 1.18% of the other (*id.* ¶ 22), and, apart from four photographs and videos, none of what it produced on October 21 was among them (ECF No. 73 at 2; Neils Decl. ¶ 49). If the whole of each image is Rule 16 material, the designations tell Mr. Medina nothing about what the government considers material or will use at trial. If the designations mean what they say, the October 21 material was never designated. Either way, calling a forensic image Rule 16 discovery does not disclose what is favorable in it. That is the production *Gil* held insufficient, and the one the Court questioned at the August 21, 2025 status conference. (Ex. N at 5.)

**B. There Can Be No Brady Certification Without a Search**

The Court made clear that, while it would not tell the government how to conduct its review, *Brady* "puts the Government on the hook if there is anything that is material that should have been turned over that wasn't." Status Conf. Tr. 16:20–17:4 (Ex. N at 8–9). That is why the government's compliance must be its own representation, made after a search. "[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Kyles*, 514 U.S. at 437 (quoted in *Coppa*, 267 F.3d at 143). The responsibility reaches what others on the government's side hold: "[t]he government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team.'" *Gil*, 297 F.3d at 106 (citing *Kyles*, 514 U.S. at 438–39).[25]

In *United States v. Saffarinia*, the government had produced some 3.5 million pages in a searchable database, and it argued that it had no obligation to "comb through the discovery." 424 F. Supp. 3d 46, 82–83, 88 (D.D.C. 2020). The court disagreed: "the government's Brady

[25] In *Gil*, the investigator was not a federal agent. The investigator worked for the New York City Off-Track Betting Corporation, the public entity whose contract the case concerned.

obligations require it to identify any known Brady material to the extent that the government knows of any such material in its production." *Id.* at 86.[26] A court in this Circuit has put it the same way: "the Government cannot hide Brady material as an exculpatory needle in a haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013). Here the certification comes first: the government cannot identify what it knows until it has looked. Courts in this Circuit have declined to require identification where the government had produced indexed, searchable files, or where nothing suggested that it had hidden what it knew.[27] But suppression violates *Brady* "irrespective of the good faith or bad faith of the prosecution," which is why *Saffarinia* found the bad-faith line unpersuasive. 424 F. Supp. 3d at 90 (quoting *Brady*, 373 U.S. at 87).[28] The images here are whole devices, and some are in Mandarin and untranslated.

Mr. Medina asks the government to answer, production by production, the question the Court asked: whether "[a]ll of the Mandarin materials are being reviewed by somebody who speaks Mandarin with an eye to identifying Brady materials," Status Conf. Tr. 10:25–11:2 (Ex. N at 6–7). He also asks the corresponding question for every other device. Courts in this Circuit that have denied early *Brady* motions have relied on the government's representation that it had looked.[29] In *United States v. Pikus*, the Second Circuit vacated convictions under the Speedy Trial Act after finding that "the Government repeatedly and inaccurately represented to the Court that it had completed discovery." 39 F.4th 39, 55, 57–58 (2d Cir. 2022). *Pikus* shows why the

[26] *See Saffarinia*, 424 F. Supp. 3d at 90–91 (ordering identification "in the interest of fundamental fairness and as a matter of case management").

[27] *See United States v. Weaver*, 992 F. Supp. 2d 152, 154–57 (E.D.N.Y. 2014) (forensic images of thirty-eight computers, produced with "detailed indices" and largely as searchable PDF and "load-ready" files); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 455–57 (S.D.N.Y. 2011) (production was electronic and searchable, and there was "no allegation of prosecutorial bad faith").

[28] Courts outside this Circuit have found *Saffarinia* factually inapposite. *See, e.g.*, *United States v. Sotomayor*, No. 1:22-cr-122 (RDA), 2022 WL 17363020, at *3–4 (E.D. Va. Dec. 1, 2022). Even so, *Sotomayor* recognized that the general rule "does not, however, preclude courts, in their discretion, from requiring the Government to specifically designate any known *Brady* material within a larger mass of disclosed evidence." *Id.* at *3.

