**FILED UNDER SEAL**

# EXHIBIT A

Documents concerning the City's 2022 inquiries to Exodus, as produced by the government

- E-MOCJ001779–80; 066672–74; 066703–05
- E-MOCJ069667–71 (June 6, 2022 letter)
- EDNY_0000010309–14, with the May 18, 2022 memorandum (#3213254.1)
- E-MOCJ069684–89 (June 8, 2022 letter); 031605; 079931–46 (Sept. 21, 2022 letter)
- EDNY_0000010620–21
- E-MOCJ004944–49; 000008
- EDNY_0000010498–505; 010601–06; 010643–694
- E-MOCJ066726–29 (M. Landa reply of Sept. 30, 2022)

**From**: Goldin, David [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C6A92302DD704BDEA5C7148D14A2F361-GOLDIN, DAV]
**Sent**: 6/3/2022 4:56:13 PM
**To**: 'DOrtiz@etcny.org' [DOrtiz@etcny.org]; 'jmedina@etcny.org' [jmedina@etcny.org]; 'drosario@etcny.org' [drosario@etcny.org]; 'JKaake@etcny.org' [JKaake@etcny.org]
**CC**: Calabrese, Anna [acalabrese@justice.nyc.gov]; Cruz, Osvaldo [ocruz@cityhall.nyc.gov]; MacLeod, Alison [amacleod@cityhall.nyc.gov]
**Subject**: Exodus Invoices for Security Service Expenses

Good afternoon Diana,

As promised, I am writing to confirm our conversation of this morning. We appreciate your cooperation and your recognition that the issues previously identified require the specific steps identified on our call and spelled out here. As explained during the call, MOCJ cannot make any payments to Exodus for security service expenses until Exodus is able to provide complete and appropriate information to support those payment requests. Such information would have to demonstrate, among other things:

1. that all guards reflected in invoices were actually present at the sites and for the times claimed for and as contractually required
2. that those guards were properly and currently licensed
3. that the guards' employing companies are identified
4. that those employing companies are
a. (a) licensed to provide security guard services
b. (b) registered to do business in New York
5. that the guards claimed to be employed by them are and have been properly reported to the New York Department of State on the appropriate forms
6. that specific funds paid by MOCJ to Exodus are based on specific payments to
a. (a) the employing companies
b. (b) the individual guards

The same information will be required for all payments for security service expenses, whether past or to be incurred in the future. The burden is on Exodus to determine and obtain appropriate documentation, but MOCJ believes that documentation should already exist in the form of payroll and bank records and contemporaneously maintained sign-in sheets, among other materials. With respect to security service expenses already invoiced, neither Exodus nor anyone else should now be creating retrospective documentation. Documentation cannot be material created by Watchforce.

Please let me know if you have any questions.

Thank you,

David

David B. Goldin
General Counsel
Mayor's Office of Criminal Justice
1 Centre St., Room 1012N
New York, N.Y. 10007
(646) 576-3498 (o)
(917) 873-8000 (c)
dgoldin@cityhall.nyc.gov

**From:** Julio Medina [jmedina@etcny.org]
**Sent:** 9/29/2022 6:11:17 PM
**To:** Schwam, Keith [kschwam@cityhall.nyc.gov]; Landa, Marjorie [mlanda@cityhall.nyc.gov]; Goldin, David [dgoldin@cityhall.nyc.gov]
**Subject:** [EXTERNAL] Fwd: Questions and information attached
**Attachments:** Outlook-Descriptio.png; Outlook-3thiktpi.png; Outlook-de2ykri0.png; Outlook-skiaummo.png; Outlook-yxbtebok.png; Outlook-152gszwr.png; Presidential Security Company.pdf; Watchforce Contract January 25 - March 31. 2021.pdf; Risk Management Response 9-29-2022.docx

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@oti.nyc.gov as an attachment (Click the More button, then forward as attachment).

I apologize for the delay. Attached are answers to questions and supporting contracts. Below are email exchanges that took place between respective teams.

Thanks for your patience and please let me know you received.

Blessings…

Julio Medina/CEO
Exodus Transitional Community, Inc
2268 3rd Avenue
New York, NY 10035
Office 917-492-0990
http://secure-web.cisco.com/1aTx0KFy5ezOyrymCX_7owoL8Sak6unANBw54r66_Dk6a0dKextnBtszZmFdSjJtR5uqPo7KfZ1TtB1vHDOsNXrQV1dZ1wnpqnJTFMzCEP0Zun5jUGhdG5DaLY8WGr58EtvfZFCykFsIu1NRJbGilVk0MhUU7bny-cgUWKK_GBaSImrQyppDtf4zGbr26AObI3QtQk04jQQwDvNrdAoDV1BDet-zC6pWEwhjRzHo8UlU27I3lUWFzAEVr8aqKNhaaX4DJnxTsDNcPwmSevLdh91tCTHqifzyHzwZyvTIHHa9cIPWPMr55VAy_dQDuWlUJEda_oioeFFoba5jwE5EMipqMfH5O8Vu3exAL2uZAz3k/http%3A%2F%2Fwww.etcny.org%26nbsp;

Begin forwarded message:

**From:** Diana Ortiz <DOrtiz@etcny.org>
**Date:** September 29, 2022 at 5:13:52 PM EDT
**To:** Julio Medina <jmedina@etcny.org>, Ululy Martinez <urm@urmlaw.com>
**Subject: Questions and information attached**

Two documents attached to support answer #2. #8 has a date Dec. 10, 2020. In the Presidential Proposal it references Watchforce role in their agreement with a budget of cost per week, per month, per year. It came in a little less then Global so it looked okay.

Here are some references to the role of Watchforce as a company.

## RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

[redacted]

Berkman-Breen, Joseph

To:
- MacLeod, Alison <AMacLeod@cityhall.nyc.gov>;
- Shawn Dougherty

+5 others

Cc:

- Diana Ortiz

Thu 3/17/2022 12:30 PM

Hi all – is Watchforce technically a subcontractor? My understanding was that International Trendz took over security services for Global and that Watchforce is the business manager for International Trendz who Exodus pays for those security services.

## Watchforce Update

DR

Danielle Rosario

To:
- Chris Dantzler <chriskraze@gmail.com>;
- Diana Ortiz;
- Julio Medina

Thu 3/17/2022 4:55 PM

Start reply with:
Great, thanks for the update.Makes sense.That's great news!
Feedback

Hi All,
Diana and I just got off the phone with the city. They want us to enter into a formal subcontract with Watchforce (since we pay them directly) and then have RSAT and International Trends be second tier subcontractors listed in the Watchforce contract. So our current system will stay in place just now in a very clear manner.

Thanks,
Danielle

**With Gratitude, Diana**

Diana Ortiz, MA, CASAC-T
**(pronouns: she/her/hers – what is this?**
**V.P. of Wellness/Genesis M.H. Centers**
Cell:(914) 645-7665

**2268 Third Avenue**
**New York, NY 10035**
**(917) 492-0990 (ext. 113)**

***"I am no poet, but"*** ***unknown author***

**www.etcny.org**

***You can donate 0.5% of the price of your eligible AmazonSmile purchases to Exodus. Simply sign up here:***

***Join our mailing list here***

***Are you registered to vote? Register to vote online today.***
***Moved recently? Update your information with the NYS Board of Elections.***
***Not sure if you're registered to vote? Search your voter registration status.***
*Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.*

Exodus response to the June 8, 2022 request for information from the Mayor's Office of Risk Management and Compliance:

**1. How did Exodus first learn that Watchforce and/or Chris Dantzler could potentially assist Exodus in providing security services in connection with Exodus's City contracts for services at the reentry hotels?**

At the onset of COVID-19, in March of 2020, MOCJ reached out to Exodus to discuss their plans to provide temporary shelter to people from Rikers Island. At this time, it was well known that Exodus had the expertise and experience to provide services to this population, but Exodus never had any experience managing a reentry housing program. Nevertheless, when MOCJ asked Exodus to help them during a difficult time for New York City, Exodus stepped up to the challenge and began to provide reentry housing and services to the people from Rikers Island at a hotel. This new programming required a substantial amount of attention and capacity building in a short amount of time. MOCJ's confidence in Exodus' ability to handle the work, lead to three additional hotels between March of 2020 and December of 2021, and the additional obligation to provide security and food services.

These reentry housing programs and services for the Rikers Island population came with a unique challenge directly tied to the hiring of Watchforce. Specifically, the security company, Global Security, that Exodus inherited from MOCJ and OEM, created a culture at a hotel that led to hostile interactions between their security staff and Exodus' staff and program participants and an influx of weapons into the hotel. The management of Watchforce became aware of this volatile situation and presented a proposal to Exodus Vice President Diana Ortiz to provide security management services. Exodus had no security management experience and the exigent circumstances lead to the hiring of Watchforce to provide security services at our reentry housing hotel sites. When Global Security abruptly ended their security services, without notice, we engaged Watchforce to expand their security services to other hotels. Watchforce provided the services in a competent manner and helped Exodus avert any harm to the health and wellbeing of the people at our hotel sites.

**2. When did Exodus decide to engage the services of Watchforce in connection with Exodus's City contracts for services at any of the reentry hotels?**

Exodus executed the first contracts for Watchforce security services on January 25, 2021, (see attached contract).

**3. What specific services has Watchforce provided to Exodus in connection with Exodus's City contracts for services at the reentry hotels?**

Watchforce handled all the security needs of Exodus by providing the following one stop shop services: a) sourced and vetted all security staff; b) ensured appropriate level of security staffing and coordinated scheduling; c) handled onboarding and training of security staff; d) implemented security conduct and procedures; e) managed daily operations, walk throughs, emergency

meetings and hotel huddles; f) fielded all issues and complaints; and G) provided periodic updates on the status of the security services to Exodus staff.

**4. Identify by name and job title the individual(s) that perform these services on behalf of Watchforce.**

The individuals by name and title that interacted with Exodus about Watchforce security services were Chris Dantzler, CEO, Ismail Qadar, Managing Partner and Steven Revell M., President.

**5. Has Exodus entered into any business or other transaction with any company in which Chris Dantzler had an ownership interest or by which he is employed? Include Watchforce and any company in which Mr. Dantzler had an interest or employment.**

Yes, Exodus contracted CD James Electric and Watchforce Security, both of which Chris Dantzler held executive positions in.

**6. Has Chris Dantzler ever been employed by Exodus or any related organization as that term is defined in Form 990? If yes, please identify the nature and dates of that employment.**

No.

**7. Who first identified International Trendz, LLC, DBA Presidential Security Company (Presidential), as a potential provider of security services in connection with Exodus's City contracts for services at one or more of the reentry hotels?**

As part of their sourcing and vetting security services, Watchforce identified International Trendz, LLC, DBA Presidential Security Company (Presidential), as a potential provider of security services in connection with Exodus's City contracts for services at one or more of the reentry hotels.

**8. Did Presidential request that Exodus pay Watchforce for services provided by Presidential? If so, provide details, including dates, names of individuals who were party to the communication of such request.**

On a telephone call on or about December 10, 2020 with Ismail Qadar and Chris Dantzler, they jointly instructed Exodus Vice President Diana Ortiz to communicate with Watchforce about the operations and payments for the security services that would be provided by Presidential.

**9. Has Exodus or any employee of Exodus or immediate family member (i.e., spouse/domestic partner, child, sibling, or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly? Include any service, thing of value, or other benefit Exodus or any of the above-specified persons received from any business in which Mr. Dantzler was associated in any way. Include any form of compensation in exchange for any type of service, in any capacity, to any business in which Mr. Dantzler had a position or interest. Include without limitation any agreement, note,**

**loan, loan repayment, advance, investment, dividend, fee, promise, and any form of transfer or contemplated transfer, or other transaction involving anything of value.**

Other than the contracted services that Exodus received from Watchforce or Mr. Dantzler, Exodus does not have any awareness or knowledge that any employee of Exodus or immediate family member of an Exodus employee received, directly or indirectly, anything of value from Watchforce or Mr. Dantzler.

Diana Ortiz
VP of Wellness/Contracts

Office of the Mayor

**Marjorie Landa**
Director
Mayor's Office of Risk Management
and Compliance

**22 Reade Street, 6th Floor**
**New York, NY 10007**

June 6, 2022

Julio Medina
Chief Executive Officer
Exodus Transitional Community, Inc.
2268 Third Avenue
New York, NY 10035

Re: Information Requested from Exodus

Dear Mr. Medina:

Further to our meeting of June 1, 2022, I write to memorialize our request to Exodus Transitional Community, Inc. (Exodus) for records and additional information in relation to Exodus's City contracts for reentry services at various hotels (reentry hotels) and the issues we discussed concerning the associated security services and payments.[1] For the purpose of this request, where we ask for a "record," we intend to include any information recorded on paper and/or electronically. Please provide the requested records and information by June 13, 2022.

[1] Exodus has provided services for formerly incarcerated persons at varying numbers of hotels since approximately April 1, 2020, hereinafter referred to as the reentry hotels, under contracts with the City. The six reentry hotels where Exodus currently provides such services are: (1) the Holiday Inn Express LGA (Queens); (2) the Wyndham Garden Fresh Meadows (Queens); (3) Fairfield Marriot Inn & Suites (LIC Queens); (4) Howard Johnson by Wyndham (LIC Queens); (5) the Wolcott Hotel (Manhattan); and (6) the Tillary Hotel (Brooklyn). A seventh hotel, the Alden Hotel (Bronx), was a reentry hotel where Exodus provided services for several months in 2021. For the purpose of the records and information requested by this letter, the abovementioned seven hotels and all others in which Exodus, under contracts with the City, provided services to formerly incarcerated persons are reentry hotels.

Records requested

| Item No. | Record |
|---|---|
| 1 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus incurred for security services from all vendors in connection with the reentry hotels, including but not limited to Watchforce Security Services, Inc., (Watchforce)[2] from July 1, 2020, through the date of your response. |
| 2 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus paid for security services to all vendors in connection with the reentry hotels, including but not limited to Watchforce from July 1, 2020, through the date of your response. |
| 3 | Bank statements evidencing all payments by Exodus to Watchforce Include images of canceled checks, front and back, for all payments made by check. |
| 4 | All written agreements between Exodus and Watchforce. Include every record that reflects the terms of an agreement under which Watchforce provides or would provide services without regard to its form and whether it was signed. |
| 5 | Records evidencing all instances, if any, in which Exodus identified an error in an invoice it received from Watchforce. |
| 6 | All written agreements in Exodus's custody or control in which any of the following persons and entities is or was a party or a signer: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. Exception: The two subcontract agreements signed 3/17/22 are already on file with the City and need not be provided to us. |
| 7 | All records in Exodus's custody or control evidencing comprehensive general liability insurance coverage maintained by any of the following persons or entities: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. |

[2] Watchforce Security Services, Inc., (Watchforce) is the company named as the Subcontractor in the Subcontract and Subcontract Amendment with Exodus signed on 3/17/2022 and on file with the City. New York State online records reflect that on or about April 5, 2022, a different entity, Watchforce Security Services, LLC, filed articles of organization with the New York Secretary of State. That entity is hereinafter referred to as "Watchforce LLC." If any record or information responsive to any request naming Watchforce concerns, instead or in addition, Watchforce LLC, please provide the record and information, and note that it pertains to Watchforce LLC.

| Item No. | Record |
|---|---|
| 8 | Exodus's most recent audited financial statements and its audited financial statements for the four years immediately preceding the most recent audited financial statements. |
| 9 | Exodus's preliminary financial statements for all reporting years following the most recent audited financial statements. |
| 10 | Exodus's most recent CHAR 500 filed with NYS Attorney General. |
| 11 | Exodus's most recent Form 990 filed with the US Treasury Department, Internal Revenue Service. |
| 12 | The most recent W-2 and/or 1099-MISC Exodus issued for every person required to be listed in Form 990 Part VII line 1a (table) for the reporting year ending 21-31-2021. |
| 13 | Exodus's payroll reports covering compensation paid in May 2022 (Redact Social Security Numbers, Tax Identification Numbers). |
| 14 | All records evidencing any agreement, invoice, service, payment, receipt, note, promise, loan, advance, pledge, contribution, account payable, account receivable, consulting agreement, or any financial transaction or transfer or exchange of anything of value in which any of the following was a party or participant: (1) any person employed by Exodus; (2) Watchforce; (3) Watchforce LLC; (4) International Trendz LLC; (5) Presidential Security Company; (6) RS & T Security Consulting, LLC; (7) RSAT; (8) Chris Dantzler; (9) Ismail Qadar; (10) Steven Muhammad; (11) C.D. James Electric, Inc.; (12) Krazie World Productions, Inc.<br>Exception: The two subcontract agreements between Exodus and Watchforce, signed 3/17/22 are already on file with the City and need not be provided to us. |

Please provide the following records in the possession, custody, or control of Exodus's vendors of security guard services for one or more reentry hotels, including Exodus's direct vendors and all vendors to Exodus's direct vendors.

| Item No. | Record |
|---|---|
| 13 | Payroll records evidencing compensation paid or payable to all security guards and supervisors for work performed in the six current reentry hotels from May 1, 2022, through and including May 22, 2022. |

| Item No. | Record |
|---|---|
| 14 | All records evidencing notice of employment forms filed with or submitted to the New York Department of State for all security guards and supervisors who worked in any of the six current reentry hotels at any between January 1, 2022, and May 22, 2022 (General Business Law §89-g; 19 NYCRR 174.7.) |
| 15 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce incurred from all vendors for security services at all reentry hotels from January 1, 2021, through the date of your response. |
| 16 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce paid to all vendors for security services at all reentry hotels, from January 1, 2021, through the date of your response. |
| 17 | Bank statements evidencing all sums received and all sums paid, transferred, withdrawn or otherwise debited by Watchforce from November 20, 2020, through the date of your response. Include images of canceled checks, front and back, for all payments made by check. |

Additional Information Requested

The questions below concern topics discussed in our meeting.

1. How did Exodus first learn that Watchforce and/or Chris Dantzler could potentially assist Exodus in providing security services in connection with Exodus's City contracts for services at the reentry hotels?

2. When did Exodus decide to engage the services of Watchforce in connection with Exodus's City contracts for services at any of the reentry hotels?

3. What specific services has Watchforce provided to Exodus in connection with Exodus's City contracts for services at the reentry hotels?

4. Identify by name and job title the individual(s) that perform these services on behalf of Watchforce.

5. Has Exodus entered into any business or other transaction with any company in which Chris Dantzler had an ownership interest or by which he is employed? Include Watchforce and any company in which Mr. Dantzler had an interest or employment.

6. Has Chris Dantzler ever been employed by Exodus or any related organization as that term is defined in Form 990? If yes, please identify the nature and dates of that employment.

7. Who first identified International Trendz, LLC, DBA Presidential Security Company (Presidential), as a potential provider of security services in connection with Exodus's City contracts for services at one or more of the reentry hotels?

8. Did Presidential request that Exodus pay Watchforce for services provided by Presidential? If so, provide details, including dates, names of individuals who were party to the communication of such request.

9. Has Exodus or any employee of Exodus or immediate family member (i.e., spouse/domestic partner, child, sibling or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly? Include any service, thing of value, or other benefit Exodus or any of the above-specified persons received from any business in which Mr. Dantzler was associated in any way. Include any form of compensation in exchange for any type of service, in any capacity, to any business in which Mr. Dantzler had a position or interest. Include without limitation any agreement, note, loan, loan repayment, advance, investment, dividend, fee, promise, and any form of transfer or contemplated transfer, or other transaction involving anything of value.

Please let us know if you have any questions. Thank you for your attention and cooperation.

Sincerely,

*Marjorie Landa*

Marjorie Landa

c. Danielle Rosario, Esq., Chief Legal Officer, Exodus
David Goldin, Esq., General Counsel, MOCJ

**From:** "Schwam, Keith" <KSchwam@cityhall.nyc.gov>
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>, Helen Gromadsky <hgromadsky@doi.nyc.gov>, "Landa, Marjorie" <MLanda@cityhall.nyc.gov>, Eleonora Rivkin <ERivkin@doi.nyc.gov>
**Subject:** [EXTERNAL] RE: Exodus
**Date:** Thu, 02 May 2024 16:14:57 -0400
**Importance:** Normal
**Attachments:** Goldin_email_to_Exodus_06032022.pdf; Post-spot-check_Updated_Draft_Recommendations_Security_Services_COVID_Emergency_Housing_5-18-22_.pdf

---

**This Message Is From an External Sender**
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to Cyber Command as an attachment (Click the "Phish Alert Report" button, then "Yes, report it.").

Hi Ivette –as requested, attaching the email MOCJ sent to Exodus in June 2022 with the conditions Exodus would need to meet to charge any further security expenses to the MOCJ hotels contract.

Also attaching a privileged memo we drafted in May 2022 that summarizes results of the unannounced spot checks DSS's field teams conducted that month, at our request, at the 6 Exodus hotels.

The DSS teams' hard copy reports are available here for pickup next week. I can work out a time with Matin if he would like.

Let me know if you need anything else.

Thanks,

Keith

Keith Schwam
First Deputy Director
Mayor's Office of Risk Management and Compliance
22 Reade Street 6th Floor
New York, NY 10007
212 416-7821 (o)
845 573-3749 (m)
kschwam@cityhall.nyc.gov

---

**From:** Ivette Morales <IMorales@doi.nyc.gov>
**Sent:** Thursday, May 2, 2024 2:12 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>; Eleonora Rivkin <ERivkin@doi.nyc.gov>
**Subject:** RE: Exodus

Hi Keith,

Let me know what time works for you and I will give you a call.

Thanks,

Ivette A. Morales/Chief Forensic Auditor
First Deputy Inspector General-Squad 5
NYC Department of Investigation
180 Maiden Lane
New York, NY  10038
Office: 212-825-5938
Cell: 646-235-1205
fax 212-825-0125
imorales@doi.nyc.gov

**From:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Sent:** Thursday, May 2, 2024 1:52 PM
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>; Eleonora Rivkin <ERivkin@doi.nyc.gov>
**Subject:** [EXTERNAL] RE: Exodus

**This Message Is From an External Sender**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to Cyber Command as an attachment (Click the "Phish Alert Report" button, then "Yes, report it.").

Hi Ivette and team – as a follow-up, I wanted to let you know one thought I had about the complaint's reference to a MOCJ "site audit" in June 2022 (paragraph 44, page 11).

I can do this in a quick call if convenient – let me know if you would like to do that.

Thanks,

Keith

Keith Schwam
First Deputy Director
Mayor's Office of Risk Management and Compliance
22 Reade Street 6th Floor
New York, NY 10007
212 416-7821 (o)
845 573-3749 (m)
kschwam@cityhall.nyc.gov

---

**From:** Ivette Morales <IMorales@doi.nyc.gov>
**Sent:** Friday, April 26, 2024 1:04 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>; Eleonora Rivkin <ERivkin@doi.nyc.gov>
**Subject:** RE: Exodus

Hi Keith,

What about next Wednesday May 1st in the afternoon after 1 pm? I would like to include the team working on this matter.

I can set up a Teams Meeting.

Let me know what time works best for you and Marjorie.

Thank you.

Ivette A. Morales/Chief Forensic Auditor
First Deputy Inspector General-Squad 5
NYC Department of Investigation
180 Maiden Lane
New York, NY  10038
Office: 212-825-5938
Cell: 646-235-1205
fax 212-825-0125
imorales@doi.nyc.gov

**From:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Sent:** Friday, April 26, 2024 12:59 PM
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>
**Subject:** [EXTERNAL] RE: Exodus

**This Message Is From an External Sender**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to Cyber Command as an attachment (Click the "Phish Alert Report" button, then "Yes, report it.").

Hi Ivette – LMK when you want to talk.
Thanks,
Keith

---

**From:** Schwam, Keith
**Sent:** Thursday, April 25, 2024 3:54 PM
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>
**Subject:** RE: Exodus

+ Marjorie

---

**From:** Ivette Morales <IMorales@doi.nyc.gov>
**Sent:** Thursday, April 25, 2024 3:21 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>
**Subject:** RE: Exodus

Also, pay close attention to page 18 of 41 that addresses same issues with RS&T.

**From:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Sent:** Thursday, April 25, 2024 2:42 PM
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>
**Subject:** [EXTERNAL] RE: Exodus

**This Message Is From an External Sender**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to Cyber Command as an attachment (Click the "Phish Alert Report" button, then "Yes, report it.").

Thank you – will review the material and get back to you.

---

**From:** Ivette Morales <IMorales@doi.nyc.gov>
**Sent:** Thursday, April 25, 2024 2:41 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>
**Subject:** RE: Exodus

No. Please share with Marjorie.

**From:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Sent:** Thursday, April 25, 2024 2:39 PM
**To:** Ivette Morales <IMorales@doi.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>
**Subject:** [EXTERNAL] RE: Exodus

**This Message Is From an External Sender**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to Cyber Command as an attachment (Click the "Phish Alert Report" button, then "Yes, report it.").

Hi Ivette – Hope all well with you!

As a preliminary matter- any reason I cannot share this with Marjorie?

Thanks,

Keith

---

**From:** Ivette Morales <IMorales@doi.nyc.gov>
**Sent:** Thursday, April 25, 2024 2:34 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>
**Cc:** Matin Modarressi <MModarressi@doi.nyc.gov>; Helen Gromadsky <hgromadsky@doi.nyc.gov>
**Subject:** Exodus

Hi Keith,

Hope all is well.

We would like to speak with you about some sections of the attached lawsuit against Exodus filed by International Trendz, LLC DBA Presidential Security Company.

The lawsuit states (page 12 of 41) that "the Mayor's investigation appeared to suggest that of all the funds that went to Exodus for their security program, a large majority of those funds, literally over $100 million, has been either allocated towards other items, absconded, or outright stolen."

Also, page 17of 41 states that emails in late June 2022, MOCJ discovered that Watchforce was making kickback payments to Exodus employees, etc.

After your review, can you please let us know when is good for you to discuss.

Thank you.

Ivette A. Morales/Chief Forensic Auditor
First Deputy Inspector General-Squad 5
NYC Department of Investigation
180 Maiden Lane
New York, NY 10038
Office: 212-825-5938
Cell: 646-235-1205
fax 212-825-0125
imorales@doi.nyc.gov

Confidentiality Notice: This e-mail communication, and any attachments, contains confidential and privileged information for the exclusive use of the recipient(s) named above. If you are not an intended recipient, or the employee or agent responsible to deliver it to an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and delete this communication from your computer. Thank you.
Confidentiality Notice: This e-mail communication, and any attachments, contains confidential and privileged information for the exclusive use of the recipient(s) named above. If you are not an intended recipient, or the employee or agent responsible to deliver it to an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and delete this communication from your computer. Thank you.
Confidentiality Notice: This e-mail communication, and any attachments, contains confidential and privileged information for the exclusive use of the recipient(s) named above. If you are not an intended recipient, or the employee or agent responsible to deliver it to an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and delete this communication from your computer. Thank you.
Confidentiality Notice: This e-mail communication, and any attachments, contains confidential and privileged information for the exclusive use of the recipient(s) named above. If you are not an intended recipient, or the employee or agent responsible to deliver it to an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and delete this communication from your computer. Thank you.
Confidentiality Notice: This e-mail communication, and any attachments, contains confidential and privileged information for the exclusive use of the recipient(s) named above. If you are not an intended recipient, or the employee or agent responsible to deliver it to an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure,

dissemination, distribution or copying of it or its contents is prohibited. If you have received this communication in error, please notify me immediately by replying to this message and delete this communication from your computer. Thank you.

NYC
Office of the Mayor

**Marjorie Landa**
Director
Mayor's Office of Risk Management
and Compliance

**22 Reade Street, 6th Floor**
**New York, NY 10007**

**To:** **Brendan R. McGuire**
**Chief Counsel to the Mayor and City Hall**

**From:** **Marjorie Landa, Director**
**Keith Schwam, First Deputy Director**
**Mayor's Office of Risk Management and Compliance**

**Date:** **May 18, 2022**

**Re:** **Privileged and Confidential Draft Recap and Update to Draft Recommendations re Risks in NYC COVID Emergency Housing Programs**

---

CONFIDENTIAL

This memo summarizes the results of the unannounced spot checks the NYC Department of Social Services' field teams conducted at MORMC's request at the six Exodus hotels on May 11, 2022, and proposes next steps for MORMC to take, in cooperation with the Mayor's Office of Criminal Justice, to determine the facts underlying areas where our preliminary review identified potential risks to the City.

**Preliminary recap of spot checks of security services at the 6 Exodus hotels**

DSS field teams simultaneously visited six Exodus hotels on the morning of May 11, 2022, entering the hotels between approximately 9:25 a.m. and 9:46 a.m.[1]

The DSS field teams learned through their field visits that the security personnel work three 8-hour shifts at the hotels (7 a.m. – 3 p.m., 3 p.m. – 11 p.m., and 11 p.m. – 7 a.m.). The field visits thus began about 2.5 hours into the 7 a.m. – 3 p.m. shift. All spot checks were concluded before 12 p.m.

The six Exodus hotels are: (1) the Holiday Inn Express LGA (Queens); (2) the Wyndham Garden Fresh Meadows (Queens); (3) Fairfield Marriot Inn & Suites (LIC Queens); (4) Howard Johnson by Wyndham (LIC Queens); (5) the Wolcott Hotel (Manhattan); and (6) the Tillary Hotel (Brooklyn). Based on the 3-shift security schedule, the DSS field teams spot-checked an estimated 1/3 of the security personnel we would expect to be working at different times in the 6 hotels.

---

[1] Five teams entered the hotels at 9:25 a.m. The sixth team entered the Tillary Hotel at 9:46 a.m. after a brief delay in locating the building—a result of confusion regarding its street address. In addition, one team's request at 9:25 a.m. to speak with the security supervisor in charge was denied by hotel staff at the Wolcott Hotel for approximately 28 minutes, during which MOCJ and MORMC requested Exodus's cooperation, which was given. Ultimately, all teams were able to find, account for, and speak with the security staff who were present at all six hotels, identify supervisors who arrived late, after the teams had arrived, and obtain requested copies of every security guard's license or photo ID, sign-in sheets, and other relevant documents. To the extent that hotel video recording systems were in use, their presence was identified and noted in several teams' reports, but the teams did not obtain, or press for, immediate access, in accordance with our pre-visit instructions.

CONFIDENTIAL

**<u>Security Staffing Levels Found</u>**

DSS field teams found a total of 45 security personnel at the 6 Exodus hotels: 36 guards and 9 supervisors. That number was 7 (13 percent) short of the 52 minimum security personnel we anticipated finding (40 guards and 12 supervisors) based on the available Watchforce/Presidential invoices. [2] (As of the date of the spot checks, MOCJ had received Watchforce/Presidential invoices for 4 of the 6 Exodus hotels, all for services rendered before March 14, 2022. As of May 9, 2022, MOCJ had not yet received any invoices from Exodus covering security services rendered after March 13, 2022, at any of the hotels.)[3]

A deficit of 4 guards and 3 supervisors in a single 8-hour shift would translate to an overcharge of $3,320 for that shift, if Watchforce and Exodus billed MOCJ for full staffing at the contractual hourly rates.

All sampled invoices we reviewed before the spot checks showed that Watchforce/Presidential billed Exodus, and Exodus billed MOCJ, for full security staffing; no variation was found in the sampled invoices. If the 13 percent deficit in actual staffing compared with full, invoiced staffing is representative of Watchforce's overall billing, the $21 million Watchforce billed for the 26-month period covered by its invoices could potentially include $2.73 million for services that were not rendered.[4] Moreover, of the 9 supervisors found during the spot checks, 2 arrived respectively 2.5 and 3 hours after the start of the shift, indicating additional discrepancies between the anticipated staffing levels and the amounts invoiced, in the event Watchforce/Presidential were to bill Exodus and MOCJ for those hours where the supervisor in question was not present at the designated hotel.

The following three tables compare the anticipated minimum numbers of security guards and supervisors with the numbers found during the spot checks for:

- all 6 Exodus hotels (Figure 1);
- the subgroup of 4 Exodus hotels for which MOCJ had Watchforce/Presidential invoices on file (Figure2); and
- the subgroup of 2 Exodus hotels for which MOCJ had not yet received Watchforce/Presidential invoices from Exodus (Figure 3).

---

[2] The sampled invoices on their face appear to have been issued by both Presidential Security Company and Watchforce Security Services using Watchforce's New York address.

[3] The 2 hotels for which MOCJ did not have Watchforce/Presidential invoices, the Holiday Inn Express LGA, and the Wyndham Garden Fresh Meadows, were previously staffed by Global Operations Security, Inc. through March 13, 2022, the date Global ceased providing services. Watchforce, which was already responsible for ensuring sufficient security guard service at the other 4 hotels, then became responsible for security at the 2 abovementioned hotels. As of May 9, 2022, MOCJ had not yet received invoices from Exodus covering security services rendered at any of the 6 Exodus hotels after March 13, 2022. Thus, MOCJ did not have any Watchforce/Presidential invoices on file for the 2 hotels previously served by Global. We based our anticipated security staffing levels at those 2 hotels on the minimum staffing levels (6 guards and 2 supervisors per hotel) reflected in the sampled Presidential/Watchforce invoices for the other 4 hotels.

[4] We have not determined the degree to which this single spot check is reflective of Watchforce/Presidential's previously invoiced staffing levels.

