**FILED UNDER SEAL**

# EXHIBIT G

Application, affidavit and warrants, No. 25-MC-545 (E.D.N.Y.), as produced by the government

- EDNY_0000059112–179

**TO: Clerk's Office**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

********************************
IN THE MATTER OF THE SEARCH
LOCATIONS DESCRIBED IN
ATTACHMENTS A-1 THROUGH A-4
FOR THE THINGS DESCRIBED IN
ATTACHMENTS B-1 THROUGH B-4

25- MC-545
Docket Number

********************************

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✓
Name: Eric W. Silverberg
Firm Name: US Attorney's Office Eastern District of New York
Address: 271A Cadman Plaza East
Brooklyn, NY 11201
Phone Number: 718-254-6365
E-Mail Address: eric.silverberg@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES_____ NO___
**If yes, state description of document to be entered on docket sheet:**

______________________________________

______________________________________

______________________________________

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:__________________
Judge/Magistrate Judge:______________________________
Date Entered:______________________________________

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

Ongoing criminal investigation

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn , NEW YORK 2-7-25

Joseph A. Marutollo
**U.S. DISTRICT JUDGE**

RECEIVED IN CLERK'S OFFICE__________________________
DATE

**MANDATORY CERTIFICATION OF SERVICE**:
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:______; or **C.)** ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

2/7/2025
DATE

Eric Silverberg
SIGNATURE

RCH:MAA/EWS/SMS
F. #2021R00664

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF LOCATION INFORMATION DESCRIBED IN ATTACHMENTS A-1 THROUGH A-4 FOR THE THINGS DESCRIBED IN ATTACHMENTS B-1 THROUGH B-4 | **TO BE FILED UNDER SEAL**<br><br>**APPLICATION FOR SEARCH WARRANTS**<br><br>Case No. 25- MC-545 |

**AFFIDAVIT IN SUPPORT OF AN**
**<u>APPLICATION FOR SEARCH WARRANTS</u>**

I, **MATTHEW LONDON**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for warrants under Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular phones assigned call numbers:

> (1) 347-539-7348 (the "DANTZLER NUMBER"), whose cellular phone service provider is Verizon Wireless ("Verizon"), located in Bedminster, New Jersey, as described in Attachment A-1, for the things described in Attachment B-1;
>
> (2) 646-319-7618 (the "MEDINA NUMBER"), whose cellular phone service provider is AT&T Corporation ("AT&T"), located in North Palm Beach, Florida, as described in Attachment A-2, for the things described in Attachment B-2;
>
> (3) 718-552-7799 ("HU NUMBER-1"), whose cellular phone provider is T-Mobile US, Inc. ("T-Mobile"), a cellular phone service provider located

in Parsippany, New Jersey, and previously was AT&T and T-Mobile at various relevant times, as described in Attachments A-2 and A-3, for the things described in Attachments B-2 and B-3;

(4) 718-258-7888 ("HU NUMBER-2"), whose cellular phone provider is T-Mobile and previously was Verizon, AT&T, and Bandwidth.com ("Bandwidth"), a cellular phone service provider located in Raleigh, North Carolina, at various relevant times, as described in Attachments A-1 through A-4, for the things described in Attachment B-1 through B-4; and

(5) 212-365-8777 ("HU NUMBER-3," and together with the MEDINA NUMBER, the DANTZLER NUMBER, HU NUMBER-1, and HU NUMBER-2, the "CELLULAR NUMBERS"), whose cellular phone service provider is AT&T, as described in Attachment A-2, for the things described in Attachment B-2.

I also make this affidavit in support of an application for warrants for records and information associated with a cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, or International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (the "MERCEDES NUMBER"), that is in the possession, custody, and/or control of Verizon, AT&T, and T-Mobile as described in Attachments A-1 through A-3, respectively, for the things described in Attachments B-1 through B-3, respectively.

2. I am a Special Agent assigned to the New York Field Office of the Federal Bureau of Investigation (the "FBI"). Thus, I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C)—that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Since becoming a Special Agent for the FBI in 2022, I have participated in numerous investigations into organized criminal activity, during the course of which I have, among other things: (a) conducted physical and electronic surveillance, (b) executed search warrants, (c) reviewed and analyzed recorded

conversations and records, (d) debriefed cooperating witnesses and informants, and (e) used other techniques to secure relevant information. Through my training, education, and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activities to conceal their behavior from detection by law enforcement authorities.

3. The facts in this affidavit come from my personal observations, my training and experience, information obtained from both government and public records databases, information obtained from other agents, and review of records and documents. When I rely on statements made by others, such statements are set forth only in part and in sum and substance unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. As set forth in this affidavit, there is probable cause to believe the information described in Attachments A-1 through A-4 contain evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) (collectively, the "SUBJECT OFFENSES") committed by JULIO MEDINA, CHRISTOPHER DANTZLER, WEIHONG HU, and others, known and unknown (together, the "SUBJECTS"), as further described in Attachments B-1 through B-4.

