**FILED UNDER SEAL**

# EXHIBIT H

Warrant packet for the search of the Bronx apartment on February 13, 2025, and the FBI arrest paperwork for that day, as produced by the government

- EDNY_MEDINA_0000000040–41 (FD-302, arrest of February 13, 2025)
- EDNY_MEDINA_0000000043 (FD-395, advice of rights)
- EDNY_MEDINA_0000000221–298 (warrant packet)

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

Date of entry 03/06/2025

On February 13, 2025, at about 5:30am, JULIO MEDINA, date of birth: August 8, 1960, was located and arrested by the FBI without incident at his apartment, 8 Fordham Hill Oval Apartment 10C Bronx, NY 10468 pursuant to an arrest warrant issued in the Eastern District of New York (EDNY). MEDINA was charged with the following violations:

- 18 U.S.C. §1343 and 1349 (wire fraud conspiracy)
- 18 U.S.C. §1343 and 1346 (honest services wire fraud)
- 18 U.S.C. §1952(a)(3) and 371 (Travel Act conspiracy)
- 18 U.S.C. §1952(a)(3)(A) (Travel Act bribery)
- 18 U.S.C. §1956(a) and 1956(h) (money laundering conspiracy)

The following law enforcement personnel were present during the arrest:

- FBI SA Joe Duome
- FBI SA William Fath
- FBI SA Daniel Onove
- FBI SA Ardijana Camaj
- FBI SA Brynlee Hairston
- FBI TFO NYPD Sergeant Tadeusz Jeremenko
- DOI Investigator Alexandra Davie
- DOI Investigator Gabriel Lipker
- DOI Investigator Mark Moran
- FBI SA Jennifer Breitenbach
- FBI SA Andrew Taff
- FBI SA Anthony Casola

At about 5:45am, MEDINA was advised of his rights by SA Hairston and SA Taff. MEDINA indicated he understood his rights and signed the FD-395.

MEDINA was transported by SA Duome and SA Fath. All times listed below are approximate.

- 6:20am: Depart 8 Fordham Hill Oval Bronx, NY
    - Mileage: 76,911
- 6:56am: Arrive FBI New York Office (NYO)
    - Mileage: 76,926

Investigation on 02/13/2025 at Bronx, New York, United States (In Person)

File # 56E-NY-4020443 Date drafted 02/24/2025

by HAIRSTON BRYNLEE HUNTER, TAFF ANDREW S, FATH WILLIAM FRANK, Joseph Duome

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

    - Processed at the FBI NYO
- 7:43am: Depart for EDNY
- 7:57am: Arrive at EDNY
- 9:45am: Arrive at US Marshal Service (USMS) for processing
- 10:00am: Complete USMS processing
- 10:05am: Arrive at pretrial services

MEDINA was given water throughout the day. MEDINA was offered food throughout the day, which he declined.

MEDINA was presented for his initial appearance in front of Magistrate Judge James Cho. MEDINA was released on a $250,000 bond and his travel is restricted to the states of New York and New Jersey.

A copy of the arrest warrant, indictment, arrest log, advice of rights, recording of advice of rights, processing paperwork, fingerprints, and release package will be maintained in the 1A section of this case file.

# FEDERAL BUREAU OF INVESTIGATION
# ADVICE OF RIGHTS

## LOCATION

Place: 8 Fordham Hill Oval APT 10G Bronx, NY 10468 Date: 2/13/25 Time: 5:45am

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during the questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

## CONSENT

I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed [signature]

## WITNESS

Witness: Brynlee Hampton

Witness: Andrew Tae

Time: 5:48am

FD-1087 (Rev. 5-8-10)

UNCLASSIFIED//FOUO

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

# FEDERAL BUREAU OF INVESTIGATION

## Collected Item Log

**Event Title:** (U//FOUO) Search of 8 Fordham Hill Oval, Bronx, NY, Apt 10C **Date:** 02/13/2025

**Approved By:** [redacted]

**Drafted By:** [redacted]

**Case ID #:** [redacted] [redacted]

**Details:**

To document evidence seized at 8 Fordham Hill Oval, Apt 10C, Bronx, NY, residence of JULIO MEDINA, on February 13, 2025.

**Collected From:** (U//FOUO) 8 Fordham Hill Oval, Apt 10C
Bronx, New York
United States

**Receipt Given?:** Yes

**Holding Office:** NY - NEW YORK

| **Item Type** | **Description** |
|---|---|
| Digital | (U//FOUO) One (1) Silver Iphone in a Black case<br>Collected On: 02/13/2025 07:54 AM EST<br>Seizing Individual: TAFF ANDREW S<br>Located By: [redacted]<br>Device Type: Cell Phone<br>Make: Apple<br>Model: Iphone<br>Number of Devices Collected: 1 |
| Digital | (U//FOUO) One (1) Gray Iphone in a black case<br>Collected On: 02/13/2025 07:54 AM EST<br>Seizing Individual: TAFF ANDREW S<br>Located By: [redacted]<br>Device Type: Cell Phone |

UNCLASSIFIED//FOUO

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Make: Apple
Model: Iphone
Number of Devices Collected: 1

General (U//FOUO) One (1) Black Adidas pants size large
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

General (U//FOUO) Car Park Systems Application Monthly Payment Account
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

General (U//FOUO) Business card for WEIHONG HU at MAYFLOWER
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

General (U//FOUO) Rolex card for Model 326235, Serial 293759V6, Two (2) Rolex Books and Rolex Cardholder
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

General (U//FOUO) Mercedes-Benz Insurance Inspection Report
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

General (U//FOUO) Handwritten Notes on MOCJ and Exodus Payments
Collected On: 02/13/2025 07:54 AM EST
Seizing Individual: [redacted]
Located By: [redacted]

♦♦

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

Date of entry 02/24/2025

On February 13, 2025, a search and seizure warrant issued in the Southern District of New York was executed at 8 Fordham Hill Oval Apt 10C Bronx, NY 10468, the residence of JULIO MEDINA. The purpose of the search was to find and seize evidence, fruits, and instrumentalities of the subject violations:

- 18 U.S.C. §1343 and 1349 (wire fraud conspiracy)
- 18 U.S.C. §1343 and 1346 (honest services wire fraud)
- 18 U.S.C. §1952(a)(3) and 371 (Travel Act conspiracy)
- 18 U.S.C. §1952(a)(3)(A) (Travel Act bribery)
- 18 U.S.C. §1956(a) and 1956(h) (money laundering conspiracy)

The search included the following participants:

- FBI SA [redacted]
- FBI SA [redacted]
- FBI SA [redacted]
- FBI SA [redacted]
- FBI TFO NYPD [redacted]
- DOI Investigator [redacted]
- DOI Investigator [redacted]
- DOI Investigator [redacted]
- FBI SA [redacted]
- FBI SA [redacted]
- FBI SA [redacted]
- FBI Photographer [redacted]

Entry photos were taken at approximately 6:14am and the search commenced shortly thereafter.

The search ended at approximately 7:55am. The evidence items described in the attached log were seized. A copy of the search warrant and receipt for property were left in the residence.

The search warrant, affidavit, execution log, sign-in log, sketch, FD-597 receipt for property, evidence collected item log, photos (discs), room numbers, and photo log will be maintained in the 1A section of this case file.

Investigation on 02/13/2025 at Bronx, New York, United States (In Person)

File # 56E-NY-4020443 Date drafted 02/14/2025

by HAIRSTON BRYNLEE HUNTER

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

56E-NY-4020443

Continuation of FD-302 of (U) Search of 8 Fordham Hill Oval Apt 10C Bronx, NY 10468, On 02/13/2025, Page 2 of 2

[Agent Note: DIANA ORTIZ, telephone number: (914) 370-1750, the girlfriend of MEDINA, was at the scene. ORTIZ left prior to the beginning of the search. Dining chairs were moved from the dining room to the front bedroom during the attempt to interview MEDINA.]