[29] *See United States v. Helbrans*, 547 F. Supp. 3d 409, 436 (S.D.N.Y. 2021) (government committed "to make a diligent search"); *United States v. Morante*, 947 F. Supp. 2d 309, 313 (E.D.N.Y. 2013) (government represented that it "is not aware of any Brady material").

statement requested here should be sworn by a person with knowledge.[30]

The same is true of the devices and accounts the government holds from other investigations (Point IV). They are in the government's possession, *Kyles*, 514 U.S. at 437, and it has told the defense that a co-defendant's communications are on them. (Neils Decl. ¶ 41.) The government cannot represent that it has disclosed what is favorable on devices it has not reviewed, and the question cannot wait for trial. *Leka*, 257 F.3d at 100.

### C. The Brady Statement

By a date certain, a statement, sworn by a person with knowledge, production by production and device by device, of what material the government has reviewed for information favorable to Mr. Medina, including impeachment material, whether in the designation sets or elsewhere; whether a person able to read that material conducted the review; whether the review is complete; and either the identification, by device and Bates range, of the favorable material found or a statement that none was found. (Sub-point B; the Rule 5(f) order, ECF No. 20.) Production of the complete images, or their designation as Rule 16 material, is not that identification.

## VI. THE GOVERNMENT'S RULE 16 PRODUCTION IS INCOMPLETE, AND THE COURT SHOULD COMPEL IT TO PRODUCE THE OUTSTANDING MATERIAL AND TO IDENTIFY WHAT IT WILL USE AT TRIAL

As of October 14, 2026, the government's production totaled 4.338 terabytes, including 3,985.79 GB of full forensic images of twelve devices, of which it designated only 58.68 GB (1.47%) as responsive. The responsive sets followed between July 29, 2025 and July 22, 2026, the last of them fourteen months after the first full images. (Neils Decl. ¶ 29.) The government still describes its review as ongoing.[31] On October 21, 2026, two days before the motion deadline then in effect, it produced more than 1,700 pages of material from Mr. Medina's own telephones,

[30] *Pikus* did not decide whether the disputed audit documents were *Brady* material. *Pikus*, 39 F.4th at 57 n.15.

[31] Ex. C at 2–4 ("The government's review of responsive materials from electronic devices is ongoing."). No responsive set has been produced from Mr. Dantzler's phone at all. (Neils Decl. ¶ 29.) Gary Jenkins's emails and phone records were produced without any apparent filter. (Neils Decl. ¶ 31.)

along with 82 photographs, four videos and a voicemail, nearly all of it material it had not designated as responsive, and at the October 26, 2026 conference it said that its filter team had sent additional material on October 23, which it would pass to its agents and then produce. (ECF No. 73 at 1–2; ECF No. 74 at 3; Neils Decl. ¶ 49.) Mr. Medina moves to compel the government to produce and identify the material described below by a date certain, and asks that material not produced or identified by then not be offered against him without leave of Court.[32]

### A. The Requests, by Subject[33]

1. **MOCJ**.[34] The indictment dates the EHP to April 2020 but begins Exodus's part with MOCJ's June 2020 contract. The HU Hotels were in the EHP before that contract.[35] The time from March 15 through July 2020 is therefore material to Count One and to the timing of any agreement. The produced MOCJ mailboxes have no Inbox or Sent Items coverage before July 2020. The twelve April 2020 emails that were produced survive only because they sat in Drafts or Deleted Items. A document known to exist is not in the production: Ms. Calabrese's April 14, 2020 email announcing the Wyndham Garden Fresh Meadows to the reentry providers, with replies from MOCJ's Mr. Garvin and from Fedcap and Exodus staff. Nothing from any source is dated April 13–15, 2020. Either the government never collected the City's email for those months, or it has the email and has not produced it.

*Produce*: under Rule 16(a)(1)(E)(i), MOCJ email from March 15 through July 31, 2020 within the government's possession, custody or control, Inbox and Sent Items included, for the custodians who ran the program (Calabrese, Garvin, Dozier-Lewis, Cassel, Kaplan, MacLeod, Grumet, Cheung), including email held by DOI or any other agency that gathered facts with the prosecution team. Under *Brady*, any of it showing MOCJ selecting the Wyndham Garden or

[32] ECF No. 45; Neils Decl. ¶¶ 29–32.

[33] Requests 1, 2 and 4 were the subject of the parties' conferral. (Neils Decl. ¶¶ 37, 40–41, 43, 45.) Request 6 was raised in Mr. Medina's letter of October 22, 2026, and the government's response did not address it. (ECF No. 73 at 2–3; ECF No. 74.) Local Crim. R. 16.1.