**Figure 1 - Security Staff Found at 6 Exodus Hotels**

| Anticipated Minimum Security Staffing Level for 6 Exodus Hotels: | Actual Security Staffing Level Found in Spot Checks at 6 Exodus Hotels: |
|---|---|
| 52 security personnel * | 45 security personnel found (-7) * |
| - 40 guards | - 36 guards (-4) |
| - 12 supervisors | - 9 supervisors (-3) ** |
| ** Anticipated minimum based on (a) reported staffing levels for 4 hotels with Watchforce/Presidential invoices on file at MOCJ; and (b) for the 2 hotels with no Watchforce/Presidential invoices, the **lowest** staffing levels reflected in sampled invoices for the other 4 hotels = 6 guards and 2 supervisors per hotel.* | ** Deficit compared with anticipated minimum.*<br>*** Of the 9 supervisors found, 2 arrived late, respectively, 2.5 and 3 hours after the start time of the 7 a.m. – 3 p.m. security shift, and after DSS Field Teams sought entry to the hotels.* |

**At the 4 hotels for which MOCJ had received Watchforce/Presidential invoices**, DSS field teams found 32 security guards and supervisors, a net deficit of (-4) (11 percent) security personnel (-2 guards/2 supervisors) compared with previous invoice levels at each hotel.

**Figure 2 - Security Staff Found at 4 Exodus Hotels with Watchforce/Presidential Invoices on File**

| Invoiced Security Staffing Total: | Actual Security Staffing Total Found in Spot Checks: |
|---|---|
| 36 security personnel invoiced* | 32 security personnel found (-4) |
| - 28 guards | - 26 guards (-2) |
| - 8 supervisors | - 6 supervisors (-2) * |
| **Sampled invoices obtained from MOCJ reflected uniform staffing levels, by hotel, throughout the sampled weeks on dates preceding the spot checks.* | ** Of the 6 supervisors found, 2 arrived late, respectively, 2.5 and 3 hours after the start time of the security shifts, and after DSS Field Teams announced their presence and asked to speak with the security supervisor in charge.* |

**At the 2 hotels formerly staffed by Global, for which MOCJ had not yet received any Watchforce/Presidential invoices**, the DSS field teams found 13 guards and supervisors. That total reflects a net deficit of (-3) (19 percent) security personnel (-2 guards/1 supervisor) compared with the **lowest** security staffing levels reflected in the sampled Watchforce / Presidential invoices for the 4 hotels for which MOCJ had Watchforce/Presidential invoices on file.

**Figure 3 - Security Staff Found at 2 Exodus Hotels with No Watchforce/Presidential Invoices on File**

| Anticipated Minimum Security Staffing Level: | Actual Security Staffing Level Found in Spot Checks: |
|---|---|
| 16 security personnel "anticipated minimum" * | 13 security personnel found (-3) * |
| - 12 guards | - 10 guards (5 at each hotel) (-2) |
| - 4 supervisors | - 3 supervisors (-1) |
| ** Anticipated minimum based on lowest staffing levels reflected in sampled Watchforce / Presidential invoices for the 4 other hotels= 6 guards and 2 supervisors per hotel, minimum.* | ** Deficit compared with anticipated minimum.* |

CONFIDENTIAL

**License Status of the Security Guards and Supervisors Found at the Exodus Hotels**

The DSS spot checks and follow-up online verification by MORMC (May 16-17) revealed that 44 of the 45 guards and supervisors found at the 6 Exodus hotels are licensed security guards. However, the 1 remaining person—a supervising security guard—presented an expired license. That supervisor does not have a current valid license as a security guard, according to the NYS DOS Licensing Division's online registry.[5]

**Figure 4 - License Status of 45 Security Guards and Supervisors Found at the 6 Exodus hotels**

| | |
|---|---|
| NYS DOS Registration Card (license) presented to DSS teams and/or license verified by MORMC: 44 (98 percent) | No current security guard license: 1 (2 percent) – a supervising security guard |

**Employers identified by the 45 security guards and supervisors at the 6 Exodus hotels:**

In brief interviews with DSS field teams, the 45 security personnel found at the 6 Exodus hotels orally identified one of three licensed companies as their employers and said they were paid by those employers, generally by direct deposit. MORMC checked the NYS DOS Licensing Division's online rosters for the named employers and found:

(1) Of the 21 guards and supervisors who said they were employed by Presidential Security Company (the assumed name of International Trendz LLC), only 2 (10 percent) are listed on Presidential Security's online roster.

(2) None of the 20 guards and supervisors who said they are employed by "RSAT" [*sic*] are on RS & T Security Consulting LLC's online roster (the NYS DOS online record states that no currently licensed guards work for the company).

(3) Of the 4 guards who said they were employed by MG Security Services LLC, 3 (75 percent) are on its online roster. MG Security Services is not identified as a security subcontractor in any of the MOCJ documents we reviewed, and we do not know whether MOCJ was previously informed of its participation.

The mismatches between the numbers of guards and supervisors who said they work for the above-mentioned companies and the online rosters for those companies raise the question of whether the companies have complied with their legal obligations to notify the NYS DOS Licensing Division of each security guard they employ.

CONFIDENTIAL

[5] The DSS field teams (1) obtained copies of the photo-ID licenses of 43 guards and supervisors, and other NYS-issued photo ID for the remaining 2 guards who did not present security guard licenses to the DSS teams, and (2) ensured by visual observation that the licenses and other photo IDs matched the guards and supervisors presenting them. MORMC then checked all the names and ID numbers the DSS field teams obtained against the NYS DOS Licensing Division's online registry.

**Figure 5 Employers Identified by Security Guards and Supervisors during the Spot Checks**

| **Presidential Security Company - 21** | RSAT [*sic*] - 20 | **MG Security Services - 4** |
|---|---|---|
| Licensed Watch Guard or Patrol agency with a NYS-maintained online roster of 43 licensed security guards.<br><br>However, only 2 (10 percent) of the 21 guards and supervisors who named Presidential as their employer are listed in its online roster maintained by the NYS DOS Licensing Division. | RS &T Security Consulting LLC is a licensed Watch Guard or Patrol agency. Its NYS DOS Licensing Division online record, last checked May 16, 2022, states, "There are no currently licensed Guards who work for this Employer." | MG Security Services LLC is not identified in Watchforce's subcontract with Exodus as a "Tier 2" subcontractor to Watchforce.<br><br>The company is a licensed private investigator and therefore allowed to employ and furnish licensed security guards to customers.<br><br>The company's NYS DOS Licensing Division online record, last checked May 17, 2022, shows a roster of 919 licensed security guards, including 3 of the 4 guards found during the spot checks who named MG Security Services as their employer. |

CONFIDENTIAL

**Follow up recommendations for additional inquiries:**

**Proposed Step 1 – Brief MOCJ** on results of spot checks; develop interim safeguards to prevent overpayment for absent, late, and unlicensed security guards and supervisors, pending a more complete audit.[6] In addition, given the various compliance issues raised (corporate registration, licensing, possible State tax reporting), advise MOCJ to check for or obtain documentation establishing that Exodus, Watchforce, and the "Tier" 2 security subcontractors are in compliance with their contractual obligations to maintain insurance coverage protecting the City.

**Proposed Step 2 - Meet with Exodus to discuss the areas of concern identified in this review.**
**Obtain** Exodus's account of certain issues identified in this review, including a discussion of the following areas of concern:

- staffing levels observed in last week's spot checks vs invoiced staffing;
- the presence of an unlicensed security supervisor;
- the existence of back up documentation to support actual staffing levels for previously invoiced periods;
- controls over the license status, attendance, and punctuality of security personnel;
- controls over the reliability of the security personnel's sign-in records;
- controls to reconcile billings for security personnel with the corresponding sign-in and attendance records;
- tax and corporate-registration compliance issues relating to Watchforce;
- Exodus's awareness of the participation of MG Security Services LLC as an employer of guards working in the Exodus hotels;
- licensing compliance issues involving Watchforce, Presidential security Company, and RS & T, including mismatches between the guards identified in the spot checks and the online rosters of the latter 2 companies; and

[6] MOCJ should also be informed of the connection between Watchforce's principal and Exodus found on Exodus's public website.

- the money flow among and between Exodus, Watchforce, and the other security companies identified in this review.

Ask Exodus to provide a full explanation of the origin and status of its security subcontracting for the Exodus hotels, including the origin of its dealings with each of the three security companies it identified as subcontractors: Watchforce, International Trendz, and RS & T. In that regard, Exodus should be asked about its connections with Watchforce and its principal—apart from the security subcontracts filed with MOCJ, including but not limited to the identification of Watchforce's principal as a coordinator for an Exodus program found on Exodus's website.

Require Exodus to update information in the Payee Information Portal to reflect its MOCJ-approved subcontractors and its payments to them.

**Proposed Step 3 – Request documents from Exodus and Watchforce for the period of January 2021 through the date(s) of their response(s). This step can be taken at or in advance of the proposed meeting referenced above.** The documents requested are relevant to the following issues: (1) the amount Exodus paid Watchforce and/or any other third parties compared with the amounts Exodus and Watchforce claimed in the invoices submitted to and paid by MOCJ; (2) the amounts Watchforce paid to its Tier 2 subcontractors for security guards for the Exodus hotels; (3) whether Watchforce has written agreements with the 3 companies that the security guards working at the Exodus hotels named as their employers; (4) whether Presidential Security Company and RS & T Security Consulting LLC have provided or can provide Watchforce and Exodus with proof of compliance with their regulatory obligations to notify the NYS DOS within 15 days of employing the security guards working for them at the Exodus hotels; and (5) whether Watchforce, the NJ corporation, has taken steps to comply with its corporate registration and tax reporting obligations in New York.

a. <u>**Exodus**</u>:

   i. All documents evidencing payments by Exodus to its subcontractor[s] for security services at the 6 Exodus hotels, including but not limited to bank statements reflecting the dates, amounts, and payees of all payments Exodus made by any means, with images of all checks, and details of all electronic payments.

   ii. The documents requested from Watchforce (listed below) should also be requested form Exodus.

b. <u>**Watchforce Security Services, Inc**</u>. (NJ Corporation):

   i. All documents evidencing agreements that Watchforce has or had with any person or entity that has provided or agreed to provide security personnel and related services at the 6 Exodus hotels.

   ii. All documents evidencing employment of the security guards and supervisors who worked at any of the 6 Exodus hotels.

   iii. All documents evidencing notifications by or for RS & T Security Consulting LLC to the New York State Department of State of the employment, retirement, resignation, or termination of any security guard that RS & T Security Consulting LLC employed and assigned to work at any of the 6 Exodus hotels.

   iv. All documents evidencing notifications by or for International Trendz LLC dba Presidential Security Company to the New York State Department of State of the employment, retirement, resignation, or termination of any security guard that Presidential Security Company employed and assigned to work at any of the 6 Exodus hotels.

CONFIDENTIAL

v. All documents evidencing payments Watchforce received from Exodus, including but not limited to bank statements with images of deposits and credits.

vi. All documents evidencing payments by Watchforce to any person or entity, including but not limited to International Trendz LLC dba Presidential Security Company. RS & T Security Consulting LLC, MG Security Services LLC, and any individual for security personnel and related services at the 6 Exodus hotels, including but not limited to bank statements reflecting the dates, amounts, and payees of all payments Watchforce made by any means, with images of canceled checks and details of all electronic payments.

vii. All documents evidencing communications between Watchforce and the New York State Department of State concerning Watchforce's authorization as a foreign (New Jersey) corporation to do business in New York.

viii. All documents evidencing communications between Watchforce and the New York State Department of Taxation and Finance concerning action taken by Watchforce to obtain the New York State tax commissioner's consent to register as a foreign corporation.

ix. All documents evidencing actions taken by and for Watchforce to ensure that all tax returns due to the State of New York are filed and all taxes due to the State of New York are paid.

**Proposed Step 4 - Review the results of the preceding steps to determine what further steps are necessary and appropriate to protect the City's interests.** These may include selecting a CPA, to be paid by Exodus and Watchforce, to conduct an audit of the two firms' billings to MOCJ for security services and of the adequacy of the controls over those billings and the related licensing and timekeeping records.

<u>**Additional Issues Highlighted by this Review**</u>

1. **Questions about practices in the security guard industry as a whole.** The discrepancies in invoicing and staffing found among the security companies employed at the six hotels Exodus manages for MOCJ raise questions about practices in the security guard industry that we believe warrant further examination to determine whether City agencies that procure security guard services or reimburse contractors for procuring and obtaining such services are exposed to financial, operational, or reputational risk as a result of industry practices.

   - **Recommendation**: Further inquiry to determine the extent to which the Exodus security subcontractors' failures to adhere to State reporting and other requirements found by this investigation are also common with other security contractors employed by the City and determine the best ways to address any problems found.

2. **Issues related to procurements made as part of the City's emergency response to the pandemic:** MOCJ's Exodus contract arose in the context of the COVID pandemic emergency response, during which time MOCJ (and other agencies, including NYCEM and DCAS) were tasked with procuring goods and services in vastly increased amounts and in areas with which the agencies had little experience and/or capacity to oversee.

   - **Recommendation**: Analyze the extent to which, as has been reported in multiple audits and the media, agencies tasked with the emergency procurements of goods and services were inadequately prepared to oversee the contracts they entered into and how best to address these deficiencies in the broader context of emergency procurement policies and practices in preparation for the next emergency. This inquiry could ultimately result in the development of procurement requirements that

CONFIDENTIAL

would better ensure the vending agencies have adequate oversight of emergency contracts with regard to performance and payment in the event of future emergencies.

CONFIDENTIAL

Office of the Mayor

**Marjorie Landa**
Director
Mayor's Office of Risk Management
and Compliance

**22 Reade Street, 6th Floor**
**New York, NY 10007**

June 8, 2022

Julio Medina
Chief Executive Officer
Exodus Transitional Community, Inc.
2268 Third Avenue
New York, NY 10035

Re: Information Requested from Exodus

Dear Mr. Medina:

Further to our meeting of June 1, 2022, and superseding my letter dated June 6, 2022, I write to memorialize our request to Exodus Transitional Community, Inc. (Exodus) for records and additional information in relation to Exodus's City contracts for reentry services at various hotels (reentry hotels) and the issues we discussed concerning the associated security services and payments.[1] For the purpose of this request, where we ask for a "record," we intend to include any information recorded on paper and/or electronically. Please provide the requested records and information by June 15, 2022.

[1] Exodus has provided services for formerly incarcerated persons at varying numbers of hotels since approximately April 1, 2020, hereinafter referred to as the reentry hotels, under contracts with the City. The six reentry hotels where Exodus currently provides such services are: (1) the Holiday Inn Express LGA (Queens); (2) the Wyndham Garden Fresh Meadows (Queens); (3) Fairfield Marriot Inn & Suites (LIC Queens); (4) Howard Johnson by Wyndham (LIC Queens); (5) the Wolcott Hotel (Manhattan); and (6) the Tillary Hotel (Brooklyn). A seventh hotel, the Alden Hotel (Bronx), was a reentry hotel where Exodus provided services for several months in 2021. For the purpose of the records and information requested by this letter, the abovementioned seven hotels and all others in which Exodus, under contracts with the City, provided services to formerly incarcerated persons are reentry hotels.

Records requested

| Item No. | Record |
|---|---|
| 1 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus incurred for security services from all vendors in connection with the reentry hotels, including but not limited to Watchforce Security Services, Inc., (Watchforce)[2] from July 1, 2020, through the date of your response. |
| 2 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus paid for security services to all vendors in connection with the reentry hotels, including but not limited to Watchforce from July 1, 2020, through the date of your response. |
| 3 | Bank statements evidencing all payments by Exodus to Watchforce. Include images of canceled checks, front and back, for all payments made by check. |
| 4 | All written agreements between Exodus and Watchforce. Include every record that reflects the terms of an agreement under which Watchforce provides or would provide services without regard to its form and whether it was signed. |
| 5 | Records evidencing all instances, if any, in which Exodus identified an error in an invoice it received from Watchforce. |
| 6 | All written agreements in Exodus's custody or control in which any of the following persons and entities is or was a party or a signer: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. Exception: The two subcontract agreements signed 3/17/22 are already on file with the City and need not be provided to us. |
| 7 | All records in Exodus's custody or control evidencing comprehensive general liability insurance coverage maintained by any of the following persons or entities: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. |

[2] Watchforce Security Services, Inc., (Watchforce) is the company named as the Subcontractor in the Subcontract and Subcontract Amendment with Exodus signed on 3/17/2022 and on file with the City. New York State online records reflect that on or about April 5, 2022, a different entity, Watchforce Security Services, LLC, filed articles of organization with the New York Secretary of State. That entity is hereinafter referred to as "Watchforce LLC." If any record or information responsive to any request naming Watchforce concerns, instead or in addition, Watchforce LLC, please provide the record and information, and note that it pertains to Watchforce LLC.

| Item No. | Record |
|---|---|
| 8 | Exodus's most recent audited financial statements and its audited financial statements for the four years immediately preceding the most recent audited financial statements. |
| 9 | Exodus's preliminary financial statements for all reporting years following the most recent audited financial statements. |
| 10 | Exodus's most recent CHAR 500 filed with NYS Attorney General. |
| 11 | Exodus's most recent Form 990 filed with the US Treasury Department, Internal Revenue Service. |
| 12 | The most recent W-2 and/or 1099-MISC Exodus issued for every person required to be listed in Form 990 Part VII line 1a (table) for the reporting year ending 12-31-2021. |
| 13 | Exodus's payroll reports covering compensation paid in May 2022 (Redact Social Security Numbers, Tax Identification Numbers). |
| 14 | All records evidencing any agreement, invoice, service, payment, receipt, note, promise, loan, advance, pledge, contribution, account payable, account receivable, consulting agreement, or any financial transaction or transfer or exchange of anything of value in which any of the following was a party or participant: (1) any person employed by Exodus; (2) Watchforce; (3) Watchforce LLC; (4) International Trendz LLC; (5) Presidential Security Company; (6) RS & T Security Consulting, LLC; (7) RSAT; (8) Chris Dantzler; (9) Ismail Qadar; (10) Steven Muhammad; (11) C.D. James Electric, Inc.; (12) Krazie World Productions, Inc. Exception: The two subcontract agreements between Exodus and Watchforce, signed 3/17/22 are already on file with the City and need not be provided to us. In addition, if (a) the record evidences a routine transaction in which an Exodus employee, acting within the scope of their employment, and in the regular course of Exodus's business, provided a service or something of value to a program participant who is neither named nor associated with any of the persons and entities named in numbers 2 through 12 of this item, and (b) the record was made in the regular course of Exodus's business, contemporaneously with the transaction or event reflected therein, then the record need not be provided to us. |

 

Please provide the following records in the possession, custody, or control of Exodus's vendors of security guard services for one or more reentry hotels, including Exodus's direct vendors and all vendors to Exodus's direct vendors.

| Item No. | Record |
|---|---|
| 15 | Payroll records evidencing compensation paid or payable to all security guards and supervisors for work performed in the six current reentry hotels from May 1, 2022, through and including May 22, 2022. |
| 16 | All records evidencing notice of employment forms filed with or submitted to the New York Department of State for all security guards and supervisors who worked in any of the six current reentry hotels at any between January 1, 2022, and May 22, 2022 (General Business Law §89-g; 19 NYCRR 174.7.) |
| 17 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce incurred from all vendors for security services at all reentry hotels from January 1, 2021, through the date of your response. |
| 18 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce paid to all vendors for security services at all reentry hotels, from January 1, 2021, through the date of your response. |
| 19 | Bank statements evidencing all sums received and all sums paid, transferred, withdrawn or otherwise debited by Watchforce from November 20, 2020, through the date of your response. Include images of canceled checks, front and back, for all payments made by check. |

Additional Information Requested

The questions below concern topics discussed in our meeting.

1. How did Exodus first learn that Watchforce and/or Chris Dantzler could potentially assist Exodus in providing security services in connection with Exodus's City contracts for services at the reentry hotels?

2. When did Exodus decide to engage the services of Watchforce in connection with Exodus's City contracts for services at any of the reentry hotels?

3. What specific services has Watchforce provided to Exodus in connection with Exodus's City contracts for services at the reentry hotels?

4. Identify by name and job title the individual(s) that perform these services on behalf of Watchforce.

5. Has Exodus entered into any business or other transaction with any company in which Chris Dantzler had an ownership interest or by which he is employed? Include Watchforce and any company in which Mr. Dantzler had an interest or employment.

6. Has Chris Dantzler ever been employed by Exodus or any related organization as that term is defined in Form 990? If yes, please identify the nature and dates of that employment.

7. Who first identified International Trendz, LLC, DBA Presidential Security Company (Presidential), as a potential provider of security services in connection with Exodus's City contracts for services at one or more of the reentry hotels?

8. Did Presidential request that Exodus pay Watchforce for services provided by Presidential? If so, provide details, including dates, names of individuals who were party to the communication of such request.

9. Has Exodus or any employee of Exodus or immediate family member (i.e., spouse/domestic partner, child, sibling or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly? Include any service, thing of value, or other benefit Exodus or any of the above-specified persons received from any business in which Mr. Dantzler was associated in any way. Include any form of compensation in exchange for any type of service, in any capacity, to any business in which Mr. Dantzler had a position or interest. Include without limitation any agreement, note, loan, loan repayment, advance, investment, dividend, fee, promise, and any form of transfer or contemplated transfer, or other transaction involving anything of value.

Please let us know if you have any questions. Thank you for your attention and cooperation.

Sincerely,

*Marjorie Landa*

Marjorie Landa

c. Danielle Rosario, Esq., Chief Legal Officer, Exodus
David Goldin, Esq., General Counsel, MOCJ

**From:** Danielle Rosario [drosario@etcny.org]
**Sent:** 6/16/2022 8:53:35 PM
**To:** Calabrese, Anna [acalabrese@justice.nyc.gov]; Berkman-Breen, Joseph [jberkmanbreen@cityhall.nyc.gov]; Montoya, Jordan [jmontoya@cityhall.nyc.gov]; Goldin, David [dgoldin@cityhall.nyc.gov]; Schwam, Keith [kschwam@cityhall.nyc.gov]; Landa, Marjorie [mlanda@cityhall.nyc.gov]
**CC:** Julio Medina [jmedina@etcny.org]; Diana Ortiz [DOrtiz@etcny.org]; Jennifer Kaake [JKaake@etcny.org]; Tomasina Salcedo [tsalcedo@etcny.org]
**Subject:** [EXTERNAL] Role Update

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hello All,

As of yesterday, I am no longer employed in any capacity related to legal matters or the practice of law at Exodus Transitional Community, Inc. Please continue to direct your communications to my capable colleagues copied here, and refrain from including me. Thank you for allowing me to collaborate and contribute to the genuinely life-changing work the partnership between MOCJ & Exodus allows every single day. I remain committed to the Exodus mission and I am eager to serve in a new and exciting way. Thank you again!

Sincerely,
Danielle Rosario
Exodus Transitional Community, Inc.
2271 Third Avenue
New York, NY 10035
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

Exodus
TRANSITIONAL COMMUNITY, INC.
CHANGING LIVES • RESTORING HOPE

Office of the Mayor

**Marjorie Landa**
Director
Mayor's Office of Risk Management
and Compliance

**22 Reade Street, 6th Floor**
**New York, NY 10007**

September 21, 2022

Julio Medina
Chief Executive Officer
Exodus Transitional Community, Inc.
2268 Third Avenue
New York, NY 10035

Re: Information Requested from Exodus

Dear Mr. Medina:

I write to update the list of the records and information received and the items that remain outstanding in response to our written request of June 8, 2022, as of September 21, 2022. As previously noted, our June 8th request for certain documents and other information contained a list of nine questions and followed our meeting of June 1, 2022, all of which concerned Exodus's contract with the City for the provision of reentry services at several hotels.

As three months have passed since our initial request, we infer that Exodus does not intend to produce additional records or respond to the written questions we sent. However, if Exodus intends to produce additional material and respond to our questions, please inform me directly upon Exodus's receipt of this letter. Thank you for your prompt attention to this matter.

Sincerely,

*Marjorie Landa*

Marjorie Landa

c. David Goldin, Esq., General Counsel, MOCJ

**APPENDIX**



Status of Exodus's Production of Records Requested in our June 8 Letter:

| Item No. | Record requested | Status |
|---|---|---|
| 1 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus incurred for security services from all vendors in connection with the reentry hotels, including but not limited to Watchforce Security Services, Inc., (Watchforce)[1] from July 1, 2020, through the date of your response. | Received, as of July 5, 2022, 3 AP ledgers and an explanatory note. |
| 2 | Accounts Payable Ledger or equivalent record evidencing all charges Exodus paid for security services to all vendors in connection with the reentry hotels, including but not limited to Watchforce from July 1, 2020, through the date of your response. | See status of Item #1, above. |
| 3 | Bank statements evidencing all payments by Exodus to Watchforce. Include images of canceled checks, front and back, for all payments made by check. | Received, as of July 5, 2022, 23 monthly bank statements for Exodus and 176 Exodus checks payable to Watchforce (front of checks only). |

[1] Watchforce Security Services, Inc., (Watchforce) is the company named as the Subcontractor in the Subcontract and Subcontract Amendment with Exodus signed on 3/17/2022 and on file with the City. New York State online records reflect that on or about April 5, 2022, a different entity, Watchforce Security Services, LLC, filed articles of organization with the New York Secretary of State. That entity is hereinafter referred to as "Watchforce LLC." Our request instructed that If any record or information responsive to any request naming Watchforce concerned, instead or in addition, Watchforce LLC, that Exodus provide the record and information, and note that it pertained to Watchforce LLC. No note indicating that any record provided pertained to Watchforce LLC was included in Exodus's response.

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| 4 | All written agreements between Exodus and Watchforce. Include every record that reflects the terms of an agreement under which Watchforce provides or would provide services without regard to its form and whether it was signed. | Received, as of July 5, 2022, 2 subcontract agreements signed 3/17/22 (received June 16, 2022).<br>**Update as of September 21, 2022**:<br>Received the following additional documents (file names as received):<br>- Watchforce Contract January 25 – March 31.pdf<br>- Watchforce Contract March 1 – March 31. 2021.pdf<br>- Watchforce Contract April 1 – June 30. 2021.pdf<br>- Watchforce Contract July 1 – Dec. 31. 2021.pdf<br>- Watchforce Contract Oct. 11 – Dec 31. 2021.pdf |
| 5 | Records evidencing all instances, if any, in which Exodus identified an error in an invoice it received from Watchforce. | Received, as of July 5, 2022, an Excel file named "February Reconciliation," referring to February 2022, and an explanatory note. |

**APPENDIX**



| | | |
|---|---|---|
| 6 | All written agreements in Exodus's custody or control in which any of the following persons and entities is or was a party or a signer: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. Exception: The two subcontract agreements signed 3/17/22 are already on file with the City and need not be provided to us. | Received, as of July 5, 2022: (1) a signed 52-page document (pdf) captioned "subcontract" signed by Exodus (6/13/2022) and International Trendz LLC, DBA Presidential Security Company (Presidential) (3/21/22); (2) an unsigned 19-page document (pdf) that identifies Presidential as a potential security provider, with "estimated costs" for "December 1, 2020 – December 31, 2021"; (3) an unsigned 52-page document (pdf) captioned "subcontract" naming Exodus and RS & T Security Consulting LLC as potential parties, for a term beginning March 21, 2022, and ending June 30, 2022, attached to an email dated 6/6/2022, from Exodus to "RSAT Security," referring to the attachment as a draft subcontract; (4) a 12-page Microsoft Word document, unsigned, named "Presidential and Watchforce Subcontractor Agreement"; (5) a 12-page Microsoft Word document, unsigned, named "Presidential and Watchforce Subcontractor AMENDMENT"; (6) a 12-page Word document, unsigned, named "RSAT and Watchforce Agreement."<br>**Update as of September 21, 2022:** Received the following additional documents (file names as received):<br>- RSAT Security Agreement_WSS_LIC2_Fairfield.pdf<br>- Management Agreement – Watchforce & Presidential.pdf |

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| | | See update to Item 4 re other documents that may be responsive to this request. |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| | | |
|---|---|---|
| 7 | All records in Exodus's custody or control evidencing comprehensive general liability insurance coverage maintained by any of the following persons or entities: (1) Watchforce; (2) International Trendz LLC; (3) Presidential Security Company; (4) RS & T Security Consulting, LLC; (5) RSAT; (6) Chris Dantzler; (7) Ismail Qadar; (8) Steven Muhammad. | Received, as of July 5, 2022: copies of several documents captioned as certificates of insurance. For International Trendz LLC DBA Presidential Security Company, we received: (1) a certificate for "DBL517119" (referring to a policy number and NYS law concerning disability and paid family leave benefits); and (2) a 3-page document captioned "certificate of liability insurance" (identifying Intech Construction LLC as "certificate holder" and several additional insureds, all located in another state, and none of which is Exodus or the City of New York).<br>For RS & T: (1) a 1-page document captioned "certificate of workers' compensation insurance; and (2) a 2-page document for "DBL 7612 76-6" (referring to a policy number and NYS law concerning disability and paid family leave benefits).<br>**Update as of September 21, 2022:**<br>Received the following two additional documents (file names as received):<br>- NFS_Insurance.pdf<br>- MG Security Insurance.pdf<br>***NB** – Exodus did not provide documents showing that any of the following persons and entities maintained comprehensive general liability (CGL) insurance coverage: (1) Watchforce; (2) RS & T Security Consulting, LLC, AKA RSAT; (3) Chris Dantzler; (4) Ismail Qadar; (5) Steven Muhammad. |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| | | In addition, the documents that Exodus provided indicate that neither the City of New York nor any City agency is named as an additional insured in the CGL insurance coverage maintained by (1) International Trendz, LLC, DBA Presidential Security Company; (2) NFS; and (3) MG Security, the three entities that maintained some form of CGL coverage, according to the documents provided. |
| 8 | Exodus's most recent audited financial statements and its audited financial statements for the four years immediately preceding the most recent audited financial statements. | As of July 5, 2022, received responsive documents for 2017, 2018, 2019, and 2020. |
| 9 | Exodus's preliminary financial statements for all reporting years following the most recent audited financial statements. | As of July 5, 2022, balance received a balance sheet and income statement for 2021. |
| 10 | Exodus's most recent CHAR 500 filed with NYS Attorney General. | Received, as of July 5, 2022, a 4-page document (pdf) captioned CHAR 500 for 2020.<br>***NB** – no Form 990 appended (normally appended to and made part of the filed CHAR 500). |
| 11 | Exodus's most recent Form 990 filed with the US Treasury Department, Internal Revenue Service. | None received (as of July 5, 2022).<br>**Update as of September 21, 2022:**<br>Received the following document:<br>- Exodus 2020 Form 990-signed.pdf |

Mr. Julio Medina
September 21, 2022

**APPENDIX**

Page 7 of 15

| Item No. | Record requested | Status |
|---|---|---|
| 12 | The most recent W-2 and/or 1099-MISC Exodus issued for every person required to be listed in Form 990 Part VII line 1a (table) for the reporting year ending 12-31-2021. | Received, as of July 5, 2022: (1) 384-page document (pdf) containing copies of W-2 forms; (2) a 6-page document (pdf) named "1099 Forms Rent 2021"; (3) a 1-page document named "1099 Forms Rent 2021 Corrected"; (4) a 36-page document (pdf) containing copies of 1099-NEC forms for 2021; (5) a 1-page corrected 1099-NEC form; (6) a 3-page document containing corrected 1099-NEC forms for 2021; (7) a 2-page document containing corrected 1099-NEC forms for 2021; (8) a 1-page corrected 1099 NEC form; and (9) 6 documents (pdfs) with copies of 1096 transmittal forms. |
| 13 | Exodus's payroll reports covering compensation paid in May 2022 (Redact Social Security Numbers, Tax Identification Numbers). | Received, as of July 5, 2022, 2 Excel files captioned "Zenefits payroll register." |
| 14 | All records evidencing any agreement, invoice, service, payment, receipt, note, promise, loan, advance, pledge, contribution, account payable, account receivable, consulting agreement, or any financial transaction or transfer or exchange of anything of value in which any of the following was a party or participant: (1) any person employed by Exodus; (2) Watchforce; (3) Watchforce LLC; (4) International Trendz LLC; (5) Presidential Security Company; (6) RS & T Security Consulting, LLC; (7) RSAT; (8) | Received, as of July 5, 2022, the following items that may be partially responsive:<br><br><u>Watchforce</u><br>(1) 4-page pdf document stamped "JPMorgan Chase Bank, N.A. [with address] captioned "Transaction History" "Customer: Watchforce Security Services Inc." listing 64 online domestic wire transfers -debits (dates and amounts only, no other information, including recipients) between 11/19/2021 and 06/02/2022 |

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| | Chris Dantzler; (9) Ismail Qadar; (10) Steven Muhammad; (11) C.D. James Electric, Inc.; (12) Krazie World Productions, Inc. Exception: The two subcontract agreements between Exodus and Watchforce, signed 3/17/22 are already on file with the City and need not be provided to us. In addition, if (a) the record evidences a routine transaction in which an Exodus employee, acting within the scope of their employment, and in the regular course of Exodus's business, provided a service or something of value to a program participant who is neither named nor associated with any of the persons and entities named in numbers 2 through 12 of this item, and (b) the record was made in the regular course of Exodus's business, contemporaneously with the transaction or event reflected therein, then the record need not be provided to us. | (also listed under "Status" for item # 19, below);<br>(2) Invoices addressed to Exodus for security guard service at 8 hotels from January 2021 to mid-May 2022;<br>(3) "Total Transactions Ledger Account name: Watchforce" (1-page pdf consisting of 5 columns, 3 rows of printed material under column headings). * **NB** – This record is further discussed under "Status" for Item # 17, below.<br><br><u>Chris Dantzler</u><br>A 1-page Excel file named Chris Dantzler AP Ledger with entries on 10/19/2021 and 10/20/2021 reflecting a $450 payment to Chris Dantzler annotated "reimbursement."<br><br><u>C.D. James Electric, Inc.</u><br>(1) 2 Excel files named in part "CD James Electric AP Ledger," reflecting transactions between, respectively, 2/22/2019 and 11/24/2020; and 12/3/2020 and 12/16/2021.<br>(2) 5 pdf files captioned and dated as follows: 2 files captioned "Invoice," dated 9/10/2021; and 3 files captioned "Proposal/Invoice" dated, respectively, 10/26/2020, 12/22/2020, and 9/10/2021.<br>***NB** –To the extent we received additional records that may be responsive to this |

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| | | request, they are listed under “Status” for other itemized requests. |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



The following requests concerned records in the possession, custody, or control of Exodus's direct and indirect vendors of security guard services for one or more reentry hotels.

| Item No. | Record requested | Status |
|---|---|---|
| 15 | Payroll records evidencing compensation paid or payable to all security guards and supervisors for work performed in the six current reentry hotels from May 1, 2022, through and including May 22, 2022. | Presidential Security Company<br>Received, as of July 5, 2022: 4 pdf files captioned or named Gusto Fairfield (420 pages); Gusto Corona (104 pages); Gusto Wyndham (93 pages); and Gusto Payroll Journal Summary by Work Location (62 pages).<br>RS & T Security Consulting LLC<br>No record received as of July 5, 2022.<br>**Update as of September 21, 2022:**<br>Received the following documents (file names as received):<br>- rsat-security-consulting-paystubs-2022-06-03 (1).pdf<br>- rsat-security-consulting-paystubs-2022-06-17.pdf<br>- payrolldetail may rsat.pdf<br>Other Security Vendors<br>No record received as of July 5, 2022.<br>**Update as of September 21, 2022:**<br>Received the following documents (file names as received; based on the content these files refer to NFS, AKA Natures Finest Security):<br>- Paystubs 05.29.22 – 06.11.22.pdf<br>- Paystubs 05.01.22 – 05.14.22.pdf<br>- Paystubs 05.15.22 – 05.28.22.pdf |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| 16 | All records evidencing notice of employment forms filed with or submitted to the New York Department of State for all security guards and supervisors who worked in any of the six current reentry hotels at any between January 1, 2022, and May 22, 2022 (General Business Law §89-g; 19 NYCRR 174.7.) | **None received (as of July 5, 2022)**<br>**Update as of September 21, 2022:** Received the following document on September 20, 2022 (file name as received):<br>- Employer._Guard Registration Form. RSAT Consulting #11000198879.pdf<br>***NB** - Received no evidence this document was filed with the NYS Department of State. From late April through September 15, 2022, periodic checks of the corresponding online roster maintained by the New York Department of State for RS & T Security Consulting, LLC returned a message that no currently licensed guards work for this employer. As of September 21, 2022, the online roster the New York Department of State maintains for that company lists 94 guards hired on July 19, 2022, compared with 97 guards hired on June 1, 2022, as stated in the above-titled document.<br><br>Received no notice of employment forms for any other security guard company or any other entity. |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| | | |
|---|---|---|
| 17 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce incurred from all vendors for security services at all reentry hotels from January 1, 2021, through the date of your response. | Received, as of July 5, 2022: "Total Transactions Ledger, Account name: Watchforce" (1-page pdf consisting of 5 columns, 3 rows of printed material under column headings).<br>***NB** – the document provided does not provide the information we requested, which would include charges actually incurred itemized by date and amount, and, among other things, the identity of the "Security Subs" and other "subs," if any associated with (1) $3,347,654.53 in "transactions billed"; (2) $2,407,936.98 in "transactions paid" [by Watchforce]; and (3) $4,855,056.12 in "transactions paid" to "RSAT Security Company" [*sic*], annotated "RSAT also paid subs from this amount."<br><br>**Update as of September 21, 2022:**<br>Received the following additional documents (file names are as received):<br>- Watchforce Ledger – Presidential & RSAT – Fairfield.pdf<br>- Watchforce Ledger – RSAT – MG – NFS.pdf<br>***NB** the two additional documents provided do not contain information regarding Watchforce's payments and are missing dates for numerous transactions under the column heading<br>"INVOICES<br>Billed" |

Mr. Julio Medina
September 21, 2022

**APPENDIX**



| Item No. | Record requested | Status |
|---|---|---|
| 18 | Accounts Payable Ledger or equivalent record evidencing all charges Watchforce paid to all vendors for security services at all reentry hotels, from January 1, 2021, through the date of your response. | See status of Item #17, above. |
| 19 | Bank statements evidencing all sums received and all sums paid, transferred, withdrawn or otherwise debited by Watchforce from November 20, 2020, through the date of your response. Include images of canceled checks, front and back, for all payments made by check. | **Not provided**.<br>***NB** – As of July 5, 2022, we received a single 4-page pdf document stamped "JPMorgan Chase Bank, N.A. [with branch address]" captioned "Transaction History" "Customer: Watchforce Security Services Inc." and a partial account number. It lists only approximately 64 online domestic wire transfers/debits (dates and amounts only, no other information, including recipients) between 11/19/2021 and 06/02/2022. It contains no further information.<br>The record provided (1) is missing various elements of the records we requested—full bank statements with details of all sums received and debited, including recipients of all payments—and (2) omits a full year of the requested period.<br><br>**Update as of September 21, 2022**: No additional material was provided. |

**APPENDIX**



Additional Information Requested by letter of June 8, 2022.