5. In addition, the government anticipates presenting evidence of the SUBJECT OFFENSES to a grand jury in the Eastern District of New York on or about

February 10, 2025, and requesting that the grand jury return an indictment charging MEDINA, DANTZLER, and HU with the SUBJECT OFFENSES. The government also anticipates seeking arrest warrants for MEDINA, DANTZLER, and HU that day, and, if issued, would plan to arrest all three individuals shortly thereafter. Accordingly, there is also probable cause to believe that the location information described in Attachments A-1 through A-4 and B-1 through B-4 will assist law enforcement in locating and arresting MEDINA, DANTZLER, and HU, who the government anticipates will each be a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## JURISDICTION

6. The Court has jurisdiction to issue the requested warrants because it is a "court of competent jurisdiction," as defined in 18 U.S.C. § 2711, i.e., the Court is a district court of the United States that has jurisdiction over the offenses being investigated. See 18 U.S.C. § 2711(3)(A)(i).

7. Because this application seeks, among other things, the prospective collection of information, including cell-site information, that may fall within the statutory definitions of information collected by a "pen register" and/or a "trap and trace device," see 18 U.S.C. §§ 3127(3) & (4), the requested warrants for the CELLULAR NUMBERS and the MERCEDES NUMBER are designed also to comply with the Pen Register Act, see 18 U.S.C. §§ 3121-3127. The requested warrants for the CELLULAR NUMBERS and the MERCEDES NUMBER therefore include all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

A. Overview of Scheme

8. The United States Attorney's Office for the Eastern District of New York, together with the FBI and the New York City Department of Investigation, are investigating a scheme by MEDINA, DANTZLER, and HU, among others, to corruptly divert millions of dollars of public funds to personally enrich themselves.

9. In sum and substance, in or around April 2020, in the midst of the Covid-19 pandemic, New York City developed an emergency transitional housing program (the "Emergency Housing Program"), in partnership with local hotels and other businesses, to combat the spread of Covid-19 in New York City jails. Under the Emergency Housing Program, inmates were released from local prisons and housed in hotels in New York City, including in Brooklyn and Queens, and offered various reentry services, including mental health, security, job training, and food services. Beginning in or around June 2020, the New York City Mayor's Office of Criminal Justice ("MOCJ") contracted with Exodus Transitional Community, Inc., a non-profit organization (together with its affiliates, "Exodus") to operate the Emergency Housing Program. Exodus subsequently entered into agreements with various hotels to operate as reentry hotels under the Emergency Housing Program (collectively, the "Program Hotels"). In total, between in or about June 2020 and December 2023, Exodus received approximately $122 million in public funds from MOCJ to operate the Emergency Housing Program at the Program Hotels. In or about and between April 2020 and December 2024, MEDINA, DANTZLER, and HU conspired to corruptly divert millions of dollars of these public funds that Exodus was receiving under the Emergency Housing Program to personally enrich themselves through kickbacks and bribes.

10. As the evidence discussed herein reflects, the SUBJECTS used, among other things, mobile electronic devices, email communications, and text and other chat communications to further this criminal scheme. Because mobile electronic devices were used by the SUBJECTS, call history records, email communications, and text messages relevant to the scheme are likely to be found on such devices. Identifying the locations of these electronic devices will allow law enforcement to locate these devices and subsequently secure the evidence contained on them.[1] In addition, location information from these mobile electronic devices is itself relevant evidence of the SUBJECT OFFENSES, because it will provide information related to with whom the SUBJECTS met and interacted and when and where those meetings occurred. Furthermore, as noted above, the government anticipates that MEDINA, HU, and DANTZLER will shortly be subject to arrest warrants related to the SUBJECT OFFENSES. The location information from the electronic devices will therefore also assist in locating and arresting MEDINA, HU, and DANTZLER pursuant to arrest warrants.

B. <u>The SUBJECTS</u>

11. MEDINA founded and served as the executive director and chief executive officer of Exodus. MEDINA participated in various public service roles in connection with his work with Exodus. For example, between in or around October 2021 and November 2022,

---

[1] The government is continuing to develop evidence about the locations of the electronic devices used by the SUBJECTS in order to determine whether the devices are located in the Eastern District of New York or other jurisdictions. The government is therefore not seeking warrants to search the devices themselves at this time. The government anticipates that it may seek subsequent search warrants for the electronic devices upon determining the jurisdiction(s) in which the devices are located.

MEDINA served as a member and, at times, the acting chair of New York City's Board of Correction, a panel that regulates and oversees New York City's jails.

12. DANTZLER served as the president of Watchforce Security Services Inc., a company that purported to provide Exodus with security services at the Program Hotels (together with its affiliates, "Watchforce") pursuant to the Emergency Housing Program. Prior to serving as the president of Watchforce, DANTZLER worked as an electrician.

13. Watchforce began operating in or around November 2020, only a few months after Exodus began operating the Emergency Housing Program. Watchforce was not a licensed security company and did not provide security services itself. Rather, Watchforce subcontracted with other security firms to provide security services for the Program Hotels. Between approximately January 2021 and May 2022, Watchforce received approximately $21 million in public funds from Exodus for purportedly providing security services at the Program Hotels, despite not actually providing any security services itself. Of that amount, Watchforce paid approximately $12 million to subcontractors who actually provided security services at the Program Hotels; DANTZLER personally captured approximately $9 million in public funds as windfall profits, despite Watchforce providing no security services itself.

14. HU operated and/or controlled several hotels in New York City, including the Wyndham Garden Fresh Meadows in Queens, New York and the Mayflower Howard Johnson Hotel in Long Island City, New York (collectively, the "HU Hotels") that operated as Program Hotels under the Emergency Housing Program. Between in or about October 2021 and November 2023, the HU Hotels received approximately $12 million in public funds from Exodus for their participation in the Emergency Housing Program as Program Hotels.