**FD-886**
07/21/2023

# FEDERAL BUREAU OF INVESTIGATION
# EVIDENCE COLLECTED ITEM LOG



**Date:** 2/13/25 **Case ID:** 56E-NY-4020443
**Location:** 8 Fordham Hill Oval, Apt 10C
Bronx, NY 10468
**Preparer/Assistants:** SA Jennifer Breitenbach

**Personnel** (full names and initials): See sign in log (JB)

| Item# | Description (e.g., One black Samsung flip phone; Serial #) | Location (e.g., Room) | Specific Location (e.g., Specific area w/in room) | Collected by/Observed by (First Name and Last Name) | Packaging Method | Comments (if needed) |
|---|---|---|---|---|---|---|
| 1 | One silver iPhone in a black case | B | On desk | Andrew Taff<br>Bryn Hairston | | Medina said this was his personal cell |
| 2 | One gray iPhone in a black case | B | on desk | Andrew Taff<br>Bryn Hairston | | Medina said this was his work cell |
| 3 | One black Adidas pants size large | I | In orange bag | Tadeusz Jeremenko<br>Alexandre Davie | | |
| 4 | Carpark systems application monthly payment account | B | In cabinet with plants on top | Andrew Taff<br>Daniel Onove | | ~~TBA~~ JB |
| 5 | Business card for Weihong Hu at Mayflower | B | ~~In cabinet with plants on top~~ JB Top left desk drawer | Andrew Taff<br>Daniel Onove | | |
| 6 | Rolex card for model 326235, serial 293759V6, two rolex books, and rolex ~~box~~ JB card holder | B | Middle right desk drawer | Andrew Taff<br>Daniel Onove | | |
| 7 | Mercedes-Benz Insurance Inspection report | B | Top of desk | Bryn Hairston<br>Tadeusz Jeremenko | | |
| 8 | Handwritten notes on MOCJ and Exodus payments | B | Top of desk | Bryn Hairston<br>Tadeusz Jeremenko | | |

~~Nothing further~~ JB 2/13/25

# PHOTOGRAPHIC LOG

PAGE 1 OF 2

*GENERAL INFORMATION*

DATE 2/13/2025

CASE ID 56E-NY-4020443

LOCATION 8 FORDHAM HILL OVAL, BRONX, NY 10486, APT. 10-C

PREPARER/PHOTOGRAPHER PENDERGAST

REMARKS

| PHOTO # | | DESCRIPTION OF PHOTOGRAPHIC SUBJECT / MISCELLANEOUS COMMENTS |
|---|---|---|
| 1 | **Entry** / Exit / Evidence | PHOTO LOG |
| 2-3 | **Entry** / Exit / Evidence | ENTRYWAY (6:14am) |
| 4-5 | **Entry** / Exit / Evidence | ROOM A CLOSET |
| 6-10 | **Entry** / Exit / Evidence | ROOM B LIVING ROOM / OFFICE |
| 11-15 | **Entry** / Exit / Evidence | ROOM C DINING ROOM |
| 16-17 | **Entry** / Exit / Evidence | ROOM D CLOSET |
| 18-21 | **Entry** / Exit / Evidence | ROOM E KITCHEN |
| 22-23 | **Entry** / Exit / Evidence | ROOM F CLOSET |
| 24-25 | **Entry** / Exit / Evidence | ROOM G CLOSET |
| 26-27 | **Entry** / Exit / Evidence | ROOM H PANTRY |
| 28-32 | **Entry** / Exit / Evidence | ROOM I BEDROOM 1 |
| 33-34 | **Entry** / Exit / Evidence | ROOM J BEDROOM 1, CLOSET |
| 35-37 | **Entry** / Exit / Evidence | ROOM K BATHROOM 1 |
| 38-40 | **Entry** / Exit / Evidence | ROOM L BATHROOM 2 |
| 41-43 | **Entry** / Exit / Evidence | ROOM M BEDROOM CLOSET 1 |
| 44-49 | **Entry** / Exit / Evidence | ROOM N BEDROOM 2 |
| 50-51 | **Entry** / Exit / Evidence | ROOM O BEDROOM 2, CLOSET 2 |
| 52-53 | Entry / Exit / **Evidence** | ROOM B, DESK, 2 CELL PHONES |
| 54-55 | Entry / Exit / **Evidence** | ITEM #1 |
| 56-57 | Entry / Exit / **Evidence** | ITEM #2 |
| 58-60 | **Entry** / Exit / Evidence | ROOM P CLOSET |
| 61 | Entry / Exit / **Evidence** | ITEM #1, NO CASE |
| 62 | Entry / Exit / **Evidence** | ITEM #2, NO CASE |
| 63 | Entry / Exit / **Evidence** | ROOM I, ORANGE BAG, TRACK PANTS |
| 64-65 | Entry / Exit / **Evidence** | ITEM #3 |
| 66 | Entry / Exit / **Evidence** | NYPD ID BADGE |
| 67 | Entry / Exit / **Evidence** | NYS VEHICLE REGISTRATION |
| 68 | Entry / Exit / **Evidence** | ROOM I, DRESSER DRAWER, GREY TRACK PANTS |
| 69-70 | Entry / Exit / **Evidence** | GREY TRACK PANT |
| 71-72 | Entry / Exit / **Evidence** | ITEM #4 |
| 73-74 | Entry / Exit / **Evidence** | ITEM #5 |
| 75-77 | Entry / Exit / **Evidence** | ITEM #6 |
| 78-79 | Entry / Exit / **Evidence** | CAR KEY FOB |
| 80-81 | Entry / Exit / **Evidence** | ITEM #7 |
| 82-88 | Entry / Exit / **Evidence** | ITEM #8 |
| 89 | Entry / **Exit** / Evidence | ROOM O |

# PHOTOGRAPHIC LOG



*GENERAL INFORMATION*

DATE 2/13/2025
CASE ID 56E-NY-4020443
LOCATION 6 FORDHAM HILL OVAL, BRONX, NY 10486, APT. 10-C
PREPARER/PHOTOGRAPHER PENDERGAST
REMARKS

| PHOTO # | | DESCRIPTION OF PHOTOGRAPHIC SUBJECT / MISCELLANEOUS COMMENTS |
|---|---|---|
| 90-90 | Entry / (Exit) / Evidence | ROOM N |
| 92 | Entry / (Exit) / Evidence | ROOM M |
| 93 | Entry / (Exit) / Evidence | ROOM L |
| 94 | Entry / (Exit) / Evidence | ROOM K |
| 95-97 | Entry / (Exit) / Evidence | ROOM I |
| 98 | Entry / (Exit) / Evidence | ROOM J |
| 99 | Entry / (Exit) / Evidence | ROOM P |
| 100 | Entry / (Exit) / Evidence | ROOM F |
| 101 | Entry / (Exit) / Evidence | ROOM G |
| 102 | Entry / (Exit) / Evidence | ROOM H |
| 103-104 | Entry / (Exit) / Evidence | ROOM E |
| 105 | Entry / (Exit) / Evidence | ROOM D |
| 106-107 | Entry / (Exit) / Evidence | ROOM C |
| 108-110 | Entry / (Exit) / Evidence | ROOM B |
| 111 | Entry / (Exit) / Evidence | ROOM A |
| 112 | Entry / (Exit) / Evidence | SEARCH WARRANT / SIEZURE RECEIPT |
| 113 | Entry / (Exit) / Evidence | DOOR SECURE APT. 10-C |
| 114 | Entry / (Exit) / Evidence | EXTERIOR 6 FORDHAM HILL OVAL (8:01 am) |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |
| | Entry / Exit / Evidence | |

No More Photographs [signature] 2/13/2025

FD-597 (Rev. 4-13-2015)



# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
# Receipt for Property

Case ID: 56E-NY-4020443

On (date) 2/13/25 item (s) listed below were:

- [x] Collected/Seized
- [ ] Received From
- [ ] Returned To
- [ ] Released To

(Name) Julio Medina

(Street Address) 8 Fordham Hill Oval, Apt 10C

(City) Bronx, NY 10468

Description of Item (s): phones;

Pants;

Documents;

cards;

Notes

Nothing further (TM) 2/13/25

**Received By:** Brynlee Hairston (Signature)

**Received From:** Not present (Signature)

**Printed Name/Title:** SA Bryn Hairston

**Printed Name/Title:** left at scene


Case Number: 56E-NY-402044
Date: 2/13/2025
Address: 8 Fordham Hill Oval
Apt 10C Bronx NY, 10468
Prepared by DOI AIG Gabriel Lipl
*Not to Scale
*See Evidence Collected Item Log
North
North
Dresser TV
window AC
Closet
Dresser
Bed
Dresser TV
bookshelf
window
AC/window
bookshelf
Closet
Closet
Bathroom
Shower
Sink
Couch
Desk/computers
Couch
Plants/cabinet
Couch
table
TV/cabinet
windows
Closet
Closet
Closet
AC
Table
closet
Kitchen Counter
Kitchen
Closets
Cabinet + Counters
Oven
Fridge
Closet

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
**Search Warrant Execution Log**