[34] Ex. O at 2–11; Neils Decl. ¶¶ 35–36.

[35] S-1 ¶¶ 2–4; Ex. A at 7; Ex. B at 3 (NYCEM contract no. 2020-020125), 11; Neils Decl. ¶ 35.

directing Exodus's work at the program hotels before the payments the indictment alleges.

*Identify*: what the government collected from MOCJ: custodians, folders and date ranges, when, and by what method, or a statement that the City no longer has the email. That is the showing on which courts decide whether another agency's files fall within the government's duty. *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 5001186, at *7 (S.D.N.Y. Aug. 4, 2023).

2. DOI, the Southern District and Global. DOI is the common thread. By the fall of 2022, it had subpoenaed bank records under a case name listing Mr. Medina, Exodus, Mr. Dantzler and Watchforce, and in 2024 it was still collecting MOCJ's and MORMC's records on Exodus. (Point I.A.6–7; Neils Decl. ¶ 47; Ex. A at 15–20.) The government says this case grew out of another investigation, but it has not said which one. (Neils Decl. ¶ 40.) Global, the City's own security contractor at the first EHP hotels, had no State license. (Point I.A.2.) The defense asked for the material on Global held by the United States Attorney's Office for the Southern District of New York (the "Southern District"). The government did not say there is none. It said only that it has no obligation to look. (Neils Decl. ¶¶ 37, 43.)

This matters to the defense. The government's theory is that Exodus used Mr. Dantzler's company because he was paying Mr. Medina, and it makes Watchforce's lack of a license part of the case. (S-1 ¶¶ 6, 10, 21.) Mr. Medina's position is that Exodus turned to Mr. Dantzler because, in an emergency, he could find and staff security companies quickly, and that using an unlicensed intermediary was a consequence of the pandemic, not a step in a fraud scheme. The City's own handling of Global shows those conditions: NYCEM brought Global in under a contract that Exodus later took over, Global turned out to be unlicensed too, and when Global walked off the job on March 13, 2022, Watchforce had guards at both hotels the next morning. (Point I.A.1–2; Ex. A at 22 n.3, 60–61.)

Statements and documents from City officials, DOI or the Southern District about those conditions, including how and why Global was selected and kept on and why its license was not checked, are favorable to the defense under *Brady* and material to preparing it under Rule 16(a)

(1)(E)(i). If the City relaxed its own requirements to get guards in place quickly, a jury could find that Exodus acted for the same reason. And if the Southern District, working with DOI, looked at the same program and chose not to bring charges, what it learned is likely to be favorable to Mr. Medina.

The government's answer, that it has no obligation to look (Neils Decl. ¶ 43), does not decide the question.[36] Where prosecutors investigate jointly "with another state or federal agency," their duty "extends to reviewing the materials in the possession of that other agency for *Brady* evidence," *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012), and "it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions," *id.* at 494. Investigators of a City entity can be part of the prosecution team. *Gil*, 297 F.3d at 106. DOI's work is in this case's discovery, and if DOI also investigated Global, its files on Global came from the same fact-gathering. (Point I; Neils Decl. ¶¶ 40, 47.)

*Produce*: under Rule 16(a)(1)(E)(i) and *Brady*, DOI's files and internal communications concerning Global, including its licensing and its representations to the City, and concerning Watchforce; any material DOI shared with the Southern District about Global; and any communication between that Office and this one about Global, Exodus or Mr. Medina.

Identify: whether the Southern District, alone or with DOI, investigated Global, the program's security contracts, Exodus or Mr. Medina; how and when this case came to this Office, and DOI's role in it; and, under *Brady*, whether the government has reviewed DOI's and the Southern District's material for information favorable to Mr. Medina, all as set out in the proposed order.

3. Gary Jenkins. The government produced 342,206 files from the email account of Gary Jenkins, the City's Commissioner of Social Services, about 217,000 of them emails, for January

[36] Whether another office's files fall within the government's obligation turns in part on whether its personnel "acted in collaboration with prosecutors and/or police, or merely in parallel with them," *United States v. Aziz*, 837 F. Supp. 3d 449, 472 (E.D.N.Y. 2026), and courts have required "disclosure of specified material from other agencies" where the agencies "engaged in significant joint fact gathering," *Tournant*, 2023 WL 5001186, at *5.