The questions below concern topics discussed in our June 1 meeting and are reproduced verbatim from our June 8 letter. **Status: None of these questions were answered in the material we received from Exodus through the date of this letter.**

1. How did Exodus first learn that Watchforce and/or Chris Dantzler could potentially assist Exodus in providing security services in connection with Exodus's City contracts for services at the reentry hotels?

2. When did Exodus decide to engage the services of Watchforce in connection with Exodus's City contracts for services at any of the reentry hotels?

3. What specific services has Watchforce provided to Exodus in connection with Exodus's City contracts for services at the reentry hotels?

4. Identify by name and job title the individual(s) that perform these services on behalf of Watchforce.

5. Has Exodus entered into any business or other transaction with any company in which Chris Dantzler had an ownership interest or by which he is employed? Include Watchforce and any company in which Mr. Dantzler had an interest or employment.

6. Has Chris Dantzler ever been employed by Exodus or any related organization as that term is defined in Form 990? If yes, please identify the nature and dates of that employment.

7. Who first identified International Trendz, LLC, DBA Presidential Security Company (Presidential), as a potential provider of security services in connection with Exodus's City contracts for services at one or more of the reentry hotels?

8. Did Presidential request that Exodus pay Watchforce for services provided by Presidential? If so, provide details, including dates, names of individuals who were party to the communication of such request.

9. Has Exodus or any employee of Exodus or immediate family member (i.e.,

**APPENDIX**



spouse/domestic partner, child, sibling or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly? Include any service, thing of value, or other benefit Exodus or any of the above-specified persons received from any business in which Mr. Dantzler was associated in any way. Include any form of compensation in exchange for any type of service, in any capacity, to any business in which Mr. Dantzler had a position or interest. Include without limitation any agreement, note, loan, loan repayment, advance, investment, dividend, fee, promise, and any form of transfer or contemplated transfer, or other transaction involving anything of value.

**From:** Danielle Rosario
**To:** Goldin, David; Diana Ortiz
**Cc:** Julio Medina; Jennifer Kaake; Calabrese, Anna; Berkman-Breen, Joseph
**Subject:** [EXTERNAL] RE: Contract Termination Notice
**Date:** Thursday, June 9, 2022 5:47:24 PM
**Attachments:** image001.jpg
image002.jpg
image003.jpg
image004.jpg
image005.jpg
image006.png
image007.png
image008.png
image009.png
image010.png
RE Contract Termination Notice .msg
Amended Signed Contract Termination Notice 6.9.22.pdf

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hello,

Attached please find email correspondence providing and amended notice of contract termination to Watchforce. For convenience, the attachment provided in the email is also separately attached here.

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Office: 917-492-0990
Preferred Pronouns: she/her/ella

**Main Office**
**2268 Third Avenue**
**New York, NY 10035**
**(917) 492-0990**
**www.etcny.org**

**Poughkeepsie Office**
**97-99 Cannon Street**
**Poughkeepsie, NY 12601**
**(845) 452-7620**

**Newburgh Office**
**85 Grand Street**
**Newburgh, NY 12550**
**(845) 565-2700**

Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.

---

**From:** Goldin, David <Dgoldin@cityhall.nyc.gov>
**Sent:** Wednesday, June 8, 2022 5:51 PM
**To:** Diana Ortiz <DOrtiz@etcny.org>

**Cc:** Julio Medina <jmedina@etcny.org>; Danielle Rosario <drosario@etcny.org>; Jennifer Kaake <JKaake@etcny.org>; acalabrese@justice.nyc.gov; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Subject:** RE: Contract Termination Notice

+Joseph Berkman-Breen

Good afternoon Diana,

Thank you for your e-mail and for the prompt response to the issues addressed on our Friday (6/3) call.

We appreciate the purpose of the contract termination notice was to be comprehensive. We are concerned, however, that some of the language is so broad that it may be misconstrued. Specifically, the notice states, "As of June 12, 2022, neither party shall be liable for further performance of any obligation enumerated under the Subcontractor Amendment." That sentence requires clarification to avoid implying, incorrectly, that Watchforce will no longer have an obligation to maintain or produce records or reports or respond to audits or investigations. In fact, that obligation is ongoing.

Subcontractor Amendment Item 7(d) provides: "Subcontractor agrees to comply with the requirements in Article 5 of Appendix A to the City Contract and all references to Contractor in Article 5 shall be construed to refer to Subcontractor." Article 5 of Appendix A addresses records, audits, reports and investigations. Watchforce's obligations under Article 5, as incorporated in the Subcontractor Amendment, will continue despite termination of the Subcontractor Amendment. Please ensure that Watchforce is put on notice of that continuing obligation as soon as possible and in any event before June 12, 2022.

Let me know if you have any questions or need additional information.

Thank you,

David

David B. Goldin
General Counsel
Mayor's Office of Criminal Justice
1 Centre St., Room 1012N
New York, N.Y. 10007
(646) 576-3498 (o)
(917) 873-8000 (c)
dgoldin@cityhall.nyc.gov

---

**From:** Diana Ortiz <DOrtiz@etcny.org>

**From**: MacLeod, Alison [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=53774FF70CA74D57A3DD293EE44F56F8-MACLEOD, AL]
**Sent**: 3/17/2022 12:26:05 PM
**To**: 'Shawn Dougherty' [sdougherty@etcny.org]; Williams, Timothy [twilliams2@cityhall.nyc.gov]; Danielle Rosario [drosario@etcny.org]; benrod1.consultantsjustforyou@gmail.com; Berkman-Breen, Joseph [jberkmanbreen@cityhall.nyc.gov]; Montoya, Jordan [jmontoya@cityhall.nyc.gov]; Bobrytska, Lada [lbobrytska@cityhall.nyc.gov]
**CC**: Diana Ortiz [DOrtiz@etcny.org]
**Subject**: RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

Thanks Shawn!

Can you please provide the exact date Watchforce Security took over?
Alison

**From:** Shawn Dougherty <sdougherty@etcny.org>
**Sent:** Thursday, March 17, 2022 10:11 AM
**To:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Williams, Timothy <TWilliams2@cityhall.nyc.gov>; Danielle Rosario <drosario@etcny.org>; benrod1.consultantsjustforyou@gmail.com; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Cc:** Diana Ortiz <DOrtiz@etcny.org>
**Subject:** [EXTERNAL] RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hi Alison,

Sorry for the delay. Watchforce Security Services EIN is: 85-4111457. Global Operations Security Inc, EIN: 83-2247503.
Thank you.

**Shawn Dougherty, MBA**
**(pronouns: he/him/his – what is this?**
**Contract Analyst Director.**
Cell: (772) 571-7201

Exodus
TRANSITIONAL COMMUNITY, INC.
CHANGING LIVES • RESTORING HOPE

**2271 Third Avenue**
**New York, NY 10035**
**(917) 492-0990 (ext. 113)**

www.etcny.org

*Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.*

**From:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>
**Sent:** Thursday, March 17, 2022 8:35 AM
**To:** Shawn Dougherty <sdougherty@etcny.org>; Williams, Timothy <TWilliams2@cityhall.nyc.gov>; Danielle Rosario <drosario@etcny.org>; benrod1.consultantsjustforyou@gmail.com; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Cc:** Diana Ortiz <DOrtiz@etcny.org>
**Subject:** RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

Hi Shawn,

Please provide the EIN for Global security even through they no longer a subcontractor and include Watchforce Security and EIN along with the start date of services.

Thank you,
Alison

**From:** Shawn Dougherty <sdougherty@etcny.org>
**Sent:** Wednesday, March 16, 2022 5:21 PM
**To:** Williams, Timothy <TWilliams2@cityhall.nyc.gov>; Danielle Rosario <drosario@etcny.org>; MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; benrod1.consultantsjustforyou@gmail.com; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Cc:** Diana Ortiz <DOrtiz@etcny.org>
**Subject:** [EXTERNAL] RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Holiday Inn Express info below **in bold.**

1. Provide a list of all companies subcontracted in this agreement (legal names and EINs).

Meiqiao LLC, 82-4427281; Salsa Catering & Special Events Inc. 13-3590240; International Trendz LLC, 20-5039567; Global Security Solutions (no longer working with Exodus), Wolcott Hotel 13-2830435; Fairfield Inn & Suites, 26-0752095; **Holiday Inn Express (Eden Park Hospitality LLC, 47-5224494)**; Tillary Hotel, 84-1945027; Howard Johnson AND Wyndham Garden (Mayflower Wenyu LLC), 81-3895118.

.

**Shawn Dougherty, MBA**
**(pronouns: he/him/his – what is this?**
**Contract Analyst Director.**
Cell: (772) 571-7201

Exodus
TRANSITIONAL COMMUNITY, INC.
CHANGING LIVES • RESTORING HOPE

**2271 Third Avenue**
**New York, NY 10035**

**(917) 492-0990 (ext. 113)**

**www.etcny.org**

*Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.*

---

**From:** Williams, Timothy <TWilliams2@cityhall.nyc.gov>
**Sent:** Wednesday, March 16, 2022 11:10 AM
**To:** Shawn Dougherty <sdougherty@etcny.org>; Danielle Rosario <drosario@etcny.org>; MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; benrod1.consultantsjustforyou@gmail.com; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Cc:** Diana Ortiz <DOrtiz@etcny.org>
**Subject:** RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

Please note that we need a full response today in order to meet the Comptroller's deadline.

Thank you,

**Timothy Williams**
Deputy Agency Chief Contracting Officer
Mayor's Office of Criminal Justice
O: (212) 416-5282
P: (347) 963-0061
www.nyc.gov/criminaljustice

---

**From:** Shawn Dougherty <sdougherty@etcny.org>
**Sent:** Wednesday, March 16, 2022 10:59 AM
**To:** Danielle Rosario <drosario@etcny.org>; MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; benrod1.consultantsjustforyou@gmail.com; Williams, Timothy <TWilliams2@cityhall.nyc.gov>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Cc:** Diana Ortiz <DOrtiz@etcny.org>
**Subject:** [EXTERNAL] RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hi Lada,

My colleague tried to respond, but forgot to copy you. Please see below.

**Shawn Dougherty, MBA**

**(pronouns: he/him/his – what is this?**
**Contract Analyst Director.**
Cell: (772) 571-7201

EXODUS TRANSITIONAL COMMUNITY, INC.
CHANGING LIVES • RESTORING HOPE

**2271 Third Avenue**
**New York, NY 10035**
**(917) 492-0990 (ext. 113)**

**www.etcny.org**

*Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.*

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Tuesday, March 15, 2022 7:31 AM
**To:** AMacLeod@cityhall.nyc.gov; benrod1.consultantsjustforyou@gmail.com; TWilliams2@cityhall.nyc.gov; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>
**Cc:** Shawn Dougherty <sdougherty@etcny.org>; Diana Ortiz <DOrtiz@etcny.org>
**Subject:** RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

Hello All,
Good morning. Ben was kind enough to share the below email with me as Shawn is away from the office. I have been in communication with Joseph and Jordan (copied here) about this matter so I am adding them to the email chain as well.

1. Provide a list of all companies subcontracted in this agreement (legal names and EINs).

- I do not personally have this information so I will ask my colleague, Diana to respond on the agency's behalf.

2. Identify all security firms at the Wyndham as a subcontractor to Exodus during the period referenced in this article Security Scramble at COVID Rikers-Release Hotel Where Woman Alleged Sexual Assault - THE CITY.

- Global Operations Security Inc. was our subcontractor for security at the hotel, until yesterday. Please note that this subcontractor was not independently selected by Exodus but rather inherited (see attached email and attached contract with Global for that period).

3. Certification regarding substantiated case of client abuse or neglect memo dated 1/3/22 indicates no substantiated case of abuse or neglect during the latest 12 month. Please email the updated version.

- Is this the form being referenced: https://www1.nyc.gov/assets/probation/pdf/procurement/forms-certification-regarding-substantiated-client-abuse-neglect.pdf
- Please note that the situation referenced in the article is alleged to have happened in August 2020, therefore the certification signed 1/3/22 covers the 12-month period directly before (namely 2021).
- Could you please provide clarity on what the standard for substantiated is for this document and clarify our duty to disclose? It's asking for level of severity and case disposition in the document, which seems to suggest criminal charges. In the article you've linked, the DA dropped criminal charges against the former employee making the claim unsubstantiated. The civil litigation is ongoing and therefore our position is that nothing has been substantiated to date. If we are misinterpreting this form and how we should be responding, please let us know and we will rectify ASAP.

- If we terminate an employee based on a participant complaint (among other factors like violation of agency policy, etc.)- is this something we should be disclosing in this form?

Thank you in advance for your guidance. I greatly appreciate it.

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Exodus Transitional Community, Inc.
2271 Third Avenue
New York, NY 100354
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

---

**From:** Ben Rodriguez <benrod1.consultantsjustforyou@gmail.com>
**Sent:** Monday, March 14, 2022 9:18 PM
**To:** Danielle Rosario <drosario@etcny.org>
**Subject:** Fwd: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

---------- Forwarded message ---------
From: **Bobrytska, Lada** <LBobrytska@cityhall.nyc.gov>
Date: Mon, Mar 14, 2022 at 5:09 PM
Subject: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller
To: MacLeod, Alison <AMacLeod@cityhall.nyc.gov>, Shawn Dougherty <sdougherty@etcny.org>, BenRod1.ConsultantsJustforYou@gmail.com <benrod1.consultantsjustforyou@gmail.com>, Williams, Timothy <TWilliams2@cityhall.nyc.gov>, Diana Ortiz <DOrtiz@etcny.org>

Good Afternoon Shawn,

I hope all is well. We received additional inquiries from the Comptroller's Office. Please provide updates by 12 p.m. tomorrow.

1. Provide a list of all companies subcontracted in this agreement (legal names and EINs).
2. Identify all security firms at the Wyndham as a subcontractor to Exodus during the period referenced in this article Security Scramble at COVID Rikers-Release Hotel Where Woman Alleged Sexual Assault - THE CITY.
3. Certification regarding substantiated case of client abuse or neglect memo dated 1/3/22 indicates no substantiated case of abuse or neglect during the latest 12 month. Please email the updated version.

Thank you,

Lada

**Lada Bobrytska**
Senior Contract Analyst
Mayor's Office of Criminal Justice
1 Centre Street, 10th Floor
New York, NY 10007
w: (646)576-3501
lbobrytska@cityhall.nyc.gov

--
**Ben Rodriguez**
**CEO/President**
**Consultants Just for You, Inc.**
**6108 Third Avenue**
**Brooklyn, New York  11220**
**646 342 4416**

**From**: Calabrese, Anna [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=732BB2322CEE41309CB41B0B11E95D42-CALABRESE,]
**Sent**: 3/14/2022 11:11:34 AM
**To**: Berkman-Breen, Joseph [jberkmanbreen@cityhall.nyc.gov]; Danielle Rosario [drosario@etcny.org]
**CC**: MacLeod, Alison [amacleod@cityhall.nyc.gov]; Dozier-Lewis, Nandi [ndozier-lewis@cityhall.nyc.gov]; Montoya, Jordan [jmontoya@cityhall.nyc.gov]; Chavez, J. Carolina [cchavez@cityhall.nyc.gov]
**Subject**: RE: Global security exit

Yes, watchforce is the new vendor to my understanding

---

**From:** Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Sent:** Monday, March 14, 2022 10:45 AM
**To:** Danielle Rosario <drosario@etcny.org>
**Cc:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Calabrese, Anna <ACalabrese@justice.nyc.gov>; Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>
**Subject:** RE: Global security exit

Hi Danielle,

Thanks for the update. Watchforce is a new provider of security at the hotels, correct? If so, our contracts team (Alison, copied here) has reminders, below, for brining on a new subcontractor. Please provide and complete the following as soon as possible, as some of these would ideally occur before a new subcontractor starts work.

1) New vendor name and EIN to do a background check. Contracts should be approving the vendor prior to the new vendor starting work.
2) Start date of new vendor
3) Signed subcontractor agreement uploaded in HHS Accelerator budget
4) Budget modification in HHS Accelerator budget to add a new line for the new vendor

Let me know if you have any questions.

Best,
Joe

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Sunday, March 13, 2022 9:27 PM
**To:** Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>
**Subject:** [EXTERNAL] Fwd: Global security exit

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Please see the below. Perhaps the information you can provide to the reporter can include that we inherited this vendor Exodus did not choose this provider! Thanks.

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Exodus Transitional Community, Inc.

2271 Third Avenue
New York, NY 10035
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

---

**From:** Diana Ortiz <DOrtiz@etcny.org>
**Sent:** Sunday, March 13, 2022 3:48:10 PM
**To:** Julio Medina <jmedina@etcny.org>; Jennifer Kaake <JKaake@etcny.org>; Tomasina Salcedo <tsalcedo@etcny.org>; Danielle Rosario <drosario@etcny.org>; Nora Reissig <NReissig@etcny.org>
**Subject:** Global security exit

Hi everyone, I received a text from Jen this morning regarding a rumor that ends up being true - Global is leaving our hotels. I contacted Global and was told that they attempted to contact us on Friday - so that didn't happen. Global does and cannot get the paperwork we've been requesting for the Mayor's office, so they decided to leave - told their staff, didn't tell us. I expressed disappointment, but told them, we'll move forward without them.

Good news, Watchforce is assembling a team to take over at 8am tomorrow. I've shared this with Jen, 5 at Holiday Inn and 6 at Wyndham. Thank you Jen for acting quickly on this and letting me know. Thanks

With Gratitude, Diana
VP of Wellness/Genesis M.H. Centers
Exodus Transitional Community, Inc
914-645-7665

Get Outlook for iOS

## Berkman-Breen, Joseph

**From:** Albelina Morillo <amorillo@ncheng.com>
**Sent:** Monday, May 2, 2022 9:51 AM
**To:** Bobrytska, Lada; Diana Ortiz; Cheung, Chi Wai
**Cc:** Williams, Timothy; Shahzad Hussain
**Subject:** [EXTERNAL] Re: [EXT]Exodus Invoicing - Updates

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Good morning, Lada,

We are gathering the support requested from Watchforce and will include when we resubmit in HHS the January through April subcontractor vouchers. I will get an update from the team today.

I will review the January vouchers and will ask Shahzad to include the calculations for the distribution.

thank you,

**Albelina Morillo**
Senior Accountant

P: 212.785.0100

40 Wall Street 32nd Floor
New York NY 10005
ncheng.com

*Empowering nonprofits since 1989*

---

**From:** Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Sent:** Friday, April 29, 2022 2:07 PM
**To:** Albelina Morillo <amorillo@ncheng.com>; Diana Ortiz <DOrtiz@etcny.org>; Cheung, Chi Wai <CWCheung@cityhall.nyc.gov>
**Cc:** Williams, Timothy <TWilliams2@cityhall.nyc.gov>
**Subject:** RE: [EXT]Exodus Invoicing - Updates

Hi Albelina,

I hope all is well.

I am confirming that item # 7 (b) on our lists has been resolved and FY21 March closeout invoice in the amount of $4,708.07 is being processed by the fiscal team.

| | | | | | |
|---|---|---|---|---|---|
| Extension III Feb Invoice #1 | $2,249,352.00 | | | 2,249,352.00 | |
| Extension III Feb Invoice # 2 | $317,281.94 | | | | |
| Extension III Mar Invoice # 1 | $1,482,206.00 | | | 1,182,206.00 | |
| Extension III Mar Invoice # 2 | $1,396,483.41 | $1,396,483.41 | | | $ |
| Extension III Mar Invoice # 3 - March closeout | $4,708.07 | $4,708.07 | | | |

In addition, I am following up on 4 invoices pending re-submission in HHS as the next Exodus payroll is approaching and MOCJ will need at least 2 weeks to process these invoices.

**Invoice List**

Listed below are the invoices for your Agency.

Filter Invoices ▾ Invoices:4

| Invoice Number | Date Submitted | Date Approved | Provider | CT# | Value($) | Status ▲ | Action |
|---|---|---|---|---|---|---|---|
| 220403800 | 04/20/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 2,072,587.20 | Returned for Revision | I need to... |
| 220403041 | 04/14/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 6,160,288.60 | Returned for Revision | I need to... |
| 220402359 | 04/12/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 6,714,400.80 | Returned for Revision | I need to... |
| 220402321 | 04/11/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 3,817,087.20 | Returned for Revision | I need to... |

Please advise the invoice preparer to fix the highlighted part of the supporting documentation for the January invoice (for example, the first Watchforce invoice states that 100% of the invoice amount was applied to the contract, which is incorrect). Furthermore, please provide the calculation for such distribution (i.e. $31,440.00 charged for 2 days).

**New York City Mayor's Office of Criminal Justice**
**Delegate Agency Quarterly Fiscal Report**
**O.T.P.S. Details (Form QFR-OS)**

| Vendor Name | % Applied To Contract | Expense This Quarter |
|---|---|---|
| Watchforce Security - Week ending-01/01/2022 | 100% | $31,440.00 |
| Watchforce Security - Week ending-01/02/2022 | 100% | $46,560.00 |
| Watchforce Security - Week ending-01/02/2022 | 100% | $31,440.00 |
| Watchforce Security - Week ending-01/02/2022 | 100% | $69,240.00 |
| Watchforce Security - Week ending-01/09/2022 | 100% | $86,520.00 |
| Watchforce Security - Week ending-01/09/2022 | 100% | $77,280.00 |
| Watchforce Security - Week ending-01/09/2022 | 100% | $77,280.00 |
| Watchforce Security - Week ending-01/09/2022 | 100% | $105,000.00 |
| Watchforce Security - Week ending-01/16/2022 | 100% | $77,280.00 |

**PRESIDENTIAL SECURITY COMPANY**
**AND**
**WATCHFORCE SECURITY SERVICES**

185 Rhododendron Drive
Westbury, NY 11590
WATCHFORCESERVICES@gmail.com
347-539-7348

**Exodus Transitional Community**

**INVOICE #** T - 12 - Holiday
**DATE:** 12/27/21 - 1/2/22

| | | |
|---|---|---|
| | | **Total Hours** **336** |
| **Rate: x $73** | | 24,528.00 |
| **Holiday Pay** | New Years Day | |
| **Rate: x $36.50** | (Saturday 48 Hours) | 1,752.00 |
| | | **Grand Total** 94,320.00 |

Thank you,
Lada

**From:** Albelina Morillo <amorillo@ncheng.com>
**Sent:** Wednesday, April 20, 2022 7:20 PM
**To:** Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>; Cheung, Chi Wai <CWCheung@cityhall.nyc.gov>
**Cc:** Williams, Timothy <TWilliams2@cityhall.nyc.gov>
**Subject:** [EXTERNAL] Re: [EXT]Exodus Invoicing - 4/20 Meeting

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hi Lada,

Item #5. I am confirming that no funds are going Global Operations directly / indirectly.

5. Amendment # 5 (7/1/2021 – 12/31/20210. Advances will be fully recouped after invoices listed below are processed. Invoice # 220303722 - Invoice Amount $333,896.50, everything will be recouped. $0 to vendor. Invoice # 220203720 - Invoice Amount $ $924,376.17, recoup $577,871.34, $346,504.83 to vendor. Please confirm one more time that no funds will go to Global - directly or indirectly, in present time or retroactively.

-
thank you,

**Albelina Morillo**
Senior Accountant

P: 212.785.0100

40 Wall Street 32nd Floor
New York NY 10005
ncheng.com

*Empowering nonprofits since 1989*

**From:** Bobrytska, Lada <LBobrytska@cityhall.nyc.gov>
**Sent:** Wednesday, April 20, 2022 4:15 PM
**To:** Albelina Morillo <amorillo@ncheng.com>; Diana Ortiz <DOrtiz@etcny.org>; Cheung, Chi Wai <CWCheung@cityhall.nyc.gov>

**Cc:** Williams, Timothy <TWilliams2@cityhall.nyc.gov>
**Subject:** [EXT]Exodus Invoicing - 4/20 Meeting

Hi Albelina and Diana,

Thank you for meeting with us earlier today. I am glad we've gotten closer to resolving the invoicing issues. Below is the recap of our conversation along with our inquiries.

1. Exodus is to provide Watchforce incorporation documentation.
2. Exodus confirmed that Watchforce invoices (and invoice #s) are created by Watchforce and submitted to Exodus. (Invoices are created by sub-vendor.)

**PRESIDENTIAL SECURITY COMPANY**
**AND**
**WATCHFORCE SECURITY SERVICES**

185 Rhododendron Drive
Westbury, NY 11590
WATCHFORCESERVICES@gmail.com
347-539-7348

**Exodus Transitional Community**

**INVOICE # 54**
**DATE:** 1/31/22 - 2/6/22

3. FY22 (1.1.2022 – 6.30.2022) contract. Exodus submitted 4 invoices in HHS and these invoices amount to $18,764,363.8. I returned all invoices on 4/20. Please upload the supporting documentation for Watchforce and resubmit at your earliest convenience. MOCJ would like to process these invoices asap.

## Invoice List

Listed below are the invoices for your Agency.

Filter Invoices ▾ Invoices:4

| Invoice Number | Date Submitted | Date Approved | Provider | CT# | Value($) | Status ▲ | Action |
|---|---|---|---|---|---|---|---|
| 220403800 | 04/20/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 2,072,587.20 | Pending Approval | I need to |
| 220403041 | 04/14/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 6,160,288.60 | Pending Approval | I need to |
| 220402359 | 04/12/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 6,714,400.80 | Pending Approval | I need to |
| 220402321 | 04/11/2022 | N/A | Exodus Transitional Community, Inc. | CT100220228804812 | 3,817,087.20 | Pending Approval | I need to |

Invoices: 4

4. MOCJ notified Exodus that outstanding unrecouped advance amount is to be calculated for every prior contract Amendment separately (Amendment # 4, Amendment # 5 and combine Base & Amendment 1-3) . Once MOCJ and Exodus ensure that all invoices for Base & Amendments 1-3 are processed and MOCJ and Exodus agree on the outstanding balance to be covered by Exodus, Exodus is to send an email confirming that a check in certain amount will be issued to MOCJ. Afterwards, MOCJ is to pay all pending invoices for Amendment # 4 and Amendment # 5. We can discuss the specifics later on once we agree on the outstanding amount for Base & Amendments 1-3 combined.

5. Amendment # 5 (7/1/2021 – 12/31/20210. Advances will be fully recouped after invoices listed below are processed. Invoice # 220303722 - Invoice Amount $333,896.50, everything will be recouped. $0 to vendor.

Invoice # 220203720 - Invoice Amount $ $924,376.17, recoup $577,871.34, $346,504.83 to vendor. Please confirm one more time that no funds will go to Global - directly or indirectly, in present time or retroactively.

## Invoice List

Listed below are the invoices for your Agency.

Filter Invoices ▾ Invoices:18

| Invoice Number | Date Submitted | Date Approved | Provider | CT# | Value($) | Status ▲ | Action |
|---|---|---|---|---|---|---|---|
| 220303722 | 03/23/2022 | N/A | Exodus Transitional Community, Inc. | CT100220201428398 | 333,896.50 | Pending Approval | I need to... |
| 220203720 | 03/21/2022 | N/A | Exodus Transitional Community, Inc. | CT100220201428398 | 924,376.17 | Pending Approval | I need to... |

a. $911,062.43 is still available under this contract. Please advise when and if MOCJ is to expect an invoice?

6. Amendment # 4 (4/1/2021 – 6/30/2021) . Advances are fully recouped. 4 invoices to be processed, therefore, funds from all 4 invoices are to be received by the vendor. Please ensure and confirm one more that that there are no Global Security charges.
    a. June 2021 Invoice #3 $483,089.32 inquiry. Supporting documentation has Watchorce invoice. There is no invoice number and the invoice states that it was approved by Diana Ortiz. Please advise why Exodus staff was approving Watchforce invoices and kindly confirm that this invoice was created by Watchforce.