15. HU, together with her adult son and daughter-in-law, also served as a member of Meiqiao LLC, a company that provided food services to formerly incarcerated individuals residing at the Program Hotels under the Emergency Housing Program, including at the HU Hotels (together with its affiliates, "Meiqiao," and collectively with the HU Hotels, the "HU Businesses"). Before the Emergency Housing Program was created, Meiqiao had operated as a subcontractor on HU's construction projects. In or about September 2020, WEIHONG HU, together with others, repurposed Meiqiao as a food services business so that MEDINA, DANTZLER, HU, and their co-conspirators could capture additional public funds under the Emergency Housing Program. Between in or about September 2020 and July 2023, Meiqiao received approximately $17 million in public funds from Exodus for providing food services to the Program Hotels pursuant to the Emergency Housing Program. HU's son, Ge, also operated and controlled Crosscity Construction LLC, a construction company associated with his family real estate projects that performed construction services for Exodus.

C. The Bribes and Kickbacks

16. The government's investigation has revealed that, during the relevant time period, MEDINA solicited and received bribes and kickbacks from DANTZLER and HU in exchange for MEDINA's providing business through Exodus to Watchforce and the HU Businesses under the Emergency Housing Program. Witness-1[2] and Witness-2 each told law

[2] Witness-1 initially filed an online complaint with the FBI reporting various criminal activity by HU. During his/her discussions with law enforcement, Witness-1 disclosed, in sum and substance, that he/she aided and abetted illegal activity committed by HU and others. Witness-1 also disclosed that he/she has a poor relationship with HU. Witness-1 stated that he/she was forced to work long hours and was poorly compensated by HU, and ultimately quit working

enforcement that they understood that HU was paying kickbacks in connection with Exodus's use of the HU Hotels. According to Witness-1, HU told Witness-1 that HU paid monthly cash kickbacks off the books to individuals associated with Exodus.

17. The bribes and kickbacks took various forms, including hundreds of thousands of dollars in U.S. currency; financing a luxury vehicle, i.e., the Mercedes-Benz described below; payments towards MEDINA and his spouse's debts, including a mortgage; and the purchase of two homes, both which were made in the names of MEDINA's co-conspirators, HU and DANTZLER, or entities associated with them, to conceal the nature and source of the bribes and kickbacks.

18. For example, on or about September 11, 2020, Exodus prepared two checks made out to Meiqiao, for $103,600 and $84,000, respectively (collectively, the "Emergency Housing Program Checks").

19. On or about the following day, September 12, 2020, HU and MEDINA met at one of the HU Hotels. During the meeting, as depicted in the following images from hotel surveillance footage, HU took a wrapped stack of U.S. currency out of her wallet, put it into a manila envelope, and provided it to MEDINA, who put it into his bag:

---

for HU in or about August 2023 due to poor working conditions, including unpaid salary. HU subsequently agreed to pay Witness-1 approximately $100,000 in exchange for, among other things, Witness-1's agreement not to disclose information regarding her employment. Separately, Witness-1 disclosed to law enforcement, in sum and substance, that MEDINA made unwanted sexual advances to him/her, including unwanted physical contact. Information provided by Witness-1 has proven reliable in this investigation and is corroborated by, among other things, witness statements, electronic messages, and other records.









20. During the same meeting, as depicted in the following image from hotel surveillance footage, MEDINA provided HU with the Emergency Housing Program Checks:



21. On or about September 13, 2020, MEDINA deposited approximately $3,000 in U.S. currency into his personal bank account. On or about September 14, 2020, Meiqiao deposited the Emergency Housing Program Checks into one of its bank accounts.

22. As another example, in or about and between August 2021 and September 2021, DANTZLER, through Watchforce, paid approximately $75,000 toward several debts incurred by MEDINA and his spouse, including a mortgage and a vehicle loan.

23. In addition, in or about November 2021, HU, through one of the HU Businesses, financed a luxury vehicle, specifically, a Mercedes-Benz bearing license plate NY KSX3695 ("the MERCEDES") for MEDINA for approximately $107,000. Witness-1 told law enforcement that he/she personally observed this transaction; Witness-1 and HU went with MEDINA to a dealership on Long Island to purchase the vehicle. In or about February and March 2024, MEDINA and HU exchanged a series of text messages about the MERCEDES. On or about February 6, MEDINA wrote from a device associated with the MEDINA NUMBER, "Car is due for inspection. I need registration." HU responded in part, from HU NUMBER-2, "I will have someone deliver it to you." On or about March 13, MEDINA returned to the subject, writing, "Did you know registration was due in November. Inspection was due in January. Can't do inspection without Registration." After HU asked for the license plate, MEDINA sent a picture of a gray Mercedez-Benz bearing license plate NY KSX3695, i.e., the MERCEDES. HU later indicated that she had lost the original registration paperwork for the MERCEDES. In or about and between January 2022 and December 2024, HU caused monthly payments of approximately $1,500 to be made toward the MERCEDES for MEDINA.