CASE ID 56E-NY-4020443

SEARCH TEAM LEADER Jennifer Breitenbach

***WARRANT INFORMATION***

WARRANT# ____________ DATE SIGNED ____________

MAGISTRATES NAME ____________

JUDICIAL DISTRICT ____________

PROPERTY TO BE SEIZED/ADDRESS : 8 Fordham Hill Oval Apt 10C
Bronx, NY

DATE WARRANT RECEIVED ____________ TIME RECEIVED ____________

DATE WARRANT EXECUTED 2/13/25 TIME EXECUTED ____________

COPY OF WARRANT PROVIDED TO: ____________

COPY OF RECEIPT PROVIDED TO: ____________

| TIME | EVENT (All times approximate) |
|---|---|
| 6:13 am | Search team enters premises. |
| | SAs ____________ serve the warrant. |
| | Initial walk-through completed by ____________. |
| | Entrance photographs taken by ____________. |
| | Sketch of premises completed by ____________. |
| | Search team assigned and begin search. |
| | Exit photographs taken by ____________. |
| | Search completed. |
| ✓ | Above-listed individual (Not present) is provided a receipt for property seized |
| 7:55 am | Search team exits premises and ensures that premises is secured Door locks behind |

**Additional Notes:** ____________

**LOG KEPT BY:** ____________
(Signature)

Diana Ortiz 914-370-1750 at scene — left prior to search
Dining chairs moved to room during attempt to interview

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>JULIO MEDINA | Case No. |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attached Affidavit and its Attachments A1, B1, A2, B2

located in the Southern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attached Affidavit and its Attachment A1, B1, A2, B2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 1346, 1952(a)(3) and 371, 1952(a)(3)(A), 1956 | wire fraud conspiracy, honest services wire fraud, Travel Act conspiracy, Travel Act bribery, and money laundering conspiracy |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Matthew London, by SDA with permission

*Applicant's signature*

Special Agent Matthew London

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 02/12/2025

[redacted]

*Judge's signature*

City and state: New York, NY

Hon. Stewart D. Aaron, U.S.M.J.

*Printed name and title*

RCH:MAA/EWS/SMS
F. #2021R00664

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE THINGS DESCRIBED IN ATTACHMENTS A-1 AND A-2 FOR THE THINGS DESCRIBED IN ATTACHMENTS B-1 AND B-2 | **To Be Filed Under Seal**<br><br>No. _____________<br><br>**APPLICATION FOR SEARCH WARRANTS** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANTS**

I, **MATTHEW LONDON**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (i) the individual described below in Attachment A-1 for the things described in Attachment B-1, and (ii) the premises known as 8 Fordham Hill Oval, Apt. 10C, Bronx, New York 10468, including any closed container and locked containers found therein (the "SUBJECT PREMISES"), believed to belong to JULIO MEDINA, as described below and in Attachment A-2, and to seize the items and information described below and in Attachment B-2.

2. I am a Special Agent assigned to the New York Field Office of the Federal Bureau of Investigation (the "FBI"). Thus, I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C)—that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Since becoming a Special Agent for the FBI in 2022, I have participated in numerous investigations into organized

criminal activity, during the course of which I have, among other things: (a) conducted physical and electronic surveillance, (b) executed search warrants, (c) reviewed and analyzed recorded conversations and records, (d) debriefed cooperating witnesses and informants, and (e) used other techniques to secure relevant information. Through my training, education, and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activities to conceal their behavior from detection by law enforcement authorities.

3. The facts in this affidavit come from my personal observations, my training and experience, information obtained from both government and public records databases, information obtained from other agents, and review of records and documents. When I rely on statements made by others, such statements are set forth only in part and in sum and substance unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. On February 11, 2025, a grand jury sitting in the Eastern District of New York returned a sealed five-count indictment charging JULIO MEDINA, CHRISTOPHER DANTZLER, and WEIHONG HU (collectively, the "SUBJECTS") with violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), 1956(a), 1957 and 1956(h) (money laundering conspiracy) (collectively, the "SUBJECT OFFENSES"). Sealed arrest warrants for all three individuals were also issued that day. A copy of the indictment is attached as Exhibit 1 and incorporated by reference.

Accordingly, there is probable cause to believe that the SUBJECTS engaged in the SUBJECT OFFENSES.

5. Based on my training and experience and the facts as set forth in this affidavit, there is also probable cause to believe that any electronic devices found on the person of JULIO MEDINA, as described in Attachment A-1, will contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as described in Attachment B-1, and that the SUBJECT PREMISES and any and all locked and closed containers found therein, described in Attachment A-2, contains evidence, instrumentalities, contraband and/or fruits of the SUBJECT OFFENSES, as described in Attachment B-2, as set forth in more detail below. As such, there is probable cause to search JULIO MEDINA and the SUBJECT PREMISES, as described in Attachments A-1 and A-2, respectively, for the things described in Attachments B-1 and B-2, respectively.

**PERSON TO BE SEARCHED**

6. This application seeks authorization to search JULIO MEDINA, as described in Attachment A-1, including any electronic devices found on his person or within his custody or control.

7. JULIO MEDINA was born on August 8, 1960. He is approximately five feet ten inches tall. As described in greater detail below, he resides at the SUBJECT PREMISES. The following photograph depicts MEDINA.




8. The investigation has revealed that MEDINA uses a cellular telephone assigned call number 646-319-7618 (the "MEDINA PHONE"). Law enforcement databases indicate that the MEDINA PHONE is associated with MEDINA. Text messages recovered in the course of the investigation corroborate that the MEDINA PHONE is used by MEDINA. For instance, in the cellular phone belonging to a former employee of WEIHONG HU ("Witness-1"),[1] which was provided to law enforcement pursuant to a grand jury subpoena, the MEDINA PHONE is listed as being associated with "Julio Medina." Law enforcement agents have reviewed numerous text messages between Witness-1 and the MEDINA PHONE. The

[1] Witness-1 initially filed an online complaint with the FBI reporting various criminal activities by HU. During his/her discussions with law enforcement, Witness-1 disclosed, in sum and substance and in part, that he/she aided and abetted illegal activity committed by HU and others. Witness-1 also disclosed that he/she has a poor relationship with HU. Witness-1 stated that he/she was forced to work long hours and was poorly compensated by HU, and ultimately quit working for HU in or about August 2023 due to poor working conditions, including unpaid salary. HU subsequently agreed to pay Witness-1 approximately $100,000 in exchange for, among other things, Witness-1's agreement not to disclose information regarding her employment. Separately, Witness-1 disclosed to law enforcement, in sum and substance and in part, that MEDINA made unwanted sexual advances to him/her, including unwanted physical contact. Information provided by Witness-1 has proven reliable in this investigation and is corroborated by, among other things, witness statements, electronic messages, and other records.

content of those communications further demonstrate that the MEDINA PHONE is associated with MEDINA.

**PREMISES TO BE SEARCHED**

9. This application seeks authorization to search the SUBJECT PREMISES, including any closed and locked containers and electronic devices found therein, as described in Attachments A-2.

10. The SUBJECT PREMISES to be searched is particularly described in Attachment A-2 as 8 Fordham Hill Oval, Apt. 10C, Bronx, New York 10468, and any closed and locked containers therein. As depicted in Figure 1 below, the SUBJECT PREMISES is contained in a beige multi-story apartment building with the number eight above the main entrance. As depicted in Figure 2 below, the lobby of the apartment building includes a board listing the occupants; it lists "Medina, J." in apartment "10C." Apartment 10C, i.e., the SUBJECT PREMISES, is on the tenth floor of the building. As depicted in Figure 3 below, the

entrance to the SUBJECT PREMISES is through a black door containing a peephole that says "10C."[2]

**Figure 1**



**Figure 2**




**Figure 3**



**Figure 4**




11. Agents have probable cause to believe that MEDINA is currently residing at the SUBJECT PREMISES. The SUBJECT PREMISES is listed as MEDINA's residence on New York State Department of Motor Vehicle records. As described above, the mailbox roster

---

[2] Figures 1, 2, 3 and 4 are photographs that were captured by law enforcement agents conducting surveillance on or about February 5, 2025.

in the building containing the SUBJECT PREMISES references MEDINA. MEDINA is also associated with the address in law enforcement databases.

12. On February 7, 2025, the Honorable Joseph A. Marutollo, United States Magistrate Judge for the Eastern District of New York, executed a warrant authorizing the collection of prospective location information about the location of the MEDINA PHONE for a period of 30 days, under E.D.N.Y. Magistrate Docket No. 25-MC-545. Information about the MEDINA PHONE obtained pursuant to the warrant reflected that the MEDINA PHONE was in the vicinity of the SUBJECT PREMISES, including as recently as February 12, 2025, which is consistent with MEDINA's known whereabouts and his residing at the SUBJECT PREMISES.