2020 through March 2023, under a single Bates number and, so far as appears, without any filter, and also his phone records. It has not said why; his agency did not run the EHP. (Neils Decl. ¶ 31.) Identify: why they were produced, any filter applied, whether they were obtained in this investigation or another, whether the government will use any of them, and whether they have been reviewed for *Brady* material (Point V.C), all as set out in the proposed order.

4. The devices from other investigations (Point IV). *Identify*: for each device and account on the July 22, 2026 list, which defendant and which investigation it concerns, and whether it has been reviewed for Rule 16 and *Brady* material as to Mr. Medina and, if not, when it will be, with a sworn statement whether that review is complete; and give written notice, by a date certain, of any evidence from them the government intends to offer at trial, including any evidence concerning Ms. Hu offered under Federal Rule of Evidence 404(b).[37]

5. Translations. The phones of Ms. Hu and four others are in Mandarin. On August 28, 2025, the government said it would translate only the responsive material from Ms. Hu's devices,[38] and only her two phones have translated reports. The government now says those are "unofficial translations" made with a Cellebrite language pack its agents no longer have, and that it cannot translate the other devices that way. (Neils Decl. ¶ 30.) It has not said how, without translations, it has reviewed the Chinese-language material on those devices for *Brady* material.

Produce: by a date certain, English translations of all foreign-language material in the government's production, including any it will offer at trial (Status Conf. Tr. 7:20–23; Ex. N at 3), with an order that material not so translated by then not be offered against Mr. Medina. Identify: the status of the August 28, 2025 commitment as to the other devices (ECF No. 45) and, under *Brady*, whether the government has reviewed the untranslated material on each device for information favorable to Mr. Medina (Point V.C). At the October 26, 2026 conference,

[37] The government's present intention is not notice. In *Pikus*, the government said the Bakry defendants' "work as medical providers . . . is not expected to be part of the trial," but "[u]ltimately, however, the Government did rely on evidence about the Bakry defendants." 39 F.4th at 50 n.9; *cf. United States v. Saenz*, 721 F. Supp. 3d 188, 195–99 (E.D.N.Y. 2024) (ordering supplementation where the government said it was "presently aware of no connection" and cited an "ongoing investigation," which the court called "a threadbare justification").

[38] For the other devices, the government said it would "work with the FBI to determine whether" anything could be translated. (ECF No. 45.)

translations were raised as still outstanding, including for a device on which no responsive material has been translated.

6. Exodus's email. Count Two charges a scheme to deprive Exodus of its right to Mr. Medina's honest services. (S-1 ¶ 26.) Apart from what appears on the seized devices and in the City's files, the government has produced no email collected from Exodus or its custodians, and Exodus's own records in the production are limited to audit reports, organizational policies and an agreement. (Neils Decl. ¶ 49.) The government has been in contact with Exodus's counsel since at least November 2025. (ECF No. 73 at 2–3.)

*Produce*: under Rule 16(a)(1)(E)(i) and *Brady*, any email and other records of Exodus or its custodians in the government's possession, custody or control. *Identify*: whether the government sought or obtained Exodus's email and, if it did not, so state, so that Mr. Medina may seek it from Exodus under Rule 17(c).

## VII. THE EVIDENCE OF OBSTRUCTION TAKEN FROM THE TELEPHONES SHOULD BE SUPPRESSED UNLESS THE GOVERNMENT SHOWS A WARRANT THAT REACHES IT, AND THE GOVERNMENT SHOULD PRODUCE THE RETURNS AND THE EXECUTION RECORD AND RETURN THE NON-RESPONSIVE DATA

The Fourth Amendment governs not only the terms of a warrant but the manner of its execution.

### A. The Telephones Were Searched for Evidence of an Offense the Warrant Does Not Name

***The Bronx warrant (February 12, 2025).*** Magistrate Judge Aaron (S.D.N.Y.) issued warrants for Mr. Medina's person and his apartment. Attachment B-1 authorizes seizure of "any cellular phone" on his person and a forensic examination of the devices "for the purpose of identifying" evidence of five named offenses "between April 1, 2020 and the present," in categories (a) through (l), each tied to those offenses.