**PRESIDENTIAL SECURITY COMPANY**
**AND**
**WATCHFORCE SECURITY SERVICES**

**185 Rhododendron Drive**
**Westbury, NY 11590**
**WATCHFORCESERVICES@gmail.com**
**347-539-7348**

**Exodus Transitional Community**

**INVOICE** Fans
**DATE:** 6/13/21

***Wolcott Hotel 4 West 31st. Street, NY 10001***

| | **Quanity** |
|---|---|
| Fans | 24 |

Approved by Diana Ortiz

| | **Total** |
|---|---|
| **$175.00** each | 4,200.00 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Receiv |
| | Amendment # 4 | | | | |
| Extension IV | Apr Invoice #1 | $2,525,236.00 | | | |
| Extension IV | Apr Invoice #2 | $335,730.73 | | | |
| Extension IV | May Invoice # 2 | $1,537,952.40 | | | 732 |
| Extension IV | May Invoice # 1 | $1,015,094.80 | | | |
| Extension IV | May Invoice # 3 | $361,579.40 | | | 361 |
| Extension IV | June 2021 # 1 | $1,540,599.40 | | | 1,540 |
| Extension IV | May Invoice # 4 | $350,144.73 | | | $350,14 |
| Extension IV | June 2021 #2 | $843,459.00 | RETURNED TO VENDOR | | |
| Extension IV | June 2021 # 3 PS-OPTS | $483,089.32 | | | $483,08 |
| Extension IV | June 2021 Closeout | $364,274.95 | | | |
| Totals | | $8,523,926.68 | | | 3,467 |

7. Amendment # 3 (01/25/2021 – 03/31/2021) & Amendment # 2 ( 11/1/2020 – 1/31/2021) & Amendment #1 (8/1/2021 10/31/2020) & Base Contract (4/1/2020 – 7/1/2020) can be combined and once MOCJ and Exodus agree on the outstanding unrecouped advance amount, Exodus is to issue a check.
   a. Albelina to ensure no Global Security charges are listed on $1,396,843.41 invoice and resubmit via email.
   b. According to our records, the approved amount for Mar Invoice # 3 is $2,212.69 rather than $4,708.07. Please see the attachment and send us the updated QFR.

| | | |
|---|---|---|
| 52 | Extension III Mar Invoice # 2 | $1,396,483.41 |
| 53 | Extension III Mar Invoice # 3 - March closeout | $9,336.89 |

   c. Albelina to confirm July 2020 adj amount ($13,606.08 was changed to $9,202.62 rather than to $10,120.68).

| | | | |
|---|---|---|---|
| Contract 1 | Invoice - Rikers Initiative: ERRT HI - July 2020 | $117,947.59 | |
| Contract 1 | Invoice - Rikers Initiative: ERRT HI - July 2020 adj | $13,606.08 | $10,120.68 |
| Contract 1 | Invoice - Rikers Initiative: ERRT WY - July & Aug 2020 adj | $4,035.05 | $4,035.05 |
| Contract 1 | Invoice - Rikers Initiative: ERRT Wolcott - June & July 2020 a | $3,450.11 | $3,450.11 |

   d. Below in red are the amounts recorded in our system.

## ERRT Analysis

| | | | |
|---|---|---|---|
| | Base Contract, calculation for BASE and Am 1-3 can be combined. Keep calculation for Am 4 and Am 5 separate. | Invoiced | Revised vouchers resubmitted to Chi Wai |
| Contract | Invoice - Rikers Initiative: ERRT HI - April 2020 | $89,106.04 | $81,005.48 |
| Contract | Invoice - Rikers Initiative: ERRT WY - April 2020 | $50,698.34 | $46,089.40 |
| Contract | Invoice - Rikers Initiative: ERRT HI - May 2020 | $83,143.64 | $75,585.12 Invoice + $6,227.87 Advance = $81,812.99 but pay $100 less to keep the K open = $81,712.99 |
| Contract | Invoice - Rikers Initiative: ERRT WY - May 2020 | $66,081.88 | $ 60,074.93 |
| Contract | Invoice - Rikers Initiative: Wolcott - June 2020 | $45,930.46 | |
| Contract | Invoice - Rikers Initiative: ERRT HI - June 2020 | $99,407.87 | $90,370.79 |
| Contract | Invoice - Rikers Initiative: ERRT WY - June 2020 | $83,180.21 | $ 75,618.37 |
| | BASE ENDS HERE | | MOCJ amounts above |

I did some research and I think I found explanation for such discrepancies. For example, the April invoice in the amount of $81,005.48 has the following supporting documentation and explanation about unallowed charged (see email snip below). Do you have any recollection on unallowed IDC charge? My assumption that the rest of the invoices had the same issue.

Hi Debbie,

Following your directive the following changes were applied to April invoices in CRM:

1. Invoice for total amount of $89,106.04 was reduced to $81,005.48
   - IDC 10% charge of $8,100.55 was removed
   - No travel charges listed on this invoice
2. Invoice for total amount of $50,698.34 was reduced to $46,089.04

6

   - IDC 10% charge of $4,608.94 was removed
   - Travel charges for $1,375.00 remains on invoice as vendor provided two MTA invoices and detailed MTA commute card usages

Warm Regards,

Please respond to this email via corresponding numbers or adding your comments in a different color. I would like to keep this email thread for our records. Please advise of your availability for another session once you have updated numbers.

Thank you,
Lada

**Lada Bobrytska**
Senior Contract Analyst
Mayor's Office of Criminal Justice
1 Centre Street, 10th Floor
New York, NY 10007
w: (646)576-3501
lbobrytska@cityhall.nyc.gov

This email originated from outside of NCheng LLP. Do not click links or open attachments unless you recognize the sender and know the content is safe.
This email originated from outside of NCheng LLP. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**From:** Berkman-Breen, Joseph
**To:** Danielle Rosario; Calabrese, Anna; MacLeod, Alison
**Cc:** Dozier-Lewis, Nandi; Montoya, Jordan; Chavez, J. Carolina; Diana Ortiz; Silvy, Mir
**Subject:** RE: Global security exit
**Date:** Monday, March 21, 2022 1:22:38 PM
**Attachments:** Subcontractor Agreement.docx

---

Hi Danielle,

Subcontractor agreement template, attached.

Best,
Joe

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Thursday, March 17, 2022 4:54 PM
**To:** Calabrese, Anna <ACalabrese@justice.nyc.gov>; MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Cc:** Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>; Silvy, Mir <MSilvy@cityhall.nyc.gov>
**Subject:** [EXTERNAL] RE: Global security exit

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Would it be possible for you to send me a city approved subcontract template you'd like me to use for the Watchforce agreement? I want to avoid reinventing the wheel.

Thanks,
Danielle

---

**From:** Calabrese, Anna <ACalabrese@justice.nyc.gov>
**Sent:** Thursday, March 17, 2022 2:16 PM
**To:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Danielle Rosario <drosario@etcny.org>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Cc:** ndozier-lewis@cityhall.nyc.gov; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>; Silvy, Mir <MSilvy@cityhall.nyc.gov>
**Subject:** RE: Global security exit

Hi Alison,

Nandi and I have a call that ends at 4:45pm.

Thanks,
Anna

---

**From:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>
**Sent:** Thursday, March 17, 2022 1:52 PM
**To:** 'Danielle Rosario' <drosario@etcny.org>; Calabrese, Anna <ACalabrese@justice.nyc.gov>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Cc:** Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>; Silvy, Mir <MSilvy@cityhall.nyc.gov>
**Subject:** RE: Global security exit

Hi everyone,

I would like to get on the phone today to make sure I understand the relationship between Exodus and each of the security Subcontractors. Is everyone available at 4:30 today?

Thanks,
Alison

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Monday, March 14, 2022 12:27 PM
**To:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Calabrese, Anna <ACalabrese@justice.nyc.gov>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Cc:** Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>
**Subject:** [EXTERNAL] RE: Global security exit

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hi Alison,

As you know I am very new to Exodus and do not directly manage contracts for the agency. I am trying to piece information together to provide a clear and accurate idea of what's currently happening around security in the hotels.

I am here in my office with Chris Dantzler, he is the owner of Watchforce Security Services. Watchforce is a business management company specializing in offering services to security agencies. . They are not a direct provider of security services and instead help security agencies with business solutions. Watchforce's EIN is: 85-4111457.

Watchforce provides their services to International Trends (DBA Presidential Security Company- paperwork with license attached) who is our current security provider at the hotels (except the 2 that Global was previously managing). At the request of International Trends, Exodus pays

Watchforce directly, and then Watchforce manages fiscal obligations on their behalf related to this contract.

At some point, the volume of security services required for the hotels outgrew International Trends' capacity to manage alone. They asked Watchforce to help them partner with another security company to fill gaps in their staffing structure. RSAT Security Company is the provider that Watchforce partnered with to help International Trends meet the demand. Currently, Exodus does not manage that sub-subcontracted relationship. We have attached RSAT's 2021 and updated license along with insurance information. Please let me know if you need further information on them.

**To Replace Global:**

Watchforce worked with International Trends to assemble a team that started today to replace Global who exited our hotels with no advance notice. These additional hotels are being added to International Trends contract with Exodus. They will work separately with RSAT to provide the manpower necessary to meet their contractual obligations.

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Exodus Transitional Community, Inc.
2271 Third Avenue
New York, NY 100354
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

---

**From:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>
**Sent:** Monday, March 14, 2022 11:25 AM
**To:** Danielle Rosario <drosario@etcny.org>; acalabrese@justice.nyc.gov; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Cc:** ndozier-lewis@cityhall.nyc.gov; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>
**Subject:** Re: Global security exit

Hi Danielle,

Does Watchforce have the same or a different EIN?
Thanks
Alison

Get Outlook for iOS

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Monday, March 14, 2022 11:15:18 AM
**To:** Calabrese, Anna <ACalabrese@justice.nyc.gov>; Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>

**Cc:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>; Diana Ortiz <DOrtiz@etcny.org>
**Subject:** [EXTERNAL] RE: Global security exit

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Hello All,
Adding Diana. My understanding is that Watchforce is part of International Trends which is an existing vendor whose contract is being expanded to cover the two hotels that Global was servicing. They are not a new vendor, their contract will fall under the International Trends umbrella. Do we still need to submit this information?

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Exodus Transitional Community, Inc.
2271 Third Avenue
New York, NY 100354
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

---

**From:** Calabrese, Anna <ACalabrese@justice.nyc.gov>
**Sent:** Monday, March 14, 2022 11:12 AM
**To:** Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Danielle Rosario <drosario@etcny.org>
**Cc:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; ndozier-lewis@cityhall.nyc.gov; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>
**Subject:** RE: Global security exit

Yes, watchforce is the new vendor to my understanding

---

**From:** Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>
**Sent:** Monday, March 14, 2022 10:45 AM
**To:** Danielle Rosario <drosario@etcny.org>
**Cc:** MacLeod, Alison <AMacLeod@cityhall.nyc.gov>; Calabrese, Anna <ACalabrese@justice.nyc.gov>; Dozier-Lewis, Nandi <NDozier-Lewis@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>; Chavez, J. Carolina <CChavez@cityhall.nyc.gov>
**Subject:** RE: Global security exit

Hi Danielle,

Thanks for the update. Watchforce is a new provider of security at the hotels, correct? If so, our

contracts team (Alison, copied here) has reminders, below, for brining on a new subcontractor. Please provide and complete the following as soon as possible, as some of these would ideally occur before a new subcontractor starts work.

1. New vendor name and EIN to do a background check. Contracts should be approving the vendor prior to the new vendor starting work.
2. Start date of new vendor
3. Signed subcontractor agreement uploaded in HHS Accelerator budget
4. Budget modification in HHS Accelerator budget to add a new line for the new vendor

Let me know if you have any questions.

Best,
Joe

---

**From:** Danielle Rosario <drosario@etcny.org>
**Sent:** Sunday, March 13, 2022 9:27 PM
**To:** Berkman-Breen, Joseph <JBerkmanBreen@cityhall.nyc.gov>; Montoya, Jordan <JMontoya@cityhall.nyc.gov>
**Subject:** [EXTERNAL] Fwd: Global security exit

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@cyber.nyc.gov as an attachment (Click the More button, then forward as attachment).

Please see the below. Perhaps the information you can provide to the reporter can include that we inherited this vendor Exodus did not choose this provider! Thanks.

Sincerely,
Danielle N. Rosario, Esq.
Chief Legal Officer
Exodus Transitional Community, Inc.
2271 Third Avenue
New York, NY 10035
Office: 917-492-0990 ext. 197
Pronouns: she/her/ella

---

**From:** Diana Ortiz <DOrtiz@etcny.org>
**Sent:** Sunday, March 13, 2022 3:48:10 PM
**To:** Julio Medina <jmedina@etcny.org>; Jennifer Kaake <JKaake@etcny.org>; Tomasina Salcedo <tsalcedo@etcny.org>; Danielle Rosario <drosario@etcny.org>; Nora Reissig <NReissig@etcny.org>
**Subject:** Global security exit

Hi everyone, I received a text from Jen this morning regarding a rumor that ends up being true - Global is leaving our hotels. I contacted Global and was told that they attempted to contact us on Friday - so that didn't happen. Global does and cannot get the paperwork we've been requesting for

the Mayor's office, so they decided to leave - told their staff, didn't tell us. I expressed disappointment, but told them, we'll move forward without them.

Good news, Watchforce is assembling a team to take over at 8am tomorrow. I've shared this with Jen, 5 at Holiday Inn and 6 at Wyndham. Thank you Jen for acting quickly on this and letting me know. Thanks

With Gratitude, Diana
VP of Wellness/Genesis M.H. Centers
Exodus Transitional Community, Inc
914-645-7665

Get Outlook for iOS

**Subcontractor EIN #: 20-5039567**

# SUBCONTRACT

This Subcontract ("Subcontract") is made as of the latest date signed by the signatory below by and between Exodus Transitional Community, Inc. a New York not-for-profit corporation, tax exempt under Internal Revenue Code § 501(c)(3) with office headquarters located at 2268 Third Avenue, NY, NY 10035, ("Contractor"), and International Trendz, DBA Presidential Security Company an organization with offices at 119-22 204th Street Suite 2, Queens, New York 11412 ("Subcontractor").

## Recitals

A. WHEREAS, Contractor has entered into an agreement, Contract I.D. # CT1-002-20228804812 ("City Contract"), with the City of New York (the "City"), acting by and through, Mayor's Office of Criminal Justice ("City Agency"); and

B. WHEREAS, Contractor wishes to engage Subcontractor, an organization/individual separate from and independent of Contractor, to provide certain program services required by the City Contract not otherwise performed by Contractor's paid or unpaid staff, as set forth in Section 2, below ("Services"), and Subcontractor is able and willing to provide the Services; and

C. WHEREAS, Contractor will utilize the City's web based system, PIP (Payee Information Portal www.nyc.gov/pip), to obtain Subcontractor approval pursuant to PPB Rule section 4-13, and will also be required to enter all Subcontractor payment information and other related information in such system during the City Contract term.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, Contractor and Subcontractor hereby agree as follows:

## Agreement

**1.** **Term:** The scope of services shall be provided during the term of the Subcontract, beginning June 3, 2022, and ending June 30, 2022 ("Term"), subject to a Term extension if agreed upon in writing by both Contractor and Subcontractor.

**2.** **Scope of Services:** Subcontractor shall provide the Services described in Annex A "Workscope" in accordance with all applicable provisions of the City Contract.

**3.** **Payment:**

a. Subject to City Agency approval of this Subcontract, and the availability of program budget funds, Contractor shall pay Subcontractor as compensation for

the Services an amount not to exceed $5,744,940 at a rate no more than $55 per hour for security guards, and $65 per hour for supervisors (“Subcontract Budget Amount”).

b. Payments to Subcontractor shall be made upon receipt by Contractor of timely, accurate, and complete invoices including staff logs from each hotel, for each and every shift.

**4. Representations and Warranties:**

a. Subcontractor represents and warrants that it has sufficient fiscal and organizational capacity to perform the Services.

b. If the Budget Amount is greater than $20,000, Subcontractor is prequalified in HHS Accelerator.

**5. Termination:**

This Subcontract will be terminated, suspended, or modified:

a. After ten (10) days’ prior written notice by Contractor to Subcontractor if:
   (i) in the sole judgment of Contractor or City agency, Subcontractor has failed to perform in accordance with the terms and conditions of this Subcontract or the City Contract, or
   (ii) the Program budget is reduced;

b. Immediately upon:
   (i) termination of the City Contract, or
   (ii) in the sole judgment of Contractor or City agency a material breach of Subcontract has occurred.

**6. Insurance:**

a. Subcontractor shall, at its expense, at all times during the term of this Subcontract, maintain insurance in the amounts and coverage as set forth below. Subcontractor shall obtain all policies required under this Subcontract from insurers licensed to do business in the State of New York and such insurers shall have a A.M. Best’s rating of no less than A-/“VII” or a Standard and Poor’s rating of at least A, unless prior written approval from Contractor is obtained. Subcontractor shall provide certificate of insurance evidencing each coverage requirement listed below to Contractor.

**INSURANCE REQUIREMENTS**

Required Policies and Amounts

| | |
|---|---|
| Workers' Compensation/ Disability Benefits: | In statutory amounts |
| Employer's Liability: | The greater of statutory amounts or $1,000,000. |
| Commercial General Liability (including Owner's Protective Liability): | The minimum combined single limit per occurrence shall be $1,000,000, with an annual aggregate of not less than $2,000,000 in the aggregate. The maximum deductible or self-insured retention ("SIR") for the Commercial General Liability policy shall be $10,000. |
| Professional Liability: | If Subcontractor is providing professional services under this Subcontract for which professional liability insurance or errors and omissions insurance is reasonably commercially available, Subcontractor shall maintain such insurance for at least $1,000,000 per claim. |

**7. Compliance**

a. Subcontractor shall only employ security guards with a valid New York State Security Guard License on Contractor operated sites, in compliance with Article 7-A of the General Business Law and Title 19 NYCRR, Part 170, and any other laws in effect at the time such services are performed.

b. Only security guards employed directly by Subcontractor will be allowed to work at Contractor operated sites. Under no circumstances is Subcontractor allowed to use security guards employed by another entity to meet staffing needs at Contractor operated sites.

c. Subcontractor shall register every security guard working on Contractor operated sites with the New York State Division of Licensing Services Security Guard Registry, in compliance with Title 19 NYCRR, Part 174, and any other laws in effect at the time such services are performed.

d. Subcontractor shall mandate all security guards on Contractor operated sites to carry an original, or clear photocopy, of a valid New York State Security Guard License on their person during each shift.

e. Subcontractor shall use sign-in logs to maintain accurate time and attendance records for every security guard on every shift at Contractor operated site in compliance with Title 19 NYCRR, Part 173, and any other laws in effect at the time such services are performed.

f. Subcontractor agrees and acknowledges that it is the Subcontractor's express responsibility to remain apprised of any changes in local, state, or federal law applicable to their industry or entity.

g. The Subcontractor shall perform all services under this Subcontract in accordance with all applicable city, state, and federal Laws as are in effect at the time such services are performed.

**8. City Contract:**

a. Nothing in this Subcontract shall impair the rights of the City under the City Contract.

b. Nothing in this Subcontract shall create any relationship between Subcontractor's employees or agents (including, without limitation, a contractual relationship, employer-employee relationship, or a quasi-employer/quasi-employee relationship) or impose any liability or duty on the City for (i) the acts, omissions, liabilities, rights or obligations of Subcontractor or its employees (including without limitation, obligations set forth in any collective bargaining agreement) or (ii) taxes of any nature or (iii) any right or benefit applicable to an official or employee of the City (including without limitation, Workers' Compensation coverage, Employer's Liability coverage, Disability Benefits coverage, Unemployment Insurance benefits, Social Security coverage, employee health and welfare benefits or employee retirement benefits, membership or credit).

c. Nothing contained in this Subcontract, or in the City Contract shall create any contractual relation between Subcontractor and the City or impose any liability or duty on the City on account of the acts, liabilities or obligations of Subcontractor, or authorize Subcontractor to hold itself out as an employee of the City.

d. Subcontractor agrees to comply with the requirements in Appendix A to the City Contract (attached hereto as Annex F), and all references to Contractor in Annex F shall be construed to refer to Subcontractor; all reference to Agreement shall be construed to refer to Subcontract.

e. Subcontractor shall not engage in any discriminatory practice prohibited by Title 8 of the City Administrative Code.

f. Subcontractor shall not knowingly permit Enforcement Personnel to have access to non-public areas of the facilities where the services provided pursuant to this Subcontract are provided unless:

(i) such Enforcement Personnel are authorized to have access pursuant to an agreement, contract, or subcontract;

(ii) such Enforcement Personnel present a judicial warrant;

(iii) access is otherwise required by law;

(iv) such Enforcement Personnel are accessing such non-public areas as part of a cooperative arrangement involving City, state or federal agencies;

(v) access furthers the purpose or mission of a City agency; or

(vi) exigent circumstances exist.

For the purposes of this Section 7(f), the phrase "Enforcement Personnel" means government personnel who are empowered to enforce civil or criminal laws, but excludes personnel of the City, the New York City Department of Education, or a local public benefit corporation or a local public authority.

g. If this Subcontract exceeds $100,000, Subcontractor shall comply with Annex C (Executive Order 50) and Annex D (Whistleblower Protection).

h. If this Subcontract involves the provision of homecare services, day care services, head start services, services to people with cerebral palsy, building services, food services, or temporary services, as those services are defined in City Administrative Code § 6-109, Subcontractor shall comply with Annex E (Living Wage).

i. The City may enforce the provisions of this Section 8 as though it were a party to this Subcontract.

**9. Entire Agreement:**

a. This Subcontract consists of the following documents, constituting the entire agreement between the parties:

- This document;
- Annex A, Workscope;
- Annex B, Identifying Information Rider;
- Annex C, Executive Order 50 provisions (applicable if the value of the Subcontract exceeds $100,000);
- Annex D, Whistleblower Protection (applicable if the value of the Subcontract exceeds $100,000);
- Annex E, Living Wage provisions (applicable if the Services involve employees covered by City Administrative Code § 6-109);

- Annex F, Appendix A Section 5 referenced in Subcontract Section 8(d); and
- Annex G, Private Investigators, Bail Enforcement Agents, Watch, Guard or Patrol Agencies and Security Guard Licensing Law May 2020 from New York State Department of State, Division of Licensing Services referenced in Subcontract Section 7.

b. This Subcontract contains all the terms and conditions agreed upon by the parties, and no other agreement, oral or otherwise, regarding the subject matter of this Subcontract shall be deemed to exist or to bind any of the parties or to vary any of the terms herein. Any waiver, alteration, modification, cancellation, or replacement of this Subcontract must be agreed upon in writing by the parties and approved in writing, in advance, by the City.

**10. Severability**

If this Subcontract contains any unlawful provision not an essential part of the Subcontract and which shall not appear to have been a controlling or material inducement to the making of this Subcontract, the unlawful provision shall be deemed of no effect and shall, upon notice by either party, be deemed stricken from the Subcontract without affecting the binding force of the remainder.

**[Remainder of the page intentionally blank.]**

**IN WITNESS WHEREOF,** the parties have executed the Subcontract on the date and year set opposite their respective authorized signatures.

**Contractor:**

________ By: ______________________________

**Date** (Signature)

______________________________

(Julio Medina)

______________________________

(Chief Executive Officer)

**Subcontractor:**

________ By: ______________________________

**Date** (Signature)

______________________________

(Ishmael Qadar)

______________________________

(Owner and General Manager)

# SUBCONTRACT

## ANNEX A WORKSCOPE

**Subcontractor:** International Trendz, DBA Presidential Security Company

**Address:** 119-22 204th Street, Suite 2 **State:** NY **Zip Code:** 11412

**Contractor:** Exodus Transitional Community Inc. **Contract ID #** CT1-002-20228804812

**Description of Services**:

International Trendz, DBA Presidential Security Company ("Subcontractor") (EIN 20-5039567) is licensed by the New York Department of State to transact business as a Watchguard or Patrol Agency. Subcontractor is responsible for maintaining a valid business license in New York State. Subcontractor is responsible for adhering to any and all city, state, or federal laws applicable to the entity or industry in effect at the time such services are performed.

Subcontractor will be responsible for employing New York State licensed security guards pursuant to established staffing patterns at three of the Exodus Transitional Community Inc. managed temporary COVID-19 emergency hotel locations throughout the various boroughs of New York City. This service will be provided twenty-four hours per day, seven days per week, for the Term of the Subcontract. The locations of these hotels are subject to change upon amendments to Contractor's agreement with the City. Subcontractor agrees to change hotel locations if Contractor is directed to do so by the City.

---

**Schedule (for each City fiscal year of the Subcontract):**

| | |
|---|---|
| Service Period Start and End Dates | 06/03/22 and 6/30/22 |
| No. Hours per Day | 24 hours per day |
| No. Days per Week | 7 days per week |
| No. Weeks per Year | 4 |

# SUBCONTRACT

# ANNEX B

# IDENTIFYING INFORMATION RIDER

**Section 1.01 Background.**

Local Laws 245 and 247 of 2017 (codified at New York City Charter ("Charter") Section 8 subdivision (h) and the Administrative Code of the City of New York ("Admin. Code") Sections 23-1201 to -1205) are effective June 15, 2018. Such laws apply to human services contracts and other contracts designated by the City Chief Privacy Officer that involve the collection, retention, or disclosure of "Identifying Information" in connection with services provided under a City contract. Accordingly, in connection with the services provided under this Subcontract, Subcontractor may collect, retain, and disclose Identifying Information only in accordance with the requirements of this Identifying Information Rider, the policies and protocols adopted pursuant to Admin. Code Sections 23-1201 to -1205, the other provisions of this Subcontract and as otherwise required by law.

**Section 1.02 Definitions.**

A. "Agency" means the City agency or office through which the City has entered into the City Contract.

B. "Agency Privacy Officer" means the person designated to exercise functions under Admin. Code Sections 23-1201 to -1205 by the Agency through which the City is a party to the City Contract.

C. "City Chief Privacy Officer" means the person designated by the Mayor pursuant to Charter Section 8 subdivision (h) as the City's Chief Privacy Officer or such person's designee.

D. "Exigent Circumstances" means circumstances where collection or disclosure is urgently necessary, such that procedures that would otherwise be required cannot be followed.

E. "Identifying Information" means any information provided by the City or Contractor to the Subcontractor or obtained by Subcontractor in connection with this Subcontract that may be used on its own or with other information to identify or locate an individual. Identifying Information includes, but is not limited to: name, sexual orientation, gender identity, race, marital or partnership status, status as a victim of domestic violence or sexual assault, status as a crime victim or witness, citizenship or immigration status, eligibility for or receipt of public assistance or city services, all information obtained from an individual's income tax records, an individual's Social Security number, information obtained from any surveillance system operated by, for the benefit of, or at the direction of the New York City Police Department, motor vehicle information or license plate number, biometrics such as fingerprints and photographs, languages

spoken, religion, nationality, country of origin, place of birth, date of birth, arrest record or criminal conviction, employment status, employer information, current and previous home and work addresses, contact information such as phone number and email address, information concerning social media accounts, date and/or time of release from the custody of the Administration for Children's Services, the Department of Correction, or the New York City Police Department, any scheduled court appearances, any scheduled appointments with the City, the Subcontractor that provides human services or other services designated by the City Chief Privacy Officer, and any other category of information designated by the City Chief Privacy Officer.

**Section 1.03 Collection.**

Absent Exigent Circumstances, Subcontractor shall not collect Identifying Information unless such collection (a) has been approved by the Agency Privacy Officer or the City Chief Privacy Officer and the collection of such Identifying Information is in furtherance of Subcontractor's obligations under this Subcontract; (b) is required by law or treaty; (c) is required by the New York City Police Department in connection with a criminal investigation; or (d) is required by a City agency in connection with the welfare of a minor or other individual who is not legally competent.

**Section 1.04 Disclosure.**

A. Absent Exigent Circumstances, Subcontractor shall not disclose Identifying Information unless such disclosure (a) has been authorized in writing by the individual to whom such information pertains or, if such individual is a minor or is otherwise not legally competent, by such individual's parent, legal guardian, or other person with legal authority to consent on behalf of the individual; (b) has been approved by the Agency Privacy Officer or the City Chief Privacy Officer and the disclosure of such Identifying Information is in furtherance of Subcontractor's obligations under this Subcontract; (c) is required by law or treaty; (d) is required by the New York City Police Department in connection with a criminal investigation; or (e) is required by a City agency in connection with the welfare of a minor or other individual who is not legally competent.

B. If Subcontractor discloses an individual's Identifying Information in violation of this Rider, Subcontractor shall notify the Agency Privacy Officer. In addition, if such disclosure requires notification to the affected individual(s) pursuant to the policies and protocols promulgated by the City Chief Privacy Officer under subdivision 6 of Section 23-1203, in the discretion of the Agency Privacy Officer Subcontractor shall either (i) make reasonable efforts to notify such individual(s) in writing of the Identifying Information disclosed and to whom it was disclosed as soon as practicable or (ii) cooperate with the Agency's efforts to notify such individual(s) in writing. The City shall have the right to direct the Contractor to withhold further payments under this Subcontract for the purpose of set-off in sufficient sums to cover the costs of notifications and/or other actions mandated by any law, administrative or judicial order, or the City Chief Privacy Officer to address the disclosure, and including any fines or disallowances imposed by the State or federal government as a result of the disclosure. The City shall also have the right to direct the Contractor to withhold further payments under this Subcontract for the purpose of set-off in sufficient sums to cover the costs of credit monitoring services for the victims of such a disclosure by a national credit reporting agency, and/or any other commercially

reasonable preventive measure. The Agency shall provide Subcontractor with written notice and an opportunity to comment on such measures prior to implementation. Alternatively, at the City's discretion, or if monies remaining to be earned or paid under this Subcontract are insufficient to cover the costs detailed above, Subcontractor shall pay directly for the costs, detailed above, if any.

C. 1.04(B) shall not require any notification that would violate any law or interfere with an investigation or otherwise compromise public safety pursuant to subdivision e of Section 23-1204.

**Section 1.05 Exigent Circumstances.**

In the event Subcontractor collects or discloses Identifying Information due to Exigent Circumstances, with no other basis for collection or disclosure under subdivisions b or c of Section 23-1202, Subcontractor shall send to the Agency Privacy Officer information about such collection or request and disclosure, along with an explanation of why such Exigent Circumstances existed, as soon as practicable after such collection or disclosure. This section shall not require any such notification for collection or disclosure of Identifying Information that: (a) is required by the New York City Police Department in connection with an open criminal investigation; (b) is required by a City agency in connection with an open investigation concerning the welfare of a minor or other individual who is not legally competent; or (c) occurs in the normal course of performing Subcontractor's obligations under this Subcontract and is in furtherance of law enforcement or public health or safety powers of the Agency under Exigent Circumstances.

**Section 1.06 Retention.**

Subcontractor shall retain Identifying Information as required by law or as otherwise necessary in furtherance of this Subcontract, or as otherwise approved by the Agency Privacy Officer or the City Chief Privacy Officer.

**Section 1.07 Reporting.**

Subcontractor shall provide the Agency with reports as requested by the Contractor, Agency Privacy Officer or City Chief Privacy Officer regarding the collection, retention, and disclosure of Identifying Information by Subcontractor. Each such report shall include information concerning Identifying Information collected, retained, and disclosed, including: (a) the types of Identifying Information collected, retained, or disclosed; (b) the types of collections and disclosures classified as "routine" and any collections or disclosures approved by the Agency Privacy Officer or City Chief Privacy Officer; and (c) any other related information that may be reasonably required by the Agency Privacy Officer or City Chief Privacy Officer.

**Section 1.08 Coordination with Agency Privacy Officer.**

The Agency may assign powers and duties of the Agency Privacy Officer to Contractor for purposes of the City Contract.

**Section 1.09 Conflicts with Provisions Governing Records, Audits, Reports and Investigations.**

To the extent allowed by law, the provisions of this Rider shall control if there is a conflict between any of the provisions of this Rider and other provisions concerning records retention, inspections, audits, and reports designated in the Subcontract. The provisions of this Rider do not replace or supersede any other obligations or requirements of the Subcontract or City Contract.

**Section 1.10 [Not used.]**

**Section 1.11 Disclosures of Identifying Information to Third Parties.**
Subcontractor shall comply with the City Chief Privacy Officer's policies and protocols concerning requirements for a written agreement governing the disclosure of Identifying Information to a third party.

# SUBCONTRACT

## ANNEX C

## EXECUTIVE ORDER 50

This Subcontract is subject to the requirements of Executive Order No. 50 (April 25, 1980) (66 RCNY § 10-14) ("E.O. 50") and the rules and regulations promulgated thereunder. No contract will be awarded unless and until these requirements have been complied with in their entirety. By signing this Subcontract, Subcontractor agrees that it:

(1) will not discriminate unlawfully against any employee or applicant for employment because of race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or citizenship status with respect to all employment decisions including, but not limited to recruitment, hiring, upgrading, demotion, downgrading, transfer, training, rates of pay or other forms of compensation, layoff, termination, and all other terms and conditions of employment;

(2) will not discriminate in the selection of subcontractors on the basis of the owner's, partners' or shareholders' race, color, creed, national origin, sex, age, handicap, marital status, sexual orientation or citizenship status;

(3) will state in all solicitations or advertisements for employees placed by or on behalf of Subcontractor that all qualified applicants will receive consideration for employment without regard to race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or citizenship status or is an equal employment opportunity employer;

(4) will send to each labor organization or representative of workers with which it has a collective bargaining agreement or other contract or memorandum of understanding, written notification of its equal employment opportunity commitments under E.O. 50 (66 RCNY § 10-14) and the rules and regulations promulgated thereunder;

(5) will furnish before the Subcontract is awarded all information and reports including an Employment Report which are required by E.O. 50 (66 RCNY § 10-14) the rules and regulations promulgated thereunder, and orders of the Director of the Office of Labor Services ("Division"). Copies of all required reports are available upon request from the contracting agency; and

(6) will permit the Division to have access to all relevant books, records and accounts by the Division for the purposes of investigation to ascertain compliance with such rules, regulations, and orders.

Subcontractor understands that in the event of its noncompliance with the nondiscrimination clauses of this Subcontract or with any of such rules, regulations, or orders, such noncompliance shall constitute a material breach of the Subcontract and noncompliance with E.O. 50 (66 RCNY § 10-14) and the rules and regulations promulgated thereunder. After a hearing held pursuant to the rules of

the Division, the Director may direct the imposition by the City Agency head of any or all of the following sanctions:

(i) disapproval of Subcontractor;

(ii) suspension or termination of the Subcontract;

(iii) declaring Subcontractor in default; or

(iv) in lieu of any of the foregoing sanctions, the Director may impose an employment program.

The Director of the Division may recommend to the contracting agency head that a Subcontractor who has repeatedly failed to comply with E.O. 50 (66 RCNY § 10-14) and the rules and regulations promulgated thereunder be determined to be not responsible.