24. As another example, in or about September 2022, DANTZLER and HU caused to be purchased for MEDINA a town house in Washington Heights, New York, for approximately $1.3 million. Records indicate that the property was financed by DANTZLER and kept in the name of HU's company. Witness-1 advised law enforcement that he/she attended a

meeting at which HU, MEDINA, and an individual that Witness-1 identified as "Chris"—whom law enforcement believes to be a reference to DANTZLER—were present. Based on his/her attendance at the meeting, Witness-1 understood that the town house was purchased for MEDINA for the purpose of securing long-term contracts with Exodus. Text messages further corroborate that MEDINA had access to the house after it was purchased. For example, on or about February 1, 2023, MEDINA texted a photograph of the property to Witness-1 and stated "Keys don't work. Why is there a for sale sign?" Eight days later, MEDINA and Witness-1 exchanged further text messages, apparently in reference to the property. MEDINA asked, "Can you send your architect to do design. We Need it for HPD [New York City Housing Preservation and Development] application. When can he be there?" Witness-1 responded, "Hi boss. We have the floor plan, we could do site visits following Monday 2/13. Does that work for you?" MEDINA then responded, "Perfect. HPD needs. We changed locks. I'll give you key."

25. Separately, in or about May 2023, DANTZLER paid to purchase and renovate a house for MEDINA in Clifton Park, New York for approximately $750,000. In or about September 2024, DANTZLER executed an indenture causing the deed to that house to be amended to include MEDINA's spouse as a tenant-in-common.

26. In total, DANTZLER and HU provided MEDINA with at least $2.5 million in U.S. currency and in-kind benefits in exchange for MEDINA's steering approximately $51 million in public funds from the Emergency Housing Program to Watchforce and the HU Businesses.

D. The Fraud Perpetrated on MOCJ

27. As part of the scheme, MEDINA executed or caused to be executed multiple contracts with MOCJ on behalf of Exodus, some of which contracts included budgets setting forth the costs of administering the Emergency Housing Program. The budgets were fraudulently inflated to account for the cost of the bribes and kickbacks to be paid to him by DANTZLER and HU. In turn, DANTZLER and HU submitted, or caused to be submitted, invoices from companies they controlled that concealed the payment of bribes and kickbacks. These invoices were provided to MOCJ to obtain payment for the fraudulently invoiced services administered under the Emergency Housing Program.

28. To conceal the scheme, MEDINA made additional misrepresentations to MOCJ regarding the nature of services Exodus was providing. For example, on or about September 29, 2022, MEDINA emailed a document setting forth Exodus's responses to various queries from New York City officials scrutinizing Exodus's operation of the Emergency Housing Program, including one query asking whether "Exodus or any employee of Exodus or immediate family member (i.e., spouse/domestic partner, child, sibling, or parent of the employee) received anything of value from Watchforce or Mr. Dantzler directly or indirectly." The response sent by MEDINA falsely stated, "Other than the contracted services that Exodus received from Watchforce or Mr. Dantzler, Exodus does not have any awareness or knowledge that any employee of Exodus or immediate family member of an Exodus employee received, directly or indirectly, anything of value from Watchforce or Mr. Dantzler."

E. Additional Efforts to Conceal the Scheme

29. In addition to the fraudulent statements made to MOCJ described above, MEDINA directed an employee of HU not to discuss information relating to the scheme on at least one occasion. On or about May 22, 2023, in an exchange of text messages between MEDINA and the employee concerning the payment of Emergency Housing Program funds, MEDINA wrote, "Don't call me no more. I don't fucking trust you! When I get the payment I will call you. You have other people on the call. You know I'm under investigation. You are fucking with the wrong person!" MEDINA later added, "I'm very paranoid. Told you that when we met. Did 12 years in prison for talking on the phone."[3]

**PROBABLE CAUSE FOR THE LOCATION INFORMATION**

30. This application seeks authorization to collect location information for the CELLULAR NUMBERS and the MERCEDES NUMBER.

31. The MEDINA NUMBER belongs to and is used by MEDINA. Law enforcement databases indicate that the MEDINA NUMBER is associated with MEDINA. Records provided by Witness-1 corroborate that the MEDINA NUMBER is used by MEDINA. In particular, in Witness-1's cellular phone, which was provided voluntarily to law enforcement, the MEDINA NUMBER is listed as being associated with "Julio Medina." Moreover, law enforcement agents have reviewed numerous text messages between Witness-1 and the MEDINA

---

[3] Based on public reporting, law enforcement understands that MEDINA was previously convicted of, and incarcerated for, a narcotics-related offense.

NUMBER. The content of those communications, which deal with, among other things, payments from "Exodus," further demonstrate that the MEDINA NUMBER is associated with MEDINA.

32. The DANTZLER NUMBER belongs to and is used by DANTZLER. Law enforcement databases indicate that the DANTZLER NUMBER is associated with DANTZLER.

33. HU NUMBER-1 and HU NUMBER-2 belonged to and have been used by HU at least as recently as October 2024. Law enforcement databases indicate that HU NUMBER-1 and HU NUMBER-2 are and have been associated with HU since prior to 2020. Law enforcement databases further indicate that the cellular service provider for HU NUMBER-1 has been T-Mobile since on or about November 15, 2024, and previously was AT&T (Cingular) from on or about January 14, 2022 through on or about November 14, 2024 and T-Mobile from on or about October 8, 2006 through on or about January 13, 2022. Law enforcement databases indicate that the cellular service provider for HU NUMBER-2 has been T-Mobile since on or about October 29, 2024, and previously was Verizon from on or about June 22, 2022 through on or about October 28, 2024, AT&T (Cingular) from on or about January 7, 2022 through on or about June 21, 2022, Bandwidth from on or about July 23, 2021 through on or about January 6, 2022, and Verizon from on or about January 1, 2024 through on or about July 22, 2021.