## PROBABLE CAUSE

13. As explained above, MEDINA was recently charged by indictment with the SUBJECT OFFENSES. See Exhibit 1. The charge arises from MEDINA's solicitation and receipt of kickbacks and bribes in exchange for funneling millions of dollars to his co-defendants, WEIHONG HU and CHRISTOPHER DANTZLER, in connection with a New York City program designed to curb the spread of COVID-19 in local jails by released inmates to New York City-area hotels, including two hotels owned and/or controlled by WEIHONG HU. In total, as set forth in the indictment, DANTZLER and HU provided MEDINA with at least $2.5 million in U.S. currency and in-kind benefits in exchange for MEDINA's steering approximately $51 million in public funds to companies controlled by DANTZLER and HU. See Exhibit 1 ¶¶ 9-18, 21.[3]

---

[3] MEDINA participated in the scheme through the non-profit of which he was the CEO and executive director, Exodus Transitional Community, Inc. ("Exodus"), which is referred to in the indictment as the "Organization." See Exhibit 1 ¶ 2. HU's companies involved in the scheme included Wyndham Garden Fresh Meadows, Mayflower Howard Johnson Hotel,

14. Because a grand jury issued an indictment charging JULIO MEDINA for the SUBJECT OFFENSES, there is probable cause to believe he has committed those offenses. There is also probable cause to believe that the SUBJECT PREMISES, including electronic devices contained therein, such as the MEDINA PHONE, contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSES.

15. As set forth in the indictment, one form in which the bribes and kickbacks paid to MEDINA included WEIHONG HU's financing of the purchase of a luxury vehicle on MEDINA's behalf. See Exhibit 1 ¶¶ 11, 15. Specifically, in or about November 2021, HU, through one of her businesses, financed a luxury vehicle bearing New York State license plate KDX3695 (the "Mercedes") for approximately $107,000. Witness-1 told law enforcement that he/she personally observed this transaction. In or about February and March 2024, MEDINA and HU exchanged a series of text messages about the Mercedes. On or about February 6, MEDINA wrote from the MEDINA PHONE, "Car is due for inspection. I need registration." HU responded in part, "I will have someone deliver it to you." On or about March 13, MEDINA returned to the subject, writing, "Did you know registration was due in November. Inspection was due in January. Can't do inspection without Registration." After HU asked for the license

---

Mayflower International Group LLC, Mayflower Wenyu LLC, and Meiqiao LLC. In the indictment, HU's companies are referred to collectively as the "HU Businesses." See id. ¶ 8. DANTZLER's companies involved in the scheme included Watchforce Security Services, Inc., which is referred to in the indictment as the "Security Company." See id. ¶ 5.

plate, MEDINA sent the following pictures of the Mercedes, which appear to have been taken inside a garage.







16. License plate reader data for the Mercedes has captured the vehicle traveling in or around Clifton Park, New York, which is where the SUBJECT PREMISES is located, including most recently as February 2025.

17. As another example, in or about September 2022, DANTZLER and WEIHONG HU caused to be purchased for MEDINA a town house in Washington Heights, New York for approximately $1.3 million. Records indicate that the property was financed by DANTZLER and kept in the name of a company associated with HU. Witness-1 advised law enforcement that he/she attended a meeting at which HU, MEDINA, and an individual that Witness-1 identified as the “Security Director” named “Chris” present. Witness-1 later identified a photograph of DANTZLER as resembling “Chris” the “Security Director.” Based on his/her attendance at the meeting, Witness-1 understood that the town house was purchased for

MEDINA for the purpose of securing long-term contracts with Exodus. Text messages further corroborate that MEDINA had access to the house after it was purchased. For example, on or about February 1, 2023, MEDINA texted a photograph of the property to Witness-1 and stated, "Keys don't work. Why is there a for sale sign?" Eight days later, MEDINA and Witness-1 exchanged further text messages, apparently in reference to the property. MEDINA asked, "Can you send your architect to do design. We Need it for HPD [New York City Housing Preservation and Development] application. When can he be here?" Witness-1 responded, "Hi boss. We have the floor plan, we could do site visits following Monday 2/13. Does that work for you?" MEDINA then responded, "Perfect. HPD needs. We changed locks. I'll give you key."

18. Based on the foregoing, I have probable cause to believe that the SUBJECT PREMISES contains evidence of the SUBJECT OFFENSES. As discussed above and in Exhibit 1, MEDINA furthered the criminal scheme through electronic communications (including text messages and email communications). See Exhibit 1 ¶ 19 (describing materially false email sent by MEDINA).

19. Moreover, based on my training and experience, I know that individuals who engage in criminal conspiracies often use cellular telephones to communicate in furtherance of their illegal activity and often store records related to their illegal activity and persons involved with them in that activity on cellular telephone such as the MEDINA PHONE. Such records can include, for example, logs of online "chats" with co-conspirators, email correspondence, contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts, records related to transactions involving proceeds from thefts and their illegal activity, images of stolen goods, and

Internet search history related to targets of thefts. Individuals engaged in criminal activity often store such records in order to, among other things, (1) keep track of co-conspirator's contact information; (2) keep an accounting of illegal proceeds for purposes of, among other things, dividing those proceeds with co-conspirators; and (3) coordinate with co-conspirators.

20. There also is reason to believe that the SUBJECT PREMISES contains paper records establishing the criminal offenses described above. Based on my training and experience, I know that bribery and/or kickback schemes often involve, out of necessity, the maintenance of ledgers. According to Witness-1, during one meeting she observed between HU and MEDINA involving the payment of cash in exchange for program checks, he/she saw MEDINA and HU writing on a piece of paper to calculate how much was owed to MEDINA as part of the scheme. The scheme also involved various contracts and invoices, see Exhibit 1 ¶ 18, which records, if recovered, would be relevant to establishing MEDINA's participation in the criminal scheme.

21. Finally, there is probable cause to believe that the SUBJECT PREMISES includes fruits of the bribery scheme. Witness-1 told law enforcement, in sum and substance, that WEIHONG HU purchased a Rolex for MEDINA as part of the criminal scheme; based on my training and experience, luxury items of jewelry are typically kept inside one's residence when not being worn. Finally, the criminal scheme included multiple hand-to-hand cash exchanges, one of which was captured on a surveillance video, as described in the Indictment. See Exhibit 1 ¶ 13. Based on my training and experience, individuals who receive excess cash as part of a criminal scheme typically keep portions of such cash in their residence in order to, among other reasons, conceal their criminal scheme.

## TECHNICAL TERMS

22. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving

or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some

computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachments B-1 and B-2, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the phones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the phones because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other

information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device in furtherance of a criminal scheme, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. The investigation indicates that others, including MEDINA's spouse and children (aged 17 and 19), may reside at the SUBJECT PREMISES. Because it is possible that several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION AND REQUEST FOR SEALING

27. Based on the foregoing facts, there is probable cause to believe that the SUBJECT PREMISES contains evidence, contraband, fruits and instrumentalities of the SUBJECT OFFENSES.

28. I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachments A-1 and A-2 and seize the items described in Attachment B-1 and B-2.

29. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, but allowing the government to disclose the application and warrant pursuant to the government's Rule 16 discovery obligations. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the subjects of the investigation, who have not yet been apprehended. While MEDINA has been charged by indictment, that indictment remains under seal. Moreover, MEDINA's co-defendants remain at large and have not yet been arrested by law enforcement. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving

subjects an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Matthew London
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone on February 12, 2025

HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**ATTACHMENT A-1**

**Person to be Searched**

The person to be searched is JULIO MEDINA ("MEDINA"), a male born on August 8 1960, and who is approximately 5 feet 10 inches tall, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant.

The following is a photograph of MEDINA



**ATTACHMENT B-1**

**Particular Things To Be Seized**

The things to be seized are any and all documents, records, and electronic devices on MEDINA's person, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant, including the following:

a. Any cellular phone, laptop, tablet, other personal computer device, camera, or other audio or video recording; and

b. Any storage device or medium that can be used to store images, videos, sounds or data captured by a camera or other audio or video recording device (collectively, the "SUBJECT DEVICES").