Agents executed the warrants on the morning of Mr. Medina's arrest and logged the two iPhones as collected. On February 21, agents searched 514 Vischer Ferry Road, Clifton Park,

under warrant No. 25-SW-34 (N.D.N.Y.).[39] No executed Rule 41(f) return has been produced for either location. Asked for the executed returns, the government pointed to the same search paperwork, in which the return sections are blank, and produced nothing further. (Neils Decl. ¶ 44.)[40]

*The obstruction warrants (April 10 and July 28, 2025).* After the indictment, the government obtained two more warrants in an investigation of obstruction: one for cell-tower records at eight locations on February 2, 2025 (No. 25-MC-1527), and one for the cell-site records of a telephone the affidavit calls the "BURNER PHONE" (No. 25-MC-2964). The second affidavit's account of January 31 to February 2, 2025 is built from Mr. Medina's two telephones, material it says agents found "[d]uring the review" of a telephone "authorized by" the Bronx warrant, which does not name 18 U.S.C. § 1512 or § 1519.[41]

"A search must be confined to the terms and limitations of the warrant authorizing it," and searches involving documents must be "conducted in a manner that minimizes unwarranted intrusions upon privacy." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)).

For electronic data, Rule 41 lets the government copy a device and sort it later. Fed. R. Crim. P. 41(e)(2)(B). But the copy is the means of the search, not the thing seized. Information "not identified as responsive at the conclusion of this review 'f[e]ll with[out] the scope of the warrant[s]' and thus [was] not seized pursuant to them." *United States v. Nejad*, 436 F. Supp. 3d 707, 736 (S.D.N.Y. 2020) (first three alterations in original) (quoting Fed. R. Crim. P. 41 advisory committee's note to 2009 amendment).

Count Six was not part of the case when the telephones were seized. The only warrant

[39] Paragraph 12 of the Clifton Park affidavit relies on 25-MC-545 data "as recently as February 11, 2025." (Ex. I at 24.) For Clifton Park, the government has produced FBI receipts and logs. The FD-302 states that the receipt, photo disc, room numbers and photo log are kept in the case file's 1A section.

[40] Ex. G at 2–69 (returns at 48, 54, 60, 66); Ex. H at 5–82 (Attachment B-1 at 34–37; FBI Collected Item Log at 5–6; returns at 65, 74); Ex. I at 2–74 (7–8, 66; return at 67).

[41] SENSITIVE_EDNY_0000185635–662 (No. 25-MC-1527; return blank); SENSITIVE_EDNY_0000186105–152 (No. 25-MC-2964), ¶¶ 14–20, 25–29 & n.4; EDNY_0000186092–097 (returns); Ex. H at 34–36 (Attachment B-1); S-1 ¶¶ 22, 34–35; ECF No. 46.

produced for them, the Bronx warrant, authorizes a search for evidence of the fraud, honest-services, Travel Act and money-laundering offenses it names. It does not name 18 U.S.C. § 1512 or § 1519. Five months after the indictment, an agent swore to a magistrate judge about what had been found on those telephones concerning obstruction, and seven weeks after that the grand jury returned Count Six. As set forth in the warrant affidavit, agents found that evidence "[d]uring the review" of a telephone under the Bronx warrant. Whether that review could lawfully gather it depends on facts only the government has.

There are three possibilities. First, a second warrant for the telephones that names §§ 1512 and 1519. None has been produced, and the government, asked, named none. If one exists, Mr. Medina asks for it, its application and its return, and for leave to challenge it. Second, the Bronx warrant itself. The government will say that messages about the car are evidence of the disposition of alleged proceeds, within Attachment B-1, or that the material came into plain view during the responsiveness review. *See United States v. Lustyik*, 57 F. Supp. 3d 213, 231–33 (S.D.N.Y. 2014). That answer turns on when and how the material was found. The designations for the second telephone were delivered on August 14, 2025, seventeen days after the affidavit was sworn, and those for the primary telephone on October 30, 2025. If the material was identified in the responsiveness review and falls within the warrant's categories, the government may have an argument. If it was found by going back into the data for evidence of a different offense, or after the review closed, that was a new search without a warrant. *Nejad*, 436 F. Supp. 3d at 736–37. Third, no authority at all. Then the evidence of obstruction taken from the telephones, the calls, messages, searches and screenshots of January 31 to February 2, 2025, and what was obtained from it, including the records returned under No. 25-MC-2964, must be suppressed. *Matias*, 836 F.2d at 747; *Nejad*, 436 F. Supp. 3d at 736–37.