# SUBCONTRACT

# ANNEX D

# WHISTLEBLOWER PROTECTIONS

In accordance with Local Laws 30 and 33 of 2012, codified at Admin. Code §§ 6-132 and 12-113, respectively,

1. Subcontractor shall not take an adverse personnel action with respect to an officer or employee in retaliation for such officer or employee making a report of information concerning conduct which such officer or employee knows or reasonably believes to involve corruption, criminal activity, conflict of interest, gross mismanagement or abuse of authority by any officer or employee relating to this Subcontract to (i) the Commissioner of the Department of Investigation, (ii) a member of the New York City Council, the Public Advocate, or the Comptroller, or (iii) the City Chief Procurement Officer, ACCO, City Agency head, or Commissioner.

2. If any of Subcontractor's officers or employees believes that he or she has been the subject of an adverse personnel action in violation of this Appendix, he or she shall be entitled to bring a cause of action against Subcontractor to recover all relief necessary to make him or her whole. Such relief may include but is not limited to: (i) an injunction to restrain continued retaliation, (ii) reinstatement to the position such employee would have had but for the retaliation or to an equivalent position, (iii) reinstatement of full fringe benefits and seniority rights, (iv) payment of two times back pay, plus interest, and (v) compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorney's fees.

3. Subcontractor shall post a notice provided by the City (attached hereto) in a prominent and accessible place on any site where work pursuant to the Subcontract is performed that contains information about:

    a. how its employees can report to the New York City Department of Investigation allegations of fraud, false claims, criminality or corruption arising out of or in connection with the Subcontract; and

    b. the rights and remedies afforded to its employees under City Administrative Code §§ 7-805 (the New York City False Claims Act) and 12-113 (the Whistleblower Protection Expansion Act) for lawful acts taken in connection with the reporting of allegations of fraud, false claims, criminality or corruption in connection with the Subcontract.

4. For the purposes of this Appendix, "adverse personnel action" includes dismissal, demotion, suspension, disciplinary action, negative performance evaluation, any action resulting in loss of staff, office space, equipment or other benefit, failure to appoint,

failure to promote, or any transfer or assignment or failure to transfer or assign against the wishes of the affected officer or employee.

# REPORT

## *CORRUPTION, FRAUD, UNETHICAL CONDUCT*

## RELATING TO A NYC-FUNDED CONTRACT OR PROJECT

## CALL THE NYC DEPARTMENT OF INVESTIGATION

## 212-825-5959

| | |
|---|---|
| **DOI CAN ALSO BE REACHED BY MAIL OR IN PERSON AT:**<br>**New York City Department of Investigation (DOI)**<br>**80 Maiden Lane, 17th floor**<br>**New York, New York 10038**<br>**Attention: COMPLAINT BUREAU**<br><br>**OR FILE A COMPLAINT ON-LINE AT:**<br>**www.nyc.gov/doi**<br><br>**All communications are confidential** | **Or scan the QR Code above to make a complaint** |

**THE LAW PROTECTS EMPLOYEES OF CITY CONTRACTORS WHO REPORT CORRUPTION**

- Any employee of a City contractor, or subcontractor of the City, or a City contractor with a contract valued at more than $100,000 is protected under the law from retaliation by his or her employer if the employee reports wrongdoing related to the contract to the DOI.
- **To be protected by this law,** an employee must report to DOI − or to certain other specified government officials − information about fraud, false claims, corruption, criminality, conflict of interest, gross mismanagement, or abuse of authority relating to a City contract valued at more than $100,000.
- Any employee who makes such a report and who believes he or she has been dismissed, demoted, suspended, or otherwise subject to an adverse personnel action because of that report is entitled to bring a lawsuit against the contractor and recover damages.

# SUBCONTRACT

## ANNEX E

## LIVING WAGE

A. Subcontractor agrees as follows:

1. Subcontractor shall comply with the requirements of Administrative Code § 6-109 ("Section 6-109"), including, where applicable, the payment of either a prevailing wage or a living wage, as those terms are defined in Section 6-109.

2. Subcontractor shall not retaliate, discharge, demote, suspend, take adverse employment action in the terms and conditions of employment or otherwise discriminate against any employee for reporting or asserting a violation of Section 6-109, for seeking or communicating information regarding rights conferred by Section 6-109, for exercising any other rights protected under Section 6-109, or for participating in any investigatory or court proceeding relating to Section 6-109. This protection shall also apply to any employee or his or her representative who in good faith alleges a violation of Section 6-109, or who seeks or communicates information regarding rights conferred by Section 6-109 in circumstances where he or she in good faith believes it applies.

3. Subcontractor shall maintain original payroll records for each of its covered employees reflecting the days and hours worked on contracts, projects, or assignments that are subject to the requirements of Section 6-109, and the wages paid and benefits provided for such hours worked. Subcontractor shall maintain these records for the duration of the term of this Subcontract and shall retain them for a period of four years after completion of this Subcontract. For contracts involving building services, food services, or temporary services, the Subcontractor shall submit copies of payroll records, certified by the Subcontractor under penalty of perjury to be true and accurate, to Contractor with every requisition for payment. For contracts involving homecare, day care, head start or services to persons with cerebral palsy, the Subcontractor shall submit either certified payroll records or categorical information about the wages, benefits, and job classifications of covered employees of the Subcontractor, which shall be the substantial equivalent of the information required in Section 6-109(2)(a)(iii).

4. Subcontractor shall pay all covered employees by check and shall provide employees check stubs or other documentation at least once each month containing information sufficient to document compliance with the requirements of the Living Wage Law concerning living wages, prevailing wages, supplements, and health benefits. In addition, if this Subcontract is for an amount greater than $750,000.00, checks issued by Subcontractor to covered employees shall be generated by a payroll service or automated payroll system (an in-house system may be used if approved by the City Agency).

5. If provided by the City Agency to Contractor, Contractor will provide written notices to Subcontractor, prepared by the Comptroller, detailing the wages, benefits, and other

protections to which covered employees are entitled under Section 6-109. Such notices will be provided in English, Spanish and other languages spoken by ten percent or more of a covered employer's covered employees. Throughout the term of this Subcontract, Subcontractor shall post in a prominent and accessible place at every work site and provide each covered employee a copy of the written notices provided by Contractor.

6. Prior to entering into the Subcontract and each year throughout the term of the Subcontract, Subcontractor shall provide to Contractor for submission to the City Agency a certification as required by Section 6-109(c)(2).

7. Failure to comply with the requirements of Section 6-109 may, in the discretion of the City Agency, constitute a material breach by Subcontractor of the terms of this Subcontract. If Subcontractor receives written notice of such a breach and fails to cure such breach within 30 days, the City shall have the right to pursue any rights or remedies available under this Subcontract or under applicable law, including termination of the Subcontract.

# SUBCONTRACT

# ANNEX F

## Appendix A: ARTICLE 5 - RECORDS, AUDITS, REPORTS, AND INVESTIGATIONS

### Section 5.01 Books and Records

The Contractor agrees to maintain separate and accurate books, records, documents, and other evidence, and to utilize appropriate accounting procedures and practices that sufficiently and properly reflect all direct and indirect costs of any nature expended in the performance of this Agreement.

### Section 5.02 Retention of Records

The Contractor agrees to retain all books, records, documents, other evidence relevant to this Agreement, including those required pursuant to Section 5.01, for six years after the final payment or expiration or termination of this Agreement, or for a period otherwise prescribed by Law, whichever is later. In addition, if any litigation, claim, or audit concerning this Agreement has commenced before the expiration of the six-year period, the books, records, documents, and other evidence must be retained until the completion of such litigation, claim, or audit. Any books, records, documents, and other evidence that are created in an electronic format in the regular course of business may be retained in an electronic format. Any books, records, documents, or other evidence that are created in the regular course of business as a paper copy may be retained in an electronic format provided that they satisfy the requirements of N.Y. Civil Practice Law and Rules ("CPLR") 4539(b), including the requirement that the reproduction is created in a manner "which does not permit additions, deletions, or changes without leaving a record of such additions, deletions, or changes." Furthermore, the Contractor agrees to waive any objection to the admissibility of any such books, records, documents, or other evidence on the grounds that such documents do not satisfy CPLR 4539(b).

### Section 5.03 Inspection

A. At any time during the Agreement or during the record retention period set forth in Section 5.02, the City, including the Department and the Department's Office of the Inspector General, as well as City, State, and federal auditors and any other persons duly authorized by the City shall, upon reasonable notice, have full access to and the right to examine and copy all books, records, documents, and other evidence maintained or retained by or on behalf of the Contractor pursuant to this Article 5. Notwithstanding any provision herein regarding notice of inspection, all books, records, documents, and other evidence of the Contractor kept pursuant to this Agreement shall be subject to immediate inspection, review, and copying by the Department's Office of the Inspector General, the Comptroller, and/or federal auditors without prior notice and at no additional cost to the City. The Contractor shall make such books, records documents, and other evidence available for inspection in the City of New York or shall reimburse the City for expenses associated with the out-of-City inspection.

B. The Department shall have the right to have representatives of the Department or of the City, State or federal government present to observe the services being performed. If observation of particular services or activity would constitute a waiver of a legal privilege or violate the Law or an ethical obligation under the New York Rules of Professional Conduct for attorneys, National Association of Social Workers Code of Ethics or other similar code governing the provision of a profession's services in New York State, the Contractor shall promptly inform the Department or other entity seeking to observe such work or activity. Such restriction shall not act to prevent government representatives from inspecting the provision of services in a manner that allows the representatives to ensure that services are being performed in accordance with this Agreement.

C. The Contractor shall not be entitled to final payment until the Contractor has complied with any request for inspection or access given under this Section 5.03.

**Section 5.04 Audit**

A. This Agreement and all books, records, documents, and other evidence required to be maintained or retained pursuant to this Agreement, including all vouchers or invoices presented for payment and the books, records, and other documents upon which such vouchers or invoices are based (e.g., reports, cancelled checks, accounts, and all other similar material), are subject to audit by (i) the City, including the Comptroller, the Department, and the Department's Office of the Inspector General, (ii) the State, (iii) the federal government, and (iv) other persons duly authorized by the City. Such audits may include examination and review of the source and application of all funds whether from the City, the State, the federal government, private sources, or otherwise.

B. Audits by the City, including the Comptroller, the Department, and the Department's Office of the Inspector General, are performed pursuant to the powers and responsibilities conferred by the Charter and the Admin. Code, as well as all orders, rules, and regulations promulgated pursuant to the Charter and Admin. Code.

C. The Contractor shall submit any and all documentation and justification in support of expenditures or fees under this Agreement as may be required by the Department and by the Comptroller in the exercise of his/her powers under Law.

D. The Contractor shall not be entitled to final payment until the Contractor has complied with the requirements of this Section 5.04.

**Section 5.05 No Removal of Records from Premises**

Where performance of this Agreement involves use by the Contractor of any City books, records, documents, or data (in hard copy, or electronic or other format now known or developed in the future) at City facilities or offices, the Contractor shall not remove any such items or material (in the format in which it originally existed, or in any other converted or derived format) from such facility or office without the prior written approval of the Department's designated official.

Upon the request by the Department at any time during the Agreement or after the Agreement has expired or terminated, the Contractor shall return to the Department any City books, records, documents, or data that has been removed from City premises.

**Section 5.06 Electronic Records**

As used in this Appendix A, the terms "books," "records," "documents," and "other evidence" refer to electronic versions as well as hard copy versions.

**Section 5.07 Investigations Clause**

A. The Contractor agrees to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State or City agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit or inquiry.

B.

1. If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, or State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the Laws of the State, or;

2. If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

C.

6. The Commissioner or Agency Head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) Days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

D. The penalties that may attach after a final determination by the Commissioner or

Agency Head may include but shall not exceed:

1. The disqualification for a period not to exceed five years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and/or

2. The cancellation or termination of any and all such existing City contracts, leases, permits or licenses that the refusal to testify concerns and that have not been assigned as permitted under this Agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; monies lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

E. The Commissioner or Agency Head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in Paragraphs (1) and (2) below. He or she may also consider, if relevant and appropriate, the criteria established in Paragraphs (3) and (4) below, in addition to any other information that may be relevant and appropriate:

1. The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

2. The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

3. The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

4. The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under Paragraph D above, provided that the party or entity has given actual notice to the Commissioner or Agency Head upon the acquisition of the interest, or at the hearing called for in Paragraph (C)(1) above gives notice and proves that such interest was previously acquired. Under either circumstance, the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

F. Definitions

1. The term "license" or "permit" as used in this Section shall be defined as a license, permit, franchise, or concession not granted as a matter of right.

2. The term "person" as used in this Section shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

3. The term "entity" as used in this Section shall be defined as any firm, partnership, corporation, association, or person that receives monies, benefits, licenses, leases, or permits from or through the City, or otherwise transacts business with the City.

4. The term "member" as used in this Section shall be defined as any person associated with another person or entity as a partner, director, officer, principal, or employee.

G. In addition to and notwithstanding any other provision of this Agreement, the Commissioner or Agency Head may in his or her sole discretion terminate this Agreement upon not less than three (3) Days written notice in the event the Contractor fails to promptly report in writing to the City Commissioner of Investigation any solicitation of money, goods, requests for future employment or other benefits or thing of value, by or on behalf of any employee of the City or other person or entity for any purpose that may be related to the procurement or obtaining of this Agreement by the Contractor, or affecting the performance of this Agreement.

**Section 5.08 Confidentiality**

A. The Contractor agrees to hold confidential, both during and after the completion or termination of this Agreement, all of the reports, information, or data, furnished to, or prepared, assembled or used by, the Contractor under this Agreement. The Contractor agrees to maintain the confidentiality of such reports, information, or data by using a reasonable degree of care, and using at least the same degree of care that the Contractor uses to preserve the confidentiality of its own confidential information. The Contractor agrees that such reports, information, or data shall not be made available to any person or entity without the prior written approval of the Department. The obligation under this Section 5.08 to hold reports, information or data confidential shall not apply where the Contractor is legally required to disclose such reports, information or data, by virtue of a subpoena, court order or otherwise ("disclosure demand"), provided that the Contractor complies with the following: (1) the Contractor shall provide advance notice to the Commissioner, in writing or by e-mail, that it received a disclosure demand for to disclose such reports, information or data and (2) if requested by the Department, the Contractor shall not disclose such reports, information, or data until the City has exhausted its legal rights, if any, to prevent disclosure of all or a portion of such reports, information or data. The previous sentence shall not apply if the Contractor is prohibited by law from disclosing to the Department the disclosure demand for such reports, information or data.

B. The Contractor shall provide notice to the Department within three days of the discovery by the Contractor of any breach of security, as defined in Admin. Code § 10-501(b), of any data, encrypted or otherwise, in use by the Contractor that contains social security numbers

or other personal identifying information as defined in Admin. Code § 10-501 ("Personal Identifying Information"), where such breach of security arises out of the acts or omissions of the Contractor or its employees, subcontractors, or agents. Upon the discovery of such security breach, the Contractor shall take reasonable steps to remediate the cause or causes of such breach, and shall provide notice to the Department of such steps. In the event of such breach of security, without limiting any other right of the City, the City shall have the right to withhold further payments under this Agreement for the purpose of set-off in sufficient sums to cover the costs of notifications and/or other actions mandated by any Law, or administrative or judicial order, to address the breach, and including any fines or disallowances imposed by the State or federal government as a result of the disclosure. The City shall also have the right to withhold further payments hereunder for the purpose of set-off in sufficient sums to cover the costs of credit monitoring services for the victims of such a breach of security by a national credit reporting agency, and/or any other commercially reasonable preventive measure. The Department shall provide the Contractor with written notice and an opportunity to comment on such measures prior to implementation. Alternatively, at the City's discretion, or if monies remaining to be earned or paid under this Agreement are insufficient to cover the costs detailed above, the Contractor shall pay directly for the costs, detailed above, if any.

C. The Contractor shall restrict access to confidential information to persons who have a legitimate work related purpose to access such information. The Contractor agrees that it will instruct its officers, employees, and agents to maintain the confidentiality of any and all information required to be kept confidential by this Agreement.

D. The Contractor, and its officers, employees, and agents shall notify the Department, at any time either during or after completion or termination of this Agreement, of any intended statement to the press or any intended issuing of any material for publication in any media of communication (print, news, television, radio, Internet, etc.) regarding the services provided or the data collected pursuant to this Agreement at least 24 hours prior to any statement to the press or at least five business days prior to the submission of the material for publication, or such shorter periods as are reasonable under the circumstances. The Contractor may not issue any statement or submit any material for publication that includes confidential information as prohibited by this Section 5.08.

E. At the request of the Department, the Contractor shall return to the Department any and all confidential information in the possession of the Contractor or its subcontractors. If the Contractor or its subcontractors are legally required to retain any confidential information, the Contractor shall notify the Department in writing and set forth the confidential information that it intends to retain and the reasons why it is legally required to retain such information. The Contractor shall confer with the Department, in good faith, regarding any issues that arise from the Contractor retaining such confidential information. If the Department does not request such information or the Law does not require otherwise, such information shall be maintained in accordance with the requirements set forth in Section 5.02.

F. A breach of this Section 5.08 shall constitute a material breach of this Agreement for which the Department may terminate this Agreement pursuant to Article 10. The Department reserves any and all other rights and remedies in the event of unauthorized disclosure.

# SUBCONTRACT

# ANNEX G

# Private Investigators, Bail Enforcement Agents, Watch, Guard or Patrol Agencies and Security Guards Licensing Law

(May 2020)

New York State
DEPARTMENT OF STATE
**Division of Licensing Services**
https://dos.ny.gov

**Kathy Hochul**
*Governor*

**Rossana Rosado**
*Secretary of State*

## Private Investigators, Bail Enforcement Agents and Watch, Guard or Patrol Agencies License Law

Article 7, General Business Law

*Section*
70 Private investigator license
70-a Bail enforcement agents and watch, guard or patrol agencies
71 Definitions
72 Application for licenses
73 Enforcement of article; investigations
74 Issuance of licenses; fee; bonds
74-a Notification
75 Posting and surrender of license certificate
76 Certificate or pocket card lost or destroyed
77 Removal of bureau, agency or office
78 Renewal of licenses
78-a Surrender of licenses
79 Hearings, notice, determinations, review
80 License certificates, pocket cards or badges
81 Employees
82 Employees not to divulge information or make false reports
83 Application of article
84 Unlawful acts
85 Prosecution
86 Reward may be presumed
87 Department of State to employ agents; expenses or enforcement of law
88 Roster of licensees
89 Inspection by Commissioner of Labor
89-a Disposition of fees and other revenue

## Security Guard Act

Article 7-A, General Business Law

*Section*
89-f Definitions
89-g Employment of security guards
89-h Requirements for a registration card
89-i Investigation
89-j Security guard registry
89-k Issuance and denial of registration cards
89-l Suspension, revocation and reissuance of registration cards
89-m Renewal of registration cards
89-n Training requirements
89-o Rules and regulations
89-p Violations and penalties
89-q Separability
89-r Preemption
89-s Reporting
89-w Applicability

## Employees Rules and Regulations

Title 19 NYCRR, Part 170

*Section*
170.1 Security guard
170.2 Fingerprinting of employees
170.3 Employee statements
170.4 Fingerprinting of qualifying licensee(s)
170.5 Principal business address
170.6 [*Repealed*]
170.7 Multiple licenses
170.8 Business records
170.9 Employees' identification cards issued by licensee
170.10 Insignia/symbols of authority

EDNY_0000010670

170.11 Advertisements
170.12 Contracts and agreements
170.13 Supervision
170.14 State issued identification card

## Qualifying School Requirements for Bail Enforcement Rules and Regulations

Title 19 NYCRR, Part 171

*Section*

171.1 Approved entities
171.2 Application for approval of course of study
171.3 Subjects of study for bail enforcement agents
171.4 Attendance
171.5 Certificate of successful completion
171.6 Faculty
171.7 Retention of records
171.8 Lists
171.9 Facilities
171.10 Auditing
171.11 Suspensions and denials of course approval
171.12 Credit for equivalent education in the bail enforcement field
170.13 Registration period and fees

## Applications Rules and Regulations

Title 19 NYCRR, Part 172

*Section*

172.1 Equivalent position and experience—private investigator
172.2 Equivalent position and experience—watch, guard or patrol agency
172.3 Notice of criminal conviction

## Statement of Services to Be Performed Rules and Regulations

Title 19 NYCRR, Part 173

*Section*

173.1 Advance statement of services and charges
173.2 Records to be maintained

## Security Guard Companies Rules and Regulations

Title 19 NYCRR, Part 174

*Section*

174.1 [*Repealed*]
174.2 Exempt entities
174.3—174.4 [*Repealed*]
174.5 Fingerprint requirement
174.6 Employment as a security guard: due diligence
174.7 Notice of employment
174.8—174.9 [*Repealed*]
174.10 Disqualifying disability
174.11 Investigation waiver
174.12 Security guard registration

EDNY_0000010671

# Private Investigators, Bail Enforcement Agents and Watch, Guard or Patrol Agencies License Law

## §70. Private Investigator license

1. The Department of State shall have the power to issue licenses to private investigators. Nothing in this article shall prevent a private investigator licensed hereunder from performing the services of a watch, guard or patrol agency or bail enforcement agents as defined herein; however, a watch, guard or patrol agency or bail enforcement agents may not perform the services of a private investigator as defined herein.

2. No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator, or advertise his, their or its business to be that of private investigator, notwithstanding the name or title used in describing such agency or notwithstanding the fact that other functions and services may also be performed for fee, hire or reward, without having first obtained from the Department of State a license so to do, as hereinafter provided, for each bureau, agency, sub-agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, company, partnership, limited liability company or corporation for the conduct of such business.

3. No person, firm, company, partnership, limited liability company or corporation shall engage in the business of furnishing or supplying for fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company, or corporation, society or association, or any person or group of persons, or as to the character or kind of the business and occupation of any person, firm, company or corporation, or own or conduct or maintain a bureau or agency for the above mentioned purposes, except exclusively as to the financial rating, standing, and credit responsibility of persons, firms, companies or corporations, or as to the personal habits and financial responsibility of applicants for insurance, indemnity bonds or commercial credit or of claimants under insurance policies, provided the business so exempted does not embrace other activities as described in §71 of this article, or except where such information is furnished or supplied by persons licensed under the provisions of §24-a or subdivision 3-b of §50 of the Workers' Compensation Law or representing employers or groups of employers insured under the Workers' Compensation Law in the State Insurance Fund, without having first obtained from the Department of State, as hereafter provided, a license so to do as private investigator for each such bureau or agency and for each and every sub-agency, office and branch office to be owned, conducted, managed or maintained by such persons, firm, limited liability company, partnership or corporation for the conduct of such business. Nothing contained in this section shall be deemed to include the business of adjusters for insurance companies, nor public adjusters licensed by the superintendent of insurance under the Insurance Law of this state.

4. Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

## §70-a. Bail enforcement agents and watch, guard or patrol agencies

1. The Department of State shall have the power to issue separate licenses to bail enforcement agents and to watch, guard or patrol agencies. Nothing in this article shall prevent a private investigator licensed hereunder from performing the services of a watch, guard or patrol agency or bail enforcement agent as defined in this article; however, a watch, guard or patrol agency or bail enforcement agent may not perform the services of a private investigator as defined in this article.

2. No person, firm, company, partnership, limited liability company or corporation shall engage in the business of bail enforcement agents or the business of watch, guard or patrol agency, or advertise his, their or its business to be that of bail enforcement agent or watch, guard or patrol agency, notwithstanding the name or title used in describing such agency or nothwithstanding the fact that other functions and services may also be performed for fee, hire or reward, without having first obtained from the Department of State a license so to do, as hereinafter provided, for each bureau, agency, sub-agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, company, partnership, limited liability company or corporation for the conduct of such business.

3. Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

## §71. Definitions

1. "Private investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to real or personal property; or the affiliation, connection or relation of any person, firm or corporation with any union, organization, society or association, or with any official, member or representative thereof; or with reference to any person or persons seeking employment in the place of any person or persons who have quit work by reason of any strike; or with reference to the conduct, honesty, efficiency, loyalty or activities of employees, agents, contractors, and sub-contractors; or the securing of evidence to be used before any authorized investigating committee, board of award, board of arbitration, or in the trial of civil or criminal cases. The foregoing shall not be deemed to include the business of persons licensed by the industrial commissioner under the provisions of §24-a or subdivision 3-b of §50 of the Workers' Compensation Law or representing employers or groups of employers insured under the Workers' Compensation Law in the State Insurance Fund, nor persons engaged in the business of adjusters for insurance companies nor public adjusters licensed by the Superintendent of Insurance under the Insurance Law of this State.

1a. "Bail enforcement agent" shall mean and include only the business of bail enforcement and shall also mean and include, separately or collectively, the engaging in the business of enforcing the terms and conditions of a person's release from custody on bail in a criminal proceeding, including locating, apprehending and returning any such person released from custody on bail who has failed to appear at any stage of a criminal proceeding to answer the charge before the court in which he may be prosecuted. The foregoing shall not be deemed to include the business of persons licensed under the provisions of §24-a or subdivision 3-b of section 50 of the Workers' Compensation Law or representing employers or groups of employers insured under the Workers'

EDNY_0000010672

Compensation Law in the State Insurance Fund, nor persons engaged in the business of adjusters for insurance companies nor public adjusters licensed by the Superintendent of Insurance under the Insurance Law of this state or the business of private investigator, watch, guard or patrol agency or security guard company.

2. "Watch, guard or patrol agency" shall mean and include the business of watch, guard or patrol agency and shall also mean and include, separately or collectively, the furnishing, for hire or reward, of watchmen or guards or private patrolmen or other persons to protect persons or property or to prevent the theft or the unlawful taking of goods, wares and merchandise, or to prevent the misappropriation or concealment of goods, wares or merchandise, money, bonds, stocks, choses in action, notes or other valuable documents, papers, and articles of value, or to procure the return thereof or the performing of the service of such guard or other person for any of said purposes. The foregoing shall not be deemed to include the business of persons licensed by the industrial commissioner under the provisions of §24-a or subdivision 3-b of §50 of the Workers' Compensation Law or representing employers or groups of employers insured under the Workers' Compensation Law in the State Insurance Fund, nor persons engaged in the business of adjusters for insurance companies nor public adjusters licensed by the Superintendent of Insurance under the Insurance Law of this State.

3. The term the "business of private investigator," and the term "private investigator" shall mean and include any person, firm, limited liability company, partnership or corporation engaged in the business of private investigator as defined in subdivision one of this section with or without the assistance of any employee or employees. The term "business of watch, guard or patrol agency" and the term "watch, guard or patrol agency" shall mean and include any person, firm, limited liability company, partnership or corporation engaged in the business of watch, guard or patrol agency as defined in subdivision two of this section or the business of a security guard company as defined in subdivision five of §89-f of this Chapter with or without the assistance of any employee or employees. For the purposes of this article, a public entity as defined in subdivision seven of §89-f of this Chapter or a security guard company which utilizes security guards solely for its own proprietary use shall not be deemed a security guard company.

4. The term "business of bail enforcement agent" and the term "bail enforcement agent" shall mean and include any person, firm, company, partnership or corporation engaged in the business of bail enforcement as defined in subdivision 1-a of this section with or without the assistance of any employee or employees.

## §72. Application for licenses

Any person, firm, partnership, limited liability company or corporation intending to conduct the business of private investigator, business of bail enforcement agent or the business of watch, guard or patrol agency, and any person, firm, partnership, limited liability company or corporation intending to conduct the business of furnishing or supplying information as to the personal character of any person or firm, or as to the character or kind of the business and occupation of any person, firm or corporation, society or association or any person or group of persons, or intending to own, conduct, manage or maintain a bureau or agency for the above mentioned purposes, or while engaged in other lawful business activities also intending to engage in any one or more of the activities set forth in §71 of this article except exclusively as to the financial rating, standing, and credit responsibility of persons, firms, companies or corporations or as to personal habits and financial responsibility of applicants for insurance indemnity bonds or commercial credit or of claimants under insurance policies shall, for each such bureau or agency and for each and every sub-agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, partnership, limited liability company or corporation for the conduct of such business, file in the office of the Department of State a written application, on forms provided by the department containing such information and documentation, including fingerprints, as the Secretary of State may require by rule and regulation.

1. If the applicant is a person, the application shall be subscribed by such person, and if the applicant is a firm or partnership the application shall be subscribed by each individual composing or intending to compose such firm or partnership. The application shall state the full name, age, residences within the past three years, present and previous occupations of each person or individual so signing the same, and shall also specify the name of the city, town or village, stating the street and number, if the premises have a street and number, and otherwise such apt description as will reasonably indicate the location thereof, where is to be located the principal place of business and the bureau, agency, sub- agency, office or branch office for which the license is desired, and such further facts as may be required by the Department of State to show the good character, competency and integrity of each person or individual so signing such application. Each person or individual signing such application shall, together with such application, submit to the Department of State, his photograph, taken within six months prior thereto in duplicate, in passport size and also two sets of fingerprints of his two hands recorded in such manner as may be specified by the Secretary of State or the Secretary of State's authorized representative. Before approving such application it shall be the duty of the Secretary of State or the Secretary of State's authorized representative to forward one copy of such fingerprints to the Division of Criminal Justice Services. Upon receipt of such fingerprints, such division shall forward to the Secretary of State a report with respect to the applicant's previous criminal history, if any, or a statement that the applicant has no previous criminal history according to its files. If additional copies of fingerprints are required the applicant shall furnish them upon request. The Secretary shall reveal the name of the applicant to the chief of police and the district attorney of the applicant's residence and of the proposed place of business and shall request of them a report concerning the applicant's character in the event they shall have information concerning it. The Secretary shall take such other steps as may be necessary to investigate the honesty, good character and integrity of each applicant. Every such applicant for a license as private investigator shall establish to the satisfaction of the Secretary of State (a) if the applicant be a person, or, (b) in the case of a firm, limited liability company, partnership or corporation, at least one member of such firm, partnership, limited liability company or corporation, has been regularly employed, for a period of not less than three years, undertaking such investigations as those described as performed by a private investigator in subdivision one of §71 of this article, as a sheriff, police officer in a city or county police department, or the Division of State Police, investigator in an agency of the state, county, or United States government, or employee of a licensed private investigator, or has had an equivalent position and experience or that such person or member was an employee of a police department who rendered service therein as a police officer for not less than twenty years or was an employee of a fire department who rendered service therein as a fire marshal for not less than 20 years. However, employment as a watchman, guard or private patrolman shall not be considered employment as a "private investigator" for purposes of this section. Every such applicant for a license as watch, guard or patrol agency shall establish to the satisfaction of the Secretary of State (a) if the applicant be a person, or, (b) in the case of a firm, limited liability company, partnership or corporation, at least one member of such firm, partnership, limited liability company or corporation, has been regularly employed, for a period of not less than two years, performing such duties or providing such services as described as those performed or furnished by a watch, guard or patrol agency in subdivision two of §71 of this article, as a sheriff, police officer in a city or county police department, or employee of an agency of the state, county or United States government, or licensed

EDNY_0000010673

private investigator or watch, guard or patrol agency, or has had an equivalent position and experience; qualifying experience shall have been completed within such period of time and at such time prior to the filing of the application as shall be satisfactory to the Secretary of State. The person or member meeting the experience requirement under subdivision one of this section and the person responsible for the operation and management of each bureau, agency, sub-agency, office or branch office of the applicant shall provide sufficient proof of having taken and passed a written examination prescribed by the Secretary of State to test their understanding of their rights, duties and powers as a private investigator and/or watchman, guard or private patrolman, depending upon the work to be performed under the license. In the case of an application subscribed by a resident of the State of New York such application shall be approved, as to each resident person or individual so signing the same, but not less than five reputable citizens of the community in which such applicant resides or transacts business, or in which it is proposed to own, conduct, manage or maintain the bureau, agency, sub-agency, office or branch office for which the license is desired, each of whom shall subscribe and affirm as true, under the penalties of perjury, that he has personally known the said person or individual for a period of at least five years prior to the filing of such application, that he has read such application and believes each of the statements made therein to be true, that such person is honest, of good character and competent, and not related or connected to the person so certifying by blood or marriage. In the case of an application subscribed by a non-resident of the State of New York such application shall be approved, as to each non-resident person or individual so signing the same by not less than five reputable citizens of the community in which such applicant resides. The certificate of approval shall be signed by such reputable citizens and duly verified and acknowledged by them before an officer authorized to take oaths and acknowledgment of deeds. All provisions of this section, applying to corporations, shall also apply to joint-stock associations, except that each such joint-stock association shall file a duly certified copy of its certificate of organization in the place of the certified copy of its certificate of incorporation herein required.

1a. Every such applicant for a license as bail enforcement agent shall establish to the satisfaction of the secretary of state (a) if the applicant be a person, or (b) in the case of a firm, company, partnership, or corporation, at least one member of such firm, partnership, company or corporation, has been regularly employed, for a period of not less than three years, performing such duties or providing such services as described as those furnished by a bail enforcement agent in § 71 of this article, as a sheriff, police officer in a city or county police department, or the Division of State Police, investigator in an agency of the state, county, or United States government, or employee of a licensed private investigator, or has had an equivalent position and experience or that such person or member was an employee of a police department who rendered service therein as a police officer for not less than 20 years or was an employee of a fire department who rendered service therein as a fire marshal for not less than 20 years.

1-b. The person or member meeting the experience requirement under subdivisions 1 and 1-a of this section and any person or member of such firm, company, partnership or corporation who engages in the apprehension and return of suspects who fail to appear before the court must either satisfactorily complete a basic certification course in training for bail enforcement agents offered by a provider that is approved by the Secretary of State; or such person or member must have served as a police officer, as that term is defined in subdivision 34 of section 1.20 of the Criminal Procedure Law, for a period of not less than three years. The basic course of training shall include at least 25 hours of training approved by the Secretary of State and must include instruction on issues involved with the rights and limitations involving the bailee/fugitive who signs a contract with the bail enforcement agent. Completion of the course shall be for educational purposes only and not intended to confer the power of arrest of a peace officer or public officer, or agent of any federal, state, or local government, unless the person is so employed by a governmental agency.