34. In addition, records provided by Witness-1 corroborate that HU NUMBER-1 and HU NUMBER-2 were used by HU. Specifically, HU NUMBER-1 is listed in Witness-1's cellular telephone as "Wei Hong Hu" and HU NUMBER-2 is listed as "weihong CALLER." Moreover, law enforcement have reviewed number text message communications between Witness-1 and HU NUMBER-1, as well as between Witness-1 and HU NUMBER-2. The content

of the communications further indicate that HU NUMBER-1 and HU NUMBER-2 are associated with HU.

35. HU NUMBER-3 belongs to and is used by HU; law enforcement understands that HU began using this number in or around 2024. Law enforcement databases indicate that HU NUMBER-3 is associated with HU and records obtained from AT&T list HU NUMBER-3's subscriber and accountholder as HU.

36. The MERCEDES is a gray 2022 CLS450C4 Mercedes-Benz bearing license plate KSX3695. Records from Mercedes-Benz USA indicate that the MERCEDES NUMBER is a cellular device assigned to the MERCEDES that functions like a cellular telephone built into the vehicle. Records obtained from Mercedes-Benz Financial Services, New York State Department of Motor Vehicles, and State Farm Insurance indicate that the MERCEDES is held in the name of Crosscity, which, as indicated above, is a construction company associated with HU's real estate dealings and is operated and controlled by HU's son. Mercedes records further list HU as the guarantor on the lease for the MERCEDES and list her birth date and the address for the WGFM as her address. These records also reflect that payments were made by checks drawn on accounts in the names of Crosscity and Meiqiao, which, as indicated above, is a food services company operated by HU. In addition, Witness-1 provided documentation relating to the MERCEDES including registration, temporary license plate, and insurance information documents, which further corroborate that HU financed the MERCEDES. Text messages between HU and MEDINA, described above, reflect that while HU financed the MERCEDES, MEDINA possessed the MERCEDES. Parking records from Bronx Car Systems indicate that a gray Mercedes-Benz bearing license plate KSX3695, <u>i.e.</u>, the MERCEDES, was assigned to

MEDINA's parking spot. In addition, License Plate Reader records place the MERCEDES in Clifton Park, New York, where MEDINA is believed to have a residence, as recently as February 2025.

37. There is reason to believe that location information associated with the CELLULAR NUMBERS and the MERCEDES NUMBER will provide evidence of the SUBJECT OFFENSES. As discussed herein, the SUBJECTS used mobile electronic devices, email communications, and text and other chat communications to further the criminal scheme. Identifying the location of these electronic devices will allow law enforcement to locate "property . . . used in committing a crime" and subsequently secure the "evidence of a crime" contained on those devices. See Fed. R. Crim. P. 41(c)(1) and (c)(3).

38. Additionally, location information from these electronic devices is itself relevant evidence of the SUBJECT OFFENSES, because it will provide information regarding with whom the SUBJECTS met and interacted and when and where those meetings occurred. For example, the location information will tend to reveal, among other things, whether and how frequently the SUBJECTS visited each other's homes and places of business, the time they spent in retail locations, whether and when the SUBJECTS met with each other or other persons of interest at other locations, as well as the use and possession of the MERCEDES and residences used in furtherance of the scheme. As reflected above, the criminal scheme at issue is complex, spanned several years, and requires coordination with numerous individuals, thus making information about the whereabouts of the SUBJECTS of particular significance.

39. Moreover, as described previously, because the government anticipates that it will shortly obtain arrest warrants for HU, DANTZLER, and MEDINA, the location information also will help to locate them for arrest.

## TECHNICAL INFORMATION

40. In my training and experience, I have learned that one or more of Verizon, AT&T, and T-Mobile (together, the "Providers") are companies that provides cellular phone access to the general public. I also understand that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for subscribers of the Providers may be located on the computers of those Providers.

41. Cellular service providers, like the Providers, often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of the Providers for weeks or months.

42. Among the services commonly offered by cellular service providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or cellular device to another phone or cellular device via one or more cellular service providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I understand that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by the Providers for short periods incident to and following their transmission. In addition, the Providers

occasionally retain printouts from original storage of text messages for a particular subscriber's account.

43. Cellular service providers, such as the Providers, typically retain certain transactional information about the use of each phone, voicemail, text-messaging account and/or data session on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long-distance phone connection records, records of session times and durations, lists of all incoming and outgoing phone numbers or email addresses associated with particular phone calls, voicemail messages, and text or multimedia messages. The providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

44. Cellular service providers, such as the Providers, may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an IMSI or an IMEI. When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular

antenna or tower records those identifiers as a matter of course. That record thus indicates the identity of the cellular device making the communication without revealing the communication's content.