This warrant authorizes the review of documents and records, as well as the manual and forensic examination of the SUBJECT DEVICES for the purpose of identifying evidence, contraband, instrumentalities and/or fruits of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) (collectively, the "Subject Offenses") committed by JULIO MEDINA, WEIHONG HU, CHRISTOPHER DANTZLER (the "Subject Individuals"), and others, known and unknown (the "Subjects") between April 1, 2020 and the present, including evidence pertaining to the following matters:

a. Records, documents and communications related to a program sponsored by the New York City Mayor's Office of Criminal Justice to operate emergency transitional housing for formerly incarcerated persons in order to curb the spread of COVID-19 in local jails (hereinafter the "Emergency Housing Program");

b. Records, documents and communications related to Watchforce Security Services, Inc., Wyndham Garden Fresh Meadows, Mayflower Howard Johnson Hotel, Mayflower International Group LLC, Mayflower Wenyu LLC, and Meiqiao LLC;

c. Evidence, fruits, and instrumentalities of a scheme to pay bribes and kickbacks to JULIO MEDINA and/or others associated with Exodus Transitional Community, including but not limited to:

    i. Any and all communications between and/or by any individuals, including the Subject Individuals, as relevant to the Subject Offenses;
    ii. Ledgers reflecting the payment of bribes and/or kickbacks;
    iii. Documents, data and information containing contact information, including contact lists, for the Subject Individuals and/or any other individuals employed by or associated with the enterprise and the SUBJECT OFFENSES;

iv. Evidence, including but not limited to bank and financial records, of any activity designed to enrich any individuals, including the Subject Individuals, through illicit means, as relevant to the Subject Offenses; and
v. Bank records, checks, credit card bills, wire transfers, accounts information and any other financial information and records, as relevant to the Subject Offenses;

d. Information related to bribes, kickbacks, gratuities, or gifts to public officials or their associates;

e. Information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

f. Information related to the physical locations of the Subjects, and any other coconspirators, individuals whose identities are not yet known, including Global Positioning System location data, IP address information, photographs, videos, audio recordings, and communications;

g. Copies of identification documents, including passports, of the Subjects and/or other coconspirators, including individuals whose identities are not yet known;

h. Financial records, including all bank records, checks, credit card bills, and account information related to the Subject Offenses;

i. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subjects and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

j. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Subject Offenses and the account subscribers;

k. Evidence of the proceeds of the Subject Offenses and the disposition of such proceeds, including U.S. currency, foreign currency, cryptocurrency, personal or real property, pre-paid debit cards, financial instruments, receipts, documents or other hard-copy records, and financial accounts constituting or traceable to the proceeds of the Subject Offenses, and including any passwords, passphrases, public or private keys, physical devices, physical keys, and cryptocurrency recovery mnemonics needed by law enforcement to access such items; and

l. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, without limitation: documents; notes; communications, including text, SMS, MMS, iMessage, Signal, Telegram, WeChat, SnapChat, Instagram, Facebook, Twitter and/or TikTok messages; contacts, including electronic contacts; invoices; spreadsheets; photographs; videos; and any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form). "Communications" includes, without limitation, emails to, from, copying, or blind copying the listed persons, and messages on any chat platform, including group chats.

Law enforcement personnel are authorized to seize the SUBJECT DEVICES from MEDINA's person, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant. During the execution of this search warrant, law enforcement personnel are authorized to: (1) press MEDINA's fingers (including thumbs) against the fingerprint scanner of each of the SUBJECT DEVICES; (2) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the facial recognition feature; and/or (3) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

The search of MEDINA and his immediate effects and any concomitant seizure of the SUBJECT DEVICES shall occur between 6 a.m. and 10 p.m. The search of the SUBJECT DEVICES and the seizure of the records as set forth herein may occur at any time in the day or night.

The review may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.by law enforcement personnel (who, for these purposes, may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

personnel assisting the government in this investigation, and outside technical experts under government control).

# ATTACHMENT A-2

## Property to be Searched

The property to be searched (the "SUBJECT PREMISES") is located at 8 Fordham Hill Oval, Apt. 10C, Bronx, New York 10468, and any closed and locked containers therein, as well as all electronic devices contained therein (the "SUBJECT DEVICES"). As depicted in Figure 1 below, the SUBJECT PREMISES is contained in a beige multi-story apartment building with the number eight above the main entrance. As depicted in Figure 2 below, the lobby of the apartment building includes a board listing the occupants; it lists "Medina, J." in apartment "10C." Apartment 10C, i.e., the SUBJECT PREMISES, is on the tenth floor of the building. As depicted in Figure 3 below, the entrance to the SUBJECT PREMISES is through a black door containing a peephole that says "10C."

**Figure 1**



**Figure 2**




**Figure 3**



**Figure 4**



## ATTACHMENT B-2

**Particular Things To Be Seized**

1. All evidence, contraband, instrumentalities and/or fruits of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) (collectively, the "Subject Offenses") committed by JULIO MEDINA, WEIHONG HU, CHRITOPHER DANTZLER (the "Subject Individuals"), and others, known and unknown (the "Subjects") between April 1, 2020 and the present, including evidence pertaining to the following matters:

   a. Records, documents and communications related to a program sponsored by the New York City Mayor's Office of Criminal Justice to operate emergency transitional housing for formerly incarcerated persons in order to curb the spread of COVID-19 in local jails (hereinafter the "Emergency Housing Program");

   b. Records, documents and communications related to Watchforce Security Services, Inc., Wyndham Garden Fresh Meadows, Mayflower Howard Johnson Hotel, Mayflower International Group LLC, Mayflower Wenyu LLC, and Meiqiao LLC;

   c. Evidence, fruits, and instrumentalities of a scheme to pay bribes and kickbacks to JULIO MEDINA and/or others associated with Exodus Transitional Community, including but not limited to:

      i. Any and all communications between and/or by any individuals, including the Subject Individuals, as relevant to the Subject Offenses;
      ii. Ledgers reflecting the payment of bribes and/or kickbacks;
      iii. Documents, data and information containing contact information, including contact lists, for the Subject Individuals and/or any other individuals employed by or associated with the enterprise and the SUBJECT OFFENSES;

iv. Evidence, including but not limited to bank and financial records, of any activity designed to enrich any individuals, including the Subject Individuals, through illicit means, as relevant to the Subject Offenses;
v. Bank records, checks, credit card bills, wire transfers, accounts information and any other financial information and records, as relevant to the Subject Offenses;
vi. A Rolex wristwatch;
vii. A 2022 Mercedes-Benz sedan bearing New York license plate KSX-3695; and
viii. U.S. currency.

d. Information related to bribes, kickbacks, gratuities, or gifts to public officials or their associates;

e. Information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

f. Information related to the physical locations of the Subjects, and any other coconspirators, individuals whose identities are not yet known, including Global Positioning System location data, IP address information, photographs, videos, audio recordings, and communications;

g. Copies of identification documents, including passports, of the Subjects and/or other coconspirators, including individuals whose identities are not yet known;

h. Financial records, including all bank records, checks, credit card bills, and account information related to the Subject Offenses;

i. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subjects and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

j. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Subject Offenses and the account subscribers;

k. Evidence of the proceeds of the Subject Offenses and the disposition of such proceeds, including U.S. currency, foreign currency, cryptocurrency, personal or real property, pre-paid debit cards, financial instruments, receipts, documents or other hard-copy records, and financial accounts constituting or traceable to the proceeds of the Subject Offenses, and including any passwords, passphrases, public or private keys, physical devices, physical keys, and cryptocurrency recovery mnemonics needed by law enforcement to access such items; and

l. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses.

2. In addition to the items described above, for any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTERS"):

a. evidence of who used, owned, or controlled the COMPUTERS at the time the things described in this warrant were created, edited, or deleted, such as logs,

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of COMPUTER access, use, and events relating to the Subject Offenses and to the COMPUTERS users;

e. evidence indicating the COMPUTERS users' state of mind as it relates to the Subject Offenses;

f. evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

h. evidence of the times the COMPUTERS were used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

j. documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS;

k. records of or information about Internet Protocol addresses used by the COMPUTERS;

l. records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, without limitation: documents; notes; communications, including text, SMS, MMS, iMessage, Signal, Telegram, WeChat, SnapChat, Instagram, Facebook, Twitter and/or TikTok messages; contacts, including electronic contacts; invoices; spreadsheets; photographs; videos; and any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form). "Communications" includes, without limitation, emails to, from, copying, or blind copying the listed persons, and messages on any chat platform, including group chats.

During the execution of this search warrant, law enforcement personnel are authorized to: (1) press MEDINA's fingers (including thumbs) against the fingerprint scanner of each of the SUBJECT DEVICES; (2) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the facial recognition feature; and/or (3) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the

contents as authorized by this warrant.

The search of MEDINA and his immediate effects and any concomitant seizure of the SUBJECT DEVICES shall occur between 6 a.m. and 10 p.m. The search of the SUBJECT DEVICES and the seizure of the records as set forth herein may occur at any time in the day or night.

The review may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.by law enforcement personnel (who, for these purposes, may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control).