Mr. Medina therefore moves to suppress that evidence and its fruits, and asks the Court to require the government to state under oath the authority under which, and the dates on which, the telephones were searched for evidence of §§ 1512 and 1519. Asked on October 14, 2026, the government named no warrant. (Neils Decl. ¶ 44.) Until the government says under what

authority the telephones were searched for that evidence, the motion cannot be framed more narrowly than this, because each of the three possibilities turns on facts the government alone holds. If the government identifies a second warrant, Mr. Medina asks leave to supplement this motion to address it.[42]

The remedy for a seizure beyond the warrant is "suppression and return of those items." *Matias*, 836 F.2d at 747. The evidence of obstruction described above should be suppressed, with its fruits, unless the government shows that it was found within the Bronx warrant's terms and before the responsiveness review closed. Under Rule 41(g), the Court should also order that the non-responsive data from both telephones (everything outside the government's designations of August 14 and October 30, 2025) be segregated, not searched or disseminated further, and returned or destroyed at the close of the case, and that every copy held by a co-defendant, a vendor or any other person be retrieved or certified destroyed.

The Court should therefore order the government, within fourteen days, to produce the executed returns and inventories for the warrant issued to AT&T under No. 25-MC-545, and for the Bronx and Clifton Park premises warrants, or, if no return was made, to say so in a sworn statement that gives the date collection under each warrant ended and states whether, when and how Mr. Medina was given notice.[43]

[42] The government has advised that it does not "presently intend to offer" Mr. Medina's statements, recorded on the evidence log, identifying the telephones as his "personal" and "work" cells, and that it will advise the defense if that changes. (Neils Decl. ¶ 44; Ex. H at 9 (evidence log).) It did not say whether it intends to offer any other statement Mr. Medina made on February 13, 2025. (*Id.*) Those statements are not on the advice-of-rights recording or the body-worn camera footage, and Mr. Medina had asked for counsel during that recording. Mr. Medina asks that the government be directed to give notice in time for a motion if its position changes and reserves the right to move to suppress the statements.

[43] The AT&T warrant also directed the carrier to produce cell-site records for Mr. Medina's number from April 1, 2020 to the present. (Ex. G at 37–38, Attachment B-2 ¶ 2.) None has been produced, and Mr. Medina reserves his challenge to that part of the warrant should any surface. Asked on October 14, 2026, the government did not say whether it will use location information at trial. (Neils Decl. ¶ 44.) Nor did it address the return for the AT&T warrant. (*Id.*)

### B. The Court Should Order the Returns and the Execution Record, and Hold a Hearing on Any Disputed Fact[44]

Mr. Medina asks that the government be ordered to disclose, within fourteen days: the executed returns and inventories and every other warrant, application and order under which his telephones, accounts or location were searched or obtained; for each telephone, the imaging date, the dates and protocols of the responsiveness review and the date each designated item was marked responsive; every later search of the full images; and the authority for, and the dates and persons involved in, any search of the telephones for evidence of §§ 1512 and 1519, all as set out in the proposed order. The facts set out above are not conjecture. They come from the government's letters and from the execution record it has produced. (Neils Decl. ¶ 44.)[45] If the government's answers leave any of the questions above in dispute, the Court should hear the agents on them.[46]

[44] The defense raised the returns, the authority for any search of the telephones for evidence of §§ 1512 and 1519, Mr. Medina's February 13, 2025 statements, and the government's intended use of location information at trial by email on October 14, 2026; the government answered on October 19, 2026. (Neils Decl. ¶ 44.) Local Crim. R. 16.1.

[45] A hearing is ordinarily required where the moving papers are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)). Where the government's own account of its execution does not permit the Court to decide whether "the search conducted by government agents [ ] actually resemble[d] a general search," the court holds a hearing to find out. *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) (alterations in original) (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000)) (ordering a suppression hearing because the court was "unable to make this determination absent evidence concerning how law enforcement agents executed" the telephone warrant).