2. If the applicant is a corporation, the application shall be subscribed by the president, secretary, treasurer, and all other officers and directors working for such corporation within the State of New York, and shall specify the name of the corporation, the date and place of its incorporation, the location of its principal place of business, and the name of the city, town or village, stating the street and number, if the premises have a street and number, and otherwise such apt description as will reasonably indicate the location thereof, where is to be located the bureau, agency, sub-agency, office or branch office for which the license is desired, the amount of the corporation's outstanding paid up capital stock and whether paid in cash or property, and, if in property, the nature of the same, and shall be accompanied by a duly certified copy of its certificate of incorporation. Each and every requirement as to character of subdivision one of this section as to a person or individual member of a firm or partnership shall apply to the president, secretary, treasurer and all other officers and directors working for such corporation within the State of New York and each such officer and director, his successor and successors shall prior to entering upon the discharge of his duties subscribe a like statement, approved in like manner, as is by said subdivision one prescribed in the case of a person or individual member of a firm or partnership.

3. Each person subscribing an application pursuant to this section shall affirm that the statements therein are true under the penalties of perjury.

4. The Secretary of State may deny, suspend or revoke the license of a corporation if, at any time, 10 per centum or more of the corporate stock is held by a person who cannot meet the character standard set for an individual licensee.

## §73. Enforcement of article; investigations

1. The Secretary of State shall have the power to enforce the provisions of this article and article 7-A of this chapter and upon complaint of any person, or on his own initiative, to investigate any violation thereof or to investigate the business, business practices and business methods of any person, firm, limited liability company, partnership or corporation applying for or holding a license as a private investigator, bail enforcement agent or watch, guard or patrol agency, if in the opinion of the Secretary of State such investigation is warranted. Each such applicant or licensee shall be obliged, on request of the Secretary of State, to supply such information, books, papers or records as may be required concerning his, their or its business, business practices or business methods, or proposed business practices or methods. Failure to comply with a lawful request of secretary shall be a ground for denying an application for a license, or for revoking, suspending, or failing to renew a license issued under this article.

2. For the purpose of enforcing the provisions of this article and article 7-A of this chapter, and in making investigations relating to any violation thereof, and for the purpose of investigating the character, competency and integrity of the applicants or licensees hereunder, and for the purpose of investigating the business, business practices and business methods of any applicant or licensee, or of the officers or agents thereof, the Department of State, acting by such officer or person in the department as the Secretary of State may designate, shall have the power to subpoena and bring before the officer or person so designated any person in this state and require the production of any books, records or papers which he deems relevant to the inquiry and administer an oath to and take testimony of any person or cause his deposition to be taken, except that any applicant or licensee or officer or agent thereof shall not be entitled to fees and/or

EDNY_0000010674

mileage. A subpoena issued under this section shall be regulated by the Civil Practice Law and Rules. Any person, duly subpoenaed, who fails to obey such subpoena without reasonable cause or without such cause refuses to be examined or to answer any legal or pertinent question as to the character or qualification of such applicant or licensee or such applicant's or licensee's business, business practices and methods or such violations, shall be guilty of a misdemeanor. The testimony of witnesses in any investigative proceeding shall be under oath, which the Secretary of State or one of his deputies, or a subordinate of the Department of State designated by the Secretary of State, may administer, and wilful false swearing in any such proceeding shall be perjury.

3. Licensees hereunder must maintain such records as the Secretary of State by rule determines and in addition, the secretary may prescribe by rule that further records be kept by certain classes of licensees.

## §74. Issuance of licenses; fee; bonds

1. (a) The application shall be accompanied by a non-refundable fee, payable to the Department of State for the use of the state, for each certificate of license, as hereinbelow enumerated, issued to the applicant, if the applicant be an individual, of $400 for a license as private investigator or bail enforcement agent or a fee of $300 for a license as watch, guard or patrol agency, or if the applicant be a firm, partnership, limited liability company or corporation, a fee of $500 for a license as private investigator or bail enforcement agent or a fee of $400 for a license as watch, guard or patrol agency.

(b) When the application shall have been examined and such further inquiry and investigation made as the Secretary of State shall deem proper, and when the Secretary of State shall be satisfied therefrom of the good character, competency and integrity of such applicant, or, if the applicant be a firm or partnership, the individual members thereof, or if the applicant be a limited liability company, the individual members thereof, or if the applicant be a corporation, the president, secretary, treasurer and all other officers and all directors thereof, and each stockholder owning 10 per centum or more of the stock and a period to 10 days from the date of the filing of the application shall have passed, the Department of State shall issue and deliver to such applicant a certificate of license to conduct such business and to own, conduct or maintain a bureau, agency, sub-agency, office or branch office for the conduct of such business on the premises stated in such application upon the applicant's executing, delivering and filing in the office of such department a surety company bond in the sum of $10,000; provided however, that an applicant for a license as bail enforcement agent shall execute, deliver and file with the office of such department a surety company bond in the sum of $500,000, conditioned for the faithful and honest conduct of such business by such applicant, which surety bond must be written by a company recognized and approved by the Superintendent of Insurance of the state, and approved by the Department of State with respect to its form, manner of execution and sufficiency provided, further, however, before a license is issued to a non-resident the applicant must file with the Secretary of State a written consent to the jurisdiction of the courts of New York (i) in any case or cases arising from any contract for the performance of private investigative services as private investigator, bail enforcement agent or watch, guard or patrol agency, made within the state or to be performed, wholly or in part, within the state or in any way connected with the conduct of business within the state, and (ii) in any case or cases arising from any tort occurring within the state or occurring in connection with the business of the licensee within the state. The license as private investigator, bail enforcement agent or watch, guard or patrol agency granted pursuant to this article shall last for a period of two years, but shall be revocable at all times by the Department of State for cause shown. Such bond shall be taken in the name of the people of the State of New York, and any person injured by the violation of any of the provisions of this article or by the wilful, malicious and wrongful act of the principal or employee may bring an action against such principal, employee or both on said bond in his own name to recover damages suffered by reason of such wilful, malicious and wrongful act. In each and every suit, or prosecution arising out of this article, the agency of any employee as to the employment and as to acting in the course of his employment, shall be presumed. The license certificate shall be in a form to be prescribed by the Secretary of State and shall specify the full name of the applicant, the location of the principal office or place of business and the location of the bureau, agency, sub-agency, office or branch office for which the license is issued, the date on which it is issued, the date on which it will expire and the names and residences of the applicant or applicants filing the statement required by §72 of this article upon which the license is issued and in the event of a change of any such address or residence the Department of State shall be duly notified in writing of such change within 24 hours thereafter, and failure to give such notification shall be sufficient cause for revocation of such license. No such license as private investigator, bail enforcement agent or watch, guard or patrol agency shall be issued to a person under the age of 25 years.

(c) The Secretary of State shall receive a non-refundable examination fee of $15 from each person who takes an examination to qualify for application for licensure pursuant to this article. Fees paid to the Department of State pursuant to this article shall be deposited in the business and licensing services account established pursuant to §97-y of the State Finance Law.

2. Except as hereinafter in this subdivision provided, no such license shall be issued to any person who has been convicted in this state or any other state or territory of a felony, or any of the following offenses, to wit:

(a) illegally using, carrying or possessing a pistol or other dangerous weapon;

(b) making or possessing burglar's instruments;

(c) buying or receiving or criminally possessing stolen property;

(d) unlawful entry of a building;

(e) aiding escape from prison;

(f) unlawfully possessing or distributing habit forming narcotic drugs;

(g) violating subdivisions 6 of §722 of the former Penal Law as in force and effect immediately prior to September 1, 1967, or violating § 165.25 or 165.30 of the Penal Law;

(h) violating §742, §743, or §745 of the said former Penal Law, or violating any section contained in article 250 of the Penal Law. Except as hereinafter in this subdivision provided, no license shall be issued to any person whose license has been previously revoked by the Department of State or the authorities of any other state or territory because of conviction of any of the offenses specified in this section. The provisions of this subdivision shall not prevent the issuance of a license to any person who, subsequent to his conviction, shall have received executive pardon therefor removing this disability or who has

EDNY_0000010675

received a certificate of relief from disabilities, or a certificate of good conduct pursuant to article 23 of the Correction Law to remove the disability under this section because of such conviction or previous license revocation occasioned thereby.

3. There shall be kept in the office of the Department of State a bulletin board, in a place accessible to the general public, on which shall be posted at noon on Friday of each week the following: a statement of all pending applications for licenses under this article, giving the name of the applicant, and whether individual, firm, limited liability company or corporation, and the proposed business address; a similar statement of all such licenses issued during the preceding week; a similar statement of all such licenses revoked during the preceding week. No holder of an employment agency license shall be licensed under this article. While holding a license under this article a licensee shall not simultaneously hold an employment agency license or have financial interest in or participate in the control and management of any employment agency or any other person, firm, limited liability company or corporation engaged in private detective business except that a licensee hereunder may own or possess stock in any corporation whose only business is to undertake for hire the preparation of payrolls and the transportation of payrolls, moneys, securities and other valuables or whose only business is to provide or furnish protective, guard or private investigator service to:

(a) the government of the United States or any subdivision, department or agency of the government of the United States, the government of the State of New York or any of its subdivisions, departments, commissions or agencies; or

(b) a corporation created under or subject to the provisions of chapter 440 of the Laws of 1926 or chapter 254 of the Laws of 1940. In the event of the filing in the office of the Department of State a verified statement of objections to the issuance of a license under the provisions of this article, no license shall be issued to such applicant until all objections shall have been heard in a public hearing and a determination made in a manner provided by §79 of this article.

4. For changing the name on a license or for changing the status of a license, the Secretary of State shall receive a non-refundable fee of $150.

5. For changing the address on a license, the Secretary of State shall receive a non-refundable fee of $10.

## §74-a. Notification

Prior to taking or attempting to take into custody a person, a bail enforcement agent shall notify a local law enforcement agency having jurisdiction over the area in which the person is believed to be located of such bail enforcement agent's intentions. The notification shall be provided on a form prescribed by the local law enforcement agency. Notwithstanding, the form shall include information including but not limited to name, address, local address and motor vehicle registration of said agent. The local law enforcement agency in prescribing such form may consult with the division of criminal justice services. A representative of a local law enforcement agency may accompany a bail enforcement agent when the bail enforcement agent enters what is believed to be an occupied structure to search for or to apprehend a person.

## §75. Posting and surrender of license certificate

Immediately upon the receipt of the license certificate issued by the Department of State pursuant to this article, the licensee named therein shall cause such license certificate to be posted up and at all times displayed in a conspicuous place in the bureau, agency, sub-agency, office or branch office for which it is issued, so that all persons visiting such place may readily see the same. Such license certificate shall at all reasonable times be subject to inspection by the Secretary of State or an authorized representative or representatives of the Department of State. It shall be unlawful for any person, firm, partnership, limited liability company or corporation holding such license certificate to post such certificate or to permit such certificate to be posted upon premises other than those described therein or to which it has been transferred pursuant to the provisions of this article, or knowingly to alter, deface or destroy any such license certificate. Every license certificate shall be surrendered to the Department of State within 72 hours after its terms shall have expired or after notice in writing to the holder that such license has been revoked. Failure to comply with any of the provisions of this section is a misdemeanor and sufficient cause for the revocation of a license.

## §76. Certificate or pocket card lost or destroyed

If it shall be established to the satisfaction of the Secretary of State, in accordance with rules and regulations of such department, that an unexpired license certificate or pocket card, issued in accordance with the provisions of this article, has been lost or destroyed without fault on the part of the holder, such department shall issue a duplicate license certificate or pocket card for the unexpired portion of the term of the original license certificate. The Secretary of State shall receive a non-refundable fee of $10 for issuing a duplicate certificate of license or identification card.

## §77. Removal of bureau, agency or office

If the holder of an unexpired license certificate issued pursuant to this article shall remove the bureau, agency, sub-agency, office or branch office to a place other than that described in the license certificate, he shall, within the 24 hours immediately following such removal, give written notice of such removal to the Department of State, which notice shall describe the premises to which such removal is made and the date on which it was made, and send such license certificate to such department, at its office in the City of Albany, and such department shall cause to be written or stamped across the face of such license certificate a statement, signed by the Secretary of State or an authorized subordinate of the Department of State, to the effect that the holder of such license has removed, on the date stated in such written notice, such bureau, agency, sub-agency, office or branch office from the place originally described in such license certificate to the place described in such written notice, and such license certificate with the indorsement thereon shall then be returned to the licensee named therein.

## §78. Renewal of licenses

A license granted under the provisions of this article may be renewed by the Department of State upon application therefor by the holder thereof, in such form as such department may prescribe, accompanied by the non-refundable fee and surety bond each in amounts equivalent to those specified in §74 of this article as pertaining to original licenses. The application shall be filed six weeks before the expiration date of the license unless the application is accompanied by a non-refundable late filing fee of $100. In no event will renewal be granted more than six months after the date of expiration of a license. No person, firm, limited liability company, partnership or corporation shall carry on any business subject to this article during any period which may exist between the date of expiration of a license and the renewal thereof.

## §78-a. Surrender of licenses

A license issued pursuant to this article may not be surrendered nor may any licensee resign as such licensee without the written approval of the Secretary of State or any deputy authorized to act for him.

EDNY_0000010676

## §79. Hearings, notice, determinations, review

1. The Department of State shall have the power to revoke or suspend any license, or in lieu thereof to impose a fine not exceeding $1,000 payable to the Department of State, or reprimand any licensee or deny an application for a license or renewal thereof upon proof:

(a) that the applicant or licensee has violated any of the provisions of this article or the rules and regulations promulgated hereunder;

(b) that the applicant or licensee has practiced fraud, deceit or misrepresentation;

(c) that the applicant or licensee has made a material misstatement in the application for or renewal of his license;

(d) that the applicant or licensee has demonstrated incompetence or untrustworthiness in his actions;

(e) that the applicant or licensee has violated any of the provisions of article 7-A of this chapter or the rules and regulations promulgated thereunder.

2. The Department of State shall, before denying an application for a license or before revoking or suspending any license, excepting a temporary suspension as provided in subdivision 5 hereof, or imposing any fine or reprimand, and at least 15 days prior to the date set for the hearing, and upon due notice to the complainant or objector, notify in writing the applicant for, or the holder of such license of any charge made and shall afford said applicant, or licensee, an opportunity to be heard in person or by counsel in reference thereto. Such written notice may be served by delivery of same personally to the applicant or licensee, or by mailing same by registered mail to the last known business address of such applicant or licensee.

3. The hearing on such charges shall be at such time and place as the Department of State shall prescribe and shall be conducted by such officer or person in the department as the Secretary of State may designate, who shall have the power to subpoena and bring before the officer or person so designated any person in this state, and administer an oath to and take testimony of any person or cause his deposition to be taken. A subpoena issued under this section shall be regulated by the Civil Practice Law and Rules. Such officer or person in the Department of State designated to take such testimony shall not be bound by common law or statutory rules of evidence or by technical or formal rules of procedure.

4. In the event that the department shall deny the application for, or revoke or suspend any such license, or impose any fine or reprimand, its determination shall be in writing and officially signed. The original of such determination, when so signed, shall be filed in the office of the department and copies thereof shall be mailed to the applicant or licensee and to the complainant within two days after the filing thereof as herein prescribed.

5. The department, acting by the officer or person designated to conduct the hearing pursuant to subdivision 3 above or by such other officer or person in the department as the Secretary of State may designate, shall have the power to suspend the license of any licensee who has been convicted in this state or any other state or territory of a felony or of any misdemeanor or offense enumerated under subdivision 2 of §74 or under §84 of this chapter for a period not exceeding 30 days pending a hearing and a determination of charges made against him. If such hearing is adjourned at the request of the licensee, or by reason of any act or omission by him or on his behalf, such suspension may be continued for the additional period of such adjournment.

6. The action of the Department of State in granting or refusing to grant or to renew a license under this article or in revoking or suspending or refusing to revoke or suspend such a license or imposing any fine or reprimand shall be subject to review by a proceeding instituted under article 78 of the Civil Practice Law and Rules at the instance of the applicant for such license, the holder of a license so revoked, suspended, fined or reprimanded or the person aggrieved.

## §80. License certificates, pocket cards or badges

Upon the issuing of a license as hereinbefore provided the Department of State shall issue to each person, partner, member of a limited liability company or officer of a corporation making and filing a statement required by §72 of this article a pocket card of such size and design as the Department of State may prescribe, which card shall contain a photograph of the licensee, the name and business address of the licensee and the imprint or impress of the seal of the Department of State which pocket card shall be evidence of due authorization pursuant to the terms of this article. All persons to whom such license certificates or pocket cards shall have been issued shall be responsible for the safe keeping of the same, and shall not lend, enable, let or allow any other person to have, hold, use or display such certificate or pocket card; and any person so parting with such a license certificate or pocket card or displaying the same without authority, or who shall display any license certificate or pocket card purporting to authorize the holder thereof to act as a private investigator, bail enforcement agent or watch, guard or patrol agency, unless the same shall have been duly issued pursuant to the provisions of this article, shall be guilty of a misdemeanor. Failure to comply with the provisions of this section shall be sufficient cause for revocation of such license, and all such certificates or pocket cards shall be returned to the Department of State within 72 hours after the holder thereof has received notice in writing of the expiration or revocation of such license. It shall be unlawful for a holder of a license or anyone else to distribute, possess, use or display any license certificate, pocket card, badge, shield or any other indicia of a license status pursuant to this article except as set forth in this article. Any person who is a licensee hereunder or an officer or authorized employee of any other person, firm, limited liability company or corporation, whether or not licensed hereunder, while performing the services of a watchman, guard or private patrolman, may wear on his outer clothing a rectangular metal or woven insignia approved by the Department of State, which insignia shall not be larger than three inches high nor four inches wide with an inscription thereon containing the word "watchman", "guard," "patrol" or "special service" and the name of such licensee or employer. It shall be unlawful for any employer, whether or not licensed hereunder, to wear or distribute to his, their or its employees any employment identification except as authorized in this article and approved by the Secretary of State. Any person violating any provision of this section shall be guilty of a misdemeanor.

## §81. Employees

1. The holder of any license certificate issued pursuant to this article may employ to assist him in his work of private detective or investigator or bail enforcement agent as described in §71 and in the conduct of such business as many persons as he may deem necessary, and shall at all times during such employment be legally responsible for the good conduct in the business of each and every person so employed. No holder of any unexpired license certificate issued pursuant to this article shall knowingly employ in connection with his or its business in any capacity whatsoever, any person who has been convicted of a felony or any of the offenses specified in subdivision 2 of §74 of this article, and who has not subsequent to such conviction received executive pardon therefor removing this disability, or received a certificate of relief from disabilities or a certificate of good conduct pursuant to article 23 of the Correction Law to remove the disability under this section because of such a conviction, or any person whose private detective or investigator's license or bail enforcement agent's license was revoked or application for such license was denied by the Department of State or by the authorities of any

EDNY_0000010677

other state or territory because of conviction of any of such offenses. Should the holder of an unexpired license certificate falsely state or represent that a person is or has been in his employ, such false statement or misrepresentation shall be sufficient cause for the revocation of such license. Any person falsely stating or representing that he is or has been a detective or employed by a detective agency or that he is or has been a bail enforcement agent or employed by a bail enforcement agency shall be guilty of a misdemeanor.

2. No person shall hereafter be employed by any holder of a license certificate until he shall have executed and furnished to such license certificate holder a verified statement, to be known as "employee's statement," setting forth:

(a) His full name, age and residence address.

(b) The business or occupation engaged in for the three years immediately preceding the date of the filing of the statement, setting forth the place or places where such business or occupation was engaged in, and the name or names of employers, if any.

(c) That he has not been convicted of a felony or of any offense involving moral turpitude or of any of the misdemeanors or offenses described in subdivision one of this section.

(d) Such further information as the Department of State may by rule require to show the good character, competency, and integrity of the person executing the statement.

3. Immediately upon the verification of an employee's statement, the holder of a license certificate by whom such person has been or is to be employed shall cause two sets of fingerprints of the two hands of such person to be recorded in such manner as the Department of State may by rule prescribe. The holder of a license certificate shall immediately stamp in indelible ink the employee's statement and each set of fingerprints with the name, year and license certificate number of such holder and a number, which number shall be determined by the number of such statements furnished to such holder and shall be in numerical sequence.

4. The holder of a license certificate shall affix one set of such fingerprints to the employee's statement in such manner that the prints can be examined without disclosing the contents of the employee's statement and shall retain such statement and prints so long as he shall be licensed under this article by the Department of State.

5. The holder of a license certificate shall file the other set of fingerprints with the Department of State by forwarding the same by registered mail to the office of the Secretary of State, Albany, New York, within 24 hours of such employment.

6. Within five days after the filing of such fingerprints the Secretary of State shall cause such fingerprints to be compared with fingerprints filed with the Division of Criminal Justice Services and, if he finds any record of any conviction as defined in the Criminal Procedure Law of a felony or any other offense specified in subdivision one of this section, he shall immediately notify the holder of such license certificate and shall also refer the matter to the attorney-general. The Secretary of State may also from time to time cause such fingerprints to be checked against the fingerprints filed with the Division of Criminal Justice Services or of other official fingerprint files within or without this state, and if he finds that such person has been convicted of a felony or any other offense specified in subdivision one of this section he shall immediately notify the holder of such license certificate and shall also refer the matter to the attorney-general. The Secretary of State shall at all times be given access to and may from time to time examine the fingerprints retained by the holder of a license certificate as provided in subdivision four of this section.

7. If any holder of a certificate shall file with the Department of State the fingerprints of a person other than the person so employed, he shall be subject to a fine not exceeding $5,000 or to imprisonment not exceeding one year, or both.

8. The provisions of this section shall not be applicable to security guards or the employment of security guards by licensees.

## §82. Employees not to divulge information or make false reports

Any person who is or has been an employee of a holder of a license shall not divulge to any one other than his employer, or as his employer shall direct, except as he may be required by law, any information acquired by him during such employment in respect of any work to which he shall have been assigned by such employer. Any such employee violating the provisions of this section and any such employee who shall wilfully make a false report to his employer in respect of any of such work, shall be guilty of a misdemeanor. The employer of any employee believed to have violated this section shall without any liability whatsoever upon said employer supply the Secretary of State or such officer or person in the Department of State as the Secretary of State may designate, all the known facts and circumstances in connection with the said employee's transaction or performance or action believed to be in violation of this article and the Secretary of State or his authorized representative shall, should the facts and circumstances be deemed to warrant, conduct further investigation and submit the evidence thus acquired to the attorney-general of the state for appropriate action in accordance with the provisions of §85 of this chapter.

## §83. Application of article

Nothing in this article shall apply to any detective or officer belonging to the police force of the state, or any county, city, town or village thereof, appointed or elected by due authority of law, or to any person in the employ of any police force or police department of the state, or of any county, city, town or village thereof while engaged in the performance of their official duties; nor to any person, firm, limited liability company, partnership, corporation, or any bureau or agency, whose business is exclusively the furnishing of information as to the business and financial standing, and credit responsibility of persons, firms, or corporations, or as to the personal habits and financial responsibility of applicants for insurance, indemnity bonds or commercial credit or of claimants under insurance policies, nor to any person licensed as a certified public accountant while engaged in the practice of public accountancy as defined in article one hundred forty-nine of the education law or any firm, limited liability company, partnership or corporation registered as a certified public accounting firm by the commissioner of education while performing services regulated under article one hundred forty-nine of the education law or Part 70 of the regulations of the commissioner of education; and whose business does not embrace other activities described in §71 of this article; or whose business is licensed by the commissioner of labor under the provisions of §24-a or subdivision 3-b of §50 of the Workers' Compensation Law or whose business is representing employers or groups of employers insured under the Workers' Compensation Law in the State Insurance Fund; nor to any corporation duly authorized by the state to operate a central burglar or fire alarm protection business; nor to any person while engaged in the business of adjuster for an insurance company nor to any public adjuster licensed by the superintendent of insurance under the Insurance Law nor to any person regularly employed as special agent, detective or investigator exclusively by one employer in connection with the affairs of that employer only nor to any charitable or philanthropic society or association duly incorporated under the laws of the state and which is organized and maintained for the public good and not for private profit, nor shall anything in this article contained be construed to affect in any way attorneys or counselors at law in the regular

EDNY_000010678

practice of their profession, but such exemption shall not enure to the benefit of any employee or representative of such attorney or counselor at law who is not employed solely, exclusively and regularly by such attorney or counselor at law. No person, firm, limited liability company, partnership, corporation or any bureau or agency exempted hereunder from the application of this article shall perform any manner of private investigator, bail enforcement agent or watch, guard or patrol agency service as described in §71 of this article, for any other person, firm, limited liability company, partnership, corporation, bureau or agency whether for fee, hire, reward, other compensation, remuneration, or consideration or as an accommodation without fee, reward or remuneration or by a reciprocal arrangement whereby such services are exchanged on request of parties thereto. The commission of a single act prohibited by this article shall constitute a violation thereof.

Nothing in this article shall be construed to affect or prohibit the right of any person to form or become affiliated with or to continue as a member of any union, association, society or organization of his own choosing.

## §84. Unlawful acts

1. It is unlawful for the holder of a license, issued under this article, or for any employee of such licensee, knowingly to commit any of the following acts within or without the state of New York: to incite, encourage, or aid in the incitement or encouragement of any person or persons who have become a party to any strike, to do unlawful acts against the person or property of any one, or to incite, stir up, create or aid in the inciting of discontent or dissatisfaction among the employees of any person, firm, limited liability company or corporation with the intention of having them strike; to interfere or prevent lawful and peaceful picketing during strikes; to interfere with, restrain, or coerce employees in the exercise of their right to form, join or assist any labor organization of their own choosing; to interfere or hinder the lawful or peaceful collective bargaining between employees and employers; to pay, offer, or give any money, gratuity, favor, consideration, or other thing of value, directly or indirectly, to any person for any verbal or written report of the lawful activities of employees in the exercise of their right of self-organization, to form, join, or assist labor organizations and to bargain collectively through representatives of their own choosing; to advertise for, recruit, furnish or replace or offer to furnish or replace for hire or reward, within or without the state of New York, any help or labor, skilled or unskilled, or to furnish or offer to furnish armed guards, other than armed guards theretofore regularly employed for the protection of payrolls, property or premises, for service upon property which is being operated in anticipation of or during the course or existence of a strike, or furnish armed guards upon the highways, for persons involved in labor disputes or to furnish or offer to furnish to employers or their agents, any arms, munitions, tear gas implements, or any other weapons; or to send letters or literature to employers offering to eliminate labor unions or distribute or circulate any list of members of a labor organization, or to advise any person of the membership of an individual in a labor organization for the express purpose of preventing those so listed or named from obtaining or retaining employment. The violation of any of the provisions of this section shall constitute a misdemeanor and shall be punishable by a fine of not less than $500, or one year's imprisonment or both. It is unlawful for the holder of a license to collect or offer or attempt to collect or directly or indirectly engage in the business of collecting of debts or claims of any kind, excepting that the taking possession, on behalf of a secured party having the right to do so under §9-503 of the Uniform Commercial Code, of property in the possession of a debtor who has defaulted in the performance of a security agreement secured by such property, shall not be considered a violation of this section and excepting further that the Secretary of State may grant exemption from this prohibition in the collection of debts to licensees who are principally engaged in the business of credit investigation and credit reporting. It is unlawful for the holder of a license to furnish or perform any services described in subdivisions 1 and 2 of §71 of this article on a contingent or percentage basis or to make or enter into any agreement for furnishing services of any kind or character, by the terms or conditions of which agreement the compensation to be paid for such services to the holder of a license is partially or wholly contingent or based upon a percentage of the amount of money or property recovered or dependent in any way upon the result achieved. It shall be unlawful for a holder of a license to use, display, cause to be printed or distributed, cards, letter-heads, circulars, brochures or any other advertising material or advertisement in which any name or indicia of the license status of the licensee is set forth in any manner other than the name under which the licensee is duly licensed. It is unlawful for a licensed private investigator or bail enforcement agent to own, have or possess or in any manner to wear, exhibit or display, a shield or badge of any material, kind, nature or description, in the performance of any of the activities as private investigator or bail enforcement agent, as distinguished from watch, guard or patrol agency, under this article. It is unlawful for a licensed private investigator or bail enforcement agent to issue to any person employed by such licensee, a badge or shield of any material, kind, nature or description, and it is unlawful for any person employed by such licensee to possess, carry or display a badge or shield of any description provided that any licensed private investigator or bail enforcement agent who also engages in the business of watch, guard or patrol agency may possess, use or display or issue to employees in the conduct of such business, a rectangular metal or woven insignia to be worn on the outer clothing and approved by the Department of State, which insignia shall not be larger than three inches high or four inches wide with an inscription thereon containing the word "watchman", "guard," "patrol" or "special service" and the name of the licensee. It shall be unlawful for any licensee to publish or cause to be published any advertisement, letter-head, circular, statement or phrase of any sort which suggests that the licensee is an official police or investigative agency or any other agency instrumentality of the state of New York or any of its political subdivisions. It shall be unlawful for any licensee to make any statement which would reasonably cause another person to believe that the licensee is a police officer or official investigator of the state of New York or any of its political subdivisions. It shall be unlawful for a licensee to offer, by radio, television, newspaper advertisement or any other means of communication, to perform services at any location which is merely the location of a telephone answer service unless full disclosure of that fact is made in the advertisement.

2. Notwithstanding any inconsistent provision of subdivision one of this section, a private investigator may contract with a local social services district to furnish or perform services for the location of absent parents and fathers of children born out of wedlock on a contingent basis.

## §85. Prosecution

Criminal action for violation of this article shall be prosecuted by the attorney general, his or her deputy, or a district attorney in the name of the people of the state. In any such prosecution the attorney general, or his or her deputy, shall exercise all the powers and perform all duties which the district attorney would otherwise be authorized to exercise or to perform therein. The attorney general or a district attorney shall, upon a conviction for a violation of any provision of this article and within ten days thereafter, make and file with the Department of State a detailed report showing the date of such conviction, the name of the person convicted and the nature of the charge.

EDNY_0000010679

## §86. Reward may be presumed

In any prosecution under this article any person, firm, limited liability company, partnership or corporation who performs or commits any of the acts set forth in §§70 and 71 of this article shall be presumed to do so for a fee, compensation, valuable consideration or reward.

## §87. Department of State to employ agents; expenses for enforcement of law

The Department of State is hereby authorized to employ such agent or agents as the Secretary of State may deem necessary to enable the Department of State to carry out the provisions of this article and to enforce compliance therewith.

## §88. Roster of licensees

The Department of State shall publish at least once in each year, a roster of the names and addresses of all persons, firms, limited liability companies and corporations licensed under the provisions of this article. A copy of each roster issued by the Department of State shall be mailed by it to any licensee upon request and without charge.

## §89. Inspection by Commissioner of Labor

All applications, papers and records on file in the Department of State in connection therewith shall at all times be open for the inspection of the Commissioner of Labor of the Department of Labor and the persons in charge thereof shall afford every reasonable facility for their examination and permit copies to be made when required by the Commissioner of Labor.

## §89-a. Disposition of fees and other revenue

All fees and other moneys derived from the operation of this article shall on the fifth day of each month be paid by the Department of State into the state treasury.

# SECURITY GUARD ACT

## §89-f. Definitions

As used in this article, the following words and phrases shall have the following meanings:

1. "Commissioner" shall mean the commissioner of the Division of Criminal Justice Services.

2. "Division" shall mean the Division of Criminal Justice Services.

3. "Secretary" shall mean the Secretary of State.

4. "Department" shall mean the Department of State.

5. "Security guard company" shall mean any person, firm, limited liability company, corporation, public entity or subsidiary or department of such firm, limited liability company, corporation or public entity employing one or more security guards or being self-employed as a security guard on either a proprietary basis for its own use or on a contractual basis for use by another person, firm, limited liability company, corporation, public entity or subsidiary thereof within the state.

6. "Security guard" shall mean a person, other than a police officer, employed by a security guard company to principally perform one or more of the following functions within the state:

a. protection of individuals and/or property from harm, theft or other unlawful activity;

b. deterrence, observation, detection and/or reporting of incidents in order to prevent any unlawful or unauthorized activity including but not limited to unlawful or unauthorized intrusion or entry, larceny, vandalism, abuse, arson or trespass on property;

c. street patrol service;

d. response to but not installation or service of a security system alarm installed and/or used to prevent or detect unauthorized intrusion, robbery, burglary, theft, pilferage and other losses and/or to maintain security of a protected premises.

Provided, however, that a security guard who is otherwise subject to regulation with respect to registration and training by the federal government in the performance of their duties, or a security guard providing such services on a voluntary basis, shall not be subject to the provisions of this article.

7. "Public entity" shall mean:

a. the state of New York;

b. a county, city, town, village or any other political subdivision or civil department or division of the state;

c. any other public corporation, public authority, commission, agency, municipal or other public housing authority, or project organized pursuant to article two of the Private Housing Finance Law;

d. any other governmental instrumentality or governmental unit in the state of New York.

8. "Security system" shall mean an assembly of equipment and devices or a single device designated to detect and/or signal an unauthorized intrusion into premises or to signal an attempted robbery, burglary, theft, pilferage or other loss at a protected premises, and with respect to which signal, police and/or security guards are expected to respond. Smoke and/or fire alarm systems are excluded from the provisions of this article.

9. "Applicant" shall mean an individual who has filed an application with the department for a security guard registration card.

10. "Holder" shall mean an individual who has been issued a registration card by the department.