45. Cellular service providers, such as the Providers, also collect and retain information about their subscribers in their normal course of business. This information can include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all phone numbers and other identifiers associated with the account and a description of the services available to the account subscribers. In addition, cellular service providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes places of payments, and the means and source of payment (including any credit card or bank account number). I also understand that cellular service providers, such as the Providers, typically collect and retain information about their subscribers' use of the cellular service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

46. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the account user or users and may assist in the identification of co-conspirators and/or victims. For example, information stored at the cellular service provider, including the information described above, may

provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the government to establish and prove each element of a charged crime or, alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a cellular service provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the cellular service provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information, or location integrated into an image or video sent via text message, to include both metadata and the physical location displayed in an image or video). Moreover, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the cellular service provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

47. I also understand that cellular service providers have technical capabilities that allow them to collect and generate information about the locations of the cellular phones to which they provide service, including E-911 Phase II data, also known as Global Positioning System ("GPS") data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular phone and, in some cases, the "sector" (i.e., faces of the towers) to which the phone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Accordingly, cell-site data provides an approximate location of the cellular phone but is typically less precise than other types of location information, such as E-911 Phase II data or GPS data.

48. Based on my training and experience, I understand that the Providers can collect cell-site data about the CELLULAR NUMBERS and that MERCEDES NUMBER. Based on my training and experience, cellular service providers routinely and in their regular course of business maintain historical records that allow them to determine which cellular devices used cellular towers on the cellular service provider's network to send or receive communications. For each communication sent or received via the cellular service provider's network, these records may include: (1) the phone call number and unique identifiers of the cellular device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (i.e.,

face of the tower), to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication. Based on my training and experience, I further understand that cellular service providers have the ability to query their historical records to determine which cellular device or devices connected to a particular cellular tower during a given period of time and to produce the information described above. I also understand that cellular service providers have the ability to determine which cellular tower or towers provided coverage to a given location at a particular time. Moreover, I understand that cellular service providers are able to determine this information even for phone call numbers and unique identifiers for which they do not provide service.

49. I further understand that cellular service providers such as the Providers typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. Based on my training and experience, I understand that the Providers can collect the content of text message correspondence to and from the CELLULAR NUMBERS and the MERCEDES NUMBER. In addition, based on my training and experience, I understand that the Providers can collect E-911 Phase II data about the location of the CELLULAR NUMBERS and the MERCEDES NUMBER, including by initiating a signal to determine the location of the CELLULAR NUMBERS and the MERCEDES NUMBER on the respective Provider's network or with such other reference points as may be reasonably available.

50. Based on my training and experience, I understand that cellular service providers such as the Providers also can collect per-call measurement data, which the Providers also refer to as "True Call," "Timing Advance" ("TA"), "Time on Arrival" ("TOA"), "Real-Time

Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD"). This type of data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## BACKGROUND ON CELLULAR LOCATION DATA AND VEHICLES

51. Based on my training and experience, I understand that since at least 2021—when the MERCEDES was financed—vehicles manufactured by Mercedes have been outfitted with cellular devices with IMEI or IMSI numbers. The IMEI number is a unique 15-digit serial number for identifying a device; every mobile device in the world has one. Accordingly, a later-model Mercedes vehicle can be geo-located in essentially the same manner as a cellular phone. I have further learned that, as indicated above, the MERCEDES NUMBER is serviced by T-Mobile.

52. As indicated above, based on my training and experience, I have learned that the Providers, including T-Mobile, have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, the Providers routinely and in their regular course of business maintain historical records that enable them to determine which cellular devices used cellular towers on the Provider's network to send or receive communications, and the Providers have the ability to query their historical records to determine which cellular device or devices connected to a particular cellular tower during a given period of time. I further understand that cellular service providers are able to determine information regarding which cellular devices used cellular towers on the Provider's network even for phone call numbers and unique identifiers for which they do not provide service. Accordingly,

I understand that Verizon and AT&T may have location information relevant to the MERCEDES NUMBER even though they do not provide cellular services for that number.

53. Information from the Providers regarding the MERCEDES NUMBER thus will show, among other things, the particular cell towers (and, where applicable, sector) used by the MERCEDES NUMBER at particular times, thus indicating the general vicinity of the MERCEDES NUMBER, and thus the MERCEDES, at those times. Such location information is relevant evidence of the SUBJECT OFFENSES, including by helping to corroborate the locations and meetings of the SUBJECTS at relevant times. Accordingly, I seek warrants to obtain historical location data for the period from November 12, 2021 to through the present for the MERCEDES NUMBER, as described in Attachments B-1 through B-3.

**AUTHORIZATION REQUEST**

54. Based on the foregoing, I request that the Court issue the proposed search warrants for the CELLULAR NUMBERS and the MERCEDES NUMBER, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrants also will function as pen register orders under 18 U.S.C. § 3123 authorizing the installation and use of pen register and/or trap and trace devices to record, decode and/or capture certain information in Attachments A-1 through A-4 for each communication to or from the devices specified therein, without geographic limit, for a period of thirty days (30) days pursuant to 18 U.S.C. § 3123(c)(1).

55. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an

adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the CELLULAR NUMBERS or the MERCEDES NUMBER would seriously jeopardize the ongoing investigation, as such a disclosure would give those individuals an opportunity to destroy evidence, change patterns of behavior, notify confederates and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachments B-1 through B-4, which are incorporated into the proposed search warrant, the proposed warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant specified therein authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

56. I further request that the Court direct the Providers to disclose to the government any information described in Attachments B-1 through B-4 that is within their possession, custody or control. I also request that the Court direct the Providers to furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the information described in Attachments B-1 through B-4 unobtrusively and with a minimum of interference with the Providers' services, including by initiating a signal to determine the location of the CELLULAR NUMBERS and the MERCEDES NUMBER on the respective Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Providers for reasonable expenses incurred in furnishing such facilities or assistance.