# EXHIBIT 1

RCH:MAA/EWS/SMS
F. #2021R00664

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
* FEBRUARY 11, 2025 *
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JULIO MEDINA,
CHRISTOPHER DANTZLER and
WEIHONG HU,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. 25-CR-54
(T. 18, U.S.C., §§ 371, 924(d)(1), 981(a)(1)(C), 982(a)(1), 982(b)(1), 1343, 1346, 1349, 1952(a)(3)(A), 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

Judge Rachel P. Kovner
Magistrate Judge Lara K. Eshkenazi

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise indicated:

INTRODUCTION AND OVERVIEW

1. In the midst of the outbreak of the novel coronavirus, SARS-CoV-2 ("Covid-19"), New York City provided tens of millions of dollars to a non-profit organization to administer an emergency transitional housing program (the "Emergency Housing Program"), in partnership with local hotels and other businesses, to combat the spread of Covid-19 in New York City jails. Under the Emergency Housing Program, inmates were released to New York City hotels and offered various reentry services, including mental health, security, job training and food services. Through kickbacks and bribes, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU capitalized on the Covid-19 crisis and exploited the Emergency Housing Program by engaging in a corrupt scheme to line their own pockets with millions of dollars intended to protect the public.

The Emergency Housing Program

2. In or around April 2020, New York City developed the Emergency Housing Program to help curb the spread of the Covid-19 pandemic. Under the Emergency Housing Program, inmates were released from local prisons and housed in hotels in New York City, including in Brooklyn and Queens. Beginning in or around June 2020, the New York City Mayor's Office of Criminal Justice ("MOCJ") contracted with a non-profit organization, the identity of which is known to the Grand Jury (together with its affiliates, the "Organization") to operate the Emergency Housing Program.

The Defendants and Relevant Entities

3. The defendant JULIO MEDINA founded and served as the executive director and chief executive officer of the Organization. MEDINA participated in various public service roles in connection with his work with the Organization. For example, between approximately October 2021 and November 2022, MEDINA served as a member and, at times, the acting chair of New York City's Board of Correction, a panel that regulated and oversaw New York City's jails.

4. The Organization provided various reentry services to formerly incarcerated individuals. Following its selection by MOCJ to operate the Emergency Housing Program, the Organization entered into agreements with various hotels to operate as reentry hotels under the Emergency Housing Program (collectively, the "Program Hotels"). In total, between in or about June 2020 and December 2023, the Organization received approximately $122 million in public funds from MOCJ to operate the Emergency Housing Program at the Program Hotels.

5. The defendant CHRISTOPHER DANTZLER served as the president of a company, an entity the identity of which is known to the Grand Jury, that purported to provide the Organization with security services at the Program Hotels (together with its affiliates, "the Security Company") pursuant to the Emergency Housing Program. Prior to serving as the president of the Security Company, DANTZLER worked as an electrician.

6. The Security Company began operating in or around November 2020, only a few months after the Organization began operating the Emergency Housing Program. The Security Company was not a licensed security company and did not directly provide security services. Rather, the Security Company subcontracted with other security firms to provide security services for the Program Hotels. Between approximately January 2021 and May 2022, the Security Company received approximately $21 million in public funds from the Organization for purportedly providing security services at the Program Hotels, despite not actually providing any security services itself. Of that amount, the Security Company paid only approximately $12 million to subcontractors who actually provided security services at the Program Hotels; the defendant CHRISTOPHER DANTZLER personally retained the remaining $9 million in public funds.

7. The defendant WEIHONG HU operated and/or controlled several hotels in New York City, including two hotels in Queens (collectively, the "HU Hotels") that operated as Program Hotels under the Emergency Housing Program. Between in or about October 2021 and November 2023, the HU Hotels received approximately $12 million in public funds from the Organization for their participation in the Emergency Housing Program as Program Hotels.

8. The defendant WEIHONG HU also served as a member of a company that provided food services to formerly incarcerated individuals residing at the Program Hotels under

the Emergency Housing Program, including at the HU Hotels (together with its affiliates, "the Catering Company," and collectively with the HU Hotels, the "HU Businesses"). Before the Emergency Housing Program was created, the Catering Company had operated as a construction company. In or about September 2020, HU, together with others, repurposed the Catering Company as a food services business so the defendants and their co-conspirators could obtain additional public funds under the Emergency Housing Program. Between in or about September 2020 and July 2023, the Catering Company received approximately $17 million in public funds from the Organization for providing food services to the Program Hotels pursuant to the Emergency Housing Program.

The Defendants' Criminal Scheme

9. In or about and between April 2020 and December 2024, the defendants conspired to corruptly divert millions of dollars that the Organization was receiving under the Emergency Housing Program to personally enrich themselves and their co-conspirators.

10. During the relevant time period, the defendant JULIO MEDINA solicited and received bribes and kickbacks from the defendants CHRISTOPHER DANTZLER and WEIHONG HU in exchange for MEDINA providing business through the Organization to the Security Company and the HU Businesses under the Emergency Housing Program.

11. These bribes and kickbacks took various forms, including hundreds of thousands of dollars in United States currency; financing for a luxury vehicle; payments towards debts held by the defendant JULIO MEDINA and his family, including a mortgage; and the purchase of two homes, both which were made in the names of MEDINA's co-conspirators or entities associated with them, to conceal the nature and source of the bribes and kickbacks.

12. For example, on or about September 11, 2020, the Organization prepared two checks made out to the Catering Business, for $103,600 and $84,000, respectively (collectively, the "Emergency Housing Program Checks").

13. The following day, on or about September 12, 2020, the defendants JULIO MEDINA and WEIHONG HU met at one of the HU Hotels in Queens, New York. That meeting was captured by surveillance cameras at the hotel. As set forth in the pictures below, during the meeting HU took a wrapped stack of United States currency out of her wallet, put it into a manila envelope, and provided it to MEDINA, who put it into his bag. During the same meeting, HU received what appear to be the Emergency Housing Program Checks from MEDINA. Approximately two days later, the Emergency Housing Program Checks were deposited into a bank account associated with the Catering Company.









14. In addition, in or about and between August 2021 and September 2021, the defendant CHRISTOPHER DANTZLER, through the Security Company, paid

approximately $75,000 toward several debts incurred by the defendant JULIO MEDINA and members of his family, including a mortgage and a vehicle loan.

15. In or about November 2021, the defendant WEIHONG HU, through one of the HU Businesses, financed a luxury vehicle for the defendant JULIO MEDINA valued at approximately $107,000. Thereafter, HU caused to be made a series of monthly payments toward the Luxury Vehicle for MEDINA, for a total of more than $50,000.

16. In or about September 2022, the defendants CHRISTOPHER DANTZLER and WEIHONG HU purchased a town house for the defendant JULIO MEDINA in Washington Heights, New York, for approximately $1.3 million.

17. In or about May 2023, the defendant CHRISTOPHER DANTZLER paid to purchase and renovate a house for the defendant JULIO MEDINA in Clifton Park, New York (the "House") for approximately $750,000. In or about September 2024, DANTZLER executed an indenture causing the deed to the House to be amended to include one of MEDINA's family members as a tenant-in-common.

18. As part of the scheme, the defendant JULIO MEDINA executed or caused to be executed multiple contracts with MOCJ on behalf of the Organization. Some of the contracts that MEDINA executed included budgets setting forth the costs of administering the Emergency Housing Program. The budgets were fraudulently inflated to account for the cost of the bribes and kickbacks to be paid to him by the defendants CHRISTOPHER DANTZLER and WEIHONG HU. In turn, DANTZLER and HU submitted, or caused to be submitted, invoices from companies they controlled that concealed the payment of bribes and kickbacks. These invoices were provided to MOCJ to obtain payment for the fraudulently invoiced services administered under the Emergency Housing Program.

19. The defendants also took steps to conceal the criminal scheme, including from New York City officials. On or about September 29, 2022, the defendant JULIO MEDINA emailed a document setting forth the Organization's responses to various queries from New York City officials scrutinizing the Organization's operation of the Emergency Housing Program, including one query asking whether "[the Organization] or any employee of [the Organization] or immediate family member (i.e., spouse/domestic partner, child, sibling, or parent of the employee) received anything of value from [the Security Company] or [the defendant CHRISTOPHER DANTZLER] directly or indirectly[.]" The response sent by MEDINA falsely stated, "Other than the contracted services that [the Organization] received from [the Security Company] or [DANTZLER], [the Organization] does not have any awareness or knowledge that any employee of [the Organization] or immediate family member of [the Organization] employee received, directly or indirectly, anything of value from [the Security Company] or [DANTZLER]."

20. The defendants and their co-conspirators discussed the fraudulent scheme using text messages and cellular phones. For example, on or about May 22, 2023, as part of an exchange of text messages between the defendant JULIO MEDINA and an employee of the defendant WEIHONG HU concerning the payment of Emergency Housing Program funds, MEDINA wrote, "Don't call me no more. I don't fucking trust you! When I get the payment I will call you. You have other people on the call. You know I'm under investigation. You are fucking with the wrong person!"