[46] The returns, the inventories and the execution chronology have not been produced. Mr. Medina therefore reserves any further challenge to the warrants or their execution (particularity, overbreadth, over-seizure, and the searches of the premises) that those materials may support, with leave to supplement this motion when they are produced.

## VIII. MR. MEDINA'S PRIVILEGED COMMUNICATIONS SHOULD BE PROTECTED: THE COURT SHOULD PRECLUDE ANY USE OF HIS PRIVILEGED COMMUNICATIONS, DIRECT AN ACCOUNTING OF WHO HAS HAD ACCESS TO THEM, AND BAR ANY FURTHER PRODUCTION OF HIS DEVICE IMAGES

**The Government Produced Mr. Medina's Privileged Communications to Co-Counsel and Possibly the Prosecution Team**

On May 28, 2025, seven weeks after it had asked for and received a list of Mr. Medina's attorneys, the government produced to all three defendants complete images of his two phones, with nothing withheld or redacted. They contained his privileged communications with his counsel, Ms. Neils, and with Ms. Rosario, while she acted as counsel; protected spousal communications with his wife; and protected health information about him and third parties. When defense counsel found the privileged material, in August 2026, they told the government in writing, and counsel for both co-defendants have since confirmed that they deleted the images. (Neils Decl. ¶¶ 19–27; Exs. J, K, L.) On October 26, 2026, the Court granted Mr. Medina's unopposed motion and entered an order under Rule 502(d). (Minute Entry and Order, Oct. 26, 2026; ECF No. 68-1.)

### A. Any Use of Mr. Medina's Attorney-Client Communications Should Be Precluded

Mr. Medina asks for an order that no communication between him and his counsel be used by the government or any co-defendant, before the grand jury, at trial or in cross-examination. Where privileged material has come into the government's hands, the court can "provide effective relief by ordering the government to return the documents and not to present the materials to the grand jury or use them at any trial that may result from the investigation." *In re Grand Jury Subpoenas Dated Sept. 13, 2023*, 128 F.4th 127, 137 n.10 (2d Cir. 2025). The privilege in his communications with his own counsel is his alone, and only he can waive it. *In re von Bulow*, 828 F.2d 94, 100–01 (2d Cir. 1987). He has not. The phones were in the government's possession, the screening was the government's to do, and the disclosure to his co-defendants was the government's act, not his. (Neils Decl. ¶¶ 20–21, 25.) Yet on October 6,

2026, the government said it intends to offer his communications with Ms. Rosario on the strength of a waiver by Exodus. (*Id.* ¶ 42.) On October 21, 2026, it produced portions of those communications, with letters from Exodus's outside counsel identifying the pages Exodus would release. (ECF No. 73-1 at 2; Neils Decl. ¶ 49.) Mr. Medina does not concede that the waiver is valid or that it reaches his own communications with Ms. Rosario. Mr. Medina also asks that the government give notice, by a date certain, of any communication with counsel it intends to offer, including those with Ms. Rosario, and identify, for each, the waiver on which it relies. Fed. R. Crim. P. 12(b)(3)(C), (b)(4)(B). Finally, he asks that the copies held by the government and the co-defendants be returned or destroyed, with any work product derived from them sequestered.

### B. Mr. Medina's Marital Communications Should Be Precluded

The images also contain communications between Mr. Medina and his wife. (Neils Decl. ¶ 24.) Confidential marital communications are privileged. *See Trammel v. United States*, 445 U.S. 40, 51 (1980).[47] The government says it does not now plan to offer communications solely between Mr. Medina and his wife, but it will not commit to that. (Neils Decl. ¶ 42.) Mr. Medina therefore asks that the government be ordered to give notice, by a date certain, of any marital communication it intends to offer, and that none be offered without that notice and a ruling. Fed. R. Crim. P. 12(b)(3)(C), (b)(4)(B).