11. "Registration card" shall mean a photographic identification card issued by the department, including a special armed guard registration card signifying that the individual identified thereon has been authorized by the department to perform security guard functions.

12. "Special armed guard registration card" shall mean a registration card issued by the department signifying that the individual thereon has been certified by the department to perform security guard functions and to carry firearms in connection with such functions. Nothing herein contained shall relieve such guard from any provision of law which requires that he or she be licensed to carry such firearm.

13. "Serious offense" shall mean any felony involving the offenses enumerated in the closing paragraph of this subdivision; a criminal solicitation of or a conspiracy to commit or an attempt to commit or a criminal facilitation of a felony involving the offenses enumerated in the closing paragraph of this subdivision, which criminal solicitation, conspiracy, attempt or criminal facilitation itself constitutes a felony or any offense in any other jurisdiction which if committed in this state would constitute a felony; any offense in any other jurisdiction which if committed in this state would constitute a felony provided that for the purposes of this article, none of the following shall be considered criminal convictions or reported as such:

(i) a conviction for which an executive pardon has been issued pursuant to the Executive Law;

EDNY_0000010680

(ii) a conviction which has been vacated and replaced by a youthful offender finding pursuant to article 720 of the Criminal Procedure Law, or the applicable provisions of law of any other jurisdiction; or

(iii) a conviction the records of which have been sealed pursuant to the applicable provisions of the laws of this state or of any other jurisdiction; and

(iv) a conviction for which other evidence of successful rehabilitation to remove the disability has been issued.

Felonies involving: assault, aggravated assault and reckless endangerment pursuant to article 120; vehicular manslaughter, manslaughter and murder pursuant to article 125; sex offenses pursuant to article 130; unlawful imprisonment, kidnaping or coercion pursuant to article 135; criminal trespass and burglary pursuant to article 140; criminal mischief, criminal tampering and tampering with a consumer product pursuant to article 145; arson pursuant to article 150; larceny and offenses involving theft pursuant to article 155; offenses involving computers pursuant to article 156; robbery pursuant to article 160; criminal possession of stolen property pursuant to article 165; forgery and related offenses pursuant to article 170; involving false written statements pursuant to article 175; commercial bribing and commercial bribe receiving pursuant to article 180; criminal impersonation and scheme to defraud pursuant to article 190; bribery involving public servants and related offenses pursuant to article 200; perjury and related offenses pursuant to article 210; tampering with a witness, intimidating a victim or witness and tampering with physical evidence pursuant to article 215; criminal possession of a controlled substance pursuant to §§220.06, 220.09, 220.16, 220.18 and 220.21; criminal sale of a controlled substance pursuant to §§220.31, 220.34, 220.39, 220.41, 220.43 and 220.44; criminal sale of marijuana pursuant to §§221.45, 221.50 and 221.55; riot in the first degree, aggravated harassment in the first degree, criminal nuisance in the first degree and falsely reporting an incident in the second or first degree pursuant to article 240; and crimes against public safety pursuant to article 265 of the Penal Law.

14. "Peace officer" shall mean a peace officer as defined by subdivision 33 of §1.20 of the Criminal Procedure Law, who is employed full-time as a peace officer and who has successfully completed the training requirements as set forth in subdivision 1 of §2.30 of such law.

15. "Police officer" shall mean a police officer as defined by subdivision 34 of §1.20 of the Criminal Procedure Law.

## §89-g. Employment of security guards

1. Except as provided in this section and §89-w of this article, no security guard company shall knowingly employ a person as a security guard and no person shall be employed as a security guard or act as a security guard unless:

a. The security guard company has verified with the department that such person possesses a valid registration card which has not expired or been revoked or suspended; or

b. Such security guard company has filed with the department in a manner prescribed by rules and regulations promulgated by the department, by certified mail:

(i) An application for a registration card completed and sworn to by such person pursuant to subdivision 1 of §89-h of this article;

(ii) A certification by the security guard company that it has exercised due diligence to verify as true the information contained in such person's application;

(iii) A certification that such person has completed the preassignment training required by subdivision 2 of §89-h of this article;

(iv) Two photographs of such person taken within 30 days prior to the filing of the application of a size prescribed by the secretary and two sets of fingerprints of such person. The fingerprints shall be taken on a standard fingerprint card approved by the division; and

(v) The fees prescribed by subdivision 10 of §89-h of this article.

2. It shall be incumbent upon each security guard company to exercise due diligence in verifying that the information contained in every application for a registration card it files with the department is true provided, however, the secretary shall, upon consultation with the security guard advisory council, promulgate rules and regulations to specify the minimum due diligence required to be exercised by such companies in order to verify the information required pursuant to subdivisions 5 and 7of §89-h of this article.

3. Except as provided in §752 of the Correction Law, no security guard company shall knowingly employ to perform security guard functions, any individual:

a. who has been convicted of a serious offense, or of a misdemeanor in the state or of any offense in any other jurisdiction which, if committed in this state, would constitute a misdemeanor, and which, in the discretion of the secretary, bears such a relationship to the performance of the duties of a security guard, as to constitute a bar to employment; or

b. who in any jurisdiction has been denied authorization to perform security guard functions or whose authorization to perform security guard functions has been suspended or revoked on grounds which would constitute a basis for denying, suspending or revoking a registration card in this state.

4. For each security guard employed by a security guard company as of the effective date of this section such security guard company shall at a time assigned by the secretary, pursuant to a staggered schedule, comply with the provisions of paragraphs a and b of subdivision 1 of this section and the provisions of §89-n of this article. Until the assigned filing date, such security guard company may continue to employ such person to perform security guard functions. No security guard company may employ such person after the assigned filing date which has not complied with the provisions of paragraphs a and b of subdivision 1 of this section with respect to such person.

5. Within 15 calendar days following the employment, retirement, resignation or termination of a security guard by a security guard company, such company shall give the department written notice thereof on a form prescribed by the department.

6. Insurance requirements. All security guard companies which are self-insured shall file with the department a certificate of insurance evidencing comprehensive general liability coverage from an insurance company licensed to do business in this state or procured by a duly licensed excess line broker pursuant to §2118 of the Insurance Law for death and personal injury, which coverage shall include false arrest or false imprisonment, malicious prosecution, libel, slander, and violation of right of privacy, in the minimum amount of $100,000 per occurrence and $300,000 in the aggregate which amount shall be available for the payment of claims. The certificate shall provide that the insurance shall not be modified or cancelled unless 30 days prior notice shall be given to the department. After the effective date of this article, no security guard company shall knowingly have in its employ a security guard unless such coverage is in force and such certificate is filed with the department.

7. Every security guard company shall maintain for each security guard it employs, and for a period of one year following the retirement, resignation or termination of such security guard's employment a copy of the application for a registration card, proof of due diligence to verify the

information therein contained, one photograph and training records, after which year the security guard company shall cause all such records and documents to be destroyed.

8. All security guard companies, except those security guard companies which employ such guards solely for their own proprietary use, shall be subject to the enforcement provisions contained in article seven of this chapter; provided, however, that whenever the Secretary of State shall have reason to believe that any security guard company has hired or intends to hire an unlicensed security guard in violation of this article, the secretary may bring an action in supreme court to enjoin the employment of unlicensed security guards in violation of this article or for an order directing the security guard company to remedy the violation.

9. No registered security guard shall accept or continue in employment with a security guard company upon notice of determination from the department that such employer has (a) violated the provisions of this article or the rules and regulations promulgated pursuant thereto, or (b) has engaged in fraud, deceit or misrepresentation.

10. All security guard companies shall maintain books and records of employees who are security guards and shall, upon request, make such books and records available to the Secretary of State.

## §89-h. Requirements for a registration card

To qualify for a registration card to perform security guard functions, an applicant shall fulfill the following requirements:

1. Application: file an application with the department sworn to or affirmed by the applicant in such form and including such information and attachments as may be prescribed or requested by the department upon consultation with the security guard advisory council including but not limited to the character and fitness, competence and employment history of the applicant;

2. Training: file a certificate with the department certifying either that the applicant has satisfactorily completed a minimum of eight hours of pre-assignment training as prescribed by the division or that such requirement has been waived in accordance with §841-c of the Executive Law;

3. Age: be at least 18 years of age;

4. Criminal record: not have been convicted of a serious offense, or of a misdemeanor in the state or of any offense in any other jurisdiction which, if committed in this state, would constitute a misdemeanor, and which, in the discretion of the secretary, bears such a relationship to the performance of the duties of a security guard, as to constitute a bar to employment;

5. Character and fitness: be of good moral character and fitness;

6. Competence: not have been declared by any court of competent jurisdiction to be incompetent by reason of mental disease or defect which has not been removed;

7. Employment history: not have been discharged from a correctional or law enforcement agency for incompetence or misconduct as determined by a court of competent jurisdiction, administrative hearing officer, administrative law judge, arbitrator, arbitration panel or other duly constituted tribunal, or resigned from such agency while charged with misconduct or incompetence; provided however, that an applicant who has been discharged or has resigned from such agency while charged with misconduct or incompetency may submit an explanation to the department and request a waiver of this requirement;

8. Disability: a physical or mental disability or disability by reason of intoxication or the use of, addiction to or dependence on alcohol or drugs which, as determined by the department, renders the applicant unable to perform the essential functions of the security guard position, with or without reasonable accommodation, or who, as determined by the department, poses a direct threat to health or safety;

9. Fees: pay (a) a fee of $36 for processing of the application, investigation of the applicant and for the initial biennial registration period. Such fees shall be deposited to the credit of the business and licensing services account established pursuant to the provisions of §97-y of the State Finance Law; and (b) a fee pursuant to subdivision 8-a of §837 of the Executive Law, and amendments thereto, for the cost of the division's full search and retain procedures, and a fee as determined by the Federal Bureau of Investigation for the cost of its fingerprint search procedures, which fees shall be remitted by the department to the division and Federal Bureau of Investigation; and

10. Changes: give the department written notice, within 14 calendar days of occurrence, of any change of circumstances which varies from the information previously given to the department hereunder.

## §89-i. Investigation

Within five business days after receipt of an application, the department shall transmit to the division two sets of fingerprints and the fees required pursuant to paragraph (b) of subdivision 10 of §89-h of this article. One set of fingerprints and the required fee shall be submitted to the Federal Bureau of Investigation for a national criminal history record check. The results will be used to ascertain whether or not the applicant has been charged with or convicted of a serious offense and may cause to be conducted an investigation to verify the information contained in the application; provided, however, that the department shall cause such investigation to be conducted for applicants whose application has not been submitted and verified pursuant to §89-g of this article. The department, in consultation with the division, may waive such background checks, investigations and fees if in its opinion, the security guard applicant has been subject to previous background checks and investigation requirements which meet or exceed the requirements of this section. The department, in consultation with the division, may not be required to conduct background checks or investigations for applicants who are also employed as peace officers.

## §89-j. Security guard registry

The department shall pursuant to §99 of the Executive Law maintain a computerized registry.

## §89-k. Issuance and denial of registration cards

1. Requirements of registration cards. Unless the department determines that the applicant does not meet the requirements of §89-h of this article or is unable to perform security guard functions, it shall issue a registration card in a form prescribed by the department, which shall include, among other information, the expiration date of such card and any renewal thereof, authorizing the applicant to perform security guard functions. If the department determines that an applicant does not meet the requirements of §89-h of this article, it shall deny the application for a registration card. Upon issuance of the registration card or denial of the application therefor, the department shall forthwith give notice of such issuance or denial to such applicant and to the security guard company which employs such applicant, by regular mail.

2. Administrative review. Denial of a registration card hereunder shall be reviewable by an administrative hearing as set forth in subdivisions 2, 3, 4 and 5 of §79 of this chapter.

EDNY_0000010682

## §89-l. Suspension, revocation and reissuance of registration cards

1. Revocations and suspensions. The secretary or any person deputized by the secretary may suspend for a period not to exceed 18 months or revoke any registration card issued pursuant to this article after a hearing pursuant to this section, except that, where revocation is sought based solely upon the holder having been convicted of a serious offense, the secretary shall provide notice to the holder, at the holder's registration address as maintained by the department, that the holder's registration card will be revoked on a date certain, but not less than 35 days after the date of the notice, unless the holder requests an administrative hearing pursuant to this section within said 35 day period.

2. Causes for revocation or suspension. A registration card issued pursuant to this article may be suspended or revoked for one or more of the following causes:

a. the holder is convicted of a serious offense, or of a misdemeanor in the state which, in the discretion of the secretary, bears such a relationship to the performance of the duties of a security guard, as to constitute a bar to employment;

b. the application contained a material false statement or omission the truth or inclusion of which would have resulted in denial of the application pursuant to §89-k of this article;

c. the holder is in violation of any provisions of this article or the rules and regulations promulgated pursuant to this article;

d. employment of the holder as a security guard constitutes a danger to the health, safety or well- being of the public.

3. Procedure. The hearing required by subdivision one of this section shall be held pursuant to the State Administrative Procedure Act, provided, however, that where a registration card has been temporarily suspended pursuant to paragraph b of subdivision 4 of this section, the hearing shall be held within 30 days and the adjudication shall be made within 45 days following the service of notice of such hearing. If such hearing is adjourned at the request of the holder or by reason of any act or omission by the holder or on the holder's behalf such suspension may be continued for the additional period of such adjournment. Where a holder has been served with notice of hearing which has not been adjourned and such holder without good cause fails to appear at the hearing, such hearing may proceed and an adjudication may be made in the absence of such holder.

4. Temporary suspension of registration cards.

a. Temporary suspension where the holder is charged with a serious offense. Where a holder is charged with a serious offense, such holder's registration card may be suspended (i) by the court pending any prosecution for a serious offense. In order for the court to impose such suspension it must find that the accusatory instrument conforms to the requirements of §140.40 of the Criminal Procedure Law and there exists reasonable cause to believe that the holder committed the serious offense with which he is charged. At such time, the holder shall be entitled to an opportunity to make a statement regarding the enumerated issues and to present witnesses and other evidence tending to rebut the court's findings. Where the suspension is imposed upon a pending charge of a serious offense which is a class A misdemeanor and the holder has requested a hearing pursuant to article 170 of the Criminal Procedure Law, or where the suspension is imposed upon a pending charge of a serious offense which is a felony and the holder has requested a hearing pursuant to article 180 of the Criminal Procedure Law, the court shall conduct such hearing. If upon completion of such hearing, the court fails to find that there is reasonable cause to believe that the holder committed a serious offense, or if the charges are dismissed or the holder is acquitted of such charges or the conviction is reversed on appeal, the court shall promptly notify the secretary and direct restoration of such registration card unless such registration card is suspended or revoked pursuant to any other provision of this section. If a holder is convicted of a serious offense, the court shall promptly notify the secretary and the suspension shall remain in effect pending a hearing held pursuant to subdivision 3 of this section; or (ii) by an officer designated by the secretary pursuant to the State Administrative Procedure Act to preside over a hearing, on application by the secretary on notice to the holder, where such officer finds that such holder has been charged with a serious offense and reasonable cause exists to believe that the holder committed the serious offense with which the holder is charged.

b. Temporary suspension pending hearing and adjudication. Pending the hearing and adjudication on suspension or revocation of a registration card, the officer designated to preside over the hearing may, on application of the secretary with notice to the holder, suspend such registration card where (i) the holder has been convicted of a serious offense, (ii) the holder has been charged with a serious offense and such officer finds that reasonable cause exists to believe that the holder committed the serious offense with which the holder is charged, or (iii) such officer finds that reasonable cause exists to believe that the employment of the holder as a security guard constitutes a danger to the health, safety or well-being of the public.

5. No registration card may be suspended pursuant to this section based upon the fact that a holder is charged with or convicted of one or more serious offenses, or of a misdemeanor in the state which, in the discretion of the secretary, bears such a relationship to the performance of the duties of a security guard, as to constitute a bar to employment unless:

a. there is a direct relationship between one or more such serious offenses and the registration card or employment of the holder as a security guard; or

b. the possession of a registration card by the holder or the employment of the holder as a security guard would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

6. Fines. Where it is determined after hearing that the holder has violated one or more provisions of this article pursuant to paragraph c of subdivision 2 of this section, the secretary may, in lieu of revocation or suspension of the registration card of such holder, impose a fine not to exceed $1,000 for each violation payable to the department.

7. Surrender of suspended or revoked registration card.

a. When the court suspends a registration card pursuant to subparagraph (i) of paragraph a of subdivision 4 of this section, the holder shall forthwith surrender the registration card to the court and the court shall promptly send the registration card to the secretary.

b. Upon suspension or revocation of the registration card by the secretary or by the officer designated by the secretary to preside over the hearing, pursuant to this section, the holder shall, if present at the time of such suspension or revocation, surrender the registration card forthwith. If the holder is not present at the time of such suspension or revocation, the secretary shall send notice of such suspension or revocation to the holder at the address indicated on the registration card or such other last known address, by personal service or by certified mail return receipt requested, in which case the holder shall within five days following receipt of such notice surrender the registration card

EDNY_0000010683

by delivering same in person or by certified mail to a location designated by the secretary. Notice of suspension or revocation shall be given by the secretary to the security guard company by which the holder was employed at the time of such suspension or revocation.

8. Reissuance of registration card. A suspended or revoked registration card may be reissued only by the secretary or by a person deputized by the secretary. Except as otherwise provided in this section, where a registration card has been revoked, it may not be reissued for at least one year following revocation.

## §89-m. Renewal of registration cards

1. Registration cards shall expire two years from the date of issuance or last renewal as the case may be. Not less than 60 nor more than 90 days prior to the expiration date of a registration card, the department shall mail to each registrant at his last known address, notice of renewal and a registration renewal form. Registration cards shall not be renewed unless not more than 60 nor less than 30 days prior to the expiration date of the registration card, the holder submits to the department, a registration renewal form sworn to or affirmed by the holder under the penalty of perjury together with a biennial renewal fee in the amount of $25 payable to the department and a certificate certifying that the holder has satisfactorily completed the required annual in-service training courses as prescribed by the commissioner pursuant to subdivision 1 of §841-c of the Executive Law. Unless the department determines the existence of facts which would constitute cause for denial, revocation or suspension of the registration card pursuant to this article, it shall renew the registration card. Denial of renewal hereunder shall be reviewable by an administrative hearing as set forth in §79 of this chapter. The $25 biennial renewal fee collected by the department shall be deposited to the licensing examinations services account established pursuant to the provisions of §97-aa of the State Finance Law. Notice that a registration card has expired or has not been renewed pursuant to this section shall be given by the secretary to the holder of such registration card and to the security guard company by which such holder was employed at the time of such expiration or non-renewal.

2. A registration card which was not renewed or which expired may be reissued only in a manner prescribed by rules and regulations promulgated by the department.

## §89-n. Training requirements

1. Security guards shall be required to satisfactorily complete training programs given and administered by security guard training schools, schools which provide security guard training programs or security guard companies prescribed, certified and approved by the commissioner pursuant to §841-c of the Executive Law to include:

a. an eight hour pre-assignment training course;

b. an on-the-job training course to be completed within 90 working days following employment, consisting of a minimum of 16 hours and a maximum of 40 hours, as determined by the council, generally relating to the security guard's specific duties, the nature of the work place and the requirements of the security guard company;

c. a 47 hour firearms training course for issuance of a special armed guard registration card;

d. an eight hour annual in-service training course; and

e. an additional eight hour annual in-service training course for holders of special armed guard registration cards.

The training programs and courses required by this subdivision may, if approved and certified by the commissioner pursuant to subdivision 2 of §841-c of the Executive Law, be given and administered by security guard companies.

Nothing herein shall be construed to prohibit a security guard company from voluntarily providing training programs and courses which exceed the minimum requirements provided by this subdivision.

Upon completion of a required training course, a security guard shall receive from the provider a certificate evidencing satisfactory completion thereof in accordance with the requirements prescribed by the commissioner pursuant to §841-c of the Executive Law.

2. a. A security guard who has been or was previously employed as a peace officer for 18 months or more who exhibits a valid certificate awarded pursuant to subdivision 6 of §2.30 of the Criminal Procedure Law attesting to his or her satisfactory completion of the training requirements imposed by §2.30 of the Criminal Procedure Law shall be exempt from the requirements of paragraph c of subdivision 1 of this section provided that such peace officer has completed a course of firearms training approved by the municipal police training council pursuant to the last paragraph of subdivision 1 of §2.30 of the Criminal Procedure Law provided, however, that nothing in this subdivision shall be deemed to authorize such guard to carry, possess, repair or dispose of a firearm unless the appropriate license therefor has been issued pursuant to §400.00 of the Penal Law.

3. A security guard who is also employed as a peace officer for 18 months or more shall be exempt from the requirements of paragraph e of subdivision 1 of this section as long as he or she is currently employed as a peace officer and provides to his or her security guard employer proof of such annual in-service training required under paragraph e of subdivision 1 of this section.

4. The provisions of this section shall not apply to a security guard who is:

a. a correction officer of any state correctional facility having the powers of a peace officer pursuant to subdivision 25 of section 2.10 of the Criminal Procedure Law;

b. a bridge and tunnel officer, sergeant or lieutenant of the Triborough Bridge and Tunnel Authority having the powers of a peace officer pursuant to subdivision 20 of §2.10 of the Criminal Procedure Law;

c. a uniformed court officer of the Unified Court System having the powers of a peace officer pursuant to subdivision 21 of §2.10 of the Criminal Procedure Law;

d. a court clerk having the powers of a peace officer pursuant to subdivision 21 of §2.10 of the Criminal Procedure Law;

e. a deputy sheriff having the powers of a peace officer pursuant to subdivision 2 of §2.10 of the Criminal Procedure Law;

f. a police officer as defined in paragraphs (a), (b), (c), (d), (e), (f), (j), (k), (l), (o), and (p) of subdivision 34 of §1.20 of the Criminal Procedure Law who has been retired from such employment for a period not to exceed 10 years, provided, however, that a retired police officer who has been retired from such employment for a period in excess of 10 years shall be required to provide proof to his or her security guard employer of his or her satisfactory completion of an eight hour annual in-service training course approved by the commissioner, and provided further, however, that a retired police officer who will be required by his or her security guard employer to carry a firearm or will be authorized to have access to a firearm shall provide to such employer proof of his or her satisfactory completion of a 47 hour firearms training course approved by

EDNY_000010684

the commissioner and, if such firearms training course has not been completed within one year prior to such employment, satisfactory completion of an additional eight hour annual firearms in-service training course approved by the commissioner, such training course to be completed at least annually; or

g. a peace officer as defined in subdivisions 2, 20 and 25 and paragraphs a and b of subdivision 21 of §2.10 of the Criminal Procedure Law who has been retired from such employment for a period not to exceed 10 years, provided, however, that a retired peace officer who has been retired from such employment for a period in excess of 10 years shall be required to provide proof to his or her security guard employer of his or her satisfactory completion of an eight hour annual in-service training course approved by the municipal police training council, and provided further, however, that a retired peace officer who will be required by his or her security guard employer to carry a firearm or will be authorized to have access to a firearm shall provide to such employer proof of his or her satisfactory completion of a 47 hour firearms training course approved by the municipal police training council and, if such firearms training course has not been completed within one year prior to such employment, satisfactory completion of an additional eight hour annual firearms in-service training course approved by the municipal police training council, such training course to be completed at least annually.

## §89-o. Rules and regulations

The secretary shall in consultation with the security guard advisory council, adopt rules and regulations implementing the provisions of this article. Such rules and regulations shall include criteria for determining whether a person is a security guard or whether a particular function is a security guard function as defined by subdivision 6 of §89-f of this article.

## §89-p. Violations and penalties

Any person who is employed as a security guard or who acts as a security guard in violation of the provisions of §89-g of this article or who knowingly and wilfully makes material misstatements in the application for or renewal of his or her registration card or who permits or authorizes the employment of a person as a security guard in violation of the provisions of §89-g of this article or any security guard company which employs a security guard in violation of the provisions of §89-g of this article shall be guilty of a misdemeanor which, upon conviction, shall be punishable by a term of imprisonment not to exceed six months, or by a fine of not more than $1,000, or by both such fine and imprisonment upon the first conviction and by a term of imprisonment not to exceed one year or by a fine of not less than $1,000 and not to exceed $2,500 or by both such fine and imprisonment upon a subsequent conviction. Any person who shall knowingly and wilfully fail to surrender his or her registration card as required by subdivision 7 of §89-l of this article shall be guilty of a violation punishable by a fine not to exceed $250 in addition to any other penalty prescribed by law. Each violation of this article shall be deemed a separate offense.

## §89-q. Separability

If any item, clause, sentence, subparagraph, subdivision, section or other part of this article, or the application thereof to any person or circumstances shall be held to be invalid, such holding shall not affect, impair or invalidate the remainder of this article, or the application of such section or part of a section held invalid, to any other person or circumstances, but shall be confined in its operation to the item, clause, sentence, subparagraph, subdivision, section or other part of this article directly involved in such holding, or to the person and circumstances therein involved.

## §89-r. Preemption

The provisions of this article shall govern notwithstanding any other law to the contrary and further, no local law shall be enacted which shall require any fee or license for the licensure or registration of security guards.

## §89-s. Reporting

On or before February 1, 1994, and on or before February 1st of each succeeding year, the secretary, upon consultation with the commissioner and the security guard advisory council, shall report to the governor, the temporary president of the senate and the speaker of the assembly on the implementation, procedures, operation, training, and enforcement of the Security Guard Act of 1992, together with any recommendations relating thereto. Such report shall include, but not be limited to:

a. the number of security guards registered and maintained in the security guard registry;

b. the number of applicants for registration, and the number of applications denied with the reason or reasons therefor;

c. statistics related to the time it takes to process fingerprint cards, applications and inquiries to the registry by security guard companies;

d. the number and length of suspensions and revocations, and the number and amount of fines imposed;

e. the amount of fees collected by the department and the division;

f. the level of appropriation authority available to the department and the division and the amount of money expended by the department and division for the purposes of carrying out the provisions of this article; and

g. any other information which the department and the division deem necessary. The division shall provide the department with any information necessary to comply with the requirements of this section.

## §89-w. Applicability

The provisions of this article shall not apply to a not-for-profit security guard company or public entity which hires a security guard or guards for a specific event or events solely for its own proprietary use and which employs such security guards only on a temporary basis for a total period not exceeding 15 days per year.

# RULES AND REGULATIONS TITLE 19 NYCRR

# EMPLOYEES PART 170

## §170.1 Security guard

(a) A person described in General Business Law section 89-f(6) is a security guard if he or she principally performs the activities of prevention, deterrence, control or enforcement.

EDNY_0000010685

(b) For purposes of this Part:

(1) prevention includes protecting persons and/or property from harm, theft, and other unlawful activity, including response to a security systems alarm;

(2) deterrence includes deterring, observing, detecting, and reporting unlawful or unauthorized activity;

(3) control includes controlling, by street or other patrol service, access to property, including employee personnel, visitors, vehicles and traffic;

(4) enforcement includes enforcing security policies, rules, regulations, and procedures.

(c) Principally performing shall mean:

(1) engaged in the functions set forth in subdivision (b) of this section for more than 50 percent of the person's regularly scheduled work hours; or

(2) employed to perform any or all of the above functions for any duration, with the condition of such employment being that he or she is armed with a weapon; or

(3) employed to perform any or all of the above functions for any duration, with the condition of such employment being that he or she wear a military style uniform or insignia, either being indicative of security guard status.

(d) Police officers

(1) When employed by a security guard company, an off-duty police officer is exempt from the registration, fingerprinting and training provisions of the General Business Law, Article 7A. When employed by a security guard company, a retired or former police officer must comply with the registration, fingerprinting and training provisions of General Business Law Article 7A.

(2) Before employing an off-duty police officer as a security guard, a security guard company licensed pursuant to Article 7 of the General Business Law shall obtain an employee statement from the police officer as required by section 81(2) of the General Business Law; provided, however, a police officer shall be exempt from the fingerprinting provisions of subdivisions 3, 4, 5, 6 and 7 of section 81 of the General Business Law.

(e) Peace officers. When employed by a security guard company, an off-duty peace officer must comply with the registration and fingerprinting provisions of General Business Law Article 7-A. The peace officer must also comply with the training provisions of General Business Law section 89-n subject to that section's special exceptions for peace officers.

(f) For the purposes of General Business Law, Article 7 and 7-A, a security guard is considered to be employed by a security guard company if the security guard is not independently licensed as a private investigator or as a watch, guard or patrol agency pursuant to General Business Law Article 7, even if the security guard is treated as an independent contractor by the security guard company for federal or state tax purposes.

## §170.2 Fingerprinting of employees

(a) Employees of any licensed private investigator or licensed watch, guard or patrol agency whether contractual or proprietary shall be fingerprinted.

(1) All fingerprinting shall be performed at the office of the licensee or of another licensed private investigator or watch, guard or patrol agency by the person who qualifies as the licensee or by a designated person who is employed by the entity and who has been previously fingerprinted.

(2) The designation of such person(s) to take fingerprints shall be made in writing by the qualifying licensee and filed with the Albany Office of the Division of Licensing Services, Department of State.

(3) The form of certification on the fingerprint pattern card as to the taking of the fingerprints of an employee shall be signed by the person authorized to take such fingerprints as provided by this section and shall not be signed by any other person.

(b) The holder of a license shall submit to the Department of State, Division of Licensing Services in Albany one set of fingerprint cards for each employee that is hired within 24 hours of such employment. One set of fingerprint cards shall be retained by the employer and attached to the front of the employee statement of each person hired.

(c) The holder of any private investigator and watch, guard and patrol license that is performing guard service for a proprietary firm, company, partnership or corporation shall fingerprint all employees whose job duties are primarily related to the operation of the security guard entity.

(d) Along with the employee statement and fingerprint card, a copy of the fingerprint transmittal form which accompanies the fingerprint card shall be attached to each employee personnel folder.

(e) Individuals possessing a current security guard registration need only complete an employee statement to be retained in the employee personnel folder, in lieu of fingerprinting.

## §170.3 Employee statements

(a) Employee statement. Each licensed private investigator, watch guard or patrol agency including every proprietary security guard company shall obtain a complete employee statement from each employee at the time of hiring. For a security guard company which has elected to form a security guard entity as provided in section 174.3 of this Title, such requirement shall apply only to those employees whose job duties are primarily related to the operation of such entity.

(b) The employee statement shall be a form prescribed by the Department of State, and shall inquire whether or not the employee has ever been convicted of an offense (other than a minor motor vehicle offense), and any such further information as the Department of State shall require.

(c) A licensee under article 7 of the General Business Law may destroy the employee's statement and fingerprint card referred to in section 81 of said article, provided that the employee has not been in the licensee's employ for the period of at least one year immediately preceding said destruction; no such destruction shall take place in the event that there is any litigation pending and arising out of and in the course of the individual's employment with the licensee.

## §170.4 Fingerprinting of qualifying licensee(s)

Applicants for licensure for a private investigator or watch guard or patrol agency may be fingerprinted by employees of the Department of State, Division of Licensing Services at designated locations and at appointed times. The fingerprints of any applicant for licensure may also be taken and recorded by local and State Police, or sheriffs and chiefs of police in a form and manner approved by the Division of Criminal Justice Services. In such case, each fingerprint card shall be signed and authenticated by the official who took the fingerprints, with his/her title of office.

## §170.5 Principal business address

All licensees under article 7 of the General Business Law shall maintain a principal place of business within New York State which shall contain the employee and business records for any licensed activities conducted within New York State.

EDNY_0000010686

## §170.7 Multiple licenses

A licensed watch, guard or patrol agency or private investigator may not hold an employment agency license or have a financial interest in or participate in the control and management of any employment agency or any other entity engaged in the business of private investigator, except that such prohibition shall not apply in the following situations:

(a) the licensee owns stock in a corporation whose only business is to undertake for hire the preparation of payrolls and the transportation of payrolls, moneys, securities and other valuables; or

(b) the licensee owns stock in a corporation whose only business is to provide or furnish protective, guard or private investigator services to the Federal or New York State government or any subdivision, department, commission or agency thereof; or

(c) the corporation was created or subject to the provisions of chapter 440 of the Laws of 1926 (with respect to raising and breeding of horses) or chapter 254 of the Laws of 1940 (with respect to the parimutuel method of betting); or

(d) the licensee is a proprietary security guard company.

## §170.8 Business records

Each licensee shall retain and maintain for a period of three years records of all transactions relating to the private investigator or watch, guard or patrol business.

## §170.9 Employees' identification cards issued by licensee

(a) Each employee of a licensed private investigator or watch, guard or patrol agency providing services as either an investigator or security guard shall be issued a company identification card as described herein.

(b) The form of the employee identification card shall be as follows:

(1) The identification card shall be 2" in height, 3¼" width.

(2) Predominate over all other information contained therein shall be the name and business address of the licensee as indicated on the license issued by the Department of State.

(3) Below this information shall be the word "employee" followed by the employee's full name, and registration title — Security Guard or Armed Security Guard.

(4) In the upper left-hand corner of the identification card shall be placed a current photograph of the employee, approximately 1½" by 1½" in size. The photograph shall at all times be a true likeness of the employee's actual appearance.

(5) Employee identification cards will be laminated after the photograph and signatures are affixed.

(6) Date of hire.

(7) The employee ID card format appears as follows:

**3¼"**

**Front** (height **2"**)

Employee Photo | (Business Name)
(Business Address)
(City, State, Zip)
__________ Employee Name __________
(Title)
This business is licensed by
THE NEW YORK STATE DEPARTMENT OF STATE

**3¼"**

**Back** (height **2"**)

Employee Name __________ has been authorized
By (BUSINESS NAME) __________
to work as a Security
Guard or Investigator.
Date of hire: ______________________
______________________
(signature of qualifier)

(c) Security guards' identification cards to be temporary. Issuance of a company identification card to those individuals involved exclusively in the activities of a security guard shall be on a temporary basis until the appropriate security guard registration card is issued or denied by the Department of State. In accordance with the provisions of article 7A of the General Business Law, the card shall bear the words "Temporary ID". After the issuance or denial of the State registration card, the temporary card shall be maintained in the personnel files of the employee for the duration of his/her employment or for a one-year period following dismissal.