57. I further request that the Court authorize execution of the warrant specified in Attachments A-1 through A-4 and B-1 thorough B-4 at any time of day or night, owing to the

potential need to locate the CELLULAR NUMBERS and the MERCEDES NUMBER outside of daytime hours.

## CONCLUSION

58. I submit that this affidavit supports probable cause for warrants to search the information described in Attachments A-1 through A-4 and to seize the items described in Attachments B-1 through B-4.

59. Furthermore, I respectfully request that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this Application, including this affidavit and the requisite inventory notice. Sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the SUBJECTS of this investigation will be searched at this time. Based upon my training and experience, I have learned that participants in fraudulent schemes often actively search for criminal affidavits and search warrants via the Internet, and may disseminate them to other participants in the scheme as they deem appropriate. Premature disclosure of the contents of this affidavit and related

documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Matthew London
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by phone
on February 7, 2025

Joseph A. Marutollo

HON. JOSEPH A. MARUTOLLO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A-1 (VERIZON)

### Property To Be Searched

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 347-539-7348, associated with Christopher Dantzler; and 718-258-7888, associated with Weihong Hu, and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by Verizon Wireless (the "Provider"), located in Bedminster, New Jersey.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the cellular phones if they are subsequently assigned different call numbers.

## ATTACHMENT B-1

### Particular Things To Be Seized

I. **Information To Be Disclosed by the Provider**

1. All information about the locations of the Target Devices described in Attachment A-1 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices:

   a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

   b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

   c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

**ATTACHMENT A-2 (AT&T)**

**Property To Be Searched**

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 646-319-7618, associated with Julio Medina; as well as 718-552-7799, 718-258-7888, and 212-365-8777, all three of which are associated with Weihong Hu, and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by AT&T Corporation (the "Provider"), a company located in North Palm Beach, Florida.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the cellular phones if they are subsequently assigned different call numbers.

## ATTACHMENT B-2

### Particular Things To Be Seized

### I. Information To Be Disclosed by the Provider

1. All information about the locations of the Devices described in Attachment A-2 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices:

   a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

   b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

   c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

## ATTACHMENT A-3 (T-MOBILE)

### Property To Be Searched

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 718-552-7799 and 718-258-7888, both of which are associated with Weihong Hu; and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by T-Mobile Corporation (the "Provider"), a company located in Parsippany, New Jersey.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the Target Devices if they are subsequently assigned different call numbers.

## ATTACHMENT B-3

### Particular Things To Be Seized

### I. Information To Be Disclosed by the Provider

1. All information about the locations of the Target Devices described in Attachment A-3 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices :

   a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

   b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

   c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices , including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

## ATTACHMENT A-4 (Bandwidth)

### Property To Be Searched

1. The cellular phone assigned call number 718-258-7888, which is associated with Weihong Hu (the "Target Cell Phone"), and whose cellular service provider is Bandwidth.com (the "Provider"), a company located in Raleigh, North Carolina.

2. Records and information associated with the Target Cell Phone that are within the possession, custody or control of the Provider, including information about the location of the cellular phone if it is subsequently assigned a different call number.

## ATTACHMENT B-4

### Particular Things To Be Seized

## I. Information To Be Disclosed by the Provider

1. The following information about the customers or subscribers associated with the Target Cell Phone for the time period July 1, 2021 through and including January 31, 2022:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

   c. Local and long distance phone connection records;

   d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   e. Length of service (including start date) and types of service utilized;

   f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

   g. Other subscriber numbers or identities (including the registration IP address);

   h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

   i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA,

TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Cell Phone.

This warrant does not authorize the seizure of any tangible property.

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
the things described in attachment A-1 for the things described in B-1.

Case No. 25- MC-545

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ________ District of New Jersey
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1.

**YOU ARE COMMANDED** to execute this warrant on or before February 21, 2025 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Duty Magistrate Judge.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ________.

Date and time issued: February 7, 2025 at 6 p.m.

Joseph A. Marutollo
*Judge's signature*

City and state: Brooklyn, New York

Hon. Joseph A. Marutollo U.S.M.J.
*Printed name and title*

**Return**

| Case No.: 25- | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

# ATTACHMENT A-1 (VERIZON)

## Property To Be Searched

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 347-539-7348, associated with Christopher Dantzler; and 718-258-7888, associated with Weihong Hu, and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by Verizon Wireless (the "Provider"), located in Bedminster, New Jersey.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the cellular phones if they are subsequently assigned different call numbers.

## ATTACHMENT B-1

### Particular Things To Be Seized

### I. Information To Be Disclosed by the Provider

1. All information about the locations of the Target Devices described in Attachment A-1 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices:

    a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

    b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

    c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

    a. Names (including subscriber names, user names, and screen names);

    b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>the things described in attachment A-2 for the things described in B-2. | Case No. 25- MC-545 |

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Southern District of Florida *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-2

**YOU ARE COMMANDED** to execute this warrant on or before February 21, 2025 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Duty Magistrate Judge.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ____________.

Date and time issued: February 7, 2025 at 6 p.m.

Joseph A. Marutollo
*Judge's signature*

City and state: Brooklyn, New York

Hon. Joseph A. Marutollo U.S.M.J.
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

**Return**

| Case No.: 25- | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

## ATTACHMENT A-2 (AT&T)

### Property To Be Searched

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 646-319-7618, associated with Julio Medina; as well as 718-552-7799, 718-258-7888, and 212-365-8777, all three of which are associated with Weihong Hu, and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by AT&T Corporation (the "Provider"), a company located in North Palm Beach, Florida.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the cellular phones if they are subsequently assigned different call numbers.