21. In total, the defendants CHRISTOPHER DANTZLER and WEIHONG HU provided the defendant JULIO MEDINA with at least $2.5 million in United States currency

and in-kind benefits in exchange for MEDINA steering approximately $51 million in public funds from the Emergency Housing Program to the Security Company and the HU Businesses.

COUNT ONE
(Wire Fraud Conspiracy)

22. The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

23. In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud MOCJ, and to obtain money and property from it by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWO
(Honest Services Wire Fraud)

24. The allegations set forth in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

25. In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Organization

of its intangible right to the honest services of MEDINA through bribery and kickbacks, to wit: one or more payments to MEDINA, and for the purpose of executing such scheme and artifice, the defendants, together with others, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: an email dated September 29, 2022 from MEDINA attaching a document titled "Risk Management Response 9-29-2022.docx."

(Title 18, United States Code, Sections 1343, 1346, 2 and 3551 et seq.)

COUNT THREE
(Conspiracy to Violate the Travel Act)

26. The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

27. In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and willfully conspire to use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of one or more unlawful activities, to wit: Commercial Bribing in the Second Degree, in violation of New York Penal Law Sections 180.00 and 20.00, and Commercial Bribe Receiving in the Second Degree, in violation of New York Penal Law Sections 180.05 and 20.00, and thereafter to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3).

28. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER

DANTZLER and WEIHONG HU, together with others, did commit and cause the commission of, among others, the following overt acts:

OVERT ACTS

(a) On or about September 11, 2020, the Organization prepared the Emergency Housing Program Checks.

(b) On or about September 12, 2020, HU and MEDINA met at one of the HU Hotels in Queens, New York.

(c) On or about September 12, 2020, HU gave MEDINA United States currency during the meeting at one of the HU Hotels in Queens, New York.

(d) On or about September 13, 2020, MEDINA deposited approximately $3,000 in United States currency into his personal bank account.

(e) On or about September 14, 2020, the Catering Business deposited the Emergency Housing Program Checks into one of its bank accounts.

(f) On or about September 17, 2021, DANTZLER issued or caused to be issued a check in the amount of $20,000 from a bank account associated with the Security Company, which was applied to an outstanding debt held by MEDINA.

(g) On or about September 29, 2022, MEDINA emailed a document on behalf of the Organization to New York City officials containing misrepresentations about the Security Company.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT FOUR</u>
(Use of Facility of Interstate Facilities in Aid of Bribery)

29. The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

30. In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally use one or more facilities in interstate and foreign commerce, to wit: (i) one or more cellular telephones, (ii) electronic mail and (iii) wire transfers, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: Commercial Bribing in the Second Degree, in violation of New York Penal Law Section 180.00, and Commercial Bribe Receiving in the Second Degree, in violation of New York Penal Law Section 180.05, and thereafter performed acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activity.

(Title 18, United States Code, Sections 1952(a)(3)(A), 2 and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT FIVE</u>
(Money Laundering Conspiracy)

31. The allegations contained in paragraphs one through 21 are realleged and incorporated as if fully set forth in this paragraph.

32. In or about and between April 2020 and December 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JULIO MEDINA, CHRISTOPHER DANTZLER and WEIHONG HU, together with others, did knowingly and intentionally conspire:

(a) to engage in one or more monetary transactions within the United States in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property of a value greater than $10,000 and derived from one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a); and

(b) to conduct one or more financial transactions, to wit: transactions in and affecting interstate and foreign commerce and transactions involving the use of a financial institution that is engaged in, and the activities of which affect, interstate and foreign commerce, which transactions involved the proceeds of one or more specified unlawful activities, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE AND TWO

33. The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts One and Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

34. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS THREE AND FOUR

35. The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts Three and Four, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which requires any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses; and (b) Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, 2461(c), which require the forfeiture of any firearm or ammunition involved in or used in any violation of any other criminal law of the United States.

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 924(d)(1) and 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT FIVE

37. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

38. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

[signature]

FOREPERSON

JOHN J. DURHAM
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

AO 93C (08/18) SDNY Rev. Warrant by Telephone or Other Reliable Electronic Means ❐ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
JULIO MEDINA

Case No.

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Southern District of New York *(identify the person or describe the property to be searched and give its location)*:

Please see Attachments A-1 and B-1.

The search and seizure are related to violation(s) of *(insert statutory citations):*

Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a), 1956(h), and 1957(a) (money laundering conspiracy)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachments A-1 and B-1

**YOU ARE COMMANDED** to execute this warrant on or before February 26, 2025 *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ______________________ .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______________ .

Date and time issued: 02/12/2025 5:12 p.m.

[redacted]
*Judge's signature*

City and state: New York, New York

Hon. Stewart D. Aaron, U.S.M.J.
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A-1**

**Person to be Searched**

The person to be searched is JULIO MEDINA ("MEDINA"), a male born on August 8 1960, and who is approximately 5 feet 10 inches tall, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant.

The following is a photograph of MEDINA



**ATTACHMENT B-1**

**Particular Things To Be Seized**

The things to be seized are any and all documents, records, and electronic devices on MEDINA's person, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant, including the following:

a. Any cellular phone, laptop, tablet, other personal computer device, camera, or other audio or video recording; and

b. Any storage device or medium that can be used to store images, videos, sounds or data captured by a camera or other audio or video recording device (collectively, the "SUBJECT DEVICES").

This warrant authorizes the review of documents and records, as well as the manual and forensic examination of the SUBJECT DEVICES for the purpose of identifying evidence, contraband, instrumentalities and/or fruits of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) (collectively, the "Subject Offenses") committed by JULIO MEDINA, WEIHONG HU, CHRISTOPHER DANTZLER (the "Subject Individuals"), and others, known and unknown (the "Subjects") between April 1, 2020 and the present, including evidence pertaining to the following matters:

a. Records, documents and communications related to a program sponsored by the New York City Mayor's Office of Criminal Justice to operate emergency transitional housing for formerly incarcerated persons in order to curb the spread of COVID-19 in local jails (hereinafter the "Emergency Housing Program");

b. Records, documents and communications related to Watchforce Security Services, Inc., Wyndham Garden Fresh Meadows, Mayflower Howard Johnson Hotel, Mayflower International Group LLC, Mayflower Wenyu LLC, and Meiqiao LLC;

c. Evidence, fruits, and instrumentalities of a scheme to pay bribes and kickbacks to JULIO MEDINA and/or others associated with Exodus Transitional Community, including but not limited to:

    i. Any and all communications between and/or by any individuals, including the Subject Individuals, as relevant to the Subject Offenses;
    ii. Ledgers reflecting the payment of bribes and/or kickbacks;
    iii. Documents, data and information containing contact information, including contact lists, for the Subject Individuals and/or any other individuals employed by or associated with the enterprise and the SUBJECT OFFENSES;

iv. Evidence, including but not limited to bank and financial records, of any activity designed to enrich any individuals, including the Subject Individuals, through illicit means, as relevant to the Subject Offenses; and

v. Bank records, checks, credit card bills, wire transfers, accounts information and any other financial information and records, as relevant to the Subject Offenses;

d. Information related to bribes, kickbacks, gratuities, or gifts to public officials or their associates;

e. Information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

f. Information related to the physical locations of the Subjects, and any other coconspirators, individuals whose identities are not yet known, including Global Positioning System location data, IP address information, photographs, videos, audio recordings, and communications;

g. Copies of identification documents, including passports, of the Subjects and/or other coconspirators, including individuals whose identities are not yet known;

h. Financial records, including all bank records, checks, credit card bills, and account information related to the Subject Offenses;

i. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subjects and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

j. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Subject Offenses and the account subscribers;

k. Evidence of the proceeds of the Subject Offenses and the disposition of such proceeds, including U.S. currency, foreign currency, cryptocurrency, personal or real property, pre-paid debit cards, financial instruments, receipts, documents or other hard-copy records, and financial accounts constituting or traceable to the proceeds of the Subject Offenses, and including any passwords, passphrases, public or private keys, physical devices, physical keys, and cryptocurrency recovery mnemonics needed by law enforcement to access such items; and

l. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, without limitation: documents; notes; communications, including text, SMS, MMS, iMessage, Signal, Telegram, WeChat, SnapChat, Instagram, Facebook, Twitter and/or TikTok messages; contacts, including electronic contacts; invoices; spreadsheets; photographs; videos; and any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form). "Communications" includes, without limitation, emails to, from, copying, or blind copying the listed persons, and messages on any chat platform, including group chats.