### C. The Government Should Account for Who Has Had Access to the Unfiltered Images, and the Court Should Hold a Hearing if the Case Team Reviewed Them

The government produced the complete images to every defendant before any privilege screen, after it had received Mr. Medina's attorney list. (Ex. J at 2–4; Ex. K at 2–4; Neils Decl. ¶¶ 20–27.) Asked about it, the government said that it had "employed an appropriate filter process and, to our knowledge, the case team has not reviewed privileged materials," and that it was "not aware of authority requiring us to describe that process." (Neils Decl. ¶ 26.) The government

[47] The joint-participant exception reaches only communications made in furtherance of joint criminal activity once both spouses have become participants in it. *United States v. Estes*, 793 F.2d 465, 466–68 (2d Cir. 1986).

made its responsive designations from the same complete images. (Neils Decl. ¶¶ 21–22.)[48]

Where the government has obtained a defendant's privileged communications, the defendant who shows that the material was privileged and that the government actually reviewed it is entitled to have the government show that the evidence it will use "was derived from legitimate, independent sources." *United States v. Gonzalez*, 144 F.4th 396, 403–04 (2d Cir. 2025) (quoting *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991)).[49] Mr. Medina asks that the government be ordered to state in writing, within fourteen days, whether a filter team reviewed the images, who was on it, when the review ran in relation to the May 28, 2025 production, and whether any member of the case team has had access to the unredacted images or to material since identified as privileged. The government has since disclosed that its filter team passed to the prosecution team text messages between Mr. Medina and Ms. Rosario over which Exodus had not disclaimed privilege, and that "[s]ome members of the prosecution team reviewed these materials" before learning of the error. On October 27, 2026, it listed 105 pages of that material that members of the prosecution team viewed, but it still has not said who viewed them. (ECF No. 73-1 at 2; ECF No. 79.) If the answers place the case team in the unfiltered images or in material the filter team had not cleared, he asks for a hearing under *Schwimmer*.

### D. No Further Production of Any Image of Mr. Medina's Devices, and Sequestration of the Health Information Already Produced

Mr. Medina asks for an order that no forensic image or extraction of his devices, complete or redacted, be produced to any other defendant without his written consent or further order of the Court. By the government's own designations, about ninety-nine percent of each of his phones was not responsive to anything, and all of it went to his co-defendants, including

[48] The government's practice was not limited to Mr. Medina's devices. It also produced to all defendants the full image of a telephone belonging to Ms. Ortiz, which contains communications between Ms. Ortiz and her counsel. On October 6, 2026, defense counsel told the government that it had produced those communications. Ms. Ortiz's counsel has advised that Ms. Ortiz did not produce them and did not intend to waive any privilege over them. (Neils Decl. ¶ 28.)

[49] A screening procedure must appear fair as well as be fair. *United States v. Stewart*, No. 02 CR 395 (JGK), 2002 WL 1300059, at *8 (S.D.N.Y. June 11, 2002). The decisions approving filter teams presuppose a team that was identified and whose determinations the defendant could test, *see United States v. Avenatti*, 559 F. Supp. 3d 274, 282–84 (S.D.N.Y. 2021). Here, there is nothing to test.

protected health information about him and about third parties. (Neils Decl. ¶¶ 22, 24.) No rule required that. Mr. Medina was entitled to his own complete images, Fed. R. Crim. P. 16(a)(1)(E)(iii); his co-defendants were entitled only to items "material to preparing the defense" or that the government "intends to use . . . in its case-in-chief at trial," *id.* 16(a)(1)(E)(i)–(ii). The government then proposed to "replace" the deleted copies, and it has since undertaken not to make that production without giving the defense "an opportunity to first seek relief from the Court." (Neils Decl. ¶¶ 25, 27.) The Court may for good cause "deny, restrict, or defer discovery or inspection, or grant other appropriate relief," Fed. R. Crim. P. 16(d)(1); *see* ECF No. 35 ¶ 23. The order should limit any further production from his devices to Rule 16 and *Brady* and *Giglio* material screened for privilege and health information and direct that the health information already produced be treated as Sensitive Discovery Material and sequestered under ECF No. 35.

## CONCLUSION

For the reasons stated, Mr. Medina respectfully requests that the Court grant the relief set out in the notice of motion and in the proposed orders submitted with it, including evidentiary hearings on any disputed issue of fact, and such other relief as the Court deems just.

Dated: October 27, 2026
New York, New York

Respectfully submitted,

**ELLIOTT LEVINE JAROSLAW NEILS LLP**

By: /s/ Lynn A. Neils
Lynn A. Neils
One Grand Central Place
60 East 42nd Street, Suite 1570
New York, New York 10165
(212) 321-0510

Attorneys for Defendant Julio Medina