(d) Termination of employment. Upon termination of employment, each employee of a licensed business shall surrender his/her identification card within five business days. A licensee shall notify the Department of State of the name of each terminated employee on a TERMINATION OF EMPLOYMENT FORM. In addition, employers must indicate on the form if the employee has not surrendered the identification card as required. Surrendered identification cards should be maintained in the personnel file of the terminated employee.

## §170.10 Insignia/symbols of authority

(a) No licensed private investigator or licensed watch, guard or patrol agency shall use any badge, patch or insignia except as described herein:

(1) Any cloth or metal insignia authorized for use shall be no larger than 3" wide by 4" high and rectangular in shape.

(2) The insignia used by security guards shall not be similar in design or appearance to the insignia of any police force or governmental agency. Such insignia shall not contain a replica of the Great Seal of the State of New York or the coat of arms of New York State. It shall show the full licensed name of the employer in a prominent and legible manner.

(3) Each insignia shall contain the words watch guard, guard, patrol, special service protection, security or armed security. The cloth patch or metal insignia shall be worn either on the shoulder or breast of the guard uniform or a hat.

(b) The exhibition, wear, or display of any insignia of authority including any badge, emblem, identification card, vehicle emblem or any advertisement which could deceive a reasonable person into believing that such item is authorized by a law enforcement agency or the bearer is a law enforcement officer is prohibited.

## §170.11 Advertisements

All media advertisements placed by an individual or business licensed under this article, other than a proprietary security guard company, shall state, "Licensed by the New York State Department of State."

EDNY_0000010687

## §170.12 Contracts and agreements

(a) Consumers conducting business with an individual or firm licensed under this article shall receive a copy of any signed contract and/or agreement.

(b) All contracts and agreements used by an individual or firm licensed under this article shall include the following statement under the name of the business: "This business is licensed by the New York Department of State, Division of Licensing Services."

## §170.13 Supervision

All licensees under article 7 of the General Business Law shall be required to provide supervision of all employees engaged in the business of investigations or security guard work. Such supervision shall consist of regular, frequent and consistent guidance, instruction, oversight and superintendence by the licensee with respect to investigations or security guard work conducted by the licensee, and all matters relating thereto.

## §170.14 State issued identification card

A security guard wearing a military style uniform shall prominently display the state issued registration card on his or her outer garment.

# QUALIFYING SCHOOL REQUIREMENTS FOR BAIL ENFORCEMENT PART 171

## §171.1 Approved entities

Courses of instruction may be given by any college or university accredited by the Commissioner of Education of the State of New York, any public and/or private vocational school, any bail enforcement professional society or organization.

## §171.2 Application for approval of course of study

An application for approval to conduct a 25-hour bail enforcement course shall be made 60 days before the proposed course is to begin and shall be submitted on a form prescribed by the department. The application shall include the following:

(a) the name and business address of the school;

(b) the name and business address of the owners;

(1) if the owner is an individual, the name and business address of the individual;

(2) if the owner is a partnership, the name and business address of each partner;

(3) if the owner is a corporation, the name and business address of each shareholder owning five percent or more of the corporate stock;

(4) if the owner is a limited liability company, the name and business address of each member of the limited liability company;

(5) if the owner is a not-for-profit corporation or education corporation, the name and business address of the corporation's president or chief executive officer;

(c) the name, business address and telephone number of the education coordinator who will be responsible for compliance with the rules contained in this Part;

(d) the locations where classes will be conducted;

(e) a description of any materials that will be distributed during the course;

(f) a copy of any book(s) that will be used for the course;

(g) a course outline including the instructional time for each subject being presented; and

(h) lesson plans along with learning objectives for the established curriculum.

## §171.3 Subjects of study for bail enforcement agents

The following are the subject to be included in the 25-hour course of instruction for bail enforcement agents. All approved schools must use this course outline in their programs.

(a) New York State Licensing Law and Regulations;

(b) liability issues;

(1) civil;

(2) criminal;

(3) search or seizure of bailee/fugitive; and

(4) entering homes, businesses and vehicles;

(c) rights of bailee/fugitive;

(1) *Taylor* v. *Taintor*;

(2) rights of accused under State law;

(3) rights of accused under Federal law;

(4) extradition;

(d) criminal and civil law relating to bail bonds;

(e) basic concepts of criminal justice law;

(f) ethics and professionalism; and

(g) report writing.

## §171.4 Attendance

To receive credit, a student must complete the entire 25-hour course of instruction.

## §171.5 Certificate of successful completion

Upon satisfactory completion of the 25-hour course of instruction by a student, the school must give the student a certificate of completion which shall be signed and dated by the school's course coordinator. The certificate must include the following information:

(a) the name of the school;

(b) the title of the course, which shall be "Bail Enforcement Course, 25 hours";

(c) the school's code number;

(d) a statement that the student, who shall be named, has satisfactorily completed a 25-hour course of study in bail enforcement subjects approved by the Secretary of State in accordance with article 7 of the General Business Law; and

(e) the date on which the student completed the course.

## §171.6 Faculty

An individual who wishes to teach any part of the 25-hour course shall submit a resume to the Department of State along with evidence that the applicant meets one of the following qualifications:

(a) is an attorney;

(b) is a police instructor;

(c) is an FBI instructor;

(d) has a teacher's certificate from the New York State Education Department;

EDNY_0000010688

(e) has five years of full-time experience as a police officer;

(f) has a four-year college degree majoring in criminal justice; or

(g) has five years, full-time experience as a licensed private investigator with significant bail enforcement experience.

## §171.7 Retention of records

Schools conducting approved courses shall retain records for students completing the school's courses for a period of three years after completion of the course. Such records shall, at all times during that period, be available for inspection by a duly authorized representative of the Department of State.

## §171.8 Lists

Within 30 days of the completion of a 25-hour course, a school must submit to the Department of State a list of the names and addresses of each student who successfully completed the course.

## §171.9 Facilities

Each 25-hour course shall be presented at a facility as necessary to properly present the course.

## §171.10 Auditing

A duly authorized representative of the Department of State may audit any course, verify attendance and inspect the records of attendance, at any time during its presentation and for a period of three years after the completion of the course.

## §171.11 Suspensions and denials of course approval

(a) Within 60 days after receipt of the application for approval of a 25-hour course, the Department of State shall inform the school whether the course has been approved or denied, or whether additional information is needed.

(b) The Department of State may deny, suspend or revoke the approval of a bail enforcement course or instructor if it is determined that either is not in compliance with article 7 of the General Business Law or the rules promulgated thereunder, or if it is determined that either has not adequately presented the course material set forth in section 171.3 of this Part.

## §171.12 Credit for equivalent education in the bail enforcement field

The Department of State may grant credit for equivalent education if the applicant provides evidence, satisfactory to the Department of State, of having completed a course of study at an accredited college or university, which course of study includes course work substantially similar to that set forth in section 171.3 of this Part. To qualify for credit, the equivalent education may not be less than 25 hours.

## §171.13 Registration period and fees

Each registration or renewal period for an approved course shall be 12 months or a part thereof. The registration or renewal period shall commence on January 1st or on the date on which the course is approved and shall expire on December 31st of the same year. The fee for registering a course with the Department of State shall be $25.00 for each registration period. Those registrants who wish to provide courses at locations other than the primary location listed on their initial application shall pay a fee of $25.00 for each additional location.

# APPLICATIONS PART 172

## §172.1 Equivalent position and experience—private investigator

To qualify for equivalent position and experience, under the provisions of section 72(1) of the General Business Law, as amended, an applicant for licensure as a private investigator shall have performed investigations as to the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, efficiency, loyalty, reputation, character, credit, business or financial responsibility or any person, group of persons, association, organization, society, firm or corporation, or as to the origins or responsibility for crimes and offenses, the location or recovery of lost or stolen property, the cause or origin of, or responsibility for losses or accidental damage or injury to persons or to real or personal property, or to secure evidence to be used before any authorized investigating committee, board of award, board of arbitration or in the trial of civil or criminal cases including as to the credibility of any witnesses. Such investigations shall have been performed for a period of three years, for an employer, firm, organization or governmental agency, whether subject to the provisions of article 7 of the General Business Law or otherwise, which required such investigations in the course of its regular operations, and which such investigations were conducted on a full-time basis in a position the primary duties of which were to conduct investigations and same comprised the major portion of the applicant's activities therein; an applicant may substitute three years' experience supervising and reviewing the work of at least three persons performing such investigations, obtained in a full-time position with such an employer, firm, organization or governmental agency, the primary duties and activities of which were such investigation supervision and review.

## §172.2 Equivalent position and experience— watch, guard or patrol agency

To qualify as an equivalent position and experience under the provisions of section 72(1) of the General Business Law, an applicant for licensure as a watch, guard or patrol agency shall have performed services as described in article 7-A, section 89-f(6). Such services shall have been performed for a period of two years for an employer, firm, organization or governmental agency, whether subject to the provisions of article 7 of the General Business Law or otherwise, which required such services in the course of its regular operations, on a full-time basis, in a position, the primary duties of which were the performance of such services and same comprised the major portion of the applicant's activities therein; an applicant may substitute two years' experience supervising and reviewing the work of at least three persons performing such services obtained in a position with such an employer, firm, organization or governmental agency, the primary duties and activities of which were such guard supervision and review.

## §172.3 Notice of criminal conviction

Any watch, guard or patrol agency licensee or any licensed private investigator, or any registered security guard who is convicted of a crime as defined in the Penal Law in this State or an offense which would constitute a crime in New York in any other state or Federal or foreign jurisdiction, shall give notice of such conviction to the Department of State, Division of Licensing Services, at its Albany Office, by certified mail, return receipt requested, within 10 days from date of conviction. Such notice shall be given notwithstanding pendency of appeal.

# STATEMENT OF SERVICES TO BE PERFORMED PART 173

## §173.1 Advance statement of services and charges

(a) No licensed private investigator, watch, guard or patrol agency shall undertake to perform any services on behalf of a client unless such licensee shall have delivered to the client a written statement, signed by the licensee, which shall set forth the specific service or services to be performed and the charge or fee therefor. In the event any or all of the services are to be performed on an hourly or other periodic basis, the rate therefor shall be set forth and a limit fixed as to the number of such periodic units of such services that may be performed without any specific authorization from the client; such statement shall also acknowledge that the licensee shall not perform any services beyond such limit unless the client shall consent thereto in writing.

(b) Anything to the contrary of this Part notwithstanding, the statement provided for in subdivision (a) of this section shall not be required to be delivered if the client and the licensee have entered into an agreement in writing, setting forth the services to be rendered and the fee or charge therefor, except that if the agreement provides for or relates to services to be rendered on a periodic basis and no limit as to such services is established by the agreement and there is no express understanding by the client waiving the fixing of any such limit, the licensee shall deliver the statement provided for in subdivision (a) of this section, to the extent of setting forth a limit as to the number of periodic units to be performed, beyond which no such services shall be performed without the written consent of the client.

(c) The licensee shall obtain an acknowledgment in writing from the client of receipt of any statement of services or charges or executed agreement delivered, or maintain receipt or proof of delivery of such statement.

## §173.2 Records to be maintained

Unless otherwise agreed to in writing the licensee shall deliver to the client a written report, setting forth the services performed on the client's behalf. This report shall be presented to the client at the time of billing and shall be maintained by the licensee for a period of three years after completion of the service, unless there is litigation pending which would require the records to be maintained until the litigation is completed.

# SECURITY GUARD COMPANIES PART 174

## §174.2 Exempt entities

(a) Public entities shall not be required to obtain a license under article 7 of the General Business Law, but shall register employees who provide guard services as defined in article 7A of the General Business Law and these regulations.

(b) Operators of central security or fire alarm stations, whose employees conduct monitoring and reporting services at the central station to police or fire departments, shall not be required to obtain a license under article 7 of the General Business Law, but shall register employees as required in article 7-A.

(c) Entities exempt from the licensing requirement of article 7 shall comply with all sections of law and regulations with regard to the registration and supervision of security guards, the maintenance of personnel records, and the filing of evidence of liability insurance.

## §174.5 Fingerprint requirement

(a) The holder of any license pursuant to article 7 of the General Business Law shall submit the fingerprints of all employees as provided in section 170.2 of this Title, or, if a designation has been made pursuant to section 174.3 of this Part, of those employees within the security guard entity.

(b) Security guard companies not subject to licensure pursuant to article 7 shall submit the fingerprints of all security guard employees. Such fingerprints may be taken by any of the methods set forth in section 170.2 of this Title, or by a designated person who is employed by the security guard company and who has been previously fingerprinted.

(c) Security guard training schools approved by the Division of Criminal Justice Services may submit the fingerprints of potential security guard registrants and of registered security guards. Such fingerprints may be taken by a designated employee of the training school who has been previously fingerprinted.

## §174.6 Employment as a security guard: due diligence

Security guard companies shall exercise the following minimum due diligence steps to determine the qualification of an applicant for employment as a security guard:

(a) When the potential guard employee is already registered by the Secretary of State:

(1) Company will have the guard employee applicant complete an employee statement form, as prescribed by the Secretary.

(2) Company will examine the registration card and record the identification number on the employee statement.

(3) Company will call or contact the licensing guard registry and will:

(i) verify the validity of the registration card; and

(ii) confirm training status and determine:

(a) if on-the-job training has been satisfactorily completed;

(b) when the annual in-service training course is due; and

(c) in the case of an armed guard, when the annual armed in-service training is due;

(iii) record guard registry transaction number and date on the employee personnel file.

(4) Submit to the Department of State, within seven days of employment, by regular mail a "Notice of Employment."

(b) When the potential guard employee has an application for registration pending which was submitted by another company:

(1) Company will have the guard employee applicant complete an employee statement form, as prescribed by the Secretary.

(2) Company will examine the temporary registration card issued by another company to the employee applicant and attach copy to employee statement.

(3) Company will call or contact the licensing guard registry and will:

(i) verify validity of the pending guard registration application;

(ii) verify that all information necessary for the registration to be issued has been submitted; and

EDNY_0000010690

(iii) confirm training status and determine:

(a) if on-the-job training has been satisfactorily completed;

(b) when the annual in-service training course is due; and

(c) in the case of an armed guard, when the annual armed in-service training is due;

(iv) record guard registry transaction number and date on the employee personnel file;

(v) company will issue the guard employee a temporary registration card on a form prescribed by the Secretary.

(4) Submit to the Department of State, within seven days of employment, by regular mail a "Notice of Employment."

(c) When the potential guard employee is new to the industry:

(1) Company will have the guard employee applicant complete an employee statement form, as prescribed by the Secretary.

(2) Company will call or contact the licensing guard registry and will:

(i) verify that no application is pending for the potential guard; and

(ii) verify that no prior disqualification of this potential guard has been made.

(3) Record guard registry transaction number and date on the employee personnel file.

(4) Verify identity. Such verification may be made by checking identifying documents such as a State- issued driver's license or State-issued I.D. card with a photograph or a U.S. military card.

(5) Verify prior employment record as indicated on the employee statement form. Such verification may be made by the procurement and filing of reference letters from former employers.

(6) Company will have the guard employee complete an application for a security guard registration, and review criminal history answers to determine eligibility for employment.

(7) Company will verify that all necessary documents are attached to the application:

(i) photo;

(ii) one set of fingerprints of the guard applicant on standard fingerprint cards approved by the division;

(iii) [*Reserved*]

(iv) certification that the guard applicant has satisfactorily completed the preassignment training, and armed guard training where applicable;

(v) fees as prescribed in section 89-h of article 7A of the General Business Law;

(vi) a certification that the company has exercised due diligence to verify as true the information contained in the employee statement; and

(vii) a completed "Notice of Employment".

(8) Company will issue the guard employee a temporary registration card on a form prescribed by the Secretary.

## §174.7 Notice of employment

All employers shall provide information on the employment of security guards to the Department of State on a notice of employment form.

(a) Notice of employment forms contained on the original application for security guard registration may be filed without additional fee.

(b) Notice of employment forms filed subsequent to the original registration application shall be accompanied by a $25 filing fee.

## §174.10 Disqualifying disability

A disqualifying disability shall mean: having a physical or mental disability or disability by reason of intoxication or the use of, addiction to or dependence on alcohol or drugs which, as determined by the department, renders the applicant unable to perform the essential functions of the security guard positions, with or without reasonable accommodation, or who, as determined by the department poses a direct threat to health or safety.

## §174.11 Investigation waiver

The department may after consultation with the Division of Criminal Justice Services waive background investigation and applicable fees if it determines that the security guard company or a security guard applicant submitting the application has been subject to such a background investigation requirement which meets or exceeds the requirements of article 7 or article 7A of the General Business Law. The department shall not be required to initiate background investigations for applicants who are also employed as police officers or as peace officers, and who have fingerprints on file with the Division of Criminal Justice Services.

## §174.12 Security guard registration

(a) All individuals hired on or after January 1, 1994 as security guards in New York State shall be registered in accordance with the provisions of article 7A of the General Business Law.

(b) All individuals hired prior to January 1, 1994 as security guards in New York State shall be registered in accordance with the provisions of article 7A of the General Business Law within a 24-month period.

(1) Those individuals hired prior to January 1, 1994 in an even year shall be registered during the calendar year 1994 by the anniversary date of their hiring.

(2) Those individuals hired prior to January 1, 1994 in an odd year shall be registered during the calendar year 1995 by the anniversary date of their hiring.

# GLOSSARY OF TERMS

**Abandonment**. Desertion by a husband or wife, of his or her spouse, with the intention of creating a permanent separation.

**Abscond**. To hide from the jurisdiction of a court in order to avoid confinement.

**Accessory**. Although not the principal actor in the commission of an offense, a person who solicits, requests, commands or intentionally aids the principal actor to engage in the commission of such offense.

**Accomplice**. A person who is liable to prosecution for the identical offense charged against a defendant on trial.

**Acquit**. To free a person legally from an accusation of criminal guilt.

**Affidavit**. A written statement under oath.

**Alibi**. A defense of having been in another place at the time the crime was committed.

**Appeal**. A review, by a higher court, to determine whether the decision, order or verdict in the lower court should be reversed, modified or affirmed.

**Arbitration**. The settlement of a disagreement, out of court, by an arbitrator chosen by the parties to the argument.

**Arraignment**. Calling a defendant before the court to answer an accusation.

**Arson**. The willful and malicious burning of property.

**Assault**. Intentionally, recklessly or with criminal negligence causing physical injury to another person.

**Attachment**. The legal seizure of the property of a defendant before judgement.

**Autopsy**. The dissection of a dead human body, by an authorized doctor, to determine the cause of death.

**Bail**. To set free or liberate from arrest and imprisonment, upon security given that the person released shall appear and answer in court.

**Ballistics**. The examination of bullets that have been fired for the purpose of discovering from which weapon a given bullet has been fired. The science that deals with the motion of projectiles.

**Bench Warrant**. A court order, in which a criminal action is pending, directing a police officer, or a uniformed court officer, to take custody of the defendant, in such action, and bring him before the court.

**Blackmail**. The extortion of goods, money, or the procuring of an illegal act by a threat, in writing, of criminal prosecution or the destruction of a person's reputation or social standing or personal injury.

**Bribery**. Promising or offering money to a witness or a public officer or official to influence his action or testimony.

**Bug**. An instrument or device used to intentionally overhear a conversation or discussion, without the consent of at least one party thereto, by a person not present thereat.

**Burglary**. To knowingly enter or remain unlawfully in a building with the intent to commit a crime therein.

**Capital Offense**. A crime for which a life sentence or the death penalty is prescribed by law.

**Circumstantial Evidence**. Evidence which includes facts, conditions, and events from which an inference may be drawn as to the existence of the fact to be established.

**Coercion**. To compel or induce a person to engage in conduct, that he has a legal right to engage in or not, by means of force or threat.

**Confession**. A statement by a person accused of a crime admitting his guilt.

**Conspiracy**. A combination of two or more persons to accomplish a criminal or unlawful act.

**Contempt of Court**. Behavior disrespectful of the authority of a court, which obstructs the execution of court orders.

**Contract**. An agreement to do or not to do a certain thing.

**Corpus Delicti**. The body of a crime.

**Corroborating Evidence**. Evidence supplementary to that already given and tending to strengthen or confirm it.

**Criminal Impersonation**. A person who impersonates or pretends to be another, and does an act, in such assumed character, with intent to obtain a benefit or to injure or defraud another.

**Criminal Trespass**. To knowingly enter or remain unlawfully in or upon premises.

**Deposition**. A sworn statement made before an officer qualified to administer oaths, which is to be used as evidence in a court proceeding.

**Direct Evidence**. Evidence in form of testimony from a witness who actually saw, heard or touched the subject of interrogation.

**Disorderly Conduct**. Intentionally causing public inconvenience, annoyance or alarm, or recklessly causing a risk.

**Duress**. Any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him/her to do an act contrary to his/her free will.

**Embezzlement**. Fraudulent appropriation by a person acting in a fiduciary capacity, of money or property entrusted by another.

**Entrapment**. The act of a public servant, or a person acting for a public servant, in inducing or encouraging a person to commit a crime not contemplated by him, for the purpose of criminal prosecution.

**Estoppel**. A legal prohibition which stops a person from making a particular statement of claim because of something he has said or done before.

**Executor**. The person named, by a testator, to carry out the provisions of his will.

**Extortion**. Taking or obtaining property from another with his consent, induced by a wrongful use of force or fear.

**Extradition**. Delivery from one state or notice to another, of fugitives from justice.

**Felony**. A crime punishable by imprisonment for a term of one year or more.

**Fiduciary**. A person who on behalf of or for the benefit of another transacts business or handles money or property not the person's own; such relationship implies great confidence and trust.

**Forgery**. The falsely making or materially altering of any instrument or article, with the intent to defraud, deceive or injure another.

**Garnishment**. The attachment of a debtor's wages or salary to satisfy or pay a judgment.

**General Release**. A formal document made out by individual certifying that he has no further cause for action against another.

**Grand Jury**. An official body, consisting of not less than 16, nor more than 23 persons, called to hear an examine evidence concerning offenses, whether criminal or otherwise, and to take action with respect to such evidence.

**Grand Larceny**. Unlawfully taking property belonging to another, which is valued at more than $1,000.00.

**Habeas Corpus**. A written order commanding the bringing of the body, of a certain person, before a certain court.

EDNY_0000010692

**Harassment**. To intentionally engage in a course of conduct or repeatedly commit acts which alarm or seriously annoy a person and which serve no legitimate purpose.

**Hearsay Evidence**. An out of court statement, offered in court for its truth.

**Homicide**. The killing of one human being by the act or omission of another human being.

**Indictment**. The accusation in writing, presented by the Grand Jury, to a superior court charging a person with a crime.

**Injunction**. A writ or order issued by a court or judge, requiring a person to refrain from a particular act.

**Inquest**. An official hearing to determine the cause of death of a human being.

**Intestate**. A person who dies without having a valid will or testament.

**Ipso Facto**. By the mere effect of an act or a fact.

**Irrevocable Consent**. A written consent by a non-resident individual or nonresident/foreign partnership or corporation, submitting to the jurisdiction of the courts of New York State, designating the Secretary of the State of New York as the agent upon whom may be served any summons, subpoena or other process, in any action, commenced in the State of New York.

**Jostling**. Unnecessarily crowding against a person with the intent to place a hand in the proximity of such person's pocket, pocketbook or handbag.

**Judgment**. The official decision of a court or justice on the claims of parties to a litigation.

**Jump Bail**. Failure to make an appearance in court in accordance with the terms imposed at the time bail was fixed.

**Jurat**. That part of an affidavit where the officer certifies that it was sworn to before him.

**Jury Tampering**. The attempt to corruptly influence a juror.

**Laches**. Failure to assert a right for an unreasonable length of time.

**Levy**. Taking possession of property by an official to satisfy a judgment.

**Libel**. A written defamatory statement that is injurious to the reputation of another.

**Lien**. A legal right or claim upon a specific property which holds the property until a debt is satisfied.

**Lis Pendens**. A legal document, filed in the office of the county clerk, giving notice that an action or proceeding is pending in the courts affecting the title to real property.

**Malingering**. The act of feigning or faking an illness or injury.

**Mandamus**. An instrument, in writing, ordering a court or administrative officer to perform some specific duty.

**Manslaughter**. To recklessly cause the death of another person.

**Misdemeanor**. An offense, other than a "traffic infraction," for which a sentence to a term of imprisonment may be in excess of 15 days or up to one year.

**Modus Operandi**. The term used to indicate the method or technique followed in the performance of a criminal act.

**Moral Turpitude**. The quality of a crime involving grave infringement of the moral sentiment of the community.

**Negligence Actions**. The general class of civil suits arising from the defendant's failure to exercise reasonable care.

**Ordinance**. A rule enacted by the legislative body of a municipality.

**Parole**. A conditional release from prison.

**Peremptory Challenge**. The right of the defendant and the prosecution in a criminal trial to offer objection to a certain number of jurors without giving any explanation.

**Perjury**. The act of willfully swearing falsely.

**Petit Jury**. The ordinary jury of men or woman for the trial of a civil or criminal action.

**Petit Larceny**. Unlawfully taking property belonging to another, which is valued at less than $1,000.00.

**Physical Evidence**. Anything that may be found, by investigators, to have a connection with a crime (for example; an article of clothing worn by the victim).

**Plaintiff**. A person who brings a civil action against another.

**Pleadings**. The formal allegations made by the parties of their respective claims and defenses for the judgment of the court.

**Police Power**. The authority inherent in a government to enact laws to promote the safety, health and general welfare of society.

**Prima Facie**. So far as can be judged from the first appearance or at first sight.

**Probate**. The act and process of proving, before a proper court, that a document is the valid will of a testator.

**Probation**. The type of penalty, whereby, a convicted person is put under the jurisdiction of the court for a stated period of time, in addition to, or instead of being sent to prison.

**Referee**. A person to whom a court action is referred, to take testimony, hear the parties and report thereon to the court.

**Relevant**. Applying to the matter in question and consequently, providing something useful to the purpose.

**Reprieve**. The withdrawing of a sentence for an interval of time, which operates in delay of execution.

**Res Gestae**. Those circumstances, which are not deliberate acts of the parties, and which are incidental to an act litigated. They can be offered in evidence to explain the act litigated.

**Robbery**. The unlawful taking of the personal property of another from his person or in his presence by force, or violence, or fear in injury.

**Rough Shadowing**. Shadowing which is done in such a manner as to cause the subject discomfort or annoyance, or interferes with him in any way.

**Search Warrant**. A written order, issued by a court, for the search of a designated premises, vehicle, or person for evidence of the commission of a crime.

**Sentence**. A judgment passed by a court on a person on trial as a criminal offender.

**Shadowing**. An unobserved close watch.

**Statute of Limitations**. A law which limits the time within which a criminal prosecution or a civil action must be started.

**Subpoena**. A writ or order directed to a person and requiring his attendance at a particular time and place to testify as a witness.

**Subpoena Duces Tecum**. A process by which the court, at the instances of a party, commands a witness who has in his possession or control some document or paper that is pertinent to the issues of a pending controversy, to produce it at the trial.

**Subornation of Perjury**. Wilfully procuring or inducing another to testify falsely under oath.

**Subrogation**. Substitution of one person's claims, rights or securities for those of another person.

**Summary Proceedings**. An action by which a case or controversy is settled, in a prompt and simple manner without the aid of a jury, presentation of facts or indictment.

**Summons**. An instrument used to commence a civil action or special proceeding and is a means of acquiring jurisdiction over a party.

**Surveillance**. To keep a close watch over someone or something. (Certain types not permissible.)

**Tail**. (See shadowing.)

**Testator**. A person who makes a last will and testament.

**Testimony**. Any statement or statements made by witnesses, under oath, in a judicial proceeding.

**Tort**. A wrongful act, wrong, injury; violation of a legal right.

**Trespass**. An unlawful interference with one's person, property or rights.

**True Bill**. An indictment handed down by a Grand Jury.

**Turpitude**. Everything done contrary to justice, honesty, modesty or good morals, is said to be done with turpitude.

**Venue**. The neighborhood, place or county in which an injury is declared to have been done, or fact declared to have happened.

**Warrant**. A writ, issued by a court, authorizing the arrest of a person, or the seizure of property.

**Writ**. An order issued from a court requiring the performance of a specified act, or giving authority to have it done.

**From**: Landa, Marjorie [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=57252E003EBF4A94A959E7BDECA80D4C-LANDA, MARJ]
**Sent**: 9/30/2022 4:59:03 PM
**To**: Julio Medina [jmedina@etcny.org]; Schwam, Keith [kschwam@cityhall.nyc.gov]; Goldin, David [dgoldin@cityhall.nyc.gov]
**Subject**: RE: Questions and information attached
**Attachments**: Exodus-outstanding items 09302022.pdf

Dear Mr. Medina,

Thank you for your email of September 29, 2022, with attachments.

Attached to this email is an updated list of the records that we have still not received based on our June 8, 2022 request, notwithstanding multiple follow-up requests. If Exodus intends to produce additional material, please inform me directly upon Exodus's receipt of this email and identify what additional material we will receive and by when. Absent such a response, we will assume that Exodus does not intend to provide any further information in response to the June 8th request.

Thank you for your prompt attention to this matter.

Sincerely,

Marjorie Landa
Director
Mayor's Office of Risk Management and Compliance
22 Reade Street, 6th Floor
New York, NY 10007
(t) 212-416-7818
(c) 929-294-6754
mlanda@cityhall.nyc.gov

---

**From:** Julio Medina <jmedina@etcny.org>
**Sent:** Thursday, September 29, 2022 6:11 PM
**To:** Schwam, Keith <KSchwam@cityhall.nyc.gov>; Landa, Marjorie <MLanda@cityhall.nyc.gov>; Goldin, David <Dgoldin@cityhall.nyc.gov>
**Subject:** [EXTERNAL] Fwd: Questions and information attached

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to phish@oti.nyc.gov as an attachment (Click the More button, then forward as attachment).

I apologize for the delay. Attached are answers to questions and supporting contracts. Below are email exchanges that took place between respective teams.

Thanks for your patience and please let me know you received.

Blessings...

Julio Medina/CEO
Exodus Transitional Community, Inc
2268 3rd Avenue
New York, NY 10035

Office 917-492-0990
http://secure-web.cisco.com/14wRGgBV8FjGh25yD8qPpLNZaPdMlPIvuQ5nBljpNll_b_y9_0aEo-F_hr4G-Npt-cTY8MbghTE42Mei8Qq7i4WG4CfMqXmWnzGnGK2Uo-jqsBhTkLM2dmgCCA0lIEC7O69km6Jm2YXq9VOFCAZp0s8mBIHOOMhdWTNyqPO4pZW9FBLbwE6putRcRhR02VS5Tj3O7jGVKLxUudNsTyCUcgYT3Da70HTrkZH4hmhUcT9LjuCDzX9D2rOcGULiVv939nJf7bTg3nOgCkLLcWEq7veIczOp0_nax7Sc5E_v_K5jasugeEQ4pJdGPki41wB1VCW4aWAhkuioJh-b0jhfSjMPtABb6QKp-kgskWyGwMQw/http%3A%2F%2Fwww.etcny.org%26nbsp;

Begin forwarded message:

**From:** Diana Ortiz <DOrtiz@etcny.org>
**Date:** September 29, 2022 at 5:13:52 PM EDT
**To:** Julio Medina <jmedina@etcny.org>, Ululy Martinez <urm@urmlaw.com>
**Subject: Questions and information attached**

Two documents attached to support answer #2. #8 has a date Dec. 10, 2020. In the Presidential Proposal it references Watchforce role in their agreement with a budget of cost per week, per month, per year. It came in a little less then Global so it looked okay.

Here are some references to the role of Watchforce as a company.

## RE: Exodus CT1 002 20228804812 - Additional Inquiries from Comptroller

[redacted]

Berkman-Breen, Joseph

To:
- MacLeod, Alison <AMacLeod@cityhall.nyc.gov>;
- Shawn Dougherty

+5 others

Cc:
- Diana Ortiz

Thu 3/17/2022 12:30 PM

Hi all – is Watchforce technically a subcontractor? My understanding was that International Trendz took over security services for Global and that Watchforce is the business manager for International Trendz who Exodus pays for those security services.

# Watchforce Update

DR

Danielle Rosario

To:
- Chris Dantzler <chriskraze@gmail.com>;
- Diana Ortiz;
- Julio Medina

Thu 3/17/2022 4:55 PM

Start reply with:
Great, thanks for the update. Makes sense. That's great news!
Feedback

Hi All,
Diana and I just got off the phone with the city. They want us to enter into a formal subcontract with Watchforce (since we pay them directly) and then have RSAT and International Trends be second tier subcontractors listed in the Watchforce contract. So our current system will stay in place just now in a very clear manner.

Thanks,
Danielle

**With Gratitude, Diana**

Diana Ortiz, MA, CASAC-T
**(pronouns: she/her/hers – what is this?**
**V.P. of Wellness/Genesis M.H. Centers**
Cell:(914) 645-7665

**2268 Third Avenue**
**New York, NY 10035**
**(917) 492-0990 (ext. 113)**

***"I am no poet, but"*** ***unknown author***

**www.etcny.org**

***You can donate 0.5% of the price of your eligible AmazonSmile purchases to Exodus. Simply sign up here:***

***Join our mailing list here***

***Are you registered to vote? Register to vote online today.***
***Moved recently? Update your information with the NYS Board of Elections.***
***Not sure if you're registered to vote? Search your voter registration status.***

*Attention: This message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual(s) or entity (ies) named above, and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this information is prohibited, and may be unlawful. If you have received this message in error, please reply immediately to the sender that you have received the message in error, and delete it.*