## ATTACHMENT B-2

### Particular Things To Be Seized

### I. Information To Be Disclosed by the Provider

1. All information about the locations of the Devices described in Attachment A-2 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices:

   a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

   b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

   c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
the things described in attachment A-3 for the things described in B-3.

Case No. 25- MC-545

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the ____________ District of New Jersey *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-3.

**YOU ARE COMMANDED** to execute this warrant on or before February 21, 2025 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Duty Magistrate Judge.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: February 7, 2025 at 6 p.m.

Joseph A. Marutollo
*Judge's signature*

City and state: Brooklyn, New York

Hon. Joseph A. Marutollo U.S.M.J.
*Printed name and title*

EDNY_0000059169

**Return**

| Case No.: 25- | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A-3 (T-MOBILE)

### Property To Be Searched

1. This warrant applies to records and information associated with (a) the cellular phones assigned call numbers 718-552-7799 and 718-258-7888, both of which are associated with Weihong Hu; and (b) the cellular device assigned Integrated Circuit Card Identification ("ICCID") number 89882280000014552687, International Mobile Station Equipment Identity ("IMEI") number 015286002830741, and International Mobile Subscriber Identifier ("IMSI") number 901405220106499 (collectively, the "Target Devices"), that are stored at premises controlled by T-Mobile Corporation (the "Provider"), a company located in Parsippany, New Jersey.

2. Records and information associated with the Target Devices that are within the possession, custody or control of the Provider, including information about the location of the Target Devices if they are subsequently assigned different call numbers.

# ATTACHMENT B-3

## Particular Things To Be Seized

## I. Information To Be Disclosed by the Provider

1. All information about the locations of the Target Devices described in Attachment A-3 for a period of thirty days, during all times of day and night. Information about the locations of the Target Devices (hereinafter "Location Information") includes the following data associated with the Target Devices :

   a. All available E-911 Phase II data, Global Positioning System ("GPS") data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Devices.

   b. Per-call measurement data, sometimes identified as "True Call," "Timing Advance" (TA) or "Time on Arrival" (TOA), "Real-Time Tool" ("RTT"), "Advanced Timing Data" and/or "Per Call Measurement Data" ("PCMD") associated with the Target Devices.

   c. Any unique identifiers associated with the cellular device, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identities ("IMEI"), Subscriber Identity Modules ("SIM"), Mobile Equipment Identifier ("MEID"), or Mobile Identification Number ("MIN"); source and destination phone numbers; and date, time, and duration of communication.

2. The following information about the customers or subscribers associated with the Target Devices for the time period April 1, 2020 through and including the present:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

c. Local and long distance phone connection records;

d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

e. Length of service (including start date) and types of service utilized;

f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

g. Other subscriber numbers or identities (including the registration IP address);

h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Devices , including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA, TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Devices.

To the extent that the Location Information is within the possession, custody or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the locations of the Target Devices on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times

directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

the things described in attachment A-4 for the things described in B-4.

Case No. 25- MC-545

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Eastern District of North Carolina *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-4.

**YOU ARE COMMANDED** to execute this warrant on or before February 21, 2025 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Duty Magistrate Judge.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ____________________.

Date and time issued: February 7, 2025 at 6 p.m.

Joseph A. Marutollo
*Judge's signature*

City and state: Brooklyn, New York

Hon. Joseph A. Marutollo U.S.M.J.
*Printed name and title*

## Return

| Case No.: 25- | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________________________
*Executing officer's signature*

____________________________________
*Printed name and title*

# ATTACHMENT A-4 (Bandwidth)

## Property To Be Searched

1. The cellular phone assigned call number 718-258-7888, which is associated with Weihong Hu (the "Target Cell Phone"), and whose cellular service provider is Bandwidth.com (the "Provider"), a company located in Raleigh, North Carolina.

2. Records and information associated with the Target Cell Phone that are within the possession, custody or control of the Provider, including information about the location of the cellular phone if it is subsequently assigned a different call number.

## ATTACHMENT B-4

**Particular Things To Be Seized**

**I. Information To Be Disclosed by the Provider**

1. The following information about the customers or subscribers associated with the Target Cell Phone for the time period July 1, 2021 through and including January 31, 2022:

   a. Names (including subscriber names, user names, and screen names);

   b. Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

   c. Local and long distance phone connection records;

   d. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   e. Length of service (including start date) and types of service utilized;

   f. Phone or instrument numbers (including Media Access Control ("MAC") addresses, ESN, MEIN, MEID, MIN, SIM, MSISDN, IMSI, or IMEI;

   g. Other subscriber numbers or identities (including the registration IP address);

   h. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

   i. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including: (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination phone numbers (call detail records), email addresses, and IP addresses (data sessions)); and (B) information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received for both call detail records and any data sessions as well as Per-call measurement data, sometimes identified as "NELOS," TA,

TOA, Real-Time Tool, RTT, Advanced Timing Data, and/or PCMD associated with the Target Cell Phone.

This warrant does not authorize the seizure of any tangible property.

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence, contraband, instrumentalities and/or fruits of violations of federal criminal law, specifically Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) by JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU, and others, known and unknown, or which may otherwise lead to property used in committing a crime.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this warrant.