Law enforcement personnel are authorized to seize the SUBJECT DEVICES from MEDINA's person, including clothing, personal items and containers (e.g., backpacks, wallets, briefcases, purses and bags) in his physical possession, on his person, or in areas within his immediate vicinity and control at the time of the execution of the search warrant. During the execution of this search warrant, law enforcement personnel are authorized to: (1) press MEDINA's fingers (including thumbs) against the fingerprint scanner of each of the SUBJECT DEVICES; (2) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the facial recognition feature; and/or (3) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

The search of MEDINA and his immediate effects and any concomitant seizure of the SUBJECT DEVICES shall occur between 6 a.m. and 10 p.m. The search of the SUBJECT DEVICES and the seizure of the records as set forth herein may occur at any time in the day or night.

The review may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.by law enforcement personnel (who, for these purposes, may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency

personnel assisting the government in this investigation, and outside technical experts under government control).

AO 93C (08/18) SDNY Rev. Warrant by Telephone or Other Reliable Electronic Means ❐ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
8 Fordham Hill Oval, Apt. 10C, Bronx, New York 10468

Case No.

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Southern District of New York *(identify the person or describe the property to be searched and give its location)*:

Please see Attachments A-2 and B-2.

The search and seizure are related to violation(s) of *(insert statutory citations):*

Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachments A-2 and B-2

**YOU ARE COMMANDED** to execute this warrant on or before February 26, 2025 *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ______________________ .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ______________ .

Date and time issued: 02/12/2025 5:12 p.m.

[redacted]
*Judge's signature*

City and state: New York, New York

Hon. Stewart D. Aaron, U.S.M.J.
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## ATTACHMENT A-2

**Property to be Searched**

The property to be searched (the “SUBJECT PREMISES”) is located at 8 Fordham Hill Oval, Apt. 10C, Bronx, New York 10468, and any closed and locked containers therein, as well as all electronic devices contained therein (the “SUBJECT DEVICES”). As depicted in Figure 1 below, the SUBJECT PREMISES is contained in a beige multi-story apartment building with the number eight above the main entrance. As depicted in Figure 2 below, the lobby of the apartment building includes a board listing the occupants; it lists “Medina, J.” in apartment “10C.” Apartment 10C, i.e., the SUBJECT PREMISES, is on the tenth floor of the building. As depicted in Figure 3 below, the entrance to the SUBJECT PREMISES is through a black door containing a peephole that says “10C.”

**Figure 1**




**Figure 2**



**Figure 3**



**Figure 4**



## ATTACHMENT B-2

**Particular Things To Be Seized**

1. All evidence, contraband, instrumentalities and/or fruits of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud conspiracy), 1343 and 1346 (honest services wire fraud), 1952(a)(3) and 371 (Travel Act conspiracy), 1952(a)(3)(A) (Travel Act bribery), and 1956(a) and 1956(h) (money laundering conspiracy) (collectively, the "Subject Offenses") committed by JULIO MEDINA, WEIHONG HU, CHRITOPHER DANTZLER (the "Subject Individuals"), and others, known and unknown (the "Subjects") between April 1, 2020 and the present, including evidence pertaining to the following matters:

a. Records, documents and communications related to a program sponsored by the New York City Mayor's Office of Criminal Justice to operate emergency transitional housing for formerly incarcerated persons in order to curb the spread of COVID-19 in local jails (hereinafter the "Emergency Housing Program");

b. Records, documents and communications related to Watchforce Security Services, Inc., Wyndham Garden Fresh Meadows, Mayflower Howard Johnson Hotel, Mayflower International Group LLC, Mayflower Wenyu LLC, and Meiqiao LLC;

c. Evidence, fruits, and instrumentalities of a scheme to pay bribes and kickbacks to JULIO MEDINA and/or others associated with Exodus Transitional Community, including but not limited to:

   i. Any and all communications between and/or by any individuals, including the Subject Individuals, as relevant to the Subject Offenses;
   ii. Ledgers reflecting the payment of bribes and/or kickbacks;
   iii. Documents, data and information containing contact information, including contact lists, for the Subject Individuals and/or any other individuals employed by or associated with the enterprise and the SUBJECT OFFENSES;

iv. Evidence, including but not limited to bank and financial records, of any activity designed to enrich any individuals, including the Subject Individuals, through illicit means, as relevant to the Subject Offenses;
v. Bank records, checks, credit card bills, wire transfers, accounts information and any other financial information and records, as relevant to the Subject Offenses;
vi. A Rolex wristwatch;
vii. A 2022 Mercedes-Benz sedan bearing New York license plate KSX-3695; and
viii. U.S. currency.

d. Information related to bribes, kickbacks, gratuities, or gifts to public officials or their associates;

e. Information related to in-person, virtual, or telephonic meetings involving one or more coconspirators, including individuals whose identities are not yet known, including audio or video recordings of such meetings or calls, notes and summaries of such meetings or calls, and communications reflecting or referring to in-person meetings and telephone calls;

f. Information related to the physical locations of the Subjects, and any other coconspirators, individuals whose identities are not yet known, including Global Positioning System location data, IP address information, photographs, videos, audio recordings, and communications;

g. Copies of identification documents, including passports, of the Subjects and/or other coconspirators, including individuals whose identities are not yet known;

h. Financial records, including all bank records, checks, credit card bills, and account information related to the Subject Offenses;

i. Photographs, videos, and/or audio recordings, including voicemails, of or related to the Subjects and/or other coconspirators, including individuals whose identities are not yet known, related to the Subject Offenses;

j. Information related to evidence indicating how and when electronic communications accounts (e.g., cellular devices, email accounts, social media accounts, and other messaging platforms) were accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Subject Offenses and the account subscribers;

k. Evidence of the proceeds of the Subject Offenses and the disposition of such proceeds, including U.S. currency, foreign currency, cryptocurrency, personal or real property, pre-paid debit cards, financial instruments, receipts, documents or other hard-copy records, and financial accounts constituting or traceable to the proceeds of the Subject Offenses, and including any passwords, passphrases, public or private keys, physical devices, physical keys, and cryptocurrency recovery mnemonics needed by law enforcement to access such items; and

l. Information related to evidence of aiding and abetting and conspiring to commit the Subject Offenses.

2. In addition to the items described above, for any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTERS"):

a. evidence of who used, owned, or controlled the COMPUTERS at the time the things described in this warrant were created, edited, or deleted, such as logs,

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, “chat,” instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of COMPUTER access, use, and events relating to the Subject Offenses and to the COMPUTERS users;

e. evidence indicating the COMPUTERS users’ state of mind as it relates to the Subject Offenses;

f. evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

h. evidence of the times the COMPUTERS were used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

j. documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS;

k. records of or information about Internet Protocol addresses used by the COMPUTERS;

l. records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, without limitation: documents; notes; communications, including text, SMS, MMS, iMessage, Signal, Telegram, WeChat, SnapChat, Instagram, Facebook, Twitter and/or TikTok messages; contacts, including electronic contacts; invoices; spreadsheets; photographs; videos; and any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form). "Communications" includes, without limitation, emails to, from, copying, or blind copying the listed persons, and messages on any chat platform, including group chats.

During the execution of this search warrant, law enforcement personnel are authorized to: (1) press MEDINA's fingers (including thumbs) against the fingerprint scanner of each of the SUBJECT DEVICES; (2) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the facial recognition feature; and/or (3) hold MEDINA in place while holding each of the SUBJECT DEVICES in front of his face to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the

contents as authorized by this warrant.

The search of MEDINA and his immediate effects and any concomitant seizure of the SUBJECT DEVICES shall occur between 6 a.m. and 10 p.m. The search of the SUBJECT DEVICES and the seizure of the records as set forth herein may occur at any time in the day or night.

The review may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.by law enforcement personnel (who, for these purposes, may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control).

Ex. H · 82

Case ID 56E-NY-4020443

Date 2/13/25

Location 8 Fordham Hill Oval Apt 10C
Bronx, NY 10468

**FEDERAL BUREAU OF INVESTIGATION**

Sign-In Log

All times approximate

Page 1 of 1

Maintained by: Jennifer Breitenbach

| Print Full Name | Agency/Division/Office | Phone | Signature | Initials | Time In | Time Out |
|---|---|---|---|---|---|---|
| [redacted] | FBI-NYO | [redacted] | [redacted] | [redacted] | 6:13 | 6:13 am |
| [redacted] | FBI-NYO | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | FBI-NYO | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | FBI-NYO | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | FBI-TFO-NY | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | DOI | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | DOI | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | DOI | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | FBI | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| [redacted] | FBI | [redacted] | [redacted] | [redacted] | 6:17 | 7:55 am |
| [redacted] | FBI | [redacted] | [redacted] | [redacted] | 6:17 | 7:54 am |
| [redacted] | FBI | [redacted] | [redacted] | [redacted] | 6:13 | 7:55 am |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

JB Nothing Further 2/13/25

v.